UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.  )<br>)<br>KASSIM TAJIDEEN, )<br>)<br>      Defendant. )<br>) | Criminal No. 17-00046 (RBW) |

### REPLY IN SUPPORT OF KASSIM TAJIDEEN'S
### MOTION FOR PRETRIAL RELEASE

In seeking to defend the continued incarceration of Kassim Tajideen before trial, the government never seriously engages with the extraordinary conditions proposed to assure Mr. Tajideen's return. Instead, the government relies on a series of third-hand rumors and empty allegations that have nothing to do with the prosecution before this Court. Mr. Tajideen is not charged with terrorism or any crime of violence; he is charged with buying frozen chickens and lockboxes from American companies. Following his arrest and extradition from Africa, he is now stuck in an unfamiliar country with no passport, no cash, no credit card, and no bank account.[1] The notion that his appearance before this Court cannot be reasonably assured with home detention and 24-hour electronic monitoring depends on imaginative but highly unlikely scenarios. Mr. Tajideen respectfully requests that this Court, consistent with the presumption of liberty inherent in our system of justice, grant his motion for pretrial release.

To justify Mr. Tajideen's continued detention, the government dredges up a 2003 Belgian prosecution in which Mr. Tajideen received a suspended sentence. But Mr. Tajideen's conduct

---

[1] The government notes that it does not have Mr. Tajideen's Lebanese passport. Mr. Tajideen has offered to surrender that passport, which is with his lawyers in Lebanon, to the U.S. Embassy in Beirut.

during that prosecution demonstrates exactly why the Court should grant his pretrial release here. Throughout that prosecution, Mr. Tajideen voluntarily traveled from Lebanon to Belgium to face interrogations by Belgian law enforcement and to appear before the court for trial and appeal. When faced with the prospect of lengthy incarceration, Mr. Tajideen nevertheless chose to leave Lebanon and repeatedly travel to Belgium to face the consequences.

In our system, where detention is the exception, it is the government's burden to prove that no combination of conditions can assure Mr. Tajideen's return. *See United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996) ("[W]hen the government seeks pretrial detention of an individual on the ground that he poses a risk of flight, the standard it must satisfy is a 'preponderance of the evidence.' That preponderance must, of course, go to the ultimate issue: that no combination of conditions ... can 'reasonably' assure that the defendant will appear for trial.") (internal citations omitted). But the government does not engage in the serious and case-specific analysis that this Court must undertake consistent with *Xulam* and *United States v. Nwokoro*, 651 F.3d 108 (D.C. Cir. 2011). Instead, the government imagines fantastic scenarios that do not seriously grapple with the statutory obligation to identify the least restrictive conditions.

**I.  THE GOVERNMENT HAS NOT CARRIED ITS BURDEN OF ESTABLISHING THAT HOME DETENTION AND 24-HOUR ELECTRONIC MONITORING DO NOT REASONABLY ASSURE RETURN**

Mr. Tajideen, like other defendants charged with sanctions violations in this District, should be released pending trial under electronic monitoring. Assuming, however, that the government would protest such conditions as inadequate, Mr. Tajideen has proposed additional security measures—which include home detention with GPS monitoring, surrender of all travel documents with no new applications, and video surveillance and monitoring by seasoned law

enforcement professionals 24 hours per day, among other things. Rather than engaging with the details of this proposal, the government has simply declared it inadequate. But it is the government's burden to prove why these conditions do not provide reasonable assurance. It has failed to do so.

### A. Mr. Tajideen Cannot Readily Access Financial Resources In the United States

The government dwells at length on Mr. Tajideen's "excessive wealth," but Mr. Tajideen has no access to that wealth here. He has no cash, checks, credit cards, or bank accounts. The government dismisses that fact as "irrelevant" (Opp'n, at 9), but the Court of Appeals believes it is highly relevant. *See Nwokoro*, 651 F.3d at 110 (noting as a fact favoring pretrial release that the defendant's bank account in the United States had been frozen, such that his substantial assets were in Nigeria). Without access to financial resources in the United States, the government's envisioned scenario—namely, that Mr. Tajideen could without detection get access to cash, locate someone to create a fake passport, get transportation to a border or the airport, and then flee the United States—is nearly impossible. Mr. Tajideen's inability to access his financial resources makes him functionally indistinguishable from any other defendant in a criminal case.

