IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  1:17-cr-0046-RBW |
| | ) | |
| KASSIM TAJIDEEN and | ) | |
| IMAD HASSOUN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT KASSIM TAJIDEEN'S MOTION TO DISMISS NO. 7
AS TO SUPERSEDING INDICTMENT**

\* \* \* \* \*

**MOTION TO DISMISS PURSUANT TO RULE OF SPECIALITY**

The United States government procured the extradition of defendant Kassim Tajideen by repeatedly representing to the Kingdom of Morocco that Mr. Tajideen was wanted in the United States for terrorism and financing of terrorism. The U.S. government relied in part on the allegations of terrorism in the initial indictment against Mr. Tajideen and, as the Moroccan court's written ruling made clear, Morocco agreed to extradite Mr. Tajideen on the basis of the U.S. government's various representations about terrorism and its understanding that Mr. Tajideen was charged with "the perpetration of terrorist acts."

Yet after convincing Moroccan authorities to extradite Mr. Tajideen because he was a terrorist, the U.S. government disclaimed its reliance on allegations of terrorism the moment it returned to this Court. It emphatically represented to this Court that the terrorism allegations in the indictment were irrelevant; it stated repeatedly that Mr. Tajideen was not charged with being a terrorist and that it would not prove any terrorism links or even provide discovery on the subject; and it ultimately obtained a superseding indictment removing all references to alleged

terrorist activity.  Even if the government's conduct – in obtaining an indictment laden with

misleading allegations of terrorism for the purpose of facilitating extradition under misleading

pretense – does not constitute abuse of the grand jury (as set forth below, it does), it assuredly

constitutes a violation of the Rule of Specialty, which limits how a prosecution may proceed

when the defendant's extradition was procured by government misconduct. For these reasons

and those set forth below, Mr. Tajideen hereby moves to dismiss the superseding indictment and

for an order to release Mr. Tajideen from custody and provide him with safe passage for his

return.

## I.      MATERIAL FACTS

Mr. Tajideen is a citizen of Lebanon who was detained in Morocco on March 12, 2017,

while traveling on business. Two days earlier the U.S. National Central Bureau (Interpol) e-

mailed its counterpart in Rabat, Morocco, with the following message:

> Attention NCB Rabat: Please be advised that the subject of this Wanted Person
> Diffusion, Kassim TAJIDEEN, is scheduled to travel to Morocco on 12 March
> 2017, on FLIGHT AT526 to Casablanca from Conokry, Guinea. TAJIDEEN
> violated an anti-terrorism order of the President of the United States of America,
> as well as U.S. Global Terrorism Sanctions Regulations.…

Ex. 01-1. The NCB's communication included the following "Additional information":

> TAJIDEEN **is a member of the Hizballah terrorist organization** and is known
> to travel with a security detail. In 2003, in Belgium, TAJIDEEN was arrested for
> financial support to terrorism, and was prosecuted there for fraud, money
> laundering, and criminal association. TAJIDEEN was born in Hanaway, Lebanon
> or Freetown, Sierra Leone.

Ex. 01-2 (emphasis added)

On page 3 of its e-mail, NCB described the "Facts of the case" as occurring from May

27, 2009, through March 7, 2017, and meeting "Offence code(s)" of "FRAUD AGAINST

GOVERNMENT, MONEY LAUNDERING." It then provided a more extensive "Summary in

English" that began as follows:

> TAJIDEEN **violated an anti-terrorism order** of the President of the United States that to [sic] protects Americans from **threats from certain terrorist organizations, including Hizballah**. He also violated U.S. Global Terrorism Sanctions Regulations that govern U.S. economic activity with different entities and individuals that threaten the safety and security of the U.S., including the Hizballah terrorist organization and its financial apparatus.

Ex. 01-3 (emphasis added). The summary also stated that "**TAJIDEEN has contributed tens of millions of dollars to Hizballah**, designated by the U.S. government as a Foreign Terrorist Organization." *Id.* (emphasis added).

