**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|                                         |   |                                |
|-----------------------------------------|---|--------------------------------|
| **UNITED STATES OF AMERICA**            | ) |                                |
|                                         | ) |                                |
| **v.**                                  | ) | **Criminal No.  1:17-cr-0046-RBW** |
|                                         | ) |                                |
| **KASSIM TAJIDEEN and**                 | ) |                                |
| **IMAD HASSOUN,**                       | ) |                                |
|                                         | ) |                                |
| **Defendants.**                         | ) |                                |

---

**MOTION TO SUPPRESS STATEMENTS SUBMITTED**
**TO OFAC AND REQUEST FOR EVIDENTIARY HEARING**

Pursuant to the Fifth Amendment rights of substantive and procedural due process and the privilege against self-incrimination, Defendant Kassim Tajideen, through undersigned counsel, respectfully moves to suppress all statements and information Mr. Tajideen or his agents submitted to the Office of Foreign Asset Control (OFAC) after the government began its criminal investigation that resulted in the indictment in this matter.

## I.   MATERIAL FACTS

According to the superseding indictment, the U.S. Department of the Treasury designated Mr. Tajideen a Specially Designated Global Terrorist (SDGT) on May 27, 2009, ostensibly for his financial support of Hizballah. ECF 89, at ¶ 16. The SDGT designation, which is expressly designed to deprive the designee of property, came without advance notice or a right to be heard. If an SDGT wants due process, that comes *after* the designation. *See* 31 C.F.R. § 501.807 (procedures governing delisting from SDGT list).

From 2009 through the date of his indictment, Mr. Tajideen made efforts to clear his name from the SDGT list by invoking the only procedural right available; i.e., the post-deprivation petition for delisting under § 501.807. In July 2010, his counsel submitted a 13-page

petition to OFAC that included numerous exhibits explaining why the designation was inaccurate. Ex. 1. The submission included a personal statement signed by Mr. Tajideen and dated July 19, 2010, which expressly denied any affiliation with Hizballah and provided other personal and financial information as requested by OFAC. On December 7, 2012, Mr. Tajideen's counsel submitted a second, even more comprehensive petition for delisting. Ex. 2. This second petition included extensive financial information and analysis by an international accounting and consulting firm showing that Mr. Tajideen had no financial or other connections to Hizballah.[1]

OFAC used these petitions to elicit substantial additional information about Mr. Tajideen and his businesses. In particular, OFAC asked Mr. Tajideen to explain his submissions in more detail, which led to numerous additional submissions by Mr. Tajideen and his lawyers, including quarterly reports dated May 6 and August 19, 2013. On December 17, 2013, OFAC requested additional information from Mr. Tajideen through a list of probing questions, replete with adjuncts, subparts, and provisos. For example, question 2(c)(4) asked:

> For all 77 properties (6 in Beirut and 71 in the Chouf district), provide details on the acquired land, including but not limited to its location, prior and intended use, and describe plans for its disposition going forward.

Ex. 3, at 10. Other questions were more open-ended but equally probing. For instance, Question 1.a asked: "Given the pervasive presence of Hizballah in Lebanon, what measures has/is Kassim Tajideen taking to ensure that his business activities in Lebanon do not involve transactions with or for the benefit of Hizballah." *Id.*, at 2.

On April 28, 2014, Mr. Tajideen's counsel submitted a response to OFAC's questions. *Id.*, at 1. The response contained numerous exhibits, annexes, and charts, all providing extensive detail about Mr. Tajideen, his businesses, his finances, and his personal relationships. On

---

[1] The identity of the firm has been redacted from the attached exhibits to preserve a contractual obligation of confidentiality.

