Exhibit 5

**Professor Paul Cassell**
c/o S.J. Quinney College of Law • University of Utah
332 S. 1400 E. Salt Lake City, UT 84112-0730
email: cassell@law.utah.edu

**Professor Chibli Mallat**
c/o Mallat Law Offices- Mathaf Building, Damascus Street, Beirut, Lebanon
email: chibli.mallat@law.utah.edu

**On behalf of Kassim Tajideen**
Residing at Adnan Hakeem Street – Jnah
Lamis Building 4th Floor
Beirut, Lebanon

TREASURY DEPARTMENT
RECEIVED
JUL 26 2010
FOREIGN ASSETS CONTROL

July 22, 2010

**HAND DELIVERY**

Mr. Michael Swanson
Assistant Director, Designation Investigations Division
Office of Foreign Assets Control
U.S. Department of the Treasury
ATTN: Designation Investigations Division
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

    Re:    **Petition Seeking Removal of Kassim Tajideen from Listing**
             FAC No. SDG-465805

Dear Mr. Swanson:

    We write on behalf of Mr. Kassim Tajideen to request his removal from your listing of him as a supporter of terrorism. Specifically, we seek administration reconsideration of Kassim Tajideen's designation as a "blocked person" as defined by 31 CFR § 501.807(a) (Specially Designated Global Terrorist or "SDGT"). The listing is based insufficient and inaccurate information and is simply incorrect. It should therefore be rescinded. We ask that this letter be viewed as Mr. Tajideen's formal petition for removal.

    In support of this request, we are submitting this letter, a personal statement and response of Mr. Tajideen (**Appendix 1**), and numerous attached exhibits describe the facts and circumstances upon which the arguments for removal are based, including detailed responses to the various requests for information propounded in your letter of February 24, 2010.

    By way of introduction, we should point out that Mr. Kassim Tajideen is a self-made businessman, who started out as a teenager working in West African exile in the late seventies,

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

Page 2

and built up his trading business by hard work well before the rise of Hizballah and other Islamist groups. By the mid- to late eighties, he had established a unique trading network by developing business in food staples across important African countries, a large part of which in difficult business environments. To develop the trade at a time when Lebanon was in turmoil, he chose Brussels as a working business center for West Africa.

On 30 November 2002, the Belgian State Security Service (the "BSSS") sent a report to the Public Prosecutor, containing accusations of financing of terrorism and smuggling of blood diamonds against Mr. Tajideen (see below). In 2003, Mr. Kassim Tajideen was arrested in Belgium in connection with several "white collar crime" offenses, and jailed for six months, together with his wife, upon coming in good faith to Belgium to defend his name and company. In the entire Belgian trial, which forced shut the Belgium-based companies Soafrimex and Afro Liner Services, the Public Prosecutor did not pursue any of the two original accusations expressed in the report of the BSSS, i.e. financing of terrorism and smuggling of blood diamonds, for lack of evidence. As the appeal was bringing an end to the trial in the course of 2009, he was suddenly put on the OFAC's 'terrorism support' list on 27 May 2009. This comes as a painful blow for an international businessman who has worked the world over with successful and highly reputable food conglomerates, including such prominent US companies as Tyson. The OFAC listing came as Mr. Tajideen was finally emerging from a hard judicial battle against similar charges originally levied against him in Belgium.

The press release distributed in conjunction with his designation is factually inaccurate. His brother is not a Hizballah commander. He has never dealt, let alone made a fortune in the trade of blood diamonds. He is not affiliated directly or indirectly with Hizballah or its leadership. He has not provided any support, financial or otherwise, to Hizballah or any other terrorist organization, nor is he aware of any such support provided by any company with whom he works in West Africa.

