WILMERHALE

December 7, 2012

**Ronald I. Meltzer**

+1 202 663 6389(t)
+1 202 663 6363(f)
ronald.meltzer@wilmerhale.com

<u>**CONFIDENTIAL TREATMENT REQUESTED**</u>
<u>**BY KASSIM TAJIDEEN**</u>

███████████

Director, Office of Foreign Assets Control
U.S. Department of Treasury
1500 Pennsylvania Avenue, NW—Annex
Washington, DC 20220

Re: <u>Petition to remove Kassim Tajideen from the list of Specially Designated Nationals</u>
<u>and Blocked Persons</u>

███████████

On behalf of Kassim Tajideen, and pursuant to 31 C.F.R. § 501.807, we hereby seek the removal of Mr. Tajideen from OFAC's list of Specially Designated Nationals and Blocked Persons ("SDN List"). On May 27, 2009, OFAC designated Mr. Tajideen as a Specially Designated Global Terrorist ("SDGT") whose property and interests in property are blocked pursuant to the International Emergency Economic Powers Act ("IEEPA") and Executive Order 13224 of September 23, 2001.[1] This petition supplements and supersedes the July 22, 2010 *Petition Seeking Removal of Kassim Tajideen from Listing FAC No. SDG-465805* ("2010 Petition").

As we explained to Paul Lurie of OFAC on May 9, 2011, and as discussed in more detail below, following the submission of the 2010 Petition Mr. Tajideen retained additional counsel as well as ████████████ redacted ████████████ to undertake an extensive forensic review of his personal and business dealings. Accordingly, we requested, and Mr. Lurie agreed, that OFAC would refrain from reaching a determination as to the 2010 Petition and would await further communication from us.

As discussed in this petition and supported by the attached report, there are compelling reasons to remove Mr. Tajideen from OFAC's SDN List: (i) redacted investigation of Mr.

---

[1] Additional Designation of Two Individuals Pursuant to Executive Order 13224, 74 Fed. Reg. 26475 (June 2, 2009).

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Beijing   Berlin   Boston   Brussels   Frankfurt   London   Los Angeles   New York   Oxford   Palo Alto   Waltham   Washington

Page 2

WILMERHALE

Tajideen's records found no direct evidence of payments to or financial support of Hizballah,[2] (ii) Mr. Tajideen is reducing and consolidating those businesses alleged to have been used as "covers" for Hizballah so that they can operate in a transparent manner with robust financial and compliance controls to fully address any ongoing risk that he or his businesses will provide financial support to Hizballah, and (iii) Mr. Tajideen is committed to implementing such controls throughout his new real estate businesses and to provide quarterly progress reports to OFAC. Accordingly, with such remediation, Mr. Tajideen's continued designation as an SDGT is inconsistent with IEEPA and Executive Order 13224, and OFAC should therefore delist Mr. Tajideen's as an SDGT. Likewise, those entities that have been designated pursuant to Executive Order 13224 that he owns or controls should also be removed from the SDN List.

The second and third reasons are particularly important, in light of the legal framework established by IEEPA and Executive Order 13224 that limits the imposition of sanctions to instances where the activities or funds of the blocked person create an actual, present threat to U.S. national security interests.[3] Under IEEPA, OFAC's designation of Mr. Tajideen is not intended to be a punitive measure. Instead, it seeks to ensure that the use of his funds will not "further ends that conflict with U.S. interests," including the "orchestration, assistance, or

---

[2] [redacted] has limited its ultimate conclusion by use of the word "direct" in light of two factors: (i) the notoriety of this case as based on its reputational source inquiries; and (ii) the financial and corporate governance deficiencies that it identified and which are discussed in Parts IV and V of this petition. Those deficiencies could leave Mr. Tajideen's businesses vulnerable to possible misuse, although [redacted] did not identify any evidence of such misuse. Moreover, once [redacted] identified these deficiencies, Mr. Tajideen committed to undertake comprehensive remedial measures to address identified deficiencies so as to remove any continuing risk of terrorist financing.

[3] See 50 U.S.C. § 1701(b) (1977) (limiting the President's exercise of his authority under IEEPA "to deal with an unusual and extraordinary threat with respect to which a national security emergency has been declared for purposes of this chapter and may not be exercised for any other purpose") (emphasis added); Executive Order 13224, Subsection 1(d) (providing for designation of persons who presently "(i) {do} assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order; or (ii) to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject ..."); 31 C.F.R. § 501.807(a) (providing for delisting for blocked persons undertaking remedial steps such as corporate reorganization, resignation from positions in a blocked entity, or similar steps, to negate the basis for designation).

Kassim Tajideen 000457

Page 3

WILMERHALE

support of unlawful and dangerous global terrorist plots."[4] Therefore, even if OFAC retains its assessment that Mr. Tajideen's businesses provided financial support to Hizballah in the past, Mr. Tajideen's commitment to adopt comprehensive remedial measures that demonstrate no continuing threat to U.S. national security interests necessitate his delisting under applicable law.

Mr. Tajideen requests that OFAC view this petition as effectively a covenant for future action. On the one hand, Mr. Tajideen commits to directly resolve the concerns that he believes OFAC has regarding possible financial support of Hizballah. In exchange, he asks that OFAC seriously consider this petition and remove him from the SDN List after Mr. Tajideen has completed the steps needed to adopt transparent, rigorous financial and compliance controls and to ensure that his businesses operate in a manner that is consistent with U.S. foreign policy and national security objectives.

In Part I of this Petition, we summarize what Mr. Tajideen knows or understands about OFAC's underlying designation of him, and explain why, in light of [redacted] findings and the comprehensive remedial measures that Mr. Tajideen is undertaking, there is no basis under the law for OFAC to continue his designation as an SDGT.

In Part II, we describe the extraordinary commitment that Mr. Tajideen undertook since the 2010 Petition to address those personal and business dealings with which OFAC has previously expressed concern. The centerpiece of this effort has been the extensive forensics investigation that Mr. Tajideen allowed [redacted] to conduct of both his personal holdings and his businesses in Lebanon, Angola, and elsewhere. We are not aware of any other case where a designated person agreed to such extensive external scrutiny to remove his name from OFAC's SDN List.

In Part III, we summarize the findings of the [redacted] report, which found no direct evidence of payments by Mr. Tajideen nor any company that he owned or controlled to Hizballah.

In Part IV, we identify the deficiencies that [redacted] identified in Mr. Tajideen's business records and financial controls.

In Part V, we describe Mr. Tajideen's plans to reduce and consolidate his previous business operations related to his SDGT designation and the comprehensive remedial measures he will undertake to ensure that neither he nor his existing businesses could provide financial support to Hizballah or other terrorist supporting groups. These actions reflect Mr. Tajideen's

---

[4] Declaration of Adam J. Szubin, Al-Haramain Islamic Found., et al. v. U.S. Dep't of the Treasury (D. Or. 2007), Case No. 07-CV-1155-KI (stating that "{t}he prohibition against dealing in property of a designation person serves important objectives, such as depriving the designated person of the benefit of the property, including services, *that might otherwise be used to further ends that conflict with U.S. interests*. Blocked assets of designated terrorists and their supporters prevents their possible use in the orchestration, assistance, or support of unlawful and dangerous global terrorist plots.") (emphasis added).

Kassim Tajideen 000458

DOJ_02768296

Page 4

WilmerHale

commitment to demonstrate to OFAC that he and his existing businesses will not engage in terrorist financing, nor be a party to any activity that could be used for that purpose.

As a follow-up to this submission, we will also be filing quarterly reports to OFAC concerning Mr. Tajideen's implementation of remedial actions and requesting another meeting with OFAC to discuss such implementation and the status of the case. In doing so, we reflect Mr. Tajideen's commitment to remain constructively engaged with OFAC and to ensure that all of OFAC's concerns are fully addressed.

\* \* \*

Kassim Tajideen 000459

Page 5

WILMERHALE

## Table of Contents

Page

(I)     Mr. Tajideen's continued designation lacks both a legal and factual basis ........................ 8

    (A)     Mr. Tajideen's continued designation lacks a statutory and regulatory basis ......... 8

        (i)     IEEPA authorizes executive action only for present threats to national security and Mr. Tajideen cannot be said to present such a threat .............. 8

        (ii)    Executive Order 13224 establishes that sanctions are appropriate to combat present support for terrorism and Mr. Tajideen does not provide such support ........................................................................................... 10

        (iii)   OFAC's regulations contemplate remedial steps such as Mr. Tajideen is taking as a path off the SDN List ............................................................... 10

    (B)     Mr. Tajideen's designation appears to have been based on incomplete or incorrect facts ............................................................................................................................ 12

        (i)     The Belgian criminal case against Mr. Tajideen was deeply flawed politically, procedurally, and substantively ................................................ 12

        (ii)    The press release issued by OFAC at the time of the designation suggested that OFAC misunderstood certain key facts that are addressed in this petition ...................................................................................................... 13

        (a)     That Ali, Husayn, and Kassim have operated a "network" of businesses together; ................................................................................................... 13

        (b)     That the Lebanese and African entities sharing the name "Tajco" are part of the same network; and ................................................................................ 14

        (c)     That Mr. Tajideen used proceeds from his companies to provide financing to Hizballah. ................................................................................................... 14

