DOJ_02768672

# WILMERHALE

April 28, 2014

Ronald I. Meltzer

+1 202 663 6389 (t)
+1 202 663 6363 (f)
ronald.meltzer@wilmerhale.com

███████████

Associate Director
Office of Global Targeting
Office of Foreign Assets Control
U.S. Department of the Treasury Office
1500 Pennsylvania Avenue, NW
Washington, DC 20220

## CONFIDENTIAL TREATMENT REQUESTED
## BY KASSIM TAJIDEEN

███████████

On behalf of Kassim Tajideen, we provide this submission in response to your December 17, 2013 letter requesting additional information to address OFAC's remaining questions about the grounds for removing Mr. Tajideen from OFAC's List of Specially Designated Nationals and Blocked Persons ("SDN List"). We hope that this is our final submission to OFAC in this matter, as we believe that Mr. Tajideen has now answered all questions posed by OFAC and fully substantiated the grounds warranting his delisting.

As noted in our previous submissions to OFAC, Mr. Tajideen has taken significant remedial steps to mitigate the sanctions risks related to his designation. Such remediation has included:

- Engaging ███████ redacted ███████ to conduct an extensive forensic investigation (covering the 2003-2011 period) of entities owned or controlled by him, with additional forensic involvement through 2014.
- Developing new policies and procedures throughout his business operations that directly address recommendations made by redacted at the conclusion of its investigation. Indeed, redacted made its recommendations based on its experience and knowledge of applicable sanctions risks. The controls developed by Mr. Tajideen and his designees were specifically designed to remediate such risks, and they cover the four categories of recommendations made by redacted accounting; cash/financial management; corporate governance; and third party due diligence.

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Beijing   Berlin   Boston   Brussels   Denver   Frankfurt   London   Los Angeles   New York   Oxford   Palo Alto   Waltham   Washington

Kassim Tajideen 000835

WILMERHALE

Page 2

- Implementing these policies and procedures, and testing their efficacy, as supplemented by [redacted] testing.
- Formally divesting from entities affiliated with his brother, Ali Tajideen, and refraining from any financial or commercial dealings with Ali Tajideen, Husayn Tajideen, and any entities owned or controlled by these or any other individuals associated with any terrorist organization, such as Hizballah.
- Consolidating and simplifying his business operations, with enhanced transparency and ongoing reporting to OFAC.

Fundamentally, Mr. Tajideen has restructured his business operations in a manner that identifies and remediates applicable sanctions risks relating to his designation. As discussed further below in response to your questions, Mr. Tajideen has refrained from any dealings with Hizballah or any other terrorist organization based on both the formal controls developed and implemented throughout his business operations and on his personal commitment to ensure full compliance with U.S. sanctions requirements. Throughout this case, Mr. Tajideen has stated that he will do whatever it takes to become removed from OFAC's SDN List – and over the past two years, he has gone to extraordinary lengths to demonstrate such commitment.

We provide responses to your specific questions below and remain available to provide any further information needed by OFAC for its delisting determination in this case.

**Activities in Lebanon**

### 1. General

*a. Given the pervasive presence of Hizballah in Lebanon, what measures has/is Kassim Tajideen taking to ensure that his business activities in Lebanon do not involve transactions with or for the benefit of Hizballah.*

We have described in past submissions to OFAC the significant controls Mr. Tajideen has put in place to ensure that his business activities in Lebanon do not involve transactions with or for the benefit of Hizballah. These measures have included:

- OFAC screening throughout his companies
- Written procedures implementing a new OFAC compliance program
- Employee training on OFAC compliance

The measures adopted by Mr. Tajideen represent sanctions compliance steps consistent with OFAC's published guidance on compliance responsibilities. We are not aware of any person in Mr. Tajideen's circumstances who has implemented such a robust OFAC compliance program.

Kassim Tajideen 000836

WILMERHALE

Page 3

Moreover, as part of Mr. Tajideen's commitment to OFAC compliance, he has sought to confirm that the measures instituted to ensure that his business activities in Lebanon do not involve transactions with or for the benefit of Hizballah are consistent with generally accepted "best practices." Such compliance "benchmarking" by Mr. Tajideen has included the following:

- <u>Comparison to business practices of other U.S. companies.</u> The development and use of written OFAC compliance procedures, the designation of a compliance officer, employee training on sanctions compliance, and OFAC screening of customers, vendors, employees, and others comprise the foundation of the sanctions compliance program of the business practices of other U.S. companies operating in the Middle East. While certain measures that are consistent with generally accepted best practices in this area, *e.g.*, the exclusive use of established, western banks, are not feasible for Mr. Tajideen given his status as an SDN, Mr. Tajideen's response to redacted recommendations has been consistent with generally accepted best practices for sanctions compliance that are commensurate with the size, sophistication, and circumstances of Mr. Tajideen's businesses.

- <u>Confirmation of consistency with U.S. government recommendations for doing business in Lebanon.</u> Mr. Tajideen has sought confirmation that his OFAC compliance program – which was specifically designed to combat the risks associated with Hizballah that are inherent in doing business in Lebanon – is consistent with the U.S. government's guidance to U.S. companies. This included, initially, a review of published materials by the U.S. Department of Commerce and U.S. Department of State providing guidance to U.S. businesses entering or maintaining operations in Lebanon. Such resources do not provide guidance to U.S. businesses with respect to sanctions-related risks, though they do identify public corruption and the Arab League boycott of Israel as key challenges to doing business in Lebanon.[1]

---

[1] *See* Export.gov, "Doing Business in Lebanon," available at http://export.gov/lebanon/doingbusinessinlebanon/index.asp (last visited March 10, 2014); Embassy of the United States, Lebanon, "Doing Business in Lebanon," available at http://lebanon.usembassy.gov/businessinleb.html (last visited March 10, 2014); "Doing Business in Lebanon, 2013 Country Commercial Guide for U.S. Companies," U.S. and Foreign Commercial Service ("U.S. Commercial Service Guide"), available at http://photos.state.gov/libraries/lebanaon/231771/PDFs/Country%20Commercial%20Guide%20Lerbanon%202013.pdf (last visited March 10, 2014).