The government makes much of the fact that Mr. Tajideen proposed to pay a $2 million cash bond, rent a facility where he would be housed, and hire a company to implement his security proposal. From these facts, the government concludes: "One thing is certain: someone—be it the defendant or someone else—has access to financial resources that can be used to assist the defendant." Opp'n at 9. This claim either ignores or misunderstands the process that would govern payments related to the proposed security plan.

Office of Foreign Asset Control ("OFAC") authorization is required for Mr. Tajideen to transfer funds into the United States, including to post the proposed $2 million cash bond and to use other funds to implement the security plan. Insofar as those transactions are ordinarily incident and necessary to give effect to Mr. Tajideen's criminal defense, OFAC authorization requires adherence to administrative measures under OFAC's regulations (e.g., the provision of quarterly reports to OFAC detailing the funds received by U.S. persons). Any transactions not generally authorized by OFAC, i.e., where such transactions are not ordinarily incident and necessary to give effect to his criminal defense, would occur only pursuant to a specific license issued by OFAC after its review of a comprehensive license application detailing all relevant details about the transaction (here, such details would include the context of a transaction in connection with this case). In light of Mr. Tajideen's status as an SDGT, these are the only means by which he could access his funds in the United States. Moreover, the willingness of Mr. Tajideen's family to support him does not mean that he can access his resources in a way that would meaningfully bear on risk of flight.

The government also offers third-hand rumors to suggest that Mr. Tajideen could use third parties to flee the country. Specifically, the government contends that the Drug Enforcement Administration ("DEA") received a report from a "reliable source" that a group of Shia sheiks offered a $20 million reward to secure Mr. Tajideen's release from Morocco. Apparently, this rumor—if true—amounted to nothing, and there were no attempts to pry Mr. Tajideen from custody. Critically, the government fails to support this assertion with any evidence, past or present, that suggests that Mr. Tajideen himself has made or attempted to bribe a third party to flee. Nor do they explain how—even if true—this rumor is now relevant, unless

they are suggesting that these mysterious sheiks could successfully smuggle Mr. Tajideen from the United States while under home detention and 24-hour electronic monitoring.

**B.    Mr. Tajideen's Lack of U.S. Contacts *Reduces* His Risk Of Flight**

The government cites Mr. Tajideen's lack of ties to the United States and significant ties abroad to assert that he has motive and opportunity to flee. First, it is plainly unfair for the government to extradite Mr. Tajideen to the United States and then insist on his detention because he has not put down roots in the country where it brought him. It would raise serious due process concerns if Mr. Tajideen was ineligible for pretrial release because of circumstances the government itself created. Second, in theory, any defendant who has been charged with a crime has motive to flee. Mr. Tajideen is no different in that regard. However, Mr. Tajideen's ability to *execute* any plan to flee the United States is significantly hampered by his minimal ties to the United States. Without domestic associates, Mr. Tajideen is unable to execute the scheme described by the government—namely, that Mr. Tajideen would use a network of wealthy associates to "make arrangements for travel, documents, payoffs, private transportation, or other avenues necessary for his escape." Opp'n at 10.

**C.    Mr. Tajideen Would Not Be Able to Leave the United States Under the Proposed Conditions**

The government grasps at straws to suggest that Mr. Tajideen will secure a fake passport. Even if he could somehow find someone to provide him with one (and obtain the money to pay for it), the government's proffered evidence does not suggest that he would do so. The government relies on emails between one of Mr. Tajideen's relatives and an employee regarding the status of Angolan visas for several employees as evidence of Mr. Tajideen's "experience and familiarity" with fake documents. Beyond the fact that this email does not include Mr. Tajideen at all, the government does not disclose that this email involves a situation in which Angolan

immigration authorities issued false work visas to 15,000 foreign workers in Angola, requiring those recipients to reapply for new visas to legally work in Angola.[2] The government's reliance on these emails demonstrates the weakness of its argument.

Similarly, the government suggests that Mr. Tajideen is not trustworthy because his passports list different places of birth. But Mr. Tajideen himself pointed out and explained this discrepancy to OFAC five years ago. The government does not allege that Mr. Tajideen has ever traveled under a false identity, and there is no basis to conclude that the passport errors resulted from misrepresentations on Mr. Tajideen's part.