The U.S. Department of State submitted certified copies of U.S. Department of Justice papers, including the original indictment in this case, the arrest warrant, the applicable statutes, a summary of facts with an Arabic translation, and a photograph of Mr. Tajideen. Ex. 02. Paragraph 1 of the Indictment submitted to Morocco stated:

> Hizballah was designated as a Foreign Terrorist Organization by the United States Department of State ("DOS") on October 8, 1997. According to DOS, Hizballah's terrorist attacks have included the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut in 1984; and the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hizballah was implicated, along with Iran, in the 1992 attacks on the Israeli Embassy in Argentina and on the 1994 bombing of the Argentine-Israeli Mutual Association in Buenos Aires. In 2000, Hizballah operatives captured three Israeli soldiers in the Shebaa Farms area and, separately, kidnapped an Israeli non-combatant in Dubai. In 2012, Hizballah stepped up the pace of its terrorist plotting, and according to the DOS, has since been implicated in several terrorist plots around the world.

Ex. 02-5. Paragraph 2 of the indictment then described Mr. Tajideen:

> At all times since May 27, 2009, to the date of this Indictment, KASSIM TAJIDEEN, a defendant herein, has been publicly designated by [OFAC] as a Specially Designated Global Terrorist ("SDGT"). According to the OFAC designation, **KASSIM TAJIDEEN is an important financial contributor to Hizballah who operates a network of businesses in Lebanon and Africa, and who has contributed tens of millions of dollars to Hizballah**….

*Id.* (emphasis added). Finally, paragraph 29 of the indictment alleged that Mr. Tajideen "misrepresented to OFAC" that he had "refrain[ed] from any financial or commercial dealings with … entities owned or controlled by … individuals associated with any terrorist organization, such as Hizbollah." Ex. 02-16 to 02-17.

> In its detailed Summary of Facts, DOJ began with the following statement:
>
> TAJIDEEN is considered a Specially Designated Global Terrorist by the United States Government due to his financial ties to the Hizballah terrorist organization. He operates [a] network of businesses in Lebanon, the United Arab Emirates, and Africa. **He has contributed tens of millions of dollars to Hizballah and has sent funds to Hizballah through his brother, a Hizballah commander in Lebanon. In addition, TAJIDEEN and his brothers run cover companies for Hizballah throughout the world.**

Ex. 02-41 (emphasis added).

After Moroccan authorities detained Mr. Tajideen, the U.S. Department of State sent a diplomatic note to the Ministry of Foreign Affairs and Cooperation of the Kingdom of Morocco. The note requested Mr. Tajideen's "extradition" to the United States "pursuant to Moroccan domestic law," or, alternatively his "removal … by way of deportation, expulsion, or other means available under the laws of Morocco." Ex. 03-1. The Department represented that "TAJIDEEN is wanted to stand trial in the United States **for terrorism and money laundering offenses**." *Id.* (emphasis added). The Public Prosecutor in Morocco understood the request for extradition to be based on terrorism, not money laundering or technical regulatory violations. The Public Prosecutor's formal presentation of the extradition request states "We informed him of the order to detain him issued against him from the American authorities **for terrorist acts**, and received his statement …." Ex. 04-B-1 (emphasis added).

Mr. Tajideen retained counsel in Morocco and contested extradition. On March 22, 2017, the Court of Cassation in Rabat, Morocco, held a hearing on the United States' request for extradition, after denying Mr. Tajideen's request for more time to prepare a defense. Ex. 04-D-3.

The Court then explained its understanding of the facts "from the exhibits and documents enclosed in the file"; i.e., that Mr. Tajideen was wanted in the United States "for the crimes of conspiracy to contract illegal transactions with terrorist organizations and money laundering." Ex. 04-D-2. Further, "It is proven from the citations of the decision that ruled that he be prosecuted due to the fact that **he donated millions of dollars to Hezbollah, that he is a leader in the same organization, and that he along with his brothers operates companies in the name of the same organization in all parts of the world**." *Id.* (emphasis added). The Court rejected Mr. Tajideen's defense and concluded that "the acts perpetrated by [Mr. Tajideen] are punishable under Moroccan law, and **constitute the crimes of perpetration of terrorist acts** and money laundering in accordance with Article 218-1 onwards of the Criminal Code and the requirements of Royal Decree 04/17/2007." Ex. 04-D-4 (emphasis added).