February 26, 2015, Mr. Tajideen's counsel submitted supplemental information relating to his current business activities and personal affairs. On January 13, 2016, counsel submitted an additional letter to OFAC, again attempting to establish Mr. Tajideen's lack of connection with Hizballah, and even offering that Mr. Tajideen would submit to an interview by U.S. government officials. Ex. 4. On May 27, 2016, Mr. Tajideen's counsel submitted a 31-page letter with additional exhibits again setting forth detailed information about his business affairs. Ex. 5. And between and amid all these submissions, Mr. Tajideen's counsel conducted telephone calls, e-mail communications, and meetings with OFAC personnel in furtherance of his petitions for delisting. As these exhibits reflect, moreover, Mr. Tajideen was not simply providing information to OFAC. In response to OFAC's continual suggestions that the list was remedial in nature, *see* Ex. 4, at 1, Mr. Tajideen was offering to take and actually taking numerous remedial steps to satisfy OFAC that he was not engaged in prohibited activity. *See* 31 C.F.R. § 501.807(a) ("The blocked person also may propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions of a blocked entity, or similar steps, which the person believes would negate the basis for designation."). These steps included engaging a major accounting firm and implementing its recommended controls; formally divesting from entities that appeared to trouble OFAC; and consolidating and simplifying his business operations. *See* Ex. 3, at 1-2.

Not once during this entire period did any agent of the United States inform Mr. Tajideen or his counsel that Mr. Tajideen was under criminal investigation by the United States Department of Justice. We now know from affidavits by government agents that DOJ opened its criminal investigation sometime before "late 2013." By that time, a DEA task force investigator had learned "during the course of my investigation," that the president of an American food

exporter had told DEA agents that his company had "conducted business with Tajideen after his SDGT designation through a third party intermediary." Ex. 6, at DOJ_01201639. Thus, the investigation was well underway by late 2013, and likely had begun months – and possibly years – earlier. *See* Josh Meyer, *The secret backstory of how Obama let Hezbollah off the hook*, Politico Magazine (2017) (available at: https://www.politico.com/interactives/2017/obama-hezbollah-drug-trafficking-investigation/) (suggesting that the DEA's overall investigation that resulted in Mr. Tajideen's indictment was launched in 2008 and that Mr. Tajideen's prosecution was kept "under wraps" for a period until the Obama administration ended).

This means that while Mr. Tajideen and his counsel were diligently responding to probing administrative inquiries from OFAC about Mr. Tajideen's business, finances, and personal relationships, federal agents were secretly building a criminal case against him from the exact same material. And as Mr. Tajideen was opening his books and records to the government and even offering to meet with government officials, government agents were surreptitiously collecting and likely intercepting Mr. Tajideen's communications, conducting *ex parte* controlled calls to Mr. Tajideen through confidential informants, and serving search warrants on internet providers for e-mail communications with Mr. Tajideen and persons or entities associated with him.

Mr. Tajideen had no notice of the criminal investigation until he was arrested by Moroccan authorities on March 12, 2017, five days after the original indictment was filed in this Court. Shockingly, the indictment explicitly relies on at least three documents Mr. Tajideen or his counsel submitted to OFAC during the delisting proceedings. ECF 89, at ¶¶ 26-28.[2] One of these documents, the detailed submission from Mr. Tajideen's counsel dated April 28, 2014, was

---

[2] These three documents are referenced expressly. It is possible that additional documents, though not referenced explicitly, form the basis for other allegations in the indictment about individual transactions or Mr. Tajideen's role within the various referenced companies.

not only submitted well after the criminal investigation had begun, it was prompted by detailed questions from OFAC that were tendered after the criminal investigation began. Mr. Tajideen submitted many other documents to OFAC after the criminal investigation was underway; documents that are plainly relevant to the investigation and would never have been tendered if the government had provided notice of the criminal investigation. As set forth below, these facts establish a stark violation of the prohibition on government use of parallel civil proceedings to support a criminal investigation, and an egregious abuse of Mr. Tajideen's constitutional rights.

## II.   ARGUMENT

### A.   The due process clause imposes limits on the government's ability to use civil processes to develop and bolster a criminal investigation

Since *United States* v. *Kordel*, 397 U.S. 1 (1970), it has been clear that the government may use civil discovery in a parallel criminal action – but within limits. The Court pointedly carved out a number of situations from its general rule permitting cross-use of civil discovery:

> We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution **or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution**; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; **nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution**.