Mr. Tajideen is especially aggrieved by the accusation that ties his business activities to those of his brother Ali, who has declared Hizballah ties (although Ali Tajideen's name does not appear in the Press Release). Kassim Tajideen has constantly avoided any association in any of his businesses with his brother Ali, and strongly believes in the need to keep a clear distance between business and politics, in particular with groups like Hizballah which are under severe international scrutiny. This guilt by family association runs exactly opposite the wise policy adopted for the Ben Laden businesses, where the US administration carefully and actively protected members of the Ben Laden family from being lumped together with the criminal acts of their notorious brother.[1]

Nor did Kassim Tajideen ever deal in any "blood diamonds" in Africa, and his business activities have nothing to do with the trade of blood diamonds.

---

[1] This policy was vindicated recently in a court case. See the decision of the Southern District of New York dismissing lawsuit against Ben Laden brothers reported at http://jurist.org/paperchase/2010/06/new-york-district-judge-dismisses-cases-against.php. Link verified on 19 July 2010.

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

In short, Mr. Tajideen is not affiliated directly or indirectly with Hizballah or its leadership.

This communication contains information that is exempt from disclosure pursuant to Exemption 4 of the Freedom of Information Act, 5 U.S.C. 552(b)(4) ("the Act"), because its disclosure would cause significant competitive harm. We understand that we will be provided notice of the receipt of any request made under the Act. See 22 C.F.R. § 171.16. Based on the nature of the materials provided, we respectfully request that this transmittal letter and the accompanying Agreement, attachments and exhibits be treated as confidential and exempt from disclosure. In this regard, this letter has been marked with the restrictive legend "BUSINESS CONFIDENTIAL AND PROPRIETARY."

### Background

On May 27, 2009, the U.S. Department of the Treasury designated Kassim Tajideen as an "Africa-based supporter of the Hizballah terrorist organization" pursuant to Executive Order 13224, which targets terrorists and those providing support to terrorists or acts of terrorism by freezing any assets the designees have under U.S. jurisdiction and prohibiting U.S. persons from engaging in any transactions with them.

In the Press Release, the U.S. Department of the Treasury alleged that

> "Kassim Tajideen is an important financial contributor to Hizballah who operates a network of businesses in Lebanon and Africa. He has contributed tens of millions of dollars to Hizballah and has sent funds to Hizballah through his brother, a Hizballah commander in Lebanon. In addition, Kassim Tajideen and his brothers run cover companies for Hizballah in Africa. In 2003, Tajideen was arrested in Belgium in connection with fraud, money laundering, and diamond smuggling."

Through his attorneys, by letter dated January 5, 2010, Mr. Tajideen sought access to the information considered by your office in connection with his designation as an SDGT, including any and all information regarding the allegations contained in the Press Release. Your response dated April 10, 2010 provided a heavily redacted version of an undated memorandum for J. Robert McBrien, Acting Director of Office of Foreign Assets Control (the "McBrien Memorandum"), which presented the conclusion that:

> "Based on the foregoing information, there is reason to believe that KASSIM TAJIDEEN meets the criteria for designation pursuant to E.O. 13224 for the following reasons:
>
> - By raising funds for Hizballah and sending money to Hizballah, KASSIM TAJIDEEN provides financial support to, or financial or other services to or in support of Hizballah, an entity designated pursuant to E.O. 13224."

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

Page 4

Remarkably, the redacted version of the McBrien Memorandum did not disclose any of the information that was alleged to have supported this conclusion or the allegations and statements contained in the Press Release. Footnote D on page 3 of the redacted version of the McBrien Memorandum merely contains a reference to the designation of Hasan Nasrallah, the leader of Hizballah, as an SDT pursuant to E.O. 12947 on January 23, 2005. Mr. Kassim Tajideen does not know Mr. Nasrallah, nor does he know a Mr. Abd Al Menhem Qubaysi, whose name appears with his in the OFAC press release on the same day Mr Tajideen was listed.

The failure to provide Mr. Kassim Tajideen with even a bare bones outline of the evidence against him raises serious constitutional questions. As the Supreme Court has explained, "process which is a mere gesture is not due process." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). A central component of due process is knowing the allegations that have been made. Due process "embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and meet them." *Morgan v. United States*, 304 U.S. 1, 18 (1938).