(II)    A Comprehensive Review Following the 2010 Petition ................................................. 14

(III)   No payments by Mr. Tajideen, nor any company that he owned or controlled, to Hizballah ..................................................................................................................................... 16

    (A)     Summary of companies owned or controlled by Mr. Tajideen and the scope of redacted review ...................................................................................................................... 17

Kassim Tajideen 000460

Page 6

WILMERHALE

(B)   Mr. Tajideen's companies engage in a regular commercial business primarily in the import/export and distribution of foodstuffs....................................................19

    (i)   No evidence of payments to Hizballah or any individual or entity on the SDN List ............................................................................................................19

    (ii)   No direct evidence of misuse of funds by shareholders or partners ..........20

    (iii)   No direct evidence of improper banking relationships...............................21

(C)   Mr. Tajideen operates all material aspects of his business separate and apart from his brother, Ali ........................................................................................................22

(IV)   Mr. Tajideen recognizes and is committed to addressing financial and recordkeeping deficiencies in his business....................................................................................................23

(A)   Internal Controls ..........................................................................................................24

(B)   Information Transparency ...........................................................................................24

(C)   Cash Activities ..............................................................................................................24

(V)   Enhanced financial and compliance controls .........................................................................24

(A)   Reduction and Consolidation of Import/Export Business and Implementation of Enhanced Controls....................................................................................................25

    (i)   Phase 1: Divestment from entities that may have formally involved Ali Tajideen ....................................................................................................26

    (ii)   Phase 2: Reduction, consolidation and reorganization of Lebanese and Angolan entities as a predicate to operational transparency and compliance26

    (iii)   Phase 3: Comprehensive implementation of [redacted] recommended financial and compliance controls at operating companies ......................27

    (iv)   Phase 4: Full implementation of enhanced financial and compliance controls recommended by [redacted] ......................................................28

(B)   Real Estate ....................................................................................................................28

    (i)   Overview........................................................................................................28

    (ii)   Transparent operation of real estate companies under strong financial and compliance controls ....................................................................................29

Kassim Tajideen 000461

Page 7

WILMERHALE

(a)  Phase 1: Operational inactivity ....................................................................30

(b)  Phase 2: Implementation of [redacted] recommended financial and compliance
     controls.........................................................................................................30

Appendix A: [redacted] Report Executive Summary

Appendix B: Reconciliation with 2010 Petition

Appendix C: Internal Control Matrix

Kassim Tajideen 000462

WILMERHALE

### (I) Mr. Tajideen's continued designation lacks both a legal and factual basis

### (A)   Mr. Tajideen's continued designation lacks a statutory and regulatory basis

Based on the facts discussed in this petition and supported by [redacted] extensive forensic investigation, Mr. Tajideen's continued designation as an SDGT is inconsistent with IEEPA, Executive Order 13224, and OFAC's regulations.

Since OFAC's designation, Mr. Tajideen has taken extraordinary measures to identify and address OFAC's concerns about possible terrorist financing and to ensure that all his personal and professional dealings are consistent with U.S. national security and foreign policy objectives. Specifically:

- Mr. Tajideen retained [redacted] to perform an extensive forensic investigation of his business and personal records; as noted, [redacted] found no direct evidence of payments to or financial support of Hizballah;

- Mr. Tajideen is implementing extensive financial and compliance controls for his businesses to fully address any ongoing risk that they or he engage in any transaction that finances or otherwise supports Hizballah; and

- Mr. Tajideen has undertaken further remedial action to close or divest from those companies that he does not control or from those which he cannot ensure full implementation of appropriate controls.

In light of these extraordinary remedial steps, OFAC should remove Mr. Tajideen's name from the SDN List as to do otherwise would be inconsistent with the legal framework supporting the SDGT designation.

### (i)   IEEPA authorizes executive action only for present threats to national security and Mr. Tajideen cannot be said to present such a threat

IEEPA contemplates sanctions against entities posing only a *present* threat to the United States. IEEPA is intended "to deal with any unusual and extraordinary threat...to the national security, foreign policy, or economy of the United States."[5] The statute does not authorize punitive measures for past conduct.[6] IEEPA also provides for periodic reviews of Presidential

---

[5] 50 U.S.C. §1701(a) (1977).

[6] *See* 50 U.S.C. §1701(b) (President's authority "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared...and *may not be exercised for any other purpose*.") (emphasis added).

Kassim Tajideen 000463

WILMERHALE

action taken pursuant to IEEPA,[7] again indicating that the sanctions imposed under the act are to be viewed in light of their purpose – addressing present national emergency threats.

Congress' expressed intent for IEEPA was to provide a "somewhat narrower" authority over international economic sanctions in circumstances short of war.[8] Previously, the Trading With the Enemy Act contained both the President's war and non-war authorities over international economic issues.[9] This authorization was criticized for providing "no time limitation" and requiring "no statement of findings and policy, and no standards to guide its administration."[10] Thus, IEEPA was enacted to authorize "a new set of international economic powers, *more restricted than those available in time of war*" with "strict procedural limitations," including review and reporting requirements.[11]

---

[7] For example, the President must explain to Congress the circumstances that necessitate the exercise of IEEPA's authority and must submit periodic follow-up reports to Congress "during each succeeding six-month period," updating any information previously submitted. 50 U.S.C. §1703(c). However, these reports need not necessarily include the rationale for an individual's designation on an OFAC order.

[8] H.R. Rep. No. 95-459, at 1 (1977) (noting that IEEPA was intended to "separate war and non[-]war authorities and procedures").

[9] 12 U.S.C. §95(a).

[10] H.R. Rep. No. 95-459, at 7-8 (1977) (quoting testimony before the House Subcommittee on International Economic Policy and Trade). This lack of criteria and "open-endedness" persuaded Congress to pass IEEPA. Id. at 8.

[11] Id. at 10-11 (emphasis added). Courts have also taken a limited, functional approach in determining whether a particular asset falls under IEEPA's purview. In *Global Relief Foundation, Inc. v. O'Neill*, an Illinois- based charitable relief foundation challenged the blocking of its assets pursuant to IEEPA, alleging that no "foreign…national" had any "interest" in its assets. 315 F.3d 748, 750 (7th Cir. 2002). The court rejected the Foundation's argument, noting that "the focus must be on how assets could be controlled and used, not on bare legal ownership." Id. at 753. While the facts in *Global Relief* are obviously different than those presented in Mr. Tajideen's case, *Global Relief* is important in demonstrating that courts embrace a functional view of IEEPA's authorities, focusing not merely to the "identity of [the asset's] owner" but the "nature of the property" and whether a particular asset might actually benefit a terrorist entity. Id. *See also* Declaration of Adam J. Szubin, Al-Haramain Islamic Found., et al. v. U.S. Dep't of the Treasury (D. Or. 2007), Case No. 07-CV-1155-KI (stating that "[t]he prohibition against dealing in property of a designated person serves important objectives, such as depriving the designated person of the benefit of the property, including services, *that might otherwise be used to further ends that conflict with U.S. interests*. Blocked assets of designated terrorists and their supporters prevents *their possible use in the orchestration, assistance, or support of unlawful and dangerous global terrorist plots*.") (emphasis added).

Kassim Tajideen 000464

WILMERHALE

Given this legislative intent, to the extent that Mr. Tajideen has undertaken significant remedial action to ensure that his businesses do not provide financial support to Hizballah or other terrorist supporting groups, Mr. Tajideen's continued designation as an SDGT is incompatible with IEEPA.

> **(ii)** **Executive Order 13224 establishes that sanctions are appropriate to combat present support for terrorism and Mr. Tajideen does not provide such support**

Like IEEPA, Executive Order 13224 makes clear that anti-terrorism sanctions are appropriate only against those who presently "assist in, sponsor, or provide financial, material or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order."[12] Courts have confirmed this reading of Executive Order 13224 by stating that the order does "constrain the exercise of discretion" of the Executive by allowing for blocking orders only when "aimed at stopping aid to terrorists."[13] Executive Order 13224 clearly authorizes OFAC to block a designated person's assets, but only where that person is currently providing material support to terrorist-related activities.

> **(iii)** **OFAC's regulations contemplate remedial steps such as Mr. Tajideen is taking as a path off the SDN List**

OFAC regulations contemplate that blocked persons may take remedial measures to remove the basis for their designation,[14] specifically identifying such remedial steps as corporate reorganization, resignation from positions in a blocked entity or similar steps.[15] Mr. Tajideen is taking bold remedial actions consistent with his commitment to do whatever is required to become delisted as an SDGT. These actions –opening his personal and professional dealings to an extensive forensic investigation by [redacted] and, by extension, to OFAC, and establishing significantly enhanced financial and compliance controls over his reorganized businesses going forward – are a direct response to OFAC's designation of Mr. Tajideen and constitute the very

---

[12] Exec. Order No. 13224, §1(d)(i), 31 Fed. Reg. 595 (Sept. 23, 2001).

[13] Humanitarian Law Project, et al. v. U.S. Dep't of Treasury, 578 F.3d 1133, 1145 (9th Cir. 2009).

[14] 31 C.F.R. §501.807(a) (1999) ("A person blocked…may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation").