Kassim Tajideen 000837

Page 4

Because the United States does not provide specific guidance to U.S. businesses in connection with Hizballah or sanctions risks in Lebanon, we contacted Tim Forsyth, Deputy, Political-Economic Section at the U.S. Embassy in Beirut, to seek additional benchmarking. Mr. Forsyth indicated that it was relatively rare for U.S. companies to confer with the U.S. Embassy in Beirut about such guidance; by contrast, Mr. Tajideen not only instructed us to contact the U.S. Embassy for specific compliance advice, but remains prepared to further enhance his existing OFAC compliance program based on the embassy's recommendations. As you know, there is significant U.S. commercial activity and investment in Lebanon, including U.S. investment in the Lebanese real estate sector.[2] If U.S. businesses and investors do not consult with the U.S. Embassy on sanctions-related risks, including with respect to Hizballah, then Mr. Tajideen's readiness to do so effectively place his OFAC compliance efforts at or above a level evidenced by other U.S. companies operating in Lebanon.

In addition, we have met with Lebanon's ambassador to the United States, Antoine Chedid, to discuss this matter and how Mr. Tajideen could address the risks associated with Hizballah.

> *b. Describe any steps taken to date to review current business relationships (e.g. customers, suppliers, employees) for connections to Hizballah. Provide any details on any such relationships that were terminated as a result of such review. {Treasury is aware of the documents presented by* [redacted] *regarding their forensic review conducted of Kassim Tajideen's businesses, as well as information provided on how Kassim Tajideen is bringing his business practices in conformity of generally accepted accounting principles (GAAP). However, to date no documentation has been provided to Treasury describing steps taken to ensure there are no Hizballah relationships between businesses and/or personnel.)*
>
> *c. Describe any steps taken to date to ensure that future business relationships are appropriately vetted to avoid connections to Hizballah—this includes any charities, companies, financial institutions, persons or single purpose entities (such as a coffee shop or bakery).*

As discussed in the 2012 Delisting Petition and subsequent quarterly reports to OFAC, one of [redacted] central recommendations concerned OFAC screening and third party due diligence. Mr. Tajideen's companies have now developed and operationalized standard operating procedures that require the screening of counterparties against the SDN List. As confirmation, we are attaching, as **Exhibit 1**, copies of screening logs, conducted at the direction of Mr. Tajideen's

---

[2] *See* U.S. Commercial Service Guide, frame 60.

WILMERHALE

Page 5

Chief Financial and Compliance Officer, for every one of Mr. Tajideen's companies that has
engaged in commercial or financial dealings in the past six months. These screening logs, along
with books and records of the companies, have been provided to redacted which has further
screened the names contained in those records, as provided by Mr. Tajideen and his designees, to
assess whether Mr. Tajideen's companies are properly (i) screening the counterparties, as
contemplated by the standard operating procedures; and (ii) identifying any counterparty
presenting an OFAC sanctions risk.[3] In doing so, redacted screening noted one instance in which
there was a "partial" hit (that turned out not to be an actual SDN) that was not discerned in one
of the companies' screening records.[4] We understand that this discrepancy was the result of the
companies' use of a higher sensitivity level for screening against OFAC's SDN Search website.
Going forward, Mr. Tajideen's companies will either screen at no higher than an 80 percent
sensitivity, or at an alternative percentage recommended by OFAC.

Mr. Tajideen's designee has also provided lists of employees in both Angola and Lebanon to
redacted which has further screened the names against government sanctions and watchlists and did
not identify any results indicating that any employees are sanctioned persons.

redacted has also evaluated the OFAC screening procedures used by Mr. Tajideen's companies.
Specifically, redacted examined a particular case in which one of Mr. Tajideen's companies
identified a partial match on the SDN List and, after further research and due diligence consistent
with OFAC's published guidance,[5] was able to conclude that the transaction party was not the
person named on the SDN List.[6]

---

[3] We note that in a transaction in the first quarter of 2013, prior to the implementation of new standard
operating procedures, one of Mr. Tajideen's companies entered into a real estate contract with Ali
Mohamed Saleh, who was the authorized representative of the seller of the underlying real estate, Amal
Issa Hourani. An Ali Mohamed Saleh was designated as a SDGT on June 27, 2012, but this was not the
same Ali Mohamed Saleh, as the two men having dissimilar dates of birth.

[4] According to general ledger details provided by Mr. Tajideen, the name "Casa Vida" is listed as an
account for four of his businesses in Angola, two in Lebanon, and one in the UAE. An entity in Mexico
named "Casa V" was sanctioned by OFAC in September 2013 for its links to Juan Jose Esparragoza
Moreno, a leader of Mexico's Sinaloa Cartel. Due to the difference in name and location, it appears
unlikely that the sanctioned entity is related to the account listed in the general ledger.

[5] See Office of Foreign Assets Control, Frequently Asked Questions and Answers, Question 5, available
at http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx (last visited March 10,
2014).

[6] The transaction party, Overseas Trading Company N.V. ("OTC"), which is registered in Belgium,
requested for International Cross Trade Company Limited , one of Mr. Tajideen's UAE-based companies,
to pay OTC's sister company Podemex N.V., which is also registered in Belgium. According to a letter
provided by OTC, this request was made due to some banks in the U.S. blocking some of OTC's funds
since the company has a similar name to a sanctioned entity located in Guatemala, Overseas Trading
Company also known as Duratex S.A.