### D. Mr. Tajideen's Faithful Return to Belgium for Criminal Proceedings Demonstrates That He Is Not a Risk of Flight

The government says that Mr. Tajideen is not trustworthy because he was convicted in Belgium of running a company that generated false invoices to avoid customs duties in Africa.[3] For that crime, he received a suspended sentence. Mr. Tajideen's conduct during those proceedings—which are described in a letter from his counsel during those proceedings, attached as Exhibit A—are the strongest evidence we have of what Mr. Tajideen would do when released pretrial facing serious charges. Over that five-year period, though Mr. Tajideen could have easily remained in Lebanon to avoid the possibility of incarceration, he repeatedly returned to Belgium to submit to interrogation by the police and to attend court hearings at trial and appeal.

That conduct is consistent with Mr. Tajideen's conduct in dealing with U.S. regulators since he was designated in 2009. Rather than remaining in Lebanon, he has consistently

---

[2] *Illegal visas worth more than US $90 million*, Maka Angola (Mar. 7, 2014), https://www.makaangola.org/2014/03/illegal-visas-worth-more-than-us-90-million/.

[3] The government unfairly suggests that Mr. Tajideen's case was about "terrorist financing." No such charges were ever brought, and no evidence that Mr. Tajideen supported terrorism was ever presented. *See* Exhibit A at 2-3.

engaged with the U.S. government, spending great time and resources to try to clear his name despite the refusal of the U.S. government to tell him what evidence supports his designation. He has affirmatively offered to meet with U.S. government officials and to submit to interviews by U.S. government agents about what he knows in order to satisfy them that he does not support terrorism. This consistent effort to engage rather than to flee over the last 15 years is strong evidence of Mr. Tajideen's commitment to appear in this case.

The government has noticeably failed to address the merits of Mr. Tajideen's actual proposal. That is because Mr. Tajideen's proposal, on its face and standing alone, clearly offers a less restrictive alternative that will assure Mr. Tajideen's appearance in this Court. These extraordinary controls proposed are more than adequate to eliminate any risk of flight.

## II. THE GOVERNMENT EXAGGERATES THE NATURE AND THE OFFENSES CHARGED AND THE STRENGTH OF ITS EVIDENCE

The government vastly overstates the seriousness of the charged offenses by repeatedly invoking terrorism. But Mr. Tajideen is not charged with being a terrorist. He is not charged with supporting terrorism. He is not charged with financing terrorism. Mr. Tajideen is charged with having his employees buy chickens from American companies. (Or worse, if the government is correct that the American companies were "unwitting," with tricking those companies into selling chickens to his companies.) Rather than acknowledging the fact that its case is about buying frozen chicken parts, the government seeks—without putting forward a scintilla of evidence—to treat Mr. Tajideen as if he were charged with the worst of crimes.

Similarly, the government greatly overstates the potential consequences facing Mr. Tajideen based on a sentencing guidelines analysis that assumes Mr. Tajideen would receive one of the longest sentences for sanctions violations in U.S. history. As Judge Contreras noted when ordering the conditional release of another defendant charged with sanctions violations,

"judges in this District have sentenced non-cooperating defendants dealing in civilian-use articles to less than two years in prison." *United States v. Hassanshahi*, 989 F. Supp. 2d 110, 117 (D.D.C. 2013) (citing Judgment, *United States v. Habibion*, No. 11–cr–00118–ESH (D.D.C. May 23, 2012), ECF No. 119 (13 months); and Judgment, *United States v. Shih*, No. 11–cr–00119–JEB (D.D.C. Feb. 22, 2012), ECF No. 53 (18 months)). The government's dubious guidelines analysis would result in a sentence that is far beyond the norm in sanctions cases.

The government asserts without any detail that its evidence is "very strong." Because the government offers conclusions rather than specifics, it is difficult to challenge that self-serving assertion. Whatever the nature of the evidence of chicken sales, the government's case is imperiled by the novelty of its legal theory. Mr. Tajideen, a foreign national, is charged with conspiring to violate the International Emergency Economic Powers Act ("IEEPA") and related regulations. Yet, according to OFAC, the IEEPA only regulates "U.S. persons," not foreign nationals.[4] If the government's theory is that Mr. Tajideen somehow "caused" unwitting Americans to violate the regulations, it has proffered no evidence of how Mr. Tajideen supposedly did so. Under these circumstances, the government's attempt to use IEEPA to target a foreign national for extraterritorial conduct is far less open-and-shut than presented.