So far as the record reflects, the United States never informed the government of Morocco that Mr. Tajideen adamantly denied any involvement with Hizbollah, and that he had been actively contesting his inclusion on the OFAC list for seven years.

After the Moroccan Court granted the government's extradition request, on March 24, 2017, agents of the U.S. Drug Enforcement Agency transported Mr. Tajideen to the United States, and he has been held without bond since his arrival. During pre-trial proceedings before this Court, Mr. Tajideen's counsel asked the government for discovery relating to its allegation that Mr. Tajideen provided financial support for Hizballah and supporting his designation as an SDGT, including in particular materials in the possession of OFAC. The government has refused to produce the information, and Mr. Tajideen was forced to file a motion to compel. *See* Defendant's Motion to Compel Discovery of Rule 16 and *Brady* Material (July 17, 2017), ECF 28. Mr. Tajideen explained that not only were the financing allegations critical to the indictment,

the government had led Moroccan authorities to believe during the extradition proceedings that Mr. Tajideen was a Hizballah leader criminally charged with perpetration of terrorist acts and engaging in illegal financing transactions with terrorist organizations. *Id.* at 3. In opposition, the government argued that "the defendant is not charged with supporting Hizballah." Gov't Response to Motion to Compel (Aug. 14, 2017), ECF 31, at 2. Indeed, the government represented that "[t]he **defendant's associations with Hizballah will play no part in this trial, and the government will present no evidence to show such associations**, nor will any information regarding such associations be relevant to the defense." *Id.* at 5 (emphasis added).

On August 29, 2017, this Court denied Mr. Tajideen's motion as moot "given the government's representations that it intends to review the files maintained by [OFAC] regarding the defendant … and to produce any discoverable, including exculpatory, information contained within those files …." ECF No. 36. Mr. Tajideen filed a second motion to compel discovery on January 4, 2018, see ECF No. 55, demanding production of OFAC documents relating to the government's allegation that Mr. Tajideen provided financial support for Hizballah and its designation of Mr. Tajideen as an SDGT. Mr. Tajideen pointed out that after the Court's prior ruling, the government had indicated that it was *not* willing to produce most of the materials at issue, again on the ostensible ground that they are irrelevant to the issues in the indictment. Mr. Tajideen further explained that the OFAC documents were relevant to specific allegations in the indictment, including that he is "an *important financial contributor to Hizballah* who operates a network of businesses in Lebanon and Africa, and who has *contributed tens of millions of dollars to Hizballah*. *See* ECF 55, at 7 (quoting Indictment ¶ 2 (emphasis in motion)). "Having included this allegation in the indictment and having filed no motion to strike it in the nine months since the indictment was returned, Rule 16 mandates that the government produce all documents in its

possession that support or undermine it." *Id.* In response, the government again insisted that the

materials were not relevant because "it does not matter **why** the Defendant was designated" an

SDGT. ECF No. 63, at 19 (emphasis in original). Moreover, "While it is true that the Indictment

includes background references connecting the Defendant to Hizballah to place the Defendant's

designation in context, the government neither expects to provide the jury with this language

from the Indictment nor to introduce these statements during trial." *Id.* at 20; *see also id.* at 22

("the Defendant's support or affiliation with Hizballah will play no role in this trial since the

Defendant is charged with violating IEEPA, not with providing material support to Hizballah").

On February 15, 2018, the government filed a superseding indictment that eliminates all

references to Hizballah. ECF No. 89. The entire content of the introductory paragraphs that the

government used so effectively in the extradition proceedings is gone. Omitted also is the

allegation that Mr. Tajideen misrepresented to OFAC that he had taken remedial steps to divest

from financial or commercial dealings with entities owned or controlled by individuals

"associated with any terrorist organization, such as Hizbollah." ECF 1, at ¶ 29; *compare* ECF 89

at ¶ 28.

## II.      ARGUMENT

### A.      The Rule of Specialty Limits Prosecution to the Same Facts as Those Set Forth in the Request for Extradition.

In general, the rule of specialty holds that "once extradited, a person can be prosecuted

only for those charges on which he was extradited." *United States* v. *Sensi*, 879 F.2d 888, 892

(D.C. Cir. 1989); *See* M. Cherif Bassiouni, INTERNATIONAL EXTRADITION 538 (6th ed. 2014).