*Id.* at 11-12 (emphasis added; footnotes omitted). In a footnote following the failure-to-advise-of-criminal-prosecution phrase, the Court cited *Smith* v. *Katzenbach*, 351 F.2d 810 (D.C. Cir. 1965), in which a taxpayer sought equitable relief after an IRS revenue agent brought an IRS special agent to an audit and the special agent conducted what amounted to a criminal inquiry without informing the taxpayer of his purpose. The case was dismissed on jurisdictional grounds, but not before the court observed that evidence taken by the government in violation of the

Fourth or Fifth amendments would entitle the aggrieved person "to institute proceedings to restrain the use of the evidence against him, and to do so in anticipation of the indictment." *Id.* at 815. Subsequently, in *United States* v. *Parrott*, 248 F. Supp. 196 (D.D.C. 1965), Judge Gasch opined that he would have suppressed evidence taken in a civil proceeding when the government did not provide a warning of a pending criminal investigation, but it was unnecessary to do so because he dismissed the indictment on other grounds. As Judge Gasch explained, "the Court is of the opinion that the danger of prejudice flowing from testimony out of a defendant's mouth at a civil proceeding is even more acute when he is unaware of the pending criminal charge." *Id.* at 200. Although *Parrott* was decided before *Kordel*, it has been cited in post-*Kordel* cases, and those cases have established that the *Kordel* "failure-to-advise" and "special circumstances" exceptions have become cognizable bases for suppression.

In *SEC* v. *Dresser Indus., Inc.*, 628 F.2d 1368 (D.C. Cir. 1980), the Court of Appeals observed that after *Kordel*, "a court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions when the interests of justice seem[] to require such action," and "[t]he court must make such determinations in the light of the particular circumstances of the case." *Id.* at 1375 (citations and quotations omitted). The *Dresser Industries* Court explained, in the context of a motion to stay the parallel civil proceeding, that the type of circumstances courts consider include "specific evidence of agency bad faith or malicious governmental tactics," and whether the "noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of [Rule 16], expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case." *Id.* at 1376; *see also In re Grand Jury Subpoena*, 836 F.2d 1468, 1472 n.6 (4th Cir. 1988) ("Fifth amendment and ethical

concerns obviously would be raised … if the government directly or indirectly sponsored a civil lawsuit or discovery requests in a civil lawsuit for the purpose of aiding a criminal investigation.").

In *United States* v. *Scrushy*, 366 F. Supp. 2d 1134 (N.D. Ala. 2005), a court in a criminal case suppressed a deposition taken in a parallel SEC civil case when the defendant was not informed of the ongoing criminal investigation prior to his deposition. Relying in part on *Parrott*, the court held that:

> When a defendant knows that he has been charged with a crime, or that a criminal investigation has targeted him, he can take actions to prevent the providing of information in an administrative or civil proceeding that could later be used against him in the criminal case. When a defendant does not know about the criminal investigation, the danger of prejudice increases.…

*Id.* at 1139.

This case does not clearly fit within existing precedent because the parallel proceeding here is not a traditional government-initiated civil enforcement matter, such as an SEC or IRS investigation that has criminal implications. Rather, the parallel proceeding is an administrative action nominally filed by Mr. Tajideen against the government. For all practical purposes, however, the parallel proceeding began when the Department of Treasury named Mr. Tajideen as an SDGT and blocked his assets. *Compare United States* v. *Posada Carriles*, 541 F.3d 344, 357 (5th Cir. 2008) (noting that "it [is] at least possible that under some circumstances civil proceedings initiated by the non-government party may be rendered pretextual or otherwise tainted by government misrepresentations"). That designation deprived Mr. Tajideen of property without due process of law. His only opportunity to rebut the designation was a post-deprivation petition for delisting – and even then OFAC provided very limited notice of what he was required to rebut. Although courts have held that this sequence satisfies procedural due process,

*see Holy Land Found.* v. *Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003), it nevertheless places a designee who is under criminal investigation between a constitutional Scylla and Charybdis. The government seizes the designee's property without process and will return it only if the designee speaks – then the government indicts the designee for what he says. Coercing Mr. Tajideen into choosing between his right to due process and his privilege against self-incrimination is bad enough, but that misconduct is exacerbated by the government's apparent effort here to coax Mr. Tajideen, time and again, into providing voluminous information relevant to the criminal investigation without ever advising him that such an investigation was underway. The government did not even provide a generic warning (as often occurs in SEC and IRS proceedings) that answers to questions posed by OFAC might be used in subsequent proceedings, civil or criminal. Instead, the government led Mr. Tajideen down a primrose path until it obtained what it needed for a criminal indictment.