Even though he is unaware of the specific evidence (and even the general kinds of evidence) that lead to the OFAC listing, Mr. Tajideen has done his best to attempt to respond to what may be OFAC's concerns on the basis of the scant information produced in the Press Release and in the McBrien Memorandum.

Part I of this letter is divided into sections, each of which addresses certain of the allegations against Kassim Tajideen as identified in the Press Release and the McBrien Memorandum:

A. The charge that "Kassim Tajideen and his brothers run cover companies for Hizballah in Africa." The section explains the nature of the Lebanese and African business network and Mr. Tajideen's role in it, and the baseless allegations that he provides, directly or indirectly, any material support to Hizballah or any other such organisation.

B. The Belgian proceedings, which resulted in a conviction of "white collar" nature, but did not demonstrate an association with any criminal action relating to diamond smuggling or financial support to (alleged) terrorist organizations, which is punishable under Belgian law.

C. The accusation that he "has contributed tens of millions of dollars to Hizballah and has sent funds to Hizballah through his brother, a Hizballah commander in Lebanon."

Part II of this letter describes the business environment of companies linked to Mr. Tajideen and some of the steps taken to ensure that no funds can be diverted to any improper purpose in association, directly or indirectly, with Mr. Tajideen, including the financial support of any terrorist organization.

Part III of this letter contains information responsive to the various requests for information propounded in your letter of February 24, 2010.

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

## PART I

This Part is divided into three sections, each of which addresses certain of the allegations against Mr. Tajideen as identified in the Press Release and the McBrien Memorandum.

A.  **Nature of the Lebanese and African Business Network and Role of Mr. Tajideen**

The Press Release states that Kassim Tajideen operates a network of businesses in Lebanon and Africa and that together with his brothers he runs "cover companies" for Hizballah in Africa. This is incorrect. Mr. Tajideen has never run any cover companies for Hizballah, and he has never provided any financial support to Hizballah. In this section, we first provide a brief history and summary of Mr. Tajideen's role in these companies.

Kassim Tajideen has no legal title or role or any direct ownership in any of these companies. He has reduced gradually his involvement, and he does not manage or direct the affairs of any of these companies. His role is best described as a consultant to his siblings and their colleagues in these companies. As the older brother who started the trade several decades ago and the initiator of many of these companies' successes, his moral standing is strictly advisory and gets solicited only when and where his business experience is absolutely necessary. While the persuasive standing of a successful individual is not unknown in any large business the world over, it is particularly meaningful in the trade established by Lebanese exiles in difficult business environments such as West Africa in the 1990s.

Members of the family provided in good faith additional information about the individual companies raised by OFAC, and contained in Part III of this letter. This information was offered by them and their business associates to help clear Mr. Tajideen's name from the OFAC list, although in some cases, these members have a very limited role in the companies, and it is difficult to get more precise information because of the reluctance of associates to volunteer information in a delicate case such as the present one. We trust that the good faith of Mr. Tajideen, his family members, and other individuals in disclosing all of these details for purpose of accelerating his removal from the OFAC list will not be used against any of these persons and/or companies. It would certainly not be consistent with basic principles of due process for this OFAC process to be used as a means to extort information from one member of a family, which is then used against other members of his family.

Attached as **Appendix 2** is a chart depicting the businesses in which various members of the Tajideen family appear in response to OFAC's request. Together, and with their associates, they provide a network of economies of scale for the supply of food products in West Africa that are designed to benefit the poorer sectors of the population for basic living staples, hence the remarkable success of the companies.

The Ovlas company (Ovlas Trading SA SAL (Offshore), hereinafter **Ovlas**) is a fully independent trading company, exclusively serving independent companies in West African

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

countries. Ovlas provides a purchasing platform and facilitates the transactions between exporter and importer without taking part in the movement of goods themselves, except for facilitating the shipment of goods. Ovlas helps create synergies and enable deals to be carried out in larger quantities in order to benefit from economies of scale.