[15] *Id.* ("The blocked person also may propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation"). *See, e.g.*, Global Relief Found., Inc. v. O'Neill, 207 F.Supp.2d 779, 804-05 (N.D. Ill. 2002) ("In fact, in other cases, the OFAC director has revoked blocking orders based upon new information provided by a designated party"), *aff'd* 315 F.3d 748 (7th Cir. 2002).

Kassim Tajideen 000465

WILMERHALE

outcome contemplated by OFAC's regulations. As Director Szubin has noted, "{t}he objectives for these {anti-terrorism} measures are typically to isolate the target as a means of *inducing it to abandon* harmful or threatening policies."[16] In this case, Mr. Tajideen's remedial steps fulfill OFAC's stated objectives and provide a clear basis for delisting, as contemplated under the regulations.

Courts have recognized post-blocking procedures as central to rights that should be afforded to persons subjected to OFAC financial sanctions.[17] Regard for due process following adverse government action (such as financial sanctions) has deep origins in Anglo-American common law[18] and arguably constitutes an international legal norm.[19] OFAC's serious consideration of Mr. Tajideen's remedial response to his designation as an SDGT would be consistent with this bedrock of the American legal tradition. As a practical matter, we understand that, despite the opportunity to do so under OFAC's regulations, "very few designated persons

---

[16] Isolating Proliferators and Sponsors of Terror: The Use of Sanctions and the International Financial System to Change Regime Behavior Before the H. Comm. on Foreign Affairs, 110th Cong. 2 (2007) (statement of Adam J. Szubin and Daniel Glaser) (emphasis added).

[17] Kindhearts for Charitable Humanitarian Dev., Inc. v. Geithner, 647 F.Supp.2d 857, 905-06 (N.D. Ohio 2009) (holding that OFAC violated the plaintiff's constitutional due process by not providing the unclassified basis for the blocking order); Al-Aqeel v. Paulson, 568 F.Supp.2d 64, 71 (D.D.C. 2008) (holding that a Saudi Arabian citizen subject to an OFAC blocking order had sufficient nexus with the United States to assert rights under the Due Process Clause). Although Mr. Tajideen is not arguing here that he has established a constitutional presence in the United States and that he should therefore benefit from the process afforded by the Due Process Clause of the 5th Amendment of the U.S. Constitution, the principle underpinning these cases is a bedrock of the Anglo-American legal heritage and may constitute an internationally cognizable legal norm.

[18] See Ryan C. Williams, The One and Only Substantive Due Process Clause, 120 YALE L.J. 408, 428 (2010) (tracing the origin of the concept of due process to the Magna Carta in 1215 and the writings of Sir William Blackstone and Sir Edward Coke).

[19] See Craig Forcese & Kent Roach, Limping into the Future: The U.N. 1267 Terrorism Listing Process at the Crossroads, 42 GEO. WASH. INT'L L. REV. 217, 233-34 (2010) (exploring whether the concept of due process constitutes a jus cogens norm of international law); Peter Gutherie, Security Council Sanctions and the Protection of Individual Rights, 60 N.Y.U. ANN. SURV. AM. L. 491, 535 (2004) (arguing that individuals subject to U.N. Security Council sanctions should "have a fair opportunity to contest their listing before an independent tribunal" in order to "comply with international standards for due process"). See also The International Covenant on Civil and Political Rights of 1966 art. 14(1), Dec. 16, 1966, 999 U.N.T.S. 171 ("In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law").

Kassim Tajideen 000466

Page 12

WILMERHALE

respond to OFAC at all, let alone with requests for mitigation measures…"[20] By contrast, Mr. Tajideen's commitments and remedial actions in this case constitute a comprehensive effort to address OFAC's concerns in a transparent, vigorous and effective fashion, thereby meeting U.S. national security objectives.

Finally, in cases where the sanctions have induced changed behavior or where the blocked persons have provided additional transparency about accounts and relationships with terrorist entities, OFAC has delisted the designated persons.[21] In the present case, OFAC's actions have clearly induced Mr. Tajideen to undertake significant corrective steps that provide transparent and reliable assurances against possible involvement in terrorist financing. These actions warrant OFAC's delisting of Mr. Tajideen as an SDGT.

**(B)    Mr. Tajideen's designation appears to have been based on incomplete or incorrect facts**

OFAC's designation of Mr. Tajideen appears to have been based in part on incomplete or incorrect facts. This petition seeks to provide further clarifications of points relevant to that designation, including facts relating to the Belgian criminal case against Mr. Tajideen and the press release issued by OFAC at the time of the designation that contained incorrect information.

**(i)    The Belgian criminal case against Mr. Tajideen was deeply flawed politically, procedurally, and substantively**

As the 2010 Petition discussed, the Belgian criminal case against Mr. Tajideen was deeply flawed. These defects were so fundamental that they offend Anglo-American notions of due process and render the case an insupportable basis for the underlying designation. The initial charges brought against Mr. Tajideen in Belgium arose amidst a highly-charged political climate, in which Mr. Tajideen may have been used as a scapegoat by overeager Belgian prosecutors at a time of high anti-Arab sentiment in that country. Regardless of the motives of prosecutors, as discussed in Exhibit 2 to the 2010 Petition (Letter from Prof. Raf Verstraeten on the Belgian courts' decisions (15 July 2010)), the charges against Mr. Tajideen proved to be almost entirely false. He was not convicted on terrorist finance charges, nor any charged related to the highly publicized and inflammatory allegations that initially were made about him. To the contrary, he

---

[20] Al Haramain Islamic Found., et al. v. U.S. Dep't of the Treasury, 660 F.3d 1019, 1037 (9th Cir. 2011).

[21] *See, e.g.*, Aaran Money Wire Serv. v. United States, 2003 WL 22143735, *3 (D. Minn. 2003) (noting that OFAC lifted the blocking notices and unfroze the assets of the plaintiffs after they furnished information about their "accounts and relationships with suspected terrorist entities," rendering the suit moot). *See also* Isolating Proliferators and Sponsors of Terror: The Use of Sanctions and the International Financial System to Change Regime Behavior Before the H. Comm. on Foreign Affairs, 110th Cong. 2 (2007) (statement of Adam J. Szubin and Daniel Glaser) ("The objectives for these {anti-terrorism} measures are typically to isolate the target as a means of inducing it *to abandon* harmful or threatening policies") (emphasis added).

Kassim Tajideen 000467

Page 13

WilmerHale

was convicted in Belgium of business fraud related to tax recordkeeping issues wholly unrelated to terrorism or terrorist financing.[22] Further, the evidence used against Mr. Tajideen was based, in part, on information provided to Belgian authorities by a company, Organman, that was a direct commercial competitor of Soafrimex NV, Mr. Tajideen's company at the time. Finally, the judicial proceedings themselves were marred by procedural shortcomings relating to the collection of evidence by Belgian authorities and to Mr. Tajideen's right to legal representation – defects that were challenged by Mr. Tajideen and his co-defendants as inconsistent with the European Declaration of Human Rights.[23]

We have no way of assessing what information OFAC has relied on to designate Mr. Tajideen. However, it is our experience that in some cases, allegations such as those raised in Belgium can metastasize over time in a circular fashion that repeats allegations from the same initial sourcing without separate sources of evidence. At the very least, then, the flaws surrounding the Belgian case necessitate a fresh and careful review of the facts underlying the designation, especially in light of [redacted] findings.

**(ii)     The press release issued by OFAC at the time of the designation suggested that OFAC misunderstood certain key facts that are addressed in this petition**

The 2010 Petition addressed several of the inaccuracies contained in OFAC's May 27, 2009 press release announcing the designation. These include statements that Mr. Tajideen is "an important financial contributor" to Hizballah, that he has sent funds to it through his brother Ali, and that he and Ali "run cover companies" for Hizballah in Africa. Each of these assertions by OFAC, for which [redacted] found no evidence, and the accuracy of which is disputed by Mr. Tajideen, is addressed elsewhere in this submission. OFAC's subsequent press release, on December 9, 2010, contained additional statements for which [redacted] found no direct evidence and the accuracy of which is disputed by Mr. Tajideen:

**(a)     That Ali, Husayn, and Kassim have operated a "network" of businesses together;**

---

[22] After an initial report by the Belgian State Security Service ("BSSS"), Belgian prosecutors indicted Mr. Tajideen on charges of being a member of a criminal organization and money laundering. The BSSS initially (and falsely) concluded that Mr. Tajideen supported the Arab European League, made "a fortune" in blood diamonds, and provided tens of millions of dollars in financing for Hizballah. But the Belgian investigators "encountered *a totally different constellation of facts*" (emphasis added). None of these assertions were true. In the matter of the Prosecution Department versus Kassim Tajideen, et al., Judgment # 3438, District Court of the judicial district of Antwerp, Division 5C (June 26, 2008) (Eng. translation), para. 4.3.1.

[23] See *id.* at paras. 4.2.1 (noting that search warrants for the home of Mr. Tajideen and the office of Sofrimex NV were missing in the file of the Crown Prosecutor) and 7.3-7.4 (discussing the violation of Mr. Tajideen's right to a fair trial because he was not provided the assistance of counsel during interrogation by Belgian police and investigators).

Kassim Tajideen 000468

WILMERHALE

> **(b)** That the Lebanese and African entities sharing the name "Tajco" are part of the same network; and
>
> **(c)** That Mr. Tajideen used proceeds from his companies to provide financing to Hizballah.