Kassim Tajideen 000839

WILMERHALE

Page 6

In addition to SDN screening, Mr. Tajideen's OFAC compliance measures include termination of commercial and financial dealings with companies (apart from those that he owns or controls) that have been designated as SDGTs. These include, notably, the companies outside of Angola that are owned or controlled by his brothers or others. `redacted` has tested the books and records of Mr. Tajideen's companies from 2013, as provided by Mr. Tajideen's designee, and noted that whereas during its forensic investigation of activity between 2003-2011 there were dealings between Mr. Tajideen's companies in Angola and those of his brothers in the Democratic Republic of Congo, The Gambia, and elsewhere, such dealings have largely ceased (*i.e.*, in 2013, Mr. Tajideen's companies only had approximately USD 1,000 of total activity involving Grand Stores and Atcom). Such cessation is illustrated in **Annex A**.

Mr. Tajideen's efforts to sever previous relationships due to Hizballah-related risks are not limited to terminating commercial dealings in Africa. As explained in the 2012 Delisting Petition and subsequent quarterly reports to OFAC, Mr. Tajideen has divested from Tajco SARL, the construction company in Lebanon owned by his brother, Ali, in which Mr. Tajideen previously maintained a nominal stake.[7/] Moreover, Mr. Tajideen has ceased leasing office space from a building owned by Tajco SARL; his companies in Beirut now have their offices at: Bazirkam (Amideast) Building, 5th Floor, Parliament Street, Downtown, Beirut, Lebanon, to avoid any entanglement whatsoever with Ali Tajideen or any other individual or entity alleged to be connected to Hizballah.[8/]

Mr. Tajideen has also adopted OFAC compliance practices in considering prospective business opportunities. For example, as explained in the August 2013 quarterly report to OFAC, Mr. Tajideen had pursued a steel manufacturing business in Iraq requiring certain capital expenditures, such as purchasing manufacturing equipment for steel production. In doing so, Mr. Tajideen ensured that the party supplying such equipment was properly screened against the SDN List. Similarly, in another case, Mr. Tajideen was approached about potential business opportunities in Burma and, before proceeding with the consideration of possible transactions, consulted with WilmerHale with respect to OFAC risks and compliance requirements for those projects.[9/] These cases demonstrate that OFAC sanctions compliance is now a core business principle for Mr. Tajideen and that `redacted` recommendations for remediating sanctions risks have

---

[7/] *See* 2012 Delisting Petition, p. 26.

[8/] As discussed below, `redacted` has supplemented its earlier forensic investigation with contemporaneous discreet reputational enquiries relating to Mr. Tajideen. It was alleged that Ali Tajideen and Tajco SARL remain entangled in Mr. Tajideen's affairs. However, as noted below, `redacted` has had further discussions with Mr. Tajideen and does not have any additional, supportable information rebutting Mr. Tajideen's denial of the allegation.

[9/] We note that Mr. Tajideen is not presently pursuing this opportunity in Burma, but did establish Lanks Holding FZE in Sharjah Airport International Free Zone (SAIF) in the United Arab Emirates with his son Mohammed Tajideen as the sole shareholder.

Kassim Tajideen 000840

WILMERHALE

Page 7

been adopted throughout his company operations, including the pursuit of new business opportunities.

Finally, Mr. Tajideen has taken another significant step to address the heightened risks presented by Hizballah. As discussed in connection with [redacted] earlier 2012 report detailing its initial forensic investigation, [redacted] has the capability to perform discreet reputational inquiries in Lebanon, Angola, and elsewhere to ascertain additional relevant information about investigation targets that may not appear in public sources. In a further effort to evaluate the effectiveness of the internal compliance controls instituted at his companies, as well as his commitment to address sanctions risks relating to his designation, Mr. Tajideen instructed [redacted] to supplement the findings of its earlier forensic investigation with contemporaneous intelligence relating to Mr. Tajideen's possible dealings with Hizballah. [redacted] conducted such information gathering during the February-March 2014 period. In doing so, such discreet inquiries produced allegations that Mr. Tajideen had ongoing business ties with Ali Tajideen and Tajco SARL. When these allegations were reported, [redacted] WilmerHale and Mr. Tajideen met in London in March 2014 to vet the information and to assess the remediation of other areas of concern identified in [redacted] prior forensic investigation. At the meeting, Mr. Tajideen thoroughly addressed such allegations, including that he is no longer engaged in any business dealings whatsoever with his brother Ali or with Tajco SARL. Mr. Tajideen explained that his interactions with his brother Ali only involved a limited number of family meetings after the death of their father. In vetting the available information, [redacted] did not identify evidence supporting such alleged business dealings through the assessment of the financial information provided by Mr. Tajideen and his designees.

A complete summary of the allegations that surfaced in [redacted] information gathering is included in **Annex B**. We want to emphasize that the information provided by [redacted] discreet inquiries is based only on interviews with individual sources and, based on its findings, [redacted] had the opportunity to address them at a recent meeting with Mr. Tajideen in London. Mr. Tajideen refuted the claims made against him, and [redacted] had no further information supporting the allegations or disproving Mr. Tajideen's explanations and clarification.

We also want to emphasize that, even though the allegations are unsubstantiated, Mr. Tajideen has agreed to include the information from [redacted] discreet inquiries in this submission as part of his commitment to enhanced transparency with OFAC and to show that he is able to vet and rebut the allegations about him that continue to persist, particularly concerning the conflation of Mr. Tajideen with other family members presenting sanctions risks. Mr. Tajideen remains available to meet with OFAC or other U.S. government officials to address any remaining questions or concerns about these allegations or any other information.