### III. MR. TAJIDEEN'S CONDITIONS OF CONFINEMENT REMAIN PUNITIVE AND UNWARRANTED

Mr. Tajideen acknowledges that his conditions have improved to some degree as a result

---

[4] *See, e.g.*, Testimony of Acting Under Secretary of the Treasury for Terrorism and Financial Intelligence Adam Szubin Before the House Committee on Foreign Affairs, May 25, 2016 ("Our primary sanctions in the U.S. control what U.S. actors can do and what they cannot do and governs the conduct of U.S. actors anywhere they reside in the world . . . *Our sanctions on the other hand do not control the actions of non-U.S. persons, whether or not the currency they're using is the dollar, the euro, the pound or the yen…And foreign actors aren't under our jurisdiction . . . .*") (emphasis added).

of the sustained efforts by himself, his counsel, the prosecution, and the Court to encourage improvements. However, the government's dismissal of the punitive conditions of Mr. Tajideen's confinement indicates that they have unfortunately been misinformed about what is occurring at the jail. For example, the government claims that Mr. Tajideen "was provided with a copy of the Koran at his arrival" at the jail. Opp'n at 13. But e-mail correspondence with jail officials indicates that they, after refusing to provide Mr. Tajideen with a Koran offered by counsel, finally provided him with one a week and a half after his arrival. Similarly, while it is true that jail officials visited Mr. Tajideen two to three times to aid him in locating Mecca, these officials provided conflicting directions each time, and as a result, Mr. Tajideen completed his five daily prayers each four times in four different directions in order to ensure that he prayed properly.

The government also seems to misunderstand—based on reference to "[o]pen sources"— what diet is required by Islam. Contrary to the government's claim, pork is not "the only meat forbidden by the Muslim faith." Opp'n at 13. Observant Muslims are also forbidden from eating other meat that is not "halal," i.e., prepared in accordance with particular religious requirements. Because the jail will not accommodate his request for halal meat, Mr. Tajideen has asked for simple foods like rice, eggs, or fish. Instead, due to its inability to accommodate the practice of Islam, the jail consistently serves him beans, which Mr. Tajideen cannot digest and which exacerbate his current medical condition. The jail has now put him on three medications to address his digestive pain, but he nevertheless must supplement those medications with his own purchases of over-the-counter medications to obtain relief.

Perhaps due to his rapid weight loss, Mr. Tajideen lost his two front teeth approximately three weeks ago. Mr. Tajideen is very concerned about the risk of infection as a result. After

repeated requests to see a dentist, today—on the eve of the hearing—Mr. Tajideen finally saw a dentist, who said he could do nothing.

As it remains unclear how the jail that has consistently failed to treat Mr. Tajideen humanely to date will accommodate Mr. Tajideen during the holy month of Ramadan, he respectfully requests that he be released under a robust set of conditions that will assure his return.

## IV. CONCLUSION

For the foregoing reasons, we respectfully request that this Court release Mr. Tajideen under the conditions set forth in the proposed order from Mr. Tajideen's Motion for Pretrial Release and any additional restrictions that the Court deems necessary.

Respectfully submitted,

Date: May 17, 2017

David W. Bowker
DC Bar #989309
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 663-6558
Fax: (202) 663-6363
E-mail: david.bowker@wilmerhale.com
Attorney for Defendant Kassim Tajideen

Matthew Jones
DC Bar #502943
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 663-6018
Fax: (202) 663-6363
E-mail: matt.jones@wilmerhale.com
Attorney for Defendant Kassim Tajideen

CERTIFICATE OF SERVICE

      I hereby certify that, on this 17th day of May, 2017, a true and correct copy of the foregoing Reply in Support of Kassim Tajideen's Motion for Pretrial Release has been served on the following counsel via electronic means:

Channing D. Phillips
United States Attorney
555 4th Street NW
Washington, D.C. 20530

_____
Matthew Jones
DC Bar #502943
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 663-6018
Fax: (202) 663-6363
E-mail: matt.jones@wilmerhale.com
Attorney for Defendant Kassim Tajideen