Section 477 of the Restatement (Third) of Foreign Relations Law of the United States explains

that the doctrine of specialty is a principle of customary international law reflected in "most

international agreements, state [*i.e.*, international sovereign] laws, and state practice." In *United*

*States* v. *Rauscher*, 119 U.S. 407, 423-24 (1886), the Supreme Court held that the "obvious meaning" of the predecessor of 18 U.S.C. § 3192 was that a party, "when brought into this country upon similar [extradition] proceedings, … shall not be arrested or tried for any other offence than that with which he was charged in those proceedings, until he shall have had a reasonable time to return unmolested to that country from which he was brought." *Id.* at 424; *see also Fiocconi* v. *Attorney General*, 462 F.2d 475, 479-80 (2d Cir. 1972) (Friendly, J.); *United States* v. *Kaufman*, 858 F.2d 994, 1007 n.4 (5th Cir. 1988) ("The rule of specialty is a general rule of international law which applies with equal force whether extradition occurs by treaty or comity."); *United States* v. *Khan*, 993 F.2d 1368, 1374-75 (9th Cir. 1993) (where Pakistan did not unambiguously extradite defendant to face charges on a specific count of an indictment, conviction on that count would be reversed); *United States* v. *Moss*, 344 F. Supp. 2d 1142 (W.D. Tenn. 2004) (dismissing certain counts of the indictment under the doctrine of specialty and allowing others to proceed to trial); *United States* v. *Evans*, 667 F. Supp. 980 (S.D.N.Y. 1987) (applying doctrine of specialty when extradition obtained through comity rather than treaty); *see also* Bassiouni, *supra* at 579-81 (explaining the sources of law that support the doctrine of specialty).

The rule of specialty applies in this case in part because the United States agreed to abide by the Moroccan law of extradition, which recognizes the rule. The government's formal request to Morocco for Mr. Tajideen's transfer came through Diplomatic Note No. 125, which states in material part:

> The Embassy of the United States of America … has the honor to request the extradition of Kassim Tajideen … to the United States **pursuant to Moroccan domestic law**. In the alternative, the United States requests the removal of TAJIDEEN to the United States by way of deportation, expulsion, or other means available under the laws of Morocco. TAJIDEEN is a citizen of Lebanon.

Ex. 03-1 (emphasis added).

The Kingdom of Morocco considered the request under its domestic law of extradition and applied that law by holding a hearing before the Court of Cassation. *See* Ex. 04-E (English translation of certain provisions of Moroccan Criminal Procedure Code), Art. 732. Under Article 721, extradition "will not be agreed" in certain circumstances. Under Article 726, the request for extradition "must be accompanied by … a commitment to respect the dispositions of article 723." Article 723 in turn provides: "Extradition is not allowed except under the condition of not prosecuting the extradited person or sentencing  him or subjecting him to any measure restricting his personal freedom, for any action whatsoever preceding the extradition, *other than the crime for which he was extradited*." Ex. 04-E-2 (emphasis supplied). These provisions enshrine the rule of specialty in Moroccan law. Indeed, they appear to be based in part on the Model Treaty on Extradition adopted by the United Nations. Article 14 of that Treaty, titled "Rule of Specialty," states that "[a] person extradited under the present Treaty shall not be proceeded against, sentenced, detained, re-extradited to a third State, or subjected to any other restriction of personal liberty in the territory of the requesting State for any offence committed before surrender other than (a) An offence for which extradition was granted …." U.N. Model Treaty on Extradition, Art. 14, § 1. Article 723 of the Moroccan Criminal Procedure Code *is* the rule of specialty, although it does not explicitly use that term.

**B.** **The Rule of Specialty Bars the Government from Proceeding on an Indictment by Deceiving the Foreign State about the Nature of the Charges to be Prosecuted.**

In *Rauscher*, the Supreme Court concluded that the government could not proceed on a charge that violated the rule of specialty until the defendant had a reasonable time "to return unmolested to the country from which he was brought." 119 U.S. at 424. In an early case applying *Rauscher*, a Canadian tribunal held that a person who had fled to Canada after conviction in the United States would not be extradited, essentially for want of dual criminality.