These outrageous facts place this case within the "special circumstances" foreseen by the *Kordel* and *Dresser Industries* courts, which were concerned not only with the Fifth Amendment right to due process and the privilege against self-incrimination, but also with basic fairness to an individual who is caught in a cross-fire of government investigations. The government's conduct here pits the designee's constitutional right to due process against his constitutional privilege against self-incrimination; either way the government wins. Moreover, the government induced Mr. Tajideen to take remedial measures to ensure transparency in his business and to minimize whatever concerns led to the designation in the first place. And Mr. Tajideen, unlike the vast majority of "SDGTs" who ignore their status, took those remedial measures in an effort to satisfy the government that he should not be on the list. But it was never enough for a government that had a secret agenda, which was to ensure a criminal conviction, not to provide administrative

remediation. The government's conduct in this case shocks the conscience, and as a result constitutes a violation of substantive due process as well. And because the government's conduct amounts to a constitutional violation, the Court should suppress all information the government obtained in violation of Mr. Tajideen's constitutional rights; in particular all statements and underlying information that Mr. Tajideen or his agents tendered to OFAC after the criminal investigation against him began.

### B.      Alternatively, the Court should hold an evidentiary hearing

If the Court concludes that it cannot fashion a meaningful suppression order from the paper record, it should hold an evidentiary hearing to determine the scope of information that must be suppressed. At the hearing, the government should be required to produce witnesses and documents sufficient to show: (1) when the criminal investigation began; and (2) the nature and details of coordination between the OFAC personnel working on the delisting proceeding and the DOJ/DEA personnel working on the criminal investigation. This information will illuminate whether the government intentionally abused the administrative action to obtain information in the criminal proceeding, or even duped Mr. Tajideen and his counsel into waiving his privilege against self-incrimination. Courts in some jurisdictions have relied on such evidence when ruling on motions to suppress for violations of the *Kordel* "special circumstances" doctrine, and some have required an evidentiary hearing to determine the pertinent facts. *See*, *e.g.*, *United States* v. *Gel Spice Co. Inc.*, 601 F. Supp. 1214, 1231 (E.D.N.Y. 1985) (ordering evidentiary hearing to explore FDA's good faith in delaying prosecution recommendation and to ascertain date on which FDA decided to prosecute defendant). In this jurisdiction, "[a] defendant is entitled to an evidentiary hearing on his motion to suppress only upon factual allegations which, if established, would warrant relief." *United States* v. *Law*, 528 F.3d 888, 903-04 (D.C. Cir. 2008) (citations

and internal quotations omitted). Defendant has easily met that burden here, and accordingly the Court at minimum should order an evidentiary hearing to determine the pertinent facts.

III.   **CONCLUSION**

For the reasons stated, defendant Kassim Tajideen respectfully requests that the Court suppress all evidence submitted by Mr. Tajideen or his agents to OFAC after the criminal investigation began; or, in the alternative, order an evidentiary hearing to determine the facts pertinent to that determination.

Dated:  May 11, 2018                                    Respectfully submitted,


Paul G. Cassell (Utah Bar. No. 6078)            ____/s/ William W. Taylor, III____
S.J. Quinney College of Law, Univ. of Utah[3]   William W. Taylor, III (D.C. Bar. No. 84194)
383 S. University Street                         Eric R. Delinsky (D.C. Bar No. 460958)
Salt Lake City, UT  84112-0730                   ZUCKERMAN SPAEDER LLP
Tel: (801) 585-5202                              1800 M Street, N.W.
Fax: (801) 585-2750                              Washington, D.C. 20036
E-mail:  cassellp@law.utah.edu                   Tel: (202) 778-1800
                                                 Fax: (202) 822-8106
                                                 E-mail:  wtaylor@zuckerman.com

                                                 William J. Murphy ((D.C. Bar No. 350371)
                                                 ZUCKERMAN SPAEDER LLP
                                                 100 East Pratt Street, Suite 2440
                                                 Baltimore, MD 21202
                                                 Tel: (410) 332-0444
                                                 Fax: (410) 659-0436
                                                 E-mail: wmurphy@zuckerman.com

*Attorneys for Defendant Kassim Tajideen*

---

[3] This address is provided for identification and contact purposes only and is not intended to imply institutional endorsement for this private representation.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 11, 2018, the foregoing was filed with the Court's CM/ECF Service and provided by email to counsel of record.

                                               /s/ William W. Taylor, III
                                             William W. Taylor, III