By tying together the orders of the same products and services for all their exclusive clients in West African countries, purchasing power is increased and prices become therefore more competitive. This purchasing platform is established because competitive pricing is crucial to success in the region, mainly due to the very poor standards of living but also because of tough competition. This platform takes orders which fall in two categories: shipping and goods. For shipping, purchasing power is obtained by negotiating, for all interested clients, actual break-bulk vessels or vessel space for container goods. In terms of goods, a competitive edge is sought by ordering the same products for all interested clients at the same time, taking therefore advantage of the lower prices that come with larger orders.

Ovlas is fully independent and is not tied together by any legal or formal structure to the companies it works with. The same is true for all West African country clients, which specialize in importing and distributing commodities and essential goods such as rice, sugar, wheat, salt and flour from everywhere around the world. (See example in Part II) Other products are imported and distributed, ranging from frozen foodstuff (meat, chicken and fish), to construction materials, home appliances, and furniture. Some of the clients carry out industrial activities by producing different products such as soaps, plastics and biscuits, for which the raw material is provided also through the purchasing platform.

Decision-making and strategy formulation is carried out independently by each client. Despite the common trading network for products and services, each client also acquires goods and services separately, locally or internationally. Ovlas is not used as an exclusive supplier for any of the companies. There is no formal or legal structure tying these local companies together, and each one remains fully independent.

The companies listed in the OFAC questionnaire are legitimate businesses that maintain all the financial and commercial records required by law in the countries in which they are incorporated and operate.

B.  **The Belgian Investigation and Court Proceedings**

The Press Release states that in 2003, "Kassim Tajideen was arrested in Belgium in connection with fraud, money laundering, and diamond smuggling."

As explained below, while it is true that Mr. Kassim Tajideen was arrested in Belgium in 2003, no charges of diamond smuggling or financing a terrorist organization were ever lodged against him.

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

### 1. The Belgian Arrest and Investigation

The genesis of the Belgian investigation into the activities of Kassim Tajideen's businesses, Mr. Tajideen himself, his wife and several of his colleagues and family members was the action taken by the Belgian authorities against the Arab European League ("AEL"), a small and insignificant Antwerp-based organization led by a Mr. Dyab Abou Jahjah, a Lebanese-Belgian national. In the wake of street demonstrations in Belgium, Mr. Jahjah was charged with (but later acquitted of) inciting people to commit violence. In connection with that prosecution, the Belgian State Security Service began investigating Soafrimex NV, a business then led by Mr. Tajideen and his wife, in an attempt to prove that they provided financial support to the AEL. The BSSS report to the Public Prosecutor (attached to this letter as **Exhibit 1-1**, together with an English translation thereof marked as **Exhibit 1-2**) further alleged that Mr. Tajideen was linked to Hizballah. Presumably the general association of Mr. Tajideen with both organizations comes from the fact that the brother of Mr. Dyab Abou Jahjah, Mr. Ziad Abou Jahjah, worked at that time for the company Soafrimex, and that Mr. Tajideen is a Muslim Shi'ite Lebanese citizen like Mr. Jahjah and the Hizballah leadership.

As discussed below, no evidence of support for AEL or Hizballah was presented in the Belgian court proceedings that followed the BSSS investigation. In addition, and in further explanation of the crimes for which Mr. Tajideen was considered guilty, Belgian criminal law expert Professor Raf Verstraeten explains the content of the Belgian decisions. (**Exhibit 2**)

### 2. The Belgian Courts: No ties to criminal organizations

Following the BSSS investigation and based in part upon the report furnished by BSSS to the Prosecutor's office, the Belgian Public Prosecutor indicted Kassim Tajideen, his wife and several of his colleagues and family members on various counts of fiscal fraud, (fiscal) forgery, use of forged documents and money laundering. In addition, a single charge of knowingly participating as a leader of a criminal organization was levied. However, as explained below, it became clear that the alleged criminal organization related to the fraud, forgery and laundering charges, and was unrelated to the financing of the AEL, Hizballah or any terrorist organization.