## (II)   A Comprehensive Review Following the 2010 Petition

Professors Paul Cassell and Chibli Mallat submitted the 2010 Petition on behalf of Mr. Tajideen seeking to have Mr. Tajideen's name removed from the SDN List.[24] Following the 2010 Petition in which Mr. Tajideen provided some explanation to OFAC of his businesses, OFAC proceeded to designate several businesses owned by Mr. Tajideen or his brothers. Specifically, on December 9, 2010, OFAC designated pursuant to IEEPA and Executive Order 13224 Afri Belg Commercio e Industria LDA, Congo Futur, Golfrate Holdings (Angola) LDA, Groupo Arosfran Empreendimentos e Participaccoes SARL, Kairaba Supermarket, Ovlas Trading S.A., and Tajco.[25]

---

[24] The 2010 Petition made six core arguments: (1) the designation was based on "guilt by association," arising from the Hizballah-related activities of Mr. Tajideen's brother, Ali Tajideen, but, in fact, Mr. Tajideen takes care to stay clear of business with his brother *in particular* as it might concern Hizballah and Ali's association with Hizballah should not be imputed to Mr. Tajideen; (2) Mr. Tajideen has never had any relationship whatsoever to either Abd Al Menhem Qubaysi, who was designated by OFAC concurrent to its designation of Mr. Tajideen, or Hasan Nasrallah, who was referenced in OFAC's internal memorandum[24] provided to previous counsel for Mr. Tajideen on April 10, 2010 with significant redactions; (3) Mr. Tajideen has never dealt, or made a "fortune," in blood diamonds, an allegation made against him by OFAC at the time of the designation; (4) Mr. Tajideen is not affiliated, directly or indirectly, with Hizballah or its leadership (including Hasan Nasrallah); (5) Mr. Tajideen's businesses were established prior to the rise of Hizballah, and a 2010 report by J.K. Gruner & Associates found no evidence of payments by any of his companies of "tens of millions of dollars" to Hizballah; and (6) Mr. Tajideen has no ownership over any African company that could be said to be a "cover" for Hizballah, an allegation against him made by OFAC in its press release accompanying the designation.

These arguments remain valid. As discussed further below, the ▓redacted▓ findings provide a significantly greater examination of Mr. Tajideen's businesses and personal affairs and the results of ▓redacted▓ investigation largely supports these arguments. As indicated in **Appendix B**, there are instances where possible confusions or inconsistencies arising from the 2010 Petition might be clarified or corrected.

[25] Designation of Three Individuals and Seven Entities Pursuant to Executive Order 13224, 75 Fed. Reg. 80112 (Dec. 21, 2010).

Page 15

WILMERHALE

Notably, these additional names were added to the SDN List by OFAC as the result of the information that Mr. Tajideen provided to OFAC in good faith as part of a delisting petition. Mr. Tajideen was surprised and disappointed by OFAC's response to his original petition. However, rather than withdraw from the process, Mr. Tajideen decided to retain additional representation and to secure the services of ▮redacted▮ to conduct an extensive forensic investigation, as predicate steps for a further delisting petition.[26]

Mr. Tajideen understood at the outset that ▮redacted▮ investigation would not be quick, would not be inexpensive, and would not be subject to influence or partiality. Notwithstanding these facts, Mr. Tajideen agreed to the forensic investigation because he has a strong sense of justice and wanted to clear his name.

Mr. Tajideen is 57 years old and has purposefully spent his life outside of politics; he felt that it is of paramount importance to reestablish his reputation and to leave for his children an untarnished name. The freedom to travel to the United States, in particular, remains an important consideration to Mr. Tajideen, especially as it impacts his children. Further, Mr. Tajideen is a modest man who lives a modest life. He has invested profits back into his companies, and has grown them for the benefit of his brothers and his children. Clearing his own name and removing the cloud that now hangs over his family are critically important objectives for Mr. Tajideen.

▮redacted▮ report covers a full forensic investigation of business and personal interests over the period January 1, 2003 through December 31, 2011. They include (i) those businesses that have been designated by OFAC pursuant to Executive Order 13224, (ii) those businesses not designated by OFAC for which Mr. Tajideen has or had some level of ownership or control (*i.e.*, direct ownership/equity investment, management role, or influence over the company's strategic or operational activities) (collectively, with those designated by OFAC, "Controlled Companies"), and (iii) the personal financial holdings and transactions of Mr. Tajideen himself. The Executive Summary of ▮redacted▮ report is included as **Appendix A**.

▮redacted▮ work was focused on the Controlled Companies, *i.e.*, those entities over which Mr. Tajideen has the level of ownership or control necessary to compel the company to open itself and its records to ▮redacted▮ investigation. As explained in ▮redacted▮ report, Mr. Tajideen's own businesses have had relationships with other businesses that are separately owned and operated by other members of the Tajideen family. Although Mr. Tajideen himself played a significant role in establishing parts of some of these businesses, he has long since relinquished ownership and/or control over many of them to other members of his family and others. Accordingly, ▮redacted▮ analysis does not include several of the entities that OFAC designated in 2010, and this petition does not seek the delisting of those entities, which Mr. Tajideen does not own or control.

---

[26] Mr. Tajideen, through the forensic review conducted by ▮redacted▮ has identified several areas in the 2010 Petition that were unclear or require further explanation. In **Appendix B**, we provide a reconciliation of four issues that were not adequately explained in the 2010 Petition.

Kassim Tajideen 000470

Page 16

WILMERHALE

[redacted] investigation sought to answer two core questions. *First*, whether Mr. Tajideen or any of the companies that he owns or controls provided financial support to Hizballah. *Second*, whether there existed deficiencies in the operation of those companies such that they could be viewed by OFAC as being exploited for that purpose. To answer these questions, [redacted] relied on:

- on-site and telephone interviews with key individuals;

- an advanced forensic analysis of general ledger financial data whereby (with the assistance of data analysts) [redacted] team used their expertise in forensic accounting, asset misappropriation and money laundering to target higher risk accounts and transactions, and source documentation review (including invoices, payment support, etc.);

- online research of public records and open source databases, onsite public records research (e.g., through local government agencies in Beirut and elsewhere); and

- discreet reputational source inquiries.

[redacted] investigation was extensive. In total, more than 30 [redacted] associates, partners, and others worked in Washington and Beirut over nearly a year to review financial records of twenty-one Controlled Companies. This included subjecting approximately 3.9 million transactions to advanced forensic analysis to identify transactions of interest. The Controlled Companies, which Mr. Tajideen began decades ago and which have grown considerably since then, had reported revenues of over $5 billion during [redacted] period of review and [redacted] was able to analyze financial records accounting for such revenues. The investigation ultimately required approximately 5,000 man hours. It included, in one of [redacted] trips to Beirut, a thorough series of interviews with Amer Hamad, who is primarily responsible for the financial operations of Mr. Tajideen's Angolan businesses. Additionally, [redacted] conducted a series of thorough interviews with those individuals responsible for managing the Controlled Companies in Beirut.

The [redacted] report, summarized in Part III, represents a truly extraordinary undertaking. It provides OFAC with an unimpeded, objective view into Mr. Tajideen's life and business by a leading forensic analysis firm so that OFAC can better consider the basis for his continued designation. Mr. Tajideen appreciates that the conclusions reached by [redacted] do not prove beyond a shadow of a doubt that no funds could ever have been moved through his companies for illicit purposes; Mr. Tajideen trusts that where some doubt remains because of deficiencies identified by [redacted] they will be resolved by his remedial actions, described in Part V.

**(III)      No payments by Mr. Tajideen, nor any company that he owned or controlled, to Hizballah**

Mr. Tajideen has stated that he has never made any financial contribution to Hizballah, and [redacted] has found no direct evidence of any such terrorist financing. Indeed, nor did [redacted] find any direct evidence of improper payments to any other individual or entity on the SDN List. [redacted] did identify gaps and deficiencies in company records and recordkeeping practices

Kassim Tajideen 000471

WILMERHALE

(described in Part IV), which Mr. Tajideen has resolved to rectify through remedial action (described in Part V). As noted, [redacted] uncovered no direct evidence that Mr. Tajideen's businesses acted as "covers" for Hizballah by contributing tens of millions of dollars to it or other terrorist organizations.

    (A)   **Summary of companies owned or controlled by Mr. Tajideen and the scope of [redacted] review**

      As noted, [redacted] report examines Mr. Tajideen's businesses during the 2003-2011 period, the period referred to in OFAC's questions to Mr. Tajideen prior to the 2010 Petition through the end of the last calendar year. Mr. Tajideen's businesses involve West African companies purchasing goods, primarily food products and consumer staples, from international suppliers via Mr. Tajideen's companies in Beirut. They then import, distribute, and sell at wholesale and retail. In some cases, Mr. Tajideen has owned manufacturing and logistics companies that leverage the African companies' existing distribution networks. The companies are interlinked to perform distinct functions in order to gain operational efficiency. For example, the Lebanese companies that act as middlemen between the African importers and the European (or other international) suppliers may purchase products for multiple African importers in bulk, thus creating economies of scale. These operations are not "fronts," but as [redacted] observed, a legitimate, substantial commercial enterprise.