Kassim Tajideen 000841

WILMERHALE

Page 8

---

**2. Real Estate Transactions**

*a. Page 5 of Kassim Tajideen's May 6, 2013, Quarterly Report submittal summarized that Kassim Tajideen's newly-acquired real estate companies had some initial activity that included the acquisition of new land during January-March 2013. Please provide the following information with respect to these activities:*

*1) Identify all parties to these transactions and provide a description of their role (to include intermediaries, sellers, finance houses, banks, and any other involved entities).*

*2) How were the transactions financed?*

*3) Provide details on the acquired land, including but not limited to its location, prior and intended use, and describe plans for its disposition going forward.*

*4) Describe any due diligence done in advance of the transactions to ensure there is no Hizballah involvement or any involvement in with an OFAC SDN.*

---

As noted in the May 2013 quarterly report, Mr. Tajideen acquired new property in Lebanon in early 2013 through one of his real estate companies. **Chart 1**, below, summarizes that acquisition and identifies the parties to the transaction (and their roles), the source of financing, and the details of the acquired land.[10]

In summary, one of Mr. Tajideen's real estate companies, Delhamyeh Development Company ("DDC") contracted for the purchase of Qoubbe Plot # 549 in Beirut. A copy of the contract is included as **Exhibit 2**, and a copy of the description of that plot is included as **Exhibit 3**. Mr. Tajideen's brother, Youssef Mohammad Tajideen, signed the contract as the representative of DDC, with Ali Mchiek the authorized contract executor for Mr. Y. Tajideen. Ali Mohamed Saleh signed as the representative of the seller, Amal Issa Hourani. Although the contract price was $1.7 million, the actual purchase price was $3.45 million, which was paid from the funds of another of Mr. Tajideen's companies, Leaders of Supply and Products SAL ("LOSAP"), through two of its nominal shareholders, Ali Mouhanna and Ali Hassan Saad. We understand that the discrepancy between the purchase price and the contract price is common and relates to Lebanese tax considerations. In any event, redacted screened Mr. Hourani's name as well as those of all parties referenced in **Exhibit 2** against government sanctions and watchlists and identified one case in which there was a "partial" hit. As noted, Mr. Hourani's representative signatory on the real estate contract, Ali Mohamed Saleh, shares the name of an individual whom OFAC designated as an SDGT in June 2012. However, the Mr. Saleh who participated in signing the

---

[10] The information illustrated by this chart, and contained in this response, is based on (i) information provided by Mr. Tajideen, including through source documentation; and (ii) analysis of such information and, where feasible, screening against government sanctions and watchlists by redacted.

Kassim Tajideen 000842

WILMERHALE

Page 9

real estate contract is not the same person as the named SDGT as their birth dates differ by seven years. Mr. Tajideen provided documentation that $3.45 million was paid by checks drawn on LOSAP bank accounts and received by Mr. Saleh on behalf of Mr. Hourani. Though not performed in advance of the sale because the new standard operating procedures had not then been implemented at that time, the screening and tracking of funds described above were subsequently performed – without identification of any sanctions issues – with the implementation of standard operating procedures addressing ⟨redacted⟩ recommendations at Mr. Tajideen's companies.

### *Chart 1*



As noted below, under the right market or financial conditions, Mr. Tajideen remains open to the prospect of developing the land for ordinary commercial purposes or selling the land to a bona fide purchaser. In doing so, Mr. Tajideen would fully comply with the internal compliance controls now in place, including conducting SDN screening of possible transactional parties and

Kassim Tajideen 000843

WILMERHALE

Page 10

performing enhanced due diligence, as appropriate.

*b. Page 4 of Appendix A of the Executive Summary of* redacted *December 7, 2012 Report states that between 2006 and 2011, Kassim Tajideen entered into the real estate business, acquiring parcels of land through real estate companies in Lebanon. Regarding these purchases, please provide the following information:*

*1) Identify all parties to these transactions and provide a description of their role (to include intermediaries, sellers, finance houses, banks, and any other involved entities).*

*2) How were the transactions financed?*

*3) Provide details on the acquired land, including but not limited to its location, prior and intended use, and describe plans for its disposition going forward.*

*4) Describe any due diligence done in advance of the transactions to ensure there is no Hizballah involvement.*

*c. Page 10 of Appendix A of the Executive Summary of* redacted *December 7, 2012 Report, states that between 2003 and 2011 Kassim Tajideen entered into two primary real estate-related transactions valued at more than $275 million in total. Each transaction involved different companies and counterparties as a means to diversify Kassim Tajideen's business holdings and develop new business opportunities. Through these transactions Kassim Tajideen acquired multiple companies with land and/or real estate holdings associated with 77 properties. Six properties were located in Beirut and 71 properties were located in the Chouf district. Tajideen funded these transactions from various sources, including distributions to the shareholders of his controlled companies and an arrangement of "set-offs" in which amounts due to Tajideen's controlled companies (i.e. receivables) were bundled and routed to the sellers by a network of third-parties trusted by Kassim Tajideen. Please provide the following information:*

*1) Identify all parties to these transactions and provide a description of their role (to include intermediaries, sellers, finance houses, banks, and any other involved entities).*

*2) How were the transactions financed? How and through whom were the "set-off transactions accomplished?*

*3) Describe any due diligence done in advance of the transactions to ensure there is no Hizballah involvement.*

*4) For all 77 properties (6 in Beirut and 71 in the Chouf district), provide details on the acquired land, including but not limited to its location, prior and intended use, and describe plans for its disposition going forward.*

Kassim Tajideen 000844

WILMERHALE

Page 11

We provide, below, a series of charts illustrating the real estate transactions referenced on page 10 of Appendix A in the 2012 Delisting Petition that identify the parties to the transactions (and their roles), the source of financing, and the details of the acquired land.[11/] We note at the outset that there may be some confusion about the number of transactions at issue. On page 4 of Appendix A of the 2012 Delisting Petition, [redacted] refers to Mr. Tajideen's entrance into the real estate business in Lebanon between 2006 and 2011; on page 10, [redacted] refers again to Mr. Tajideen's entrance into the real estate business during [redacted] period of evaluation (*i.e.*, 2003-2011). These are not separate sets of real estate transactions (*i.e.*, [redacted] is referring in both places to the same transactions that it describes in more specific detail on page 10).