9

*See Johnson* v. *Browne*, 205 U.S. 309 (1907). The United States then re-indicted the individual on a different charge, and Canada granted the extradition request on that ground. When the United States incarcerated the defendant on the original conviction and did not pursue the new charge, a federal court ordered the defendant released on a writ of habeas corpus. Faced with this deception by the United States, the Supreme Court affirmed. *See Browne*, 27 S. Ct. at 539 (statement by Peckham, J., not printed in U.S. Reports); *Browne*, 205 U.S. at 320 (fact that treaty did not expressly bar punishment for offense different than one supporting extradition did not authorize prosecution on new offense).

In this case, Mr. Tajideen would not have been extradited absent the terrorism allegations; defendant therefore requests release and safe passage for his return in accord with the holding of *Johnson* v. *Browne*, where the government procured extradition by obtaining a separate indictment it declined to pursue after the defendant was safely in U.S. custody. In this case, the government procured extradition by obtaining an indictment with inflammatory allegations that it declined pursue after the defendant was safely in U.S. custody.

The D.C. Circuit has recognized that U.S. government misconduct, such as deceiving a foreign court about the nature of the charges that the government will actually prosecute, is a basis for challenging an extradition. *United States* v. *Trabelsi*, 845 F.3d 1181, 1189 (D.C. Cir. 2017); *see United States* v. *Sensi*, 879 F.2d 888, 892 (D.C. Cir. 1989). While cases involving extradition by deception are rare, Judge Wald's concurring opinion in *Casey* v. *Department of State*, 980 F.2d 1472, 1479-82 (D.C. Cir. 1992), sets out the principles that should govern Mr. Tajideen's case. Casey filed a challenge in a United States court to his extradition from Costa Rica to the United States *before* he was actually extradited. Casey also challenged his extradition in Costa Rican courts, and one dispute in *Casey* was how much deference a U.S. court was

required to accord to a foreign court's decision on extradition pursuant to a treaty. Ultimately, however, the majority in *Casey* held the district court lacked jurisdiction to consider a preemptive challenge to extradition. *Id.* at 1478 ("If Casey is ultimately extradited to the United States, he can then challenge his extraditability and thereby, in a timely manner, test the limits on our judicial review of the issues to be determined by the Costa Rican courts."). In her concurrence, Judge Wald explained why Casey's argument – that the United States engaged in deception to procure his extradition – did not call for deference to the foreign court, unlike the typical challenge to a foreign court's interpretation of its extradition authority. *Id.* at 1479. Casey's core contention was the same as Mr. Tajideen's: that the government had sought extradition under false pretenses. *See id.* at 1479 (Wald, J. concurring) ("Casey alleged … that his arrest … and subsequent detention pending extradition were the result of deliberate misinformation planted by the United States government," specifically that he would be tried for narcotics offenses as well as the RICO offenses alleged). Citing *Johnson* v. *Browne* and other authority, Judge Wald concluded that a U.S. court could review the decisions of the Costa Rican courts for evidence of misconduct that resulted in injury to Casey. *See id.* at 1480 ("[t]he doctrine of international comity does not prohibit this court from reading the decisions of the Costa Rican courts for evidence that United States government misconduct resulted in injury to a United States citizen, but only prevents this court from challenging a decision properly vested in the foreign court,"—i.e., "whether the offenses satisfy the dual criminality requirement.") *Id.* at 1480.[1] Judge Wald decided Casey was not entitled to relief only because it was clear that the misrepresentation in the diplomatic note seeking Casey's extradition "did not proximately cause Casey to be found extraditable." *Id.* at 1482.

---

[1] It makes no difference to the analysis that the deception in *Casey* concerned the international law "dual criminality" requirement for extradition rather than the rule of international law invoked here—the rule of specialty. Both doctrines concern the nature of the charges that the government seeks to prosecute.

The D.C. Circuit's recent decision in *Trabelsi* cited *Casey* for the proposition that "misconduct on the part of the United States in procuring an extradition" can rebut the ordinary presumption of deference to the foreign court's extradition decision. 845 F.3d at 1189. When the court in the sending country is misled about the facts, and would "object to [the] prosecution" if it had not been misled, the prosecution violates the doctrine of specialty and the indictment is subject to dismissal. *See Sensi*, 879 F.2d at 895 (citing *United States* v. *Jetter*, 722 F.2d 371, 373 (8th Cir. 1983), for the proposition that the "standard  is whether the surrendering state would regard the prosecution as a breach of the extradition treaty"); *see also Khan*, *supra*, 993 F.2d at 1373-74 (where evidence was ambiguous as to whether Pakistan intended to extradite defendant to face specific charge, court could not presume that doctrine of specialty was satisfied and would reverse conviction on that count).