Notwithstanding the allegations made in the BSSS report and an extensive judicial inquiry in Belgium, Sierra Leone, Mozambique, Portugal, Switzerland, Luxembourg and the United Kingdom, no charges of financing of terrorism or smuggling of blood diamonds were brought against Kassim Tajideen. *Such criminal charges are contemplated and available under Belgian criminal law under articles 140-141 of the Criminal Code (financing of terrorism) and articles 220-224 of the Law on Customs and Excises (smuggling of blood diamonds). Therefore, Belgian law would have permitted these specific charges to be levied had there been evidence to support such charges. However, the Public Prosecutor did not levy any such charges.*

A copy of the judgment of the District Court is attached as **Exhibit 3-1**; an English

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

Page 8

translation of the judgment is attached as **Exhibit 3-2**. In its decision, the court stated

> "the file of the State Security relates to the alleged contribution of various of the accused prosecuted in this case would have had in the financing of the Arab-European League. None of the current accused is however prosecuted for such facts because the detectives ran quickly into a completely different constellation of facts that is completely unrelated to the AEL."[2]

Therefore, no finding of support for either AEL or Hizballah or any other terrorist organization was made in the Belgian court proceedings that lasted seven years.

3. **Rejection of Diamond Smuggling Allegations**

Although the BSSS report alleged that Mr. Tajideen "made a fortune in the trade of Angolan blood diamonds",[3] as explained above no charges of smuggling of blood diamonds were brought against him. The Court of Appeal made it clear that the criminal organization conviction was not based upon trading in blood diamonds (**Exhibit 4**).

Soafrimex NV, the company run at the time by Mr. Tajideeen and his wife that was the subject of the investigation that led to the Belgian court proceedings, was made bankrupt by the lengthy trial in Belgium. The Belgian courts found that Soafrimex became involved in trade with diamond merchants, as explained above, to facilitate payments for goods over and above the amounts paid against the proforma invoices, but in addition, Soafrimex, as well as many other companies, became involved in such transactions in order to repatriate funds from certain African countries because of the shortage of hard currency and the limited ability of the local banking industry to settle international transactions at the time.[4] The former common use of cash payments in the African diamond industry is also explained in a letter by Prof. Verstraeten in **Exhibit 5**, and in the letter of the Diamond High Council in Belgium (**Exhibit 6-1**) with its English translation (**Exhibit 6-2**).

However, these complicated payment arrangements are no longer necessary because the banking systems of these countries have since matured to the point that they are capable of handling the current volume of international commercial transactions. All trading companies, where Tajideen family members work, utilize legitimate financial institutions to process all of their financial transactions. None of these companies currently participate in any manner in the lawful diamond trade, let alone in illegal diamond smuggling.

C. **Alleged Support for Hizballah**

The Press Release states that "Mr. Tajideen is an important financial contributor to

---

[2] *See* page 37 of Exhibit 3-2.
[3] *See* page 1 of Exhibit 1-2.
[4] *See* pages 39 and 46 of Exhibit 3-2 and pages 106 and 109 of Exhibit 4-2.

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

Page 9

Hizballah who ... has contributed tens of millions of dollars to Hizballah and has sent funds to Hizballah through his brother, a Hizballah commander in Lebanon." This is factually incorrect. Mr. Tajideen has never contributed money to Hizballah, directly or through his brother, nor is his brother a "commander" in the organization.

1. **Relationship with Ali Tajideen**

Out of nine brothers, only Ali Tajideen has been a supporter of Hizballah, never a 'commander', and he was "not connected to the military arm of the movement," according to the Gruner Report at p. 2 (See next section on the Gruner Report). He is a businessman who runs a construction company involved in repairing properties owned by people in southern Lebanon that were damaged during the Israeli occupation, many of whom sympathize or work with Hizballah. Surely Mr. Tajideen cannot be made responsible for the beliefs or actions of a brother working in total independence from him.