      Mr. Tajideen began this venture in Sierra Leone in the late 1970s, where he founded Tajco Ltd.[27] By the early 1990s, Mr. Tajideen had transferred ownership and full control of Tajco Ltd. in Sierra Leone to his brother, Jaffer Tajideen, and moved his family to Belgium. This pattern – establishing import and distribution companies in West Africa in connection with members of his family, and then leaving those family members in full ownership and control of those companies – would be repeated in Ghana, The Gambia, and Sierra Leone.[28] Only in Angola would Mr. Tajideen retain ownership and control over the businesses he developed there.

      Each of the African businesses came to rely on Mr. Tajideen's relationships with suppliers in Europe and elsewhere, which he managed from the late 1980s through early 2000s

---

[27] Note that Tajco Ltd. in Sierra Leone and Tajco Ltd. in The Gambia are unrelated to Tajco SARL, the Lebanese construction company owned and operated by Mr. Tajideen's brother Ali Tajideen. This distinction between the companies is addressed in the [redacted] report, and discussed further below.

[28] Although we are aware that inconsistent information about Mr. Tajideen's role in the Democratic Republic of the Congo exists, Mr. Tajideen has stated that he never exercised control over Congo Futur in the Democratic Republic of the Congo, though his companies did act as suppliers to that company.

Kassim Tajideen 000472

Page 18

WILMERHALE

primarily through Soafrimex, a company that he established in Belgium.[29] Later, the supplier relationship, and logistics management, would be run through two companies in Lebanon: Afrimex SAL Off-Shore and Ovlas Trading S.A. Over time, Mr. Tajideen relinquished ownership and control over the non-Angolan companies to members of his family so that they could work for themselves and build upon the foundation that he had started. These companies would experience considerable success, as, for example, they reported over $5 billion in revenue during [redacted] period of review. Although Mr. Tajideen continued to offer counsel and guidance to his family members in Africa, as the years passed his family came to rely on his input less and less. By the end of the period reviewed by [redacted] Mr. Tajideen retained no ownership or control over the non-Angolan African companies *and* retained no significant role even in providing counsel or guidance to his family there. Thus, the companies that Mr. Tajideen played a role in forming in Ghana, The Gambia, and Sierra Leone[30] are not among the Controlled Companies reviewed by [redacted]

Although several of Mr. Tajideen's brothers took on key operational and/or management roles in his businesses, these did not include Mr. Tajideen's brother Ali Tajideen. As Mr. Tajideen indicated in the 2010 Petition, Ali Tajideen's business interests have remained predominantly within Lebanon where he runs one of the largest construction companies in the country: Tajco SARL. Although listed in OFAC's designation as part of a group of aliases that included Tajco Ltd. in Sierra Leone and The Gambia, Tajco SARL is in fact not one of Mr. Tajideen's trading companies and is not connected with the Tajco Ltd. companies in Africa that are. The common name "Tajco" may be the source of confusion; in addition to being a reference to the family name, "Tajco" also results from wordplay involving the Arabic word for "crown," which is pronounced "taj." In any case, Tajco SARL in Lebanon is not a part of Mr. Tajideen's enterprises. Tajco SARL was outside the scope of [redacted] review, and Mr. Tajideen does not include the company within his petition for delisting from the SDN List.

The [redacted] report provides a summary of which companies exist within the business group established by Mr. Tajideen and which were actually owned or controlled by Mr. Tajideen during [redacted] period of review. Importantly, of the companies that OFAC designated in 2010, Mr. Tajideen had no ownership or control over the following companies during [redacted] period of review: Kairaba Supermarket, Tajco Ltd. (The Gambia), Tajco Ltd. (Sierra Leone), Tajco SARL,

---

[29] In Part I, we discussed the Belgian criminal case against Mr. Tajideen, which found no connection whatsoever between him and any terrorist organization. This case should not and cannot serve, even in part, for the designation. It is relevant here to state that following the Belgian prosecution of Mr. Tajideen, Soafrimex was closed and Mr. Tajideen relocated himself and his family to Lebanon.

[30] As noted in footnote 27, Mr. Tajideen never exercised control over Congo Futur in the Democratic Republic of the Congo, though his companies did act as suppliers to that company. Congo Futur, as well as Kairaba Supermarket and Tajco Ltd. in The Gambia, Tajco Ltd. in Sierra Leone, and Tajco SARL in Lebanon, were not Controlled Companies and are thus outside the scope of both the [redacted] report and this petition.

Kassim Tajideen 000473

WILMERHALE

or Congo Futur Group. Therefore, these companies, although designated by OFAC, were not within the scope of [redacted] review, and this petition does not seek their removal from the SDN List. Several additional companies, described in the [redacted] report, were owned or controlled by Mr. Tajideen during the period of review and, because their operations were relevant to the overall operations of Mr. Tajideen's trading business, were reviewed by [redacted] and are within the scope of its report.

As noted, [redacted] review found no direct evidence that any of these Controlled Companies was used to make payments to Hizballah or any other terrorist supporting organization. These reviewed companies include the six entities that OFAC designated in 2010 that Mr. Tajideen actually did own or control (*i.e.*, Afribelg LDA, Golfrate, Grupo Arosfran SARL, Ovlas Trading S.A., and Ovlas Trading SA SAL Off-Shore) as well as several additional companies.[31]

(B)   **Mr. Tajideen's companies engage in a regular commercial business primarily in the import/export and distribution of foodstuffs**

[redacted] confirmed that the Controlled Companies conducted activities consistent with their purported business operations, *e.g.*, purchasing, shipping, importing, distribution, resale, and manufacturing. Indeed, in its advanced forensic analysis of over 3.9 million transactions, [redacted] found no direct evidence that any of the Controlled Companies engaged in any business other than regular commercial activities typical for companies meeting their respective industrial profiles.

(i)   **No evidence of payments to Hizballah or any individual or entity on the SDN List**

[redacted] performed an extensive review of invoices, payment support materials, and other documents, to determine whether any of the Controlled Companies had made any payments to Hizballah or to any other individual or entity on the SDN List. This review was based on established methodology developed by [redacted] whereby it compared general ledger account names

---

[31] Mr. Tajideen is disclosing the existence of these additional companies to OFAC in good faith, accompanied by a report from [redacted] that confirms that there is no direct evidence of payments by or through these companies to Hizballah or any other individual or entity on the SDN List (except as disclosed and explained in this petition, *e.g.*, transactions between entities that would later become SDNs in connection with OFAC's designation of Mr. Tajideen). We note further, and discuss at length in Part V, that Mr. Tajideen is now either closing these companies or reorganizing them as a predicate to implementing financial and compliance controls that will ensure that risks for illicit financing identified by [redacted] have been substantially addressed. Mr. Tajideen understands that by operation of law, these companies that he owns or controls are effectively SDNs themselves. However, their explicit designation by OFAC will only complicate the efforts described in Part V to establish effective financial and compliance controls in the future. Therefore, Mr. Tajideen requests that OFAC refrain from formally designating those companies during the pendency of its review of his delisting petition.

Kassim Tajideen 000474

WILMERHALE

against sanctions lists, compared known Hizballah affiliates against the Controlled Companies' general ledgers and payment records, and used OFAC's recommended methodology to assess the results of those comparisons. This review was thorough, establishing multiple levels of scrutiny that included heightened due diligence (in many cases, high-level intelligence inquiries) by ▇redacted▇ of approximately 75 high-risk entities with which the Controlled Companies or Mr. Tajideen did business during the period of review. ▇redacted▇ found no direct evidence of support by Mr. Tajideen or his companies to Hizballah or any other terrorist supporting organization.

▇redacted▇ identified one transaction between a Controlled Company and an "Ali Tajideen," but was able to confirm that the transaction involved Ali *K.* Tajideen, a son of Mr. Tajideen's, rather than Ali, his brother. ▇redacted▇ also identified a transaction with SDN Al Manar TV, which was to pay $1300 for satellite television services. Overall, ▇redacted▇ identified 37 unconfirmed parties[32] based on at least partial matches to names of individuals or entities on the SDN List or other sanctions lists. However, upon further analysis of these individuals and entities based on their geography, industry, and other factors, ▇redacted▇ was able to determine that all of these apart from the minimal transaction with Al Manar were false positives and/or not, in fact, the subject of U.S. sanctions.

The Controlled Companies did not have any screening procedures or other diligence measures in place at the time of these transactions such that they could have confirmed the identity of their counterparties. Of course, OFAC screening is not standard practice for non-U.S. companies in that region or business sector, including for Mr. Tajideen's competitors. However, in light of OFAC's concerns that Mr. Tajideen's companies have been used as "covers" for Hizballah to send the terrorist organization "tens of millions of dollars," Mr. Tajideen is committed to implementing meaningful entity screening at all companies that will remain operational under the enhanced remedial measures described in Part V. Therefore, whatever gaps existed in the past, OFAC should favorably view Mr. Tajideen's adoption of entity screening in light of the legal framework established by IEEPA and OFAC's regulations governing the delisting process.[33]

### (ii)   No direct evidence of misuse of funds by shareholders or partners

One mechanism by which funds could be directed by Mr. Tajideen to Hizballah would be through the withdrawals by or dividends paid to shareholders or partners of the Controlled Companies. ▇redacted▇ specifically examined these disbursements and identified no direct evidence that Mr. Tajideen's companies directed the flow of funds to his business partners in support of Hizballah. This is a crucial finding because, apart from commercial transactions, such

---

[32] In this case, "unconfirmed parties" excludes those that are other Controlled Companies themselves or were otherwise named in connection with OFAC's designation of Mr. Tajideen and his brothers.