**Chart 2** illustrates the acquisition of five properties in Beirut by Al Massar Real Estate SAL in October 2010, though we understand that payments for this acquisition were spread out over several years prior to October 2010.

**Chart 3** illustrates the acquisition of seventy-one properties in the Chouf region of Lebanon, which actually occurred through the purchase of several real estate companies in a series of three phases between June 2010 and 2012.

As previously explained, Mr. Tajideen's designation placed significant restraints on the conduct of his financial dealings and left him vulnerable to intimidation and exploitation by certain parties in Angola. To mitigate these effects and to develop business operations that reduced sanctions risks relating to his designation, Mr. Tajideen sought to scale back his activities in Africa and to redirect his financial resourcews to real estate holdings in Lebanon.

In carrying out such plans without encountering additional blocking actions by financial institutions, Mr. Tajideen was required to engage in a complex series of transactions involving (i) the acquisition of multiple real estate companies that, in turn, own the land in the Chouf region; (ii) the use of third parties and "set-offs" to make payments to the sellers of those companies; and (iii) the supplementation of written agreements and records with informal communications and recordkeeping. For Mr. Tajideen, these practices were born of necessity due to his designation, and they all occurred before [redacted] provided its recommendations to Mr. Tajideen concerning enhanced OFAC compliance controls. Indeed, these transactions would not have occurred now, as they did in the past, under the new standard operating procedures and internal compliance controls that Mr. Tajideen has put into place as part of his remediation.

---

[11/] The information illustrated by these charts, and contained in this response, are based on (i) information provided by Mr. Tajideen, including through source documentation; and (ii) analysis of such information and, where feasible, screening against government sanctions and watchlists by [redacted].

Kassim Tajideen 000845

WILMERHALE

Page 12

## *Chart 2*



In summary, in October 2010, Mr. Tajideen acquired five plots in Beirut through his company, Al Massar Real Estate SAL ("AMRE"): Plot #s 4050 and 4654 (both in Mosseitbeh), and Plot #s 5426, 5445 and 5443 (all in Mazraa). According to Mr. Tajideen, while he is not a listed shareholder, he is the real owner of AMRE, and his family members (excluding those who are SDNs) are his proxies. A copy of the contract for sale of the five properties is included as **Exhibit 4**, and a copy of descriptions of the plots are included as **Exhibit 5**. Mr. Tajideen's brother, Youssef Mohammad Tajideen, signed the contract as the representative of AMRE. Mohamed Saleh Abdul Hadi Saydani, Joseph George Zgheib, Habib Amin Hatem, and Yasmin Rose Majid Al Safadi, signed or were otherwise represented on the contract on behalf of the seller. We understand from Mr. Tajideen that these individuals were acting on behalf of the Hariri family, which effectively owned the company and the land. Although the contract price was $5 million, Mr. Tajideen stated that the actual purchase price was $32 million, which was paid in full out of funds from Mr. Tajideen's companies. As noted, we understand that the discrepancy between the purchase price and the contract price is common and relates to Lebanese tax considerations. And while such practice did result in additional funds being

Kassim Tajideen 000846

WILMERHALE

Page 13

provided to Ms. Safadi that are not reflected in the stated contract price, <span>redacted</span> has screened the names of Ms. Safadi and others referenced in **Exhibit 4** other individuals that were parties to this transaction, as reflected in the contract provided by Mr. Tajideen, against government sanctions and watchlists. <span>redacted</span> did not identify any results indicating that these parties are sanctioned persons. Again, such due diligence was not performed at the time of the sale because the transaction predated the implementation of standard operating procedures addressing <span>redacted</span> recommendations at Mr. Tajideen's companies.

### *Charts 3a, 3b, 3c, and 3d*



The chart above summarizes Mr. Tajideen's purchase of 71 plots in the Chouf region, which occurred in three distinct phases through his ultimate acquisition of several pre-existing real estate companies: DDC, Delhamyeh Country Club ("DCC"), and Societe Rifeh Pour Amelioration Fonciere SARL ("RDC") (collectively "the REC"). As indicated above, the seller

Kassim Tajideen 000847

WILMERHALE

Page 14

of these companies was Robert Mouawad and his associates[12/] ("Mouawad"), and the buyer, ultimately, was Mr. Tajideen. As illustrated in the subsequent charts, a third party, Nazeem Said Ahmad ("Ahmad"), initially acquired the REC and then re-sold first a portion and then all shares therein to Mr. Tajideen. Mr. Tajideen paid approximately $274.2 million for the REC through two channels: (1) a loan totaling $85.7 million secured initially by Ahmad through the REC that was assigned to Mr. Tajideen when he acquired the REC, issued by the Lebanese Canadian Bank ("LCB") and then subsequently transferred to BLC Bank; and (2) funds transferred from Mr. Tajideen's companies, including through the assignment of receivables, to Mouawad (either directly or indirectly via Ahmad) through third party agents of Mr. Tajideen's. We understand that these third parties were used to convey funds to Mouawad (totaling approximately $28 million) and Ahmad (totaling approximately $160.5 million) due to the banking restrictions Mr. Tajideen faced as a result of his designation.

---

[12/] The phrase "associates" is used in these charts to indicate that the individuals identified as the primary parties in interest had others named as actual or nominal, minority shareholders in the real estate companies. Mr. Mouawad's identified associates were include Allan Robert Mouawad, Antoine Philip Shaheen, and Lily Phillip Shaheen, and Elissa Adil Dagher. Mr. Ahmad's associates were redacted o provide}.Said Ali Ahmad, Rami Kamel Yaqoub Baker, Hussein Abdul Mutallab Jawad, Ahmad Youssef Shmeisani, Bilal Ahmad Shmeisani, Wafa Mohamed Nassar Allameh, Rawan Hassan Saleh, and Firas Nazem Ahmad.