The decisions in *Trabelsi* and *Sensi*, as informed by *Casey* and *Johnson* v. *Browne*, confirm the rule of specialty as it is articulated in the Restatement and other authorities: "What the doctrine of specialty requires is that the prosecution be 'based on the same facts as those set forth in the request for extradition.'" *Sensi*, 879 F.2d at 895-96 (quoting Restatement (Third) of Foreign Relations Law of the United States, § 477, comment a). These cases further suggest that the rule of specialty has particular significance when the requesting country misrepresents the facts of prosecution to the requested country. In that scenario, a presumption of deference to a foreign tribunal's determination is not warranted, and indeed a presumption that the foreign tribunal would *not* have permitted extradition had it known the true facts is more justifiable.

**C.      In this Case, the Government Misled Moroccan Authorities into Concluding that Extradition was Warranted**

As set forth above in Part I, the evidence is incontrovertible that the United States misled Moroccan authorities into believing that Mr. Tajideen was charged with being a terrorist and

would be prosecuted for serious crimes of terrorism in this country. Over and over the United States informed Moroccan authorities that Mr. Tajideen "is a member of the Hizballah terrorist organization"; that he "has contributed tens of millions of dollars to Hizballah"; that he "has sent funds to Hizballah through his brother, a Hizballah commander in Lebanon"; that he and his brothers "run cover companies for Hizballah throughout the world"; and that he "is wanted to stand trial in the United States for terrorism and money laundering offenses." *See supra* Part I.

There is no need to ponder whether the government's misconduct had an effect on the Moroccan tribunal: the effect is written into the Court of Cassation's decision. The Court understood from the U.S. government's representations that Mr. Tajideen "donated millions of dollars to Hezbollah, that he is a leader in the same organization, and that he along with his brothers operates companies in the name of the same organization in all parts of the world." Moreover, the Court of Cassation concluded that "the acts perpetrated by [Mr. Tajideen] … constitute the crimes of perpetration of terrorist acts and money laundering." *Id.* at 4.

The government's misconduct is all the more egregious because the government knew throughout the extradition proceedings that Mr. Tajideen adamantly denied any link to terrorism or terrorist financing and that he had been trying for seven years to show the government that his inclusion on the OFAC list was factually insupportable. The government knew that Mr. Tajideen had retained independent financial experts to ensure that his businesses had *no* financial links to terrorism. The government knew that those experts had presented comprehensive financial evidence showing that no such ties existed. And, perhaps most important, the government knew that the financial transactions that formed the basis for the money laundering charges in this case involved the purchase and sale of frozen chicken parts destined for African markets, and the purchase of other commercial products – not monies directed to a terrorist organization.  Indeed,

as set forth in Mr. Tajideen's motion to dismiss No. 6 regarding the money laundering charge (ECF 109) and his reply, the government surely knew that the money laundering charge in the indictment was facially insufficient and could play no proper role in justifying Mr. Tajideen's extradition. Yet so far as the record reveals, the government gave no hint of any of that evidence to the Moroccan authorities. Instead, the government hid behind its own inflammatory allegations in the original indictment, which it then promptly renounced after Mr. Tajideen was behind bars in the United States, and his counsel began seeking discovery to support the government's allegations of terrorism and money laundering in support of Hizballah.

The government's misconduct is exacerbated by its backtracking when faced with formal demands that it produce evidence of ties linking Mr. Tajideen to Hizballah, or proof that Mr. Tajideen contributed tens of millions of dollars to Hizballah. Pressed by defense counsel, the government finally struck from the indictment all references to Hizballah, and the government now wishes to proceed on a superseding indictment that excludes all of the inflammatory allegations that were presented to the Moroccan authorities. In other words, the government admits that it has no intention to show an American *jury* the terrorism allegations it used to procure Mr. Tajideen's extradition. These facts meet any fair understanding of the *Trabelsi* "misconduct" test.