As background to the *de facto* situation in Lebanon, it should be noted that in the latest 2009 elections, which were monitored internationally, and supported by the US government, Hizballah received about three-quarters of the vote in South Lebanon. In the Lebanese national unity government, Hizballah has two declared ministers, and ten per cent of the Lebanese Parliament is constituted by Hizballah members. Mr. Tajideen is unable to repudiate the fact that Ali is his brother, nor the fact that Hizballah members are official members of the Lebanese government and parliament. Nor can he be asked to vouch for the political opinions or leanings of anyone in his family. However, and because of the nature of Mr. Tajeddin's international business, he was and remains personally adamant to stay clear of any business with his brother Ali or his brother's company, and with Hizballah in particular. Ali's name does not appear in any of the companies associated with Mr. Kassim Tajideen, as can be seen in the detailed description of shareholders and directors in **Appendix 3**.

2. **"Cover companies" and "Tens of millions of dollars" for Hizballah**

The Press Release states after the mention of Mr. Tajideen's brother: "In addition, Kassim Tajideen and his brothers run cover companies for Hizballah in Africa." This is incorrect. Most of the companies who operate in the informal network described above were established well before Hizballah's political prominence in the early 1990s. They could not have been therefore 'cover companies' for the organization. The McBrien Memorandum also alleges, in the short sections not blacked out, that Mr. Tajideen has provided financial support to, or financial or other services to or in support of Hizballah, "by raising funds for Hizballah and sending money to Hizballah."

The "tens of millions of dollars" allegation is not supported by any evidence made available to counsel. Mr. Tajeddin emphatically denies having provided financial support to, or financial or other services to or in support of Hizballah, by raising funds for Hizballah and sending money to Hizballah or otherwise, or to have participated in the running of "cover companies" for Hizballah. A reputable investigator hired by counsel, J.K. Gruner & Associates,

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

Inc. ("**Gruner**") conducted an extensive investigation of his background and business activities, extending throughout Europe, Africa and the Middle East. He provided a written report on the results of his investigation dated April 23, 2010 (the "**Gruner Report**"). Gruner was unable to substantiate any charges that Mr. Tajideen, or any of the Africa businesses associated with him, previously provided any financial support to any terrorist organization. A copy of the Gruner Report is attached as **Exhibit 7**.

In the course of his investigation, Gruner interviewed Lebanese and African officials, who confirmed he was a legitimate businessman with interests in Lebanon and Africa and that he has no relationship with Hizballah and no involvement in providing funds to it. In particular, Vice Minister Darwezi Mokombe of the Democratic Republic of the Congo ("DRC"), reiterated that his businesses enjoyed a good reputation in the DRC and confirmed that a Belgian rogatory commission sent to the DRC to investigate him did not find any evidence of ties with Hizballah. *See* Gruner Report at pp. 2, 3.

Despite the allegation that Mr. Tajideen has provided "tens of millions of dollars to Hizballah," Mr. Gruner was unable to uncover any evidence substantiating charges that he provides funds to his brother or his company, or to Hizballah or any of its organizations. *See* **Exhibit 7** *passim*.

## PART II- Corrective Steps

This Part describes the various steps taken which would negate any possible basis for designation, even though Mr. Tajideen does not concede that there has at any time existed a sufficient basis for his designation as an SDGT.

Mr. Tajideen confirms that, to the best of his knowledge, none of his relatives or business managers in the companies mentioned in the OFAC questionnaire or working in West Africa has provided any support to Hizballah.

All of these companies's shareholders and directors insist on to the legitimacy of these banking relationships and the due diligence conducted on all transactions for all customers to ensure all funds transfers are *bona fide*. All these companies have implemented financial controls to ensure against money laundering and fraud, and these controls also have the effect of ensuring against support for terrorism. No funds can be diverted to any improper purpose, including the financial support of any terrorist organization.