[33] 31 C.F.R. § 501.807(a) (contemplating the establishment of remedial steps as a basis for OFAC's removal of the designation).

Kassim Tajideen 000475

WILMERHALE

transactions represent the most likely possible source of payment from Mr. Tajideen or the Controlled Companies to Hizballah. As discussed in Part IV, redacted identified deficiencies in financial records associated with the relationship between the partners and the Controlled Companies, and these gaps are being addressed by the adoption of remedial measures described in Part V. However, in no case did redacted find any direct evidence that Mr. Tajideen, through his companies' disbursements to shareholders or partners, provided financial support to Hizballah.

redacted obtained a substantial overview of cash outflows from the Controlled Companies to shareholders based on banking, corporate, and real estate documents, as well as through interviews both with Mr. Tajideen and third party sources in Beirut. While redacted has not been able to determine how every dollar of such outflows was used, its report does indicate that the net shareholder disbursements were either reinvested into Mr. Tajideen's businesses or deployed as a source of funding to acquire the new real estate businesses in Lebanon. These new businesses, including the financial and compliance controls being developed for them, are discussed in Part V.

### (iii)   No direct evidence of improper banking relationships

There is no direct evidence of Mr. Tajideen, or the Controlled Companies, maintaining any improper banking relationship with Lebanese banks that are the target of U.S. government scrutiny. Mr. Tajideen is aware of the notoriety of his case, including in a December 2011 story published in *The New York Times*, "Beirut Bank Seen as a Hub of Hizballah Financing." Because that story seems to indirectly tie him to improper banking activities at certain Lebanese banks under scrutiny by the U.S. Department of Justice, redacted carefully analyzed the Controlled Companies' banking relationships to determine whether there was any direct evidence of impropriety that might result in Hizballah financing. The December 2011 news report contained a reference to Ali Tajideen, and suggested that a relative of his, through the Lebanese Canadian Bank and from companies that have been designated by the United States as Hizballah fronts, had invested in a development corporation that made a $240 million purchase in the Chouf region of Lebanon. In light of this story, and the allegations that appear to reference Tajco SARL or those Controlled Companies that OFAC designated in 2010, redacted closely scrutinized Mr. Tajideen's relationship (both individually and through the Controlled Companies) to the Lebanese Canadian Bank in particular. redacted also carefully examined banking records insofar as they concerned other Lebanese banks mentioned in the U.S. Department of Justice's civil money-laundering and in rem forfeiture complaint and accompanying press release related to Hizballah's use of the U.S. financial system to launder narcotics trafficking and other criminal proceeds through West Africa and back into Lebanon. redacted uncovered no direct evidence of any impropriety in Mr. Tajideen's banking relationship with the Lebanese Canadian Bank or any other bank that is the target of U.S. enforcement action.

Specifically, redacted concluded, based on interviews and an assessment of the Controlled Companies' general ledgers and bank statements, that the Controlled Companies do have legitimate banking relationships with three banks that have been associated with Hizballah financing: the Lebanese Canadian Bank, BLOM Bank, and MEAB Bank. According to the

Kassim Tajideen 000476

Page 22

WILMERHALE

Controlled Companies general ledgers reviewed by ▨redacted the Controlled Companies held 27 accounts at Lebanese Canadian Bank (with transactions totaling approximately $480 million), three accounts at BLOM Bank (with transactions totaling approximately $28 million), and two accounts at MEAB (with transactions totaling approximately $14 million). But far from identifying any impropriety in these relationships, ▨redacted review procedures with respect to these banking relationships indicated that the activity was in the normal course of business and not for any illicit activity. To the contrary, the record indicates banking activity for ordinary commercial purposes, including Mr. Tajideen's legitimate repayment of a loan from the Lebanese Canadian Bank in support of the real estate transaction referred to in the aforementioned story in *The New York Times* and discussed in more detail in Part V.

▨redacted reviewed and analyzed Mr. Tajideen's personal banking records, including his personal bank accounts held at Byblos Bank and KBC Bank. These accounts also show no unusual banking activity.

### (C)    Mr. Tajideen operates all material aspects of his business separate and apart from his brother, Ali

As Mr. Tajideen indicated in the 2010 Petition, he has operated his businesses separate and apart from his brother, Ali, in all material aspects. Mr. Tajideen has sought to make clear that he has not and does not support his brother Ali's political views. Indeed, Mr. Tajideen has sought, to the extent possible, to conduct his business without regard to Lebanese politics. Further, while Mr. Tajideen has worked cooperatively with many of his brothers and their families, and has turned over ownership and control of parts of his businesses to those family members, he has largely avoided any entanglement with Ali.

Ali's principal business activities are those involving Tajco SARL in Lebanon, a construction company that, as noted above, has no commercial relationship to Mr. Tajideen's import/export business or with Tajco Ltd. in Sierra Leone and Tajco Ltd. in The Gambia. As discussed, although Tajco SARL in Lebanon, Tajco Ltd. in Sierra Leone, and Tajco Ltd. in The Gambia are all listed as aliases for one another on the SDN List, the Lebanese company run by Ali Tajideen is, in fact, completely separate and unaffiliated from those in West Africa. For the reasons discussed above (*i.e.*, relying on the family name Tajideen and the Arabic for "crown" being pronounced "taj"), "Tajco" has become a popular corporate name for several members of the Tajideen family. But these entities are not affiliated, and ▨redacted established review procedures found the entities to be separate companies. Mr. Tajideen's past ownership and control of, or past affiliation with, any of the West African companies should therefore not serve as the basis for his links to Ali Tajideen and Tajco SARL.

▨redacted did find, however, that there existed some links between Mr. Tajideen and his brother Ali, but that these were limited to matters of corporate formality. As Mr. Tajideen has explained, requirements of Lebanese corporate law necessitated his reliance on his family (including and especially his brothers) and close friends to act as shareholders and/or corporate officers of his companies even when those individuals were not actively involved in those

Kassim Tajideen 000477

companies.[34] Likewise, Ali had historically done the same vis-à-vis Mr. Tajideen. As a result, Mr. Tajideen held a 20 percent stake in Tajco SARL from its incorporation until he divested from it in August 2010. And, for example, Ali Tajideen has also owned shares – until 2009 – in Hyram Maritime, a ship brokering company in Mr. Tajideen's import/export business. But despite these overlapping ownership interests, █redacted█ uncovered no direct evidence of either brother playing any managerial or supervisory role in any of the other's business affairs. It found no evidence that Ali Tajideen has played any role in the operations of Hyram Maritime, nor evidence that Mr. Tajideen has played any role in the operations of Tajco SARL or any other entity controlled by Ali Tajideen, although █redacted█ of course lacked full visibility into the corporate records of Ali Tajideen's companies.

Given these formal linkages, Mr. Tajideen recognizes why OFAC might have concluded that "Ali Tajideen and Kassim Tajideen were business partners and co-owners of Tajco SARL, operating as Tajco Company LLC in Tyre, Lebanon, with Ali Tajideen serving as the managing partner." However, █redacted█ investigation found no actual operational role by the one brother in the business affairs of the other. Therefore, to the extent OFAC has determined that Ali Tajideen or Tajco SARL has supported Hizballah including through the provision financial support, such activity cannot and should not be imputed to Mr. Tajideen. In any case, Mr. Tajideen has taken and will continue to take concrete steps, including the divestment of his shares in companies co-owned with his brother, to remove either the appearance or fact of commercial or financial involvement between him and his brother Ali.

**(IV)   Mr. Tajideen recognizes and is committed to addressing financial and recordkeeping deficiencies in his business**

Although █redacted█ uncovered no direct evidence that Mr. Tajideen has used his businesses as "fronts" for Hizballah, its analysis revealed a number of deficiencies in the financial operation of those businesses which created gaps in controls. Mr. Tajideen is firmly committed to addressing these problems. While many of these deficiencies are common for privately-held, family-run businesses in the developing world, Mr. Tajideen recognizes that they may have contributed to OFAC's concerns. In Part V, we describe the comprehensive remedial measures that Mr. Tajideen is taking to ensure that there will be no risk of terrorist financing at his companies in the future. These actions include reducing and consolidating the existing import/export businesses and putting into place enhanced financial and compliance controls. Mr. Tajideen recognizes the importance of demonstrating to OFAC the seriousness of his commitment to take all required action to become delisted as an SDGT.

---

[34] Mr. Tajideen has also explained that the requirements of Angolan law, and those of other West African countries, have necessitated other comparable arrangements (*e.g.*, recruiting and relying upon local partners who can hold ownership stakes in those companies).

Kassim Tajideen 000478

Page 24

WilmerHale

### (A)   Internal Controls

redacted review identified certain deficiencies in the Controlled Companies' accounting processes. Records that a publicly-traded company would keep in the ordinary course of business were not maintained under a record retention policy at the Controlled Companies. Likewise, the Controlled Companies typically did not fully note relevant account numbers and names when recording particular transactions. Available audited financial statements could not always be reconciled to the corresponding general ledgers. Finally, as discussed above, Mr. Tajideen's Partners had the ability to withdraw funds from the Controlled Companies regardless of the balance in their capital accounts.