Kassim Tajideen 000848

**DOJ_02768686**

WILMERHALE

Page 15



In the first phase of the transaction,[13] in June-July 2010, Mouawad sold 100 percent of his shares in DDC, DCC, and RDC to Ahmad. We also understand that in connection with Ahmad's acquisition of these shares, LCB issued a $100 million loan to DDC and DCC, with Elissa Adil Dagher signing the loan agreement on behalf of those companies. A copy of that loan agreement is attached as **Exhibit 6**. At this stage, we understand that Mr. Tajideen also was in discussions with Ahmad about acquiring some percentage of shares in these companies.

---

[13] We have limited visibility into this first phase because we understand that Mr. Tajideen was not involved, and this information is based on information provided by Mr. Tajideen.

Kassim Tajideen 000849

DOJ_02768687

WILMERHALE

Page 16





In the second phase, in the second half of 2010, Mr. Tajideen acquired approximately 34 percent of Ahmad's shares in DDC and DCC. In this connection, Mr. Tajideen paid $42.5 million to LCB in service of the DDC and DCC loans, and paid $28 million directly to Mouawad. We understand that the source of Mr. Tajideen's funds for this transactions were amounts due to Mr. Tajideen's companies from individuals or vendors in Africa and the Middle East. We are including, as **Exhibit 7**, a copy of the LCB Statement of Account evidencing payments from Youssef Tajideen during this time in service of the loan. With respect to the payments to Mouawad, Mr. Tajideen has explained that these payments were made through the assignment of trade receivables through third party agents – again due to the banking restrictions Mr. Tajideen faced as a result of his designation. Although Mr. Tajideen's records relating to these transactions are imperfect, he has provided supporting documentation to [redacted] for its evaluation. To the extent that the records were legible or otherwise available in the documentation that Mr. Tajideen provided, [redacted] has screened the names of individuals (including third parties that Mr. Tajideen indicated were used as couriers) against government sanctions and watchlists. Based on such documentation, [redacted] did not identify results indicating that any of these parties are sanctioned persons.

Kassim Tajideen 000850

WILMERHALE

Page 17



In the final phase, between 2011-2012, Mr. Tajideen paid an additional $160.5 million to Ahmad through third party agents. Mr. Tajideen also repaid an additional $43.2 million on the LCB loan (which was transferred by LCB to BLC Bank). We understand that the source of Mr. Tajideen's funds for this transactions were amounts due to Mr. Tajideen's companies from individuals or vendors in Africa and the Middle East; however, [redacted] was not able to trace the amounts back to the companies' receivables. Ahmad, in addition to conveying to Mr. Tajideen the remaining 66 percent shares in DDC and DCC, transferred 100 percent of the shares of RDC to Mr. Tajideen. [redacted] has assessed publicly-available corporate records in Lebanon and has noted that although Ahmad and his associates were listed as nominal shareholders in DDC and DCC after transferring 100 percent of the shares in those companies to Mr. Tajideen, current records reflect the fact that Mr. Tajideen's family members and other individuals are now the majority shareholders of all REC. According to Mr. Tajideen, while he is not a listed shareholder, he is the real owner of the REC, and his family members and the other individuals are his proxies. Again, to the extent that the records were legible or otherwise available in the documentation that

Kassim Tajideen 000851

WILMERHALE

Page 18

Mr. Tajideen provided, redacted as evaluated the transactional parties involved in this final phase and did not identify results indicating that any of these parties are sanctioned persons.

Between February and March 2014, redacted retrieved a sample of 20 plots neighboring the plots held by Mr. Tajideen's real estate companies. These records identified various individuals, companies and organizations, including the Egyptian Embassy in Beirut,[14] as the owners of such neighboring plots. redacted screened the identified owners of such neighboring plots against government sanctions and watchlists and did not identify results indicating that any of these parties are sanctioned persons. This further supports Mr. Tajideen's statements that neither his land holdings nor those around him are owned or used in a manner that involve sanctions risks, including those relating to Hizballah.

> *d. Explain the discrepancies between the description of Kassim Tajideen's real estate companies as dormant in the December 2012 and May 2013 documents and Dun and Bradstreet business information reporting from Lebanon describing the businesses as active with operational officers and financial activity.*

As stated in the 2012 Delisting Petition and the first quarterly report to OFAC, Mr. Tajideen's REC were "not operational" and "inactive." Indeed, these companies did not engage in any commercial activity until the first quarter of 2013, when they acquired some land.[15] We have pulled Dun and Bradstreet business information reporting and note that the companies status is listed as "active" (copies of those reports are provided in **Exhibit 8** to ensure that they are the same materials as those referenced in your December 17, 2103 letter). As you know, Dun and Bradstreet reporting is based primarily on public records, such as business and government registries, media reports, and Internet sources. In some cases, Dun and Bradstreet will use on-location correspondents and obtain information directly from the subject of its reports. In this case, we believe that the "active" designation reflects only the fact that the companies at issue are currently registered with the relevant Lebanese authorities and remain in good standing at this time. Indeed, we have contacted Dun and Bradstreet and confirmed that the term "active" is meant to indicate that the company has not shut down or dissolved. From that standpoint, Mr. Tajideen's REC are "active," although they have not yet engaged in any significant commercial activity. However, as stated above, under the right market or financial conditions, Mr. Tajideen remains open to the prospect of developing the land for ordinary commercial purposes or selling the land to a bona fide purchaser. Of course, in doing so Mr. Tajideen would fully comply with the internal compliance controls now in place, including screening the possible transactional parties against the SDN List and performing enhanced due diligence, as appropriate.

---

[14] The plot of land owned by the Egyptian Embassy (Mosseitbeh Plot # 4653) neighbors a plot of land held by Al Massar (Mosseitbeh Plot #4654).