Doubtless the government will contend that its statements about Hizballah and terrorism were immaterial because it *also* informed the Moroccan authorities about the precise statutory charges at issue in the original indictment, and those charges remain at issue in the superseding indictment. But the Moroccan Public Prosecutor relied solely on allegations of terrorist acts in his presentation of the charges to Mr. Tajideen, not on money laundering or regulatory violations. See Ex. 04-B-1 (citing "the order to detain [Mr. Tajideen] issued against him from the

American authorities for terrorist acts"). The Court of Cassation's passing reference to money laundering was not the focus of the extradition;[2] clearly in this case allegations of terrorism were "the facts in respect of which [the defendant's] extradition has been granted." *Sensi*, 879 F.2d at 895. Nothing in the record suggests that the Moroccan court would have authorized Mr. Tajideen's extradition without the allegations that he was personally a terrorist and was charged with terrorism and money laundering in support of terrorism.

**D.      The Government's Misuse of the Grand Jury to Secure Extradition Also Warrants Dismissal of the Indictment or, Alternatively, Prompt Disclosure of All Grand Jury Transcripts**

As noted above, the government obtained an indictment that led with sensational allegations of terrorism, and then used those allegations to persuade the Moroccan court to extradite Mr. Tajideen. Once in the United States, however, the government abandoned those very allegations as utterly irrelevant – indeed, so irrelevant that it obtained a superseding indictment in order to remove them from the case. It thus is beyond peradventure that the government used the grand jury in the first instance not to pass on the elements of the charged offenses, but to generate an instrument that would more readily secure Mr. Tajideen's extradition, even if under misleading pretenses. That is grand jury abuse in its most egregious form.

It is settled that the government may not use a grand jury investigation for an improper purpose. *See United States* v. *R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991). In this regard, "practices which do not aid the grand jury in its quest for information bearing on the decision to indict are forbidden." *In re Antitrust Grand Jury Investigation (Under Seal)*, 714 F.2d 347, 349-50 (4th Cir. 1983). "The principle[] that the powers of the grand jury may be used only to further

---

[2] Moreover, the Moroccan court's opinion shows no awareness that the money laundering at issue was for the purpose of purchasing chicken parts rather than funding Hizballah.

its investigation … rests on the simple, but fundamental, concept that the grand jury serves an independent investigatory function and is not meant to be the private tool of the prosecutor." *Id.* (quotation omitted).

The Court of Appeals for the District of Columbia Circuit has held that "serious prosecutorial misconduct may so pollute a criminal prosecution as to require dismissal of the indictment or a new trial, without regard to prejudice to the accused." *United States* v. *McCord*, 509 F.2d 334, 349 (D.C. Cir. 1974) (en banc).

> This principle is not strictly limited to situations in which the defendant has suffered arguable prejudice by reason of the prosecutorial conduct. This is so because the principle is not one of fairness to the defendant alone but rather, in Justice Brandeis' words, is one designed to "maintain respect for law; . . . to promote confidence in the administration of justice; … to preserve the judicial process from contamination . . . ."

*Id.* at 350.  The *McCord* decision explained that prejudice was relevant but not strictly required. Several more recent decisions have concluded that subsequent Supreme Court authority requires a showing of prejudice to the defendant, although the *en banc* decision in *McCord* has not been explicitly overruled. *See United States* v. *Valdez*, 2011 U.S. Dist. Lexis 152740, at *56-57 & n.9 (W.D. La. Dec. 30, 2011) (citing *United States* v. *Hasting*, 461 U.S. 499 (1983) and *Bank of Nova Scotia* v. *United States*, 487 U.S. 250 (1988)). Although the prejudice prong of *McCord* has been limited by *Bank of Nova Scotia*, *see*, *e.g.*, *United States* v. *Espy*, 23 F. Supp. 2d 1, 9 (D.D.C. 1998), even in *Nova Scotia* the Supreme Court acknowledged that certain types of prosecutorial misconduct are so fundamental that a showing of prejudice is presumed. *See* 487 U.S. at 257. Under more recent interpretations of the standard, "a court must assess if the alleged violation substantially influenced the grand jury's decision to indict, or if there was grave doubt that the decision to indict was free from the substantial influence of such violations." *Espy*, 23 F.