A typical transaction is conducted as follows:

Ovlas receives an order from a client with details on quantity, quality, packaging and time of delivery of wheat flour. Ovlas gets in touch with all of the prospective clients in Angola, Sierra Leone and The Republic Democratic Republic of Congo and ties all of the orders together. The manufacturer is then contacted and a large order is negotiated on behalf of all the participating clients. By grouping together all of these orders, economies

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

of scale is realized since goods are purchased at a lower price. The more orders are grouped together, the more purchasing power the platform gains and the more competitive the orders become.

Once the contracts are signed, Ovlas then coordinates the shipment of the goods to the various destinations by negotiating with shipping companies. Again, by tying together the orders of all the shipments, a competitive price is established with the shipping company. Ovlas is then invoiced by the supplier and the shipping company, and invoices the participating clients on the basis of the order of goods and their shipment, in addition to a fee for providing them with this service.

The purchasing platform does not take part in the actual movement of the goods, except for coordinating the shipments. The goods therefore go from the origin directly to its specific destination in Africa. However, the financial transaction does go through the purchasing platform. Ovlas pays the suppliers and the shipping companies and invoices their clients in Africa.

*Most emphatically, Mr. Tajideen is keen to take action to the fullest extent of his moral standing against any individual in companies where he has any influence, and who might have used funds to support terrorism. Mr. Tajideen is open to considering and helping implement continuing improvements in control procedures, as directed by OFAC, if this is necessary in order to provide assurances to your office that no support is being provided inadvertently to Hizballah.*

## PART III

Attached as **Appendix 3**, please find responses to the requests for information propounded in your letter of February 24, 2010. Please note that the detailed description of the trading activities follow a pattern of economies of scale generally similar in all the companies.

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

## CONCLUSION

Based on all of the information provided in this letter, Mr. Tajideen's attached personal statement, and accompanying exhibits, we ask that Mr. Kassim Tajideen be rapidly removed from your list of supporters of terrorism. The listing has no basis in fact. The listing needs to be corrected to undo damage that is being done to Mr. Tajideen's good name as well as his business reputation and interests.

If you have any questions regarding this removal petition, please do not hesitate to contact us at telephone numbers or e-mail addresses listed on the cover page.[5] If we do not hear favorably from you soon, we will be requesting a meeting pursuant to 31 C.F.R. § 501.807(c).

Respectfully submitted on behalf of Kassim Tajideen,

_____          _____
Paul G. Cassell                     Chibli Mallat

---

[5] Mr. Cassell's listing of his University of Utah mailing address is not intended to imply institutional endorsement of the University of Utah.

*BUSINESS CONFIDENTIAL AND PROPRIETARY*

Page 13

**ATTACHMENTS:**

| | |
|---|---|
| Appendix 1 | Personal statement of Kassim Tajideen |
| Appendix 2 | Chart Depicting the Network of Companies |
| Appendix 3 | Detailed Responses to February 24, 2010 OFAC Request for Information |
| Appendix 4 | Copy of passport |
| Exhibit 1-1 | Belgian Special Security Service Report to the Public Prosecutor (Original) |
| Exhibit 1-2 | Belgian Special Security Service Report to the Public Prosecutor (English) |
| Exhibit 2 | Letter from Prof. Raf Verstraeten on the Belgian courts' decisions |
| Exhibit 3-1 | District Court Antwerp Judgment (Original) |
| Exhibit 3-2 | District Court Antwerp Judgment (English) |
| Exhibit 4-1 | Court of Appeal Antwerp Judgment (Original) |
| Exhibit 4-2 | Court of Appeal Antwerp (English) |
| Exhibit 5 | Letter from Prof. Raf Verstraeten on the common use of cash in the diamonds trade in the 1990s |
| Exhibit 6-1 | Letter from the Diamond High council on the use of cash in diamonds trade (Original) |
| Exhibit 6-2 | Letter from the Diamond High council on the use of cash in diamonds trade (English) |
| Exhibit 7 | Report from J.K. Gruner & Associates |

*BUSINESS CONFIDENTIAL AND PROPRIETARY*