In response to the redacted review, Mr. Tajideen has agreed to address these and other deficiencies through remedial actions for all entities owned or controlled by him that will be operational in the future so that his companies can maintain reliable financial information, prevent or detect errors, and ensure that their assets are properly safeguarded.

### (B)   Information Transparency

Mr. Tajideen has also agreed to address certain transparency gaps in the Controlled Companies' records. For example, redacted identified cases where the Controlled Companies would record multiple transactions as a single journal entry, which made identifying each discrete increase and decrease of the companies' liability a challenge. Elsewhere, redacted found that the Controlled Companies made adjustments to the amounts in their internal accounting to convert foreign currencies into Angolan Kwanza. These practices are not uncommon among smaller, family-run businesses in the developing world, but do not meet internationally accepted accounting standards. Nevertheless, Mr. Tajideen is now working to directly address these deficiencies for those entities that will remain operational in the future.

### (C)   Cash Activities

The Controlled Companies in Angola are primarily importers, distributors and resellers of foodstuffs and consumer goods. redacted learned in its investigation that over 90 percent of the Angolan business is cash-based. This is common for commodities businesses in Africa. However, cash is fungible, and redacted investigation found that the Controlled Companies lack sophisticated accounting methods and thus are vulnerable to misuse. Although the consolidated Angolan business must continue to operate predominantly in cash due to the nature of its retail sales, it is developing enhanced financial and compliance controls to ensure that all cash transactions (including cash outflows) can be accounted for going forward.

### (V) Enhanced financial and compliance controls

As noted, Mr. Tajideen is undertaking comprehensive remedial measures to address the risk of improper diversion of funds or misuse of funds. While redacted review of the Controlled Companies and Mr. Tajideen's personal accounts did not uncover any direct evidence of

Kassim Tajideen 000479

WILMERHALE

payments to or support of Hizballah, it did reveal the need for strengthened financial and compliance controls.

As a result, Mr. Tajideen has decided to take two critical steps to ensure that he and his businesses present no risk to the national security and foreign policy objectives of the United States.

- Mr. Tajideen will reduce and consolidate his import/export business in an orderly way and implement the financial and compliance controls recommended by [redacted] and

- Mr. Tajideen is redirecting much of his capital and energy into real estate holdings in Lebanon, which will be operated legitimately and transparently, with more robust financial and compliance controls.

### (A)   Reduction and Consolidation of Import/Export Business and Implementation of Enhanced Controls

Mr. Tajideen's willingness to reduce and consolidate his import/export business represents an extraordinary commitment to do what it takes to achieve his delisting, including a clear demonstration that he presents no continuing or future risks to U.S. national security and foreign policy interests. Although [redacted] found no direct evidence that his companies have been used as Hizballah "fronts," Mr. Tajideen appreciates that the deficiencies found in the financial management of these businesses remain an area of possible concern to OFAC, so he is undertaking a major reorganization of these entities and implementing the enhanced controls described below.

To complete this process, Mr. Tajideen has committed to execute a series of company closures, divestitures, and other means of reorganization, as well as the installation of financial and compliance controls. During this period, Mr. Tajideen will provide full transparency, including through the submission of quarterly reports to OFAC describing the status of his progress.

The four phases of this process, listed below, are intended to provide a general framework and expected chronology. However, it is possible that some of the reorganization and implementation of compliance controls may occur in a sequence slightly different from that described here. Mr. Tajideen is using the Internal Control Matrix, a customized set of recommendations prepared by [redacted] and included with this petition as **Appendix B**, as his primary guide in implementing enhanced controls. In any case, the quarterly reports will provide to OFAC the opportunity to maintain full visibility into this process on an ongoing basis.

Kassim Tajideen 000480

Page 26

WILMERHALE

### (i)     Phase 1: Divestment from entities that may have formally involved Ali Tajideen

Phase 1 is nearly complete. Mr. Tajideen has confirmed that any residual formal ties he previously had to entities involving his brother Ali have been severed. <span style="background:gray">redacted</span> has confirmed such divestments in its report. These include a demonstration of Mr. Tajideen's formal divestiture from Tajco SARL (in 2010), Eagle's International for General Trade and Industry SARL (in 2007) and others that <span style="background:gray">redacted</span> was unable to confirm during its initial review of Mr. Tajideen's records. Thus, based on Phase 1, while the results of the <span style="background:gray">redacted</span> report indicated that neither brother played an actual role in the activities or decision-making of the other brother's business affairs, Mr. Tajideen has now demonstrated that all *formal* connections between the two brothers have been severed. To the extent OFAC has had concerns related to Mr. Tajideen's relationship with his brother Ali, those concerns should be resolved through the combination of <span style="background:gray">redacted</span> analysis of the business operations and Mr. Tajideen's demonstration that the formal ties to Ali Tajideen no longer exist.

### (ii)    Phase 2: Reduction, consolidation and reorganization of Lebanese and Angolan entities as a predicate to operational transparency and compliance

In Phase 2, Mr. Tajideen will reduce, consolidate and reorganize those Controlled Companies in Lebanon and Angola[35] so they can be operated in a transparent manner, with enhanced financial and compliance controls to address OFAC's apparent concerns. The structure of this effort and the procedures recommended to Mr. Tajideen by <span style="background:gray">redacted</span> for this phase are described in the Internal Control Matrix. Ultimately, all of the companies that Mr. Tajideen owns or controls will fall into one of three categories.

In the first category are "Asset Only" companies, which are those that will remain open because they have funds that are currently blocked by global financial institutions in conformance with OFAC's regulations. These "Asset Only" companies would close if and when OFAC removes their designation as SDGTs, at which time they would transfer the unblocked assets to Mr. Tajideen's operational businesses with full transparency to OFAC. These companies will not engage in any commercial activity, and will maintain adequate recordkeeping and compliance procedures so that Mr. Tajideen can demonstrate to OFAC that they are remaining open for this limited purpose.

In the second category are "Operational" companies, which are those that are undergoing a consolidation and reorganization as a predicate to operating transparently and under enhanced financial and compliance controls.

---

[35] This phase will also involve the orderly cessation of activities of an entity in the British Virgin Islands, Ovlas Trading SA, that OFAC designated as an SDN and over which Mr. Tajideen currently exercises control. This phase will not involve the SDNs over which Mr. Tajideen does not exercise control and which were not among the Controlled Companies assessed by <span style="background:gray">redacted</span>.

WILMERHALE

All of Mr. Tajideen's past business with entities that he does not own or control and that were the target of OFAC's designation (*e.g.*, Congo Futur) will cease. The remaining import/export business has been consolidated and will be limited to two new Dubai entities, Oriental International Limited and International Cross Trade Company Ltd. ("ICTC"), and three new Angolan entities, All Commerce-Angola, LDA ("All Commerce"), FozKudia Industrial, LDA ("FozKudia"), and Cogimbo Imobilaria, Lda. ("Koximbo"). Oriental International Limited and ICTC were created in Dubai because Mr. Tajideen has encountered political pressure in Angola resulting from his SDGT designation, and he has already been forced to sell certain Angolan assets by that government without receiving fair compensation. The creation of these Dubai entities, where ICTC will own all remaining Angolan assets, will limit the Angolan government's interference in his business. FozKudia will engage in factory operations, thus continuing one of Mr. Tajideen's key remaining Angolan assets, with purchasing support (primarily for raw materials and industrial equipment) from Oriental International Limited. Koximbo is engaged in real estate development with respect to Mr. Tajideen's remaining real estate holdings in Angola. Both FozKudia and Koximbo will rely on financial support from All Commerce, which holds the proceeds from the aforementioned sale of Mr. Tajideen's past Angolan assets. As described in Phase 3, below, these reorganized companies will implement redacted recommended financial and compliance controls.

The "Operational" companies also include several entities in Lebanon that, though currently dormant, own real estate holdings. These entities, as discussed in subpart (B), below, will not begin any operations until they have implemented redacted recommended financial and compliance controls.

Finally, in the third category, Mr. Tajideen will "wind down" a number of companies that will not be a part of the reorganized import/export business. redacted Internal Control Matrix provides specific recommendations for winding down these entities in an orderly way, with transparency and sound recordkeeping so the OFAC can have full visibility into the liquidation and/or disbursement of their assets.

### (iii)   Phase 3: Comprehensive implementation of redacted recommended financial and compliance controls at operating companies

In Phase 3, Mr. Tajideen will commence the comprehensive implementation of redacted recommended financial and compliance controls at the operating companies, as outlined in the Internal Control Matrix. These enhanced controls include:

- Appointment of designated compliance officer;
- Entity screening for third parties receiving benefits (*e.g.*, cash or other assets) from the company including shareholders, vendors, suppliers, customers, lessors, management, and others, including the pre-screening of specific, trusted parties to create an approved third-party payee list;
- The reduction of total bank accounts, as well as the reconciliation of accounts and establishment of limits on access to those accounts;

Kassim Tajideen 000482

WILMERHALE

- The maintenance of separate shareholder accounts, and the establishment of a regular (and limited) schedule for shareholder withdrawals;
- Enhanced cash management policies, controls, and documentation; and
- The development and operation of enhanced recordkeeping and document retention policies and procedures.