[15] *See* Quarterly Report in Support of Delisting Petition of Kassim Tajideen (May 6, 2013), p. 5.

Kassim Tajideen 000852

WILMERHALE

Page 19

> ### 3. Activities Outside of Lebanon
>
> *a. Provide additional explanation of the need for the maintenance of asset-only companies, given that they may create additional compliance risk.*

As explained in the 2012 Delisting Petition, Mr. Tajideen has kept the asset-only companies because they are owed payments that have been blocked as a result of his designation.[16] In total, over $3 million and approximately €40,000 have been blocked by Deutsche Bank Trust Company; Standard Chartered Bank (New York); HSBC Bank USA; and Citibank N.A. (London). **Exhibit 9** provides a list of such blocked payments.

Over the past several years, these companies have been completely dormant, existing only to preserve Mr. Tajideen's interest in the blocked payments. With the exception of Ovlas Trading SA in the British Virgin Islands, which has never had any commercial or financial activity and thus no bank statements nor accounting records, [redacted] has evaluated the bank statements and/or the general ledger details, to the extent they were available, for such asset-only companies and noted that there has been no significant financial activity.

> *b. Regarding the sale of the Angolan-based assets to NDAD, provide information on who NDAD is, who financed the deal, the disposition of the proceeds from the sale and who currently owns the properties where the businesses are located.*

As noted in a June 13, 2013 email to OFAC (Paul Lurie and Geoffrey Schaab), one of Mr. Tajideen's employees in Angola, Chadi Zabad, provided information to Thomas Hastings at the U.S. Embassy in Luanda regarding the sale of certain Angolan-based assets to NDAD. Mr. Zabad did so in a letter to Mr. Hastings, which is attached at **Exhibit 10**, responding to an inquiry by Mr. Hastings at a meeting last summer with Adelia Bandeira of NDAD. The letter explains that in June 2011, Mr. Tajideen reached an agreement in principle with NDAD for the sale of certain assets belonging to three of his Angolan companies that maintained warehousing and distribution networks throughout Angola.

In that transaction, Mr. Tajideen and NDAD agreed to a total sale price of $150 million. The assets included warehouses, containers, automobiles, fixed assets, and inventory. To the best of Mr. Tajideen's knowledge and belief, those assets have been used by NDAD in its ordinary,

---

[16] While Grupo Arosfran Empreendimentos e Participacoes SARL, Afrimex SAL Off-Shore, and Ovlas Trading SA SAL Off-Shore all have outstanding receivables currently blocked by global financial institutions in compliance with U.S. sanctions laws and regulations, Golfrate Holdings (Angola) Ltda. has an outstanding payable that is blocked. The last identified asset-only company, Leaders of Supply and Products SAL Off-Shore ("LOSAP"), was mistakenly misclassified as an asset-only company. LOSAP has been, in fact, an operational company. However, its activities have been carried out under the standard operating procedures for compliance implememted throughout Mr. Tajideen's companies.

Kassim Tajideen 000853

WILMERHALE

Page 20

commercial enterprise (*i.e.*, in support of warehousing and distribution of foodstuffs and other consumer goods). Of the total sale price, approximately $44 million is yet unpaid, but remains due to Mr. Tajideen by NDAD.

The funds that NDAD did pay to Mr. Tajideen in connection with the sale have been held in the Banco BIC account of All Commerce-Angola LDA and were used to pay ordinary business expenses of Mr. Tajideen's remaining operations in Angola. [redacted] has analyzed the Banco BIC account of All Commerce-Angola-LDA and noted that funds were being transferred to Mr. Tajideen's operational companies in Angola, which, we understand, were used to meet cash flow challenges at such companies.

As explained in the letter to Mr. Hastings, Mr. Tajideen currently owns a building referred to as the "Cuca Building" through Cogimbo Imobiliaria Lda., and rents space in that office to various private parties, including NDAD.[17] However, Mr. Tajideen does not retain any ownership or control over NDAD, nor the assets that he conveyed to NDAD.

Mr. Tajideen also provides the following information about NDAD, based on his information and belief:

- NDAD was created for the purpose of purchasing Mr. Tajideen's Angola assets. The listed shareholders of NDAD are Vincent Miclet and Tala Adelia Bandeira, who own the company for the benefit of General Kopelipa and Carlos Feijo; and
- NDAD used a loan from Bank BAI to fund the purchase of Mr. Tajideen's Angola assets.

> *c. Provide additional information on the disposition of the companies identified on page 5 of Kassim Tajideen's May 6, 2013, Quarterly Report. Are any other companies associated with Kassim Tajideen that are located in Angola not mentioned in the report?*

In the first quarterly report to OFAC, we explained that Mr. Tajideen had encountered banking issues in Angola that necessitated the use of two new companies, Sicam Limited, LDA ("Sicam") and Tanit Plastics Limited, LDA ("Tanit") in place of FozKudia Industrial, LDA ("FozKudia"). Sicam and Tanit are Mr. Tajideen's operational companies in Angola. Tanit purchases raw materials for Mr. Tajideen's remaining manufacturing operations in Angola, and Sicam purchases trading goods in support of Mr. Tajideen's remaining wholesale/distribution operations in Angola. Despite intending to wind-down FozKudia last year, Mr. Tajideen had legal difficulty transferring that company's manufacturing license to Sicam or Tanit. Thus, FozKudia continues to operate in Angola as Mr. Tajideen's manufacturing company.

---

[17] We note that the building owned by Mr. Tajideen is not the notable Luanda landmark Cuca Building bearing the "Cuca" sign at the top. Mr. Tajideen's "Cuca Building" is referred to as such because of its proximity to that Luanda landmark.