Supp. 2d at 9 (citing *Bank of Novia Scotia* and *United States* v. *Mechanik*, 475 U.S. 66 (1986); (quotation marks omitted)).

This standard is met here. Although the abuse at issue impacted the decision to extradite rather than the decision to indict, the inclusion of terrorism allegations in the first indictment – which the government now labels irrelevant, outside the four corners of the charges, and not even subject to discovery or proof – "substantially influenced" the Moroccan court's decision to extradite or, at a minimum, created "grave doubt" that the extradition decision was free from the substantial influence of this misconduct. The written ruling of the Moroccan court makes clear that it believed that Mr. Tajideen "donated millions of dollars to Hezbollah," that he "is a leader in the same organization," and that he is charged in the U.S. with "the perpetration of terrorist acts." Had the indictment omitted such allegations and instead tracked the new, superseding indictment and the government's repeated representations to this Court about the extraneous nature of the Hizballah allegations, there is grave doubt whether Mr. Tajideen ever would have been extradited. The only meaningful remedy for government misconduct in this instance is dismissal of the indictment so that the unlawful extradition process can be undone.[3]

At minimum, the Court should order the government to produce all grand jury transcripts forthwith so the defendant and the Court can ascertain whether the government in fact procured Mr. Tajideen's initial indictment and subsequent extradition based on misconduct that occurred

---

[3] In *United States* v. *Noriega*, 117 F.3d 1206, 1214 (11th Cir. 1997), the Court cited *United States* v. *Payner*, 447 U.S. 727, 735 n.7 (1980), for the proposition that it had no power to dismiss an indictment based on substantive due process or the court's supervisory powers when the defendant challenged the nature of his extradition, which in that case was through a military invasion. The Court of Appeals reasoned that dismissal of the indictment was a supervisory power of the court, and a footnote in *Payner* stated that "[t]he supervisory power merely permits federal courts to supervise 'the administration of criminal justice' among the parties before the bar." 447 U.S. at 735 n.7. The *Payner* footnote is a thin basis for the broad holding in *Noriega*; other authority cited above, including a court's recognized authority to quash third-party grand jury subpoenas, would suggest that there is no *per se* rule limiting the court's supervisory authority to grand jury misconduct that is aimed initially at a non-target of the investigation, such as an extraditing authority. Moreover, even if dismissal of the indictment is not available, the Court can and should order other relief, such as immediate production of grand jury transcripts so defendant can ascertain whether the government presented evidence to the grand jury for an improper purpose.

before the grand jury; e.g., presentation of evidence of terrorist acts that the government had no intention to pursue.

## III.   CONCLUSION

For the reasons stated, defendant respectfully requests that the Court grant the motion, dismiss the superseding indictment, and order the government to release Mr. Tajideen from custody and provide him with safe passage for return.

Dated:  March 16, 2018                                             Respectfully submitted,


                                                                          /s/ Eric R. Delinsky
                                                                          William W. Taylor, III (D.C. Bar. No. 84194)
                                                                          Eric R. Delinsky (D.C. Bar No. 460958)
                                                                          ZUCKERMAN SPAEDER LLP
                                                                          1800 M Street, N.W.
                                                                          Washington, D.C. 20036
                                                                          Tel: (202) 778-1800
                                                                          Fax: (202) 822-8106
                                                                          E-mail:  edelinsky@zuckerman.com

                                                                          Paul G. Cassell (Utah Bar. No. 6078)
                                                                          S.J. Quinney College of Law, Univ. of Utah[4]
                                                                          383 S. University Street
                                                                          Salt Lake City, UT  84112-0730
                                                                          Tel: (801) 585-5202
                                                                          Fax: (801) 585-2750
                                                                          E-mail:  cassellp@law.utah.edu

                                                                          *Attorneys for Defendant Kassim Tajideen*

---

[4] This address is provided for identification and contact purposes only and is not intended to imply institutional endorsement for this private representation.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 16, 2018, the foregoing was served on counsel of

record via the Court's CM/ECF Service.


_____/s/ Eric R. Delinsky_____
Eric R. Delinsky