Mr. Tajideen's companies will provide summaries to OFAC demonstrating the implementation of enhanced financial and compliance controls, based on:

- Journal ledgers and charts of accounts;
- Cash management documentation;
- Lists of bank accounts opened with documented authorization to open such accounts;
- Monthly bank statements and bank reconciliation documentation;
- Signature blocks or other documentation for individuals that are authorized to accept entity funds;
- Third-party management documentation;
- Records of contributions made or distributions taken by each shareholder with adequate information documented about the source and use of such funds; and
- Narratives of any payments made on behalf of these entities by shareholders or other business operations.

The quarterly updates to OFAC will include not only an accounting of cash inflows and outflows to demonstrate that there is no apparent risk of improper terrorist financing, but also progress reports concerning the implementation of enhanced financial and compliance controls at each entity.

### (iv)   Phase 4: Full implementation of enhanced financial and compliance controls recommended by redacted

In Phase 4, Mr. Tajideen will ensure that all the entities described in subpart (iii) have implemented redacted recommended financial and compliance controls to remove the material risk of improper terrorist financing. OFAC will continue to receive quarterly updates on such implementation during the pendency of this delisting petition and even *after*, if OFAC believes such action is required.

### (B)   Real Estate

#### (i)   Overview

Mr. Tajideen is aware of the story published in *The New York Times* in December 2011, "Beirut Bank Seen as a Hub of Hizballah's Financing," which describes a "$240 million purchase ... of more than 740 pristine acres overlooking the Mediterranean in the religiously diverse Chouf region" and identifies "a relative of a former Hizballah commander, Ali

Page 29

WilmerHale

Tajeddine" as a major investor. The story concerns the new real estate venture into which Mr. Tajideen has transferred a significant amount of the assets from the Controlled Companies, and into which he intends to further redirect his business efforts.

*The New York Times* story was largely accurate with respect to Mr. Tajideen. However, it mischaracterizes the transaction as being part of a Hizballah political strategy.

It is true that the Chouf land is worth approximately $240 million, that the seller was a Christian jeweler, Robert Mouawad, and that Nazem Said Ahmad played a role in the transaction.

It is also true that Mr. Tajideen ("a relative of a former Hizballah commander, Ali Tajeddine") was directly involved and that the money used to finance a significant part of the transaction flowed through the Lebanese Canadian Bank from companies that OFAC has designated as SDGTs (*i.e.*, several of the Controlled Companies).

Specifically, Mr. Ahmad took out a "crucial loan" for approximately $80 million from the Lebanese Canadian Bank, a loan that Mr. Tajideen assumed when he purchased the several real estate companies from Mr. Ahmad.

However, [redacted] has reviewed the transaction, as well as the payments made by Mr. Tajideen and the Controlled Companies in support of the loan, and its review of these documents did not uncover any direct evidence of payments and/or financial support to Hizballah.

*The New York Times* story suggested that this transaction may be part of a pattern of acquisitions by or on behalf of Hizballah in which it acquires militarily strategic pieces of property in largely Christian areas. [redacted] investigation found no direct evidence demonstrating the involvement of Hizballah in this transaction. Nor is there evidence linking Mr. Tajideen's purchase of these real estate companies to a larger Hizballah land grab. Instead, [redacted] found that a significant portion of the payments made by Mr. Tajideen in connection with this transaction flowed through third parties not identified in *The New York Times*, such as debtors to the Controlled Companies. This use of third parties is a longstanding practice in the Arab world and its use has been examined by [redacted] here. Its investigation found no direct evidence that these payments were directed toward or used for terrorist financing, including and especially in support of Hizballah.

### (ii)  Transparent operation of real estate companies under strong financial and compliance controls

Mr. Tajideen is strongly committed to operating these new real estate companies in a transparent manner, under robust policies and procedures to avoid the material weaknesses associated with his prior import/export business. Mr. Tajideen's operation of these new real estate companies will be in accordance with [redacted] recommendations as outlined in the Internal Control Matrix.

Kassim Tajideen 000484

Page 30

WILMERHALE

#### (a)     Phase 1: Operational inactivity

Mr. Tajideen's acquired real estate companies are currently not operational. For example, these companies have limited or no revenues or employees, and are not actively involved in development projects on the real estate that they own. Mr. Tajideen's hope is that, ultimately, the properties owned by these real estate companies can be commercially developed. Under Phase 1, these companies will remain inactive until the implementation of ▓redacted▓ recommend financial and compliance controls is complete.

#### (b)     Phase 2: Implementation of ▓redacted▓recommended financial and compliance controls

As outlined in the Internal Control Matrix, the enhanced financial and compliance controls recommended by ▓redacted▓ include (but are not limited to) the following:

- Appointment of designated compliance officer;
- Entity screening for third parties receiving benefits (*e.g.*, cash or other assets) from the company including shareholders, vendors, suppliers, customers, lessors, management, and others, including the pre-screening of specific, trusted parties to create an approved third-party payee list;
- The reduction of total bank accounts, as well as the reconciliation of accounts and establishment of limits on access to those accounts;
- The maintenance of separate shareholder accounts, and the establishment of a regular (and limited) schedule for shareholder withdrawals;
- Enhanced cash management policies, controls, and documentation; and
- The development and operation of enhanced recordkeeping and document retention policies and procedures.

The quarterly reports provided to OFAC will demonstrate the implementation of these controls, including through summaries of: journal ledgers and charts of accounts, cash management documentation, lists of bank accounts opened with documented authorization to open such accounts, monthly bank statements and bank reconciliation documentation, signature blocks or other documentation for individuals that are authorized to accept entity funds, third-party management documentation, records of contributions made or distributions taken by each shareholder with adequate information documented about the source and use of such funds, and narratives of any payments made on behalf of these entities by shareholders or other business operations.

* * *

We have highlighted three points that we believe should guide OFAC's review of this petition. *First*, Mr. Tajideen and his businesses have not provided financial or other support, directly, or indirectly, to Hizballah.. *Second*, IEEPA, Executive Order 13224, and OFAC's regulations contemplate the imposition of sanctions not as a punitive measure for past wrongs,

Kassim Tajideen 000485

WILMERHALE

but as economic restrictions intended to address a present, ongoing threat to critical U.S. national security and foreign policy interests. Therefore, even if OFAC remains unconvinced that Mr. Tajideen did not use his companies as "fronts" for Hizballah in the past, his continued designation is lawful only if OFAC appropriately concludes that Mr. Tajideen and his new businesses constitute an ongoing threat of terrorist financing. *Third*, Mr. Tajideen is strongly committed to resolving OFAC's concerns about such possible threat. He is both reorganizing his prior import/export business that was the source of OFAC's concerns, as well as implementing robust financial and compliance controls for all remaining companies to ensure that there is no ongoing risk of support to Hizballah. Additionally, he is providing transparency to OFAC through quarterly reports on these remedial measures during the pendency of this petition (and beyond delisting, if OFAC so requires).

Accordingly, Mr. Tajideen requests that OFAC view this petition as effectively a covenant for future action. His commitment to undertake comprehensive remedial action to resolve any concerns OFAC may have about his possible financial support of Hizballah would be met by OFAC's serious consideration of this petition and its removal of Mr. Tajideen's SDGT designation and those of the entities that he owns or controls upon a demonstration that he and the new businesses are operating consistent with U.S. foreign policy and national security objectives.

The first quarterly report will be provided at the end of the first quarter of 2013, which will be followed by an additional report at the end of the second quarter of 2013. Following the submission of that report, we will request another meeting with OFAC to review those reports and to discuss the status of this case. In doing so, we reflect Mr. Tajideen's commitment to constructively engage with OFAC on this matter to ensure that all of OFAC's concerns are fully addressed.

Mr. Tajideen requests that all information contained in this petition and its enclosures (collectively, the "Confidential Material") be maintained in confidence and be used solely for the purposes of OFAC's consideration of Mr. Tajideen's delisting. Accordingly, this petition and the enclosed materials have been marked "Confidential Treatment Requested by Kassim Tajideen." The Confidential Material concerns or may concern customarily nonpublic, confidential and privileged business, commercial and personal information concerning Mr. Tajideen and/or the Controlled Companies. The Confidential Material may be exempt from mandatory disclosure under various provisions of the Freedom of Information Act ("FOIA"): 5 U.S.C. § 552(b)(4) (which protects trade secrets and confidential and privileged financial and commercial information); and 5 U.S.C. § 552(b)(6) (which protects files "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"). Moreover, disclosure of the Confidential Material may be prohibited under 18 U.S.C. § 1905. If a decision is made by your office or by any other U.S. Government agency to release this information to the public, to any private third party, or to any foreign government officials or offices, despite this request for confidentiality, Mr. Tajideen respectfully requests an opportunity to be heard on the matter prior to such release.

**DOJ_02768324**

Page 32

WILMERHALE

If you have any questions about this petition or need additional information for your review of this matter, please contact the undersigned at (202) 663-6389 or ronald.meltzer@wilmerhale.com.

Sincerely,

Ronald I. Meltzer