Kassim Tajideen 000854

WILMERHALE

Page 21

Apart from Cogimbo Imobiliaria Lda. and other Angolan entities already identified to OFAC in past submissions, we are not aware of any other companies that Mr. Tajideen owns or operates in Angola. As noted, there are tenants of the "Cuca Building" that pay rent to Cogimbo Imobiliaria Lda., however, none of these tenants is owned or controlled by Mr. Tajideen. A list of such tenants is included as **Exhibit 11**.

> *d. With respect to Kassim Tajideen's businesses in the United Arab Emirates, please explain why the businesses appear to be registered in separate Free Trade Zones—one appears to be registered in Dubai and the other appears to be registered in Ras Al Khaimah (RAK)?*

According to corporate records provided by Mr. Tajideen, Mohammed Kassim Tajideen ("Mohammed"), Mr. Tajideen's son, is the sole shareholder of Universal Steel FZE, which is registered with the Sharjah Airport International Free Zone Authority ("SAIF"). Mr. Tajideen stated that Universal Steel FZE was established as a part of a plan to do business in Iraq, which has stalled in the past year because of security and rule of law issues in the country.

A search of UAE corporate records identified an entity named Universal Steel FZCO, which is registered with the Jebel Ali Free Zone Authority ("JAFZA"). UAE corporate records list the shareholders of Universal Steel FZCO as Thomas D'Souza and Abbas Bolar Mohammed, both Indian nationals who each hold 50% of the shares.

As noted, [redacted] recently conducted additional forensic research, including discreet inquiries regarding Mr. Tajideen. This produced unsubstantiated allegations that Universal Steel FZCO in JAFZA has connections with individuals affiliated with the Syrian regime and that the company is front for Mr. Tajideen's UAE companies, including Universal Steel FZE in SAIF and two companies registered in Ras Al Khaimah (Oriental International Limited and International Cross Trade Company Limited). These allegations were vetted at the March 2014 meeting in London that WilmerHale and [redacted] held with Mr. Tajideen. There, Mr. Tajideen explained that the Universal Steel FZCO registered with JAFZA is not related to his Universal Steel FZE registered with SAIF and refuted the claim that his companies have any connection to Syria or Syrian nationals.

In addition, as part of his commitment to enhanced transparency with OFAC, Mr. Tajideen wished to note that his son Mohammad established Lanks Holding FZE in the UAE as its sole shareholder. Mr. Tajideen stated that Lanks Holding FZE was established to pursue commercial opportunities in Myanmar. However, those opportunities did not materialize as anticipated, and Lanks Holding FZE remains dormant.

WILMERHALE

Page 22

---

### 4. Miscellaneous

*a. As outlined in documents from December 7, 2012 and May 6, 2013, Kassim Tajideen apparently intends to continue using his companies as sources of cash for personal transactions.*

*1) How do the accountability measures that the companies are putting into place account for these cash withdrawals?*

*2) Is Kassim Tajideen, or other persons, required to provide a specific justification each time that cash is withdrawn from one of the businesses?*

*3) Is there any accountability for the use of the funds once they are withdrawn by Kassim Tajideen?*

*4) Can measures be credibly enforced against Kassim Tajideen since he is the owner?*

*5) Can examples be provided (with documentation) where this has worked in practice since the controls have been implemented?*

---

As described in the 2012 Delisting Petition, Mr. Tajideen lives modestly in Beirut (and at his village residence) where the focus of his personal life is immediate family. Beyond normal household expenses, Mr. Tajideen has explained that the primary use of his personal funds is on spending for his wife and grandchildren, as well as for personal travel.

Due to banking restraints relating to his designation, Mr. Tajideen continues to use his companies as a source of cash for personal transactions – and such use is governed by the standard operating procedures that establish limits on shareholder access to corporate funds and disbursements. Moreover, the internal compliance controls also provide for separate shareholder accounts that are intended to capture and document any shareholder distributions and establish appropriate accountability and transparency in company records.

Mr. Tajideen receives a monthly cash payment of $15,000 for personal expenditures from Murex Investment and Development SAL Off-Shore, one of his operational companies in Lebanon. Such payments are documented in **Exhibit 12**. Any shareholder distribution in excess of this amount must be documented and justified by the shareholder and accountant. redacted evaluation of company records indicates that apart from in the first quarter of 2013 (as described in the first quarterly report to OFAC), there has been no reported instance of disbursements by the company to Mr. Tajideen or any other shareholder above established authorization limits. These controls are designed to mitigate the possible risk that personal funds could be used improperly, including to finance terrorist activity by Hizballah or any other similar group.

\* \* \*

Kassim Tajideen 000856

WILMERHALE

Page 23

Throughout this delisting process, Mr. Tajideen has been committed to transparency and accountability with OFAC and to complete remediation of the risks relating to his designation. In meeting those commitments, Mr. Tajideen has provided OFAC with an extraordinary amount of information about his business and personal affairs, including a comprehensive account of real estate activity in Lebanon. Over the past two years, Mr. Tajideen has actively engaged with OFAC to implement significant remedial action and to substantiate the grounds for his delisting. During this period, we have held several meetings with OFAC and provided numerous submissions, including quarterly reports demonstrating Mr. Tajideen's implementation of internal compliance controls recommended by [redacted] By the end of 2013, OFAC indicated that it had no further questions about Mr. Tajideen's remediation and would set forth any remaining concerns it had in a letter requesting additional information. We trust that the December 17, 2013 letter captures all of those concerns and believe that this response fully addresses the remaining points that OFAC identified to reach a delisting determination in this case. In providing this response, together with the 2012 Delisting Petition, the 2013 quarterly reports, and other filings and communications to OFAC, we further submit that Mr. Tajideen has established the factual and legal basis warranting the removal of his name from the SDN List.

We respectfully request a meeting with you at your earliest convenience to address any questions you may have about this response and to discuss OFAC's delisting determination in this case.

Sincerely,

Ronald I. Meltzer