WILMERHALE

Ronald I. Meltzer

+1 202 663 6389 (t)
+1 202 683 6363 (f)
ronald.meltzer@wilmerhale.com

May 27, 2016

**CONFIDENTIAL TREATMENT REQUESTED**

VIA EMAIL AND HAND DELIVERY

Gregory Gatjanis
Associate Director, Office of Global Targeting
Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW-Annex
Washington, DC 20220

> **Re: Delisting Petition of Kassim Tajideen**
> **FAC-No.: SDG-465805**
> **New Case ID: SDGT-6540**

Dear Mr. Gatjanis:

On behalf of Kassim Tajideen, we are providing this submission in connection with his re-opened SDGT delisting case and to substantiate key points we have discussed with your staff about the (i) the September 4, 2015 OFAC letter identifying various activities or interactions in which Mr. Tajideen is alleged to have engaged since his designation which OFAC believes supports a finding that he should not be delisted; and (ii) the September 3, 2015 OFAC memorandum summarizing the administrative record that was the basis for OFAC's denial of Mr. Tajideen's initial delisting request (FAC-No.: SDG-465805) ("OFAC Memo") (*See* **Exhibits A and B**, respectively, for copies of the September 4, 2015 OFAC letter and the OFAC Memo).

In this submission, we also refer to our January 13, 2016 letter to OFAC reiterating Mr. Tajideen's long-stated commitment to take whatever action OFAC believes is necessary to show that he is not a supporter of Hizballah (**Exhibit C**). This is an important aspect of the case because OFAC has indicated that concern about Mr. Tajideen's continued support of Hizballah strongly colors its view of his delisting efforts. In our discussion with OFAC, we have proposed various ways to establish that this concern is unfounded. Indeed, Mr. Tajideen has already undertaken one such step in furtherance of his commitment by making public statements to the press and in court that he has not supported, and does not support, Hizballah.

With respect to the September 4, 2015 letter, Mr. Tajideen denies all of the allegations made about his activities since 2011, and in Part I of this submission we provide a full rebuttal of the instances noted by OFAC as grounds justifying Mr. Tajideen's continued designation as an SDGT.

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006
Beijing   Berlin   Boston   Brussels   Denver   Frankfurt   London   Los Angeles   New York   Oxford   Palo Alto   Waltham   Washington

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 2

With respect to the OFAC Memo, we believe that it is significantly flawed and cannot be relied upon as a basis for OFAC's consideration of Mr. Tajideen's re-opened delisting case. As discussed below, the OFAC Memo is problematic because it (i) contains critical factual and legal errors; (ii) misreads the administrative record; and (iii) reaches unsupported conclusions. We substantiate our view concerning the OFAC Memo by identifying in Part II of this submission the numerous false or misplaced factual assertions, conclusions, or characterizations set forth in the memo.

Finally, in Part III of this submission, we refer to points made in our January 13, 2016 letter to OFAC proposing various ways in which Mr. Tajideen is willing to demonstrate that OFAC's concern about his continuing support of Hizballah is unfounded. In that regard, Mr. Tajideen remains committed to pursuing any action requested by OFAC to show that he is not a supporter of Hizballah and that this case merits removal of Mr. Tajideen as an SDGT. After the extraordinary efforts he has undertaken in this case over the past five years, it would be unconscionable for OFAC to ignore Mr. Tajideen's willingness to do what OFAC believes is necessary for delisting and to deny him the opportunity to make good on his long-stated commitment to fully remediate his designation, which OFAC has acknowledged throughout this case is sufficient for removal as an SDGT.

***

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 3

## Part I

### The Allegations in OFAC's September 4, 2015 Letter Are Mistaken

The September 4, 2015 letter identifies a number of activities in which Mr. Tajideen is alleged to have engaged since 2011, which, according to OFAC, support his continued designation as an SDGT. In this section, we provide information and documentation that refute such allegations and substantiate that the activities of concern cited in the September 4, 2015 letter cannot be used as a basis to reject Mr. Tajideen's delisting efforts.

**1. The purchase, refurbishment, and reselling of properties within the Hanouiyeh and Housh areas of southern Lebanon for Hizballah to build schools, in order to present Hizballah as a legitimate organization**

OFAC alleged in its September 4, 2015 letter that Mr. Tajideen is involved (as of 2012) in the purchase, refurbishment, and reselling of properties in the Hanouiyeh (or "Hanaway") and Housh areas of southern Lebanon for Hizballah to build schools.

As you know, WilmerHale's co-counsel in this case is Chibli Mallat, a Lebanese-born legal scholar, jurist, and human rights advocate, who until last year served on the faculty of the University of Utah S.J. Quinney College of Law as Professor of Middle Eastern Law and Politics.[1]  Mr. Mallat currently is the Principal Counsel of the Mallat Law Offices in Beirut[2] and has long been an outspoken critic of Hizballah, including during his bid for the Lebanese presidency in 2005-06. In responding to the September 4, 2015 letter, the Mallat Law Offices hired Jocelyne George Abi Sleiman, an expert real estate investigator, to examine OFAC's allegation concerning schools in Hanouiyeh and Housh.

---

[1] Mr. Mallat also holds the EU Jean Monnet Chair of Law at Saint Joseph's University in Lebanon and has held research and teaching positions at Princeton University, the University of Virginia Law School, the Library of Congress, the University of California at Berkeley (Boalt Hall) School of Law, London University's School of Oriental and African Studies, the University of Lyon, and the Islamic University in Lebanon. In 2011 Mr. Mallat was the Custodian of the Two Holy Mosques Visiting Professor of Islamic Legal Studies at Harvard Law School, and in 2012 a visiting professor of law and Oscar M. Ruebhausen Distinguished Senior Fellow at Yale Law School.
[2] The Mallat Law Firm was founded over 60 years ago by Mr. Mallat's father, Wajdi Mallat, who became president of the Lebanese Constitutional Council. It specializes in international and domestic private law, and represents major international companies including Lebanese, Arab, and international firms in corporate law, civil law, administrative cases, and human rights. It also provides legal and advisory services to several embassies. Mr. Mallat himself has been a consultant on various issues of Islamic and Middle Eastern laws, including for the Foreign and Commonwealth Office, the United Nations Human Rights Council, Amnesty International, and the World Bank. From 2008 to 2010, Mr. Mallat was a senior legal advisor to the Global Justice Project: Iraq, a legal think-tank established in Baghdad with two major grants from the U.S. Department of State to work with the Iraqi government on constitutional, legislative, judicial, and anti-corruption issues.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 4

For this matter, the Abi Sleiman team conducted a full examination of the properties at issue and provided a report that reached the following conclusions in direct contradiction of OFAC's allegation.

First, the Abi Sleiman team conducted site visits to the two relevant districts, Hanouiyeh and Housh, visiting the schools and examining relevant land registrar/cadaster titles and liens. It found that there are 10 schools in the two districts, as follows:

1. The national school, al-madrasa al-wataniyya
2. The Mustafa school, madrasat al-mustafa
3. The international creativity school, madrasat al-ibda' al-dawliyya
4. Imperial college school, madrasat imperial college
5. Old Hanway Lycée, lisi Hanaway al-qadima
6. New Hanaway Lycée, lisi Hanaway al-jadida
7. Public Hanaway School, madrasat Hanaway al-rasmiyya
8. Qana Martyrs Institute, ma'had shuhada' qana
9. Salhab school, madrasat salhab
10. The Public School of the 'Ayn B'al emigrants, madrasat mughtaribi 'Ayn B'al al-rasmiyya'

The Abi Sleiman team found upon visiting each of the 10 schools that they appeared to operate normally in furtherance of their educational missions, apart from the Old Hanaway Lycée which had been closed and incorporated into the New Hanaway Lycée.

The Abi Sleiman team found – through methods consistent with official Lebanese land-surveying practices – that none of the land on which these schools had been built appears to be tied whatsoever to Mr. Tajideen and in any case all of the schools in the Hanouiyeh and Housh districts were established prior to 2012. The team found that the land was either owned by private persons or the Lebanese state.

Second, the Abi Sleiman team examined the plots owned by Mr. Tajideen in the Hanouiyeh district to assess whether and to what extent this land could be tied to the schools in that district (Mr. Tajideen does not own any real estate in the Housh district, as confirmed by the Abi Sleiman team). It found that Mr. Tajideen's land in the Hanouiyeh district was all acquired prior to 2001, apart from plot 1169 in Hanouiyeh, which Mr. Tajideen acquired from Abbas Wehbe Sa'egh in 2013. Mr. Tajideen was born in Hanouiyeh, and his family has lived in a small village there for several generations, which is the reason why he has acquired land there over the years.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 5

In no case did the Abi Sleiman team find that Mr. Tajideen's land in the Hanouiyeh district was used in connection with any of the schools identified there.

We are attaching, as **Exhibit D**, a copy of the Abi Sleiman report. We are also attaching, as **Exhibit E**, the land titles and maps of each of the identified schools, as well as **Exhibit F**, which provides the land title and contracts related to Mr. Tajideen's separate properties. The Abi Sleiman team obtained these records from the official land register and from Google maps, as described in its report. They demonstrate that the land owned by Mr. Tajideen in Hanouiyeh has no apparent connection with land on which the Hanouiyeh schools exist and operate (as noted above, the Abi Sleiman team found that Mr. Tajideen owned no land in Housh).

The findings of the Abi Sleiman team are corroborated by signed and stamped declarations, included as **Exhibit G**, from the Ministry of Interior and Municipalities, South Lebanon Region, Municipality of Hanaway. These records affirm that "Mr. Kassem Tajideen has no relation to any of the schools existing in the domain of the municipality." Comparable declarations from the Municipalities of Ayn B'al, Bazuriyya, and Northern Burj, included as **Exhibits H-J**, all affirm the same with respect to Housh and the neighboring municipalities.

If OFAC has additional information about schools that the Abi Sleiman team did not identify and/or coincide with property in the Hanouiyeh or Housh districts owned by Mr. Tajideen that were also not identified, then we urge OFAC to disclose this information so that we can assess its veracity (including through the use of experts in Lebanon who have familiarity with Lebanese land registries and comparable records). If OFAC does not have additional information connecting specific property owned by Mr. Tajideen with schools in Hanouiyeh or Housh – let alone specific information connecting his property to "front" schools in those districts – then OFAC should not rely on this allegation as evidence that Mr. Tajideen supports Hizballah or should be maintained as an SDGT despite his delisting efforts.

**2. The construction of a village in the Ahmadieh district of Hasbaya, Lebanon, to provide both a safe stopping point for Hizballah members and fighters, as well as a weapons depot in the event of renewed fighting between Hizballah and Israel, managed by Kassim Tajideen and his family in order to mask Hizballah's affiliation to the village**

OFAC alleged in its September 4, 2015 letter that Mr. Tajideen is involved with constructing and "manag{ing}" a village in the Ahmadieh district of Hasbaya.

In fact, Mr. Tajideen does not have any property in the Ahmadieh district of Hasbaya. However, his brother, Ali Tajideen, is known to be involved in real estate development there. A 2007 story

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 6

in the Lebanese newspaper An-Nahar Daily contained quotes from MP Walid Jumblatt in which he stated that "large tracts of land in the regions of Hasbayya and Marjeyoun had turned into military settlements" tied to Ali Tajideen, a "wealthy Shi'i{} close to {Hizballah}."

Notably, the record in this case includes a letter from MP Jumblatt (which was omitted from analysis contained in the OFAC Memo), a prominent anti-Hizballah political leader in Lebanon, in which he asserted that, based on his meetings with Mr. Tajideen and his independent inquiries, Mr. Tajideen's real estate activities were legitimate business endeavors that did not involve, benefit, nor serve the interests of Hizballah. (*See* **Exhibit K**). In that letter, MP Jumblatt also advocated for Mr. Tajideen's delisting, describing such action as a "welcome step" for Lebanon and for U.S. interests in that country and the region (*i.e.,* in support for Shi'a moderates like Mr. Tajideen whose commercial activities serve as a bulwark against Hizballah and other extremists).

In any case, MP Jumblatt's comments in 2007 concerned Ali Tajideen, and the record in this case contains extensive evidence requiring that OFAC distinguish between the activities of Ali Tajideen and that of Kassim Tajideen. Most notably, our October 25, 2013 letter to OFAC (which was also omitted from the analysis contained in the OFAC Memo) addressed the false conflation of these two men in Mr. Tajideen's delisting case.

Mr. Tajideen has been forthcoming with OFAC in this case about the fact that he and Ali have had some links in the past, including the fact that each brother served as a nominal shareholder of each other's companies. As the record shows, [redacted] found these links to have been "limited to matters of corporate formality," reflecting a common practice in Lebanon for family members to act as nominal shareholders and/or corporate officers even when they are not actively involved in company operations. Petition at 22-23. Although this practice applied to Ali and Kassim Tajideen in some of their companies, the record makes clear that "[redacted]uncovered no direct evidence of either brother playing any managerial or supervisory role in the other's business affairs." Id. at 23.[3]

As part of his delisting efforts, Mr. Tajideen's remediation addressed the issue of nominal links with his brothers. Specifically, he put into place internal controls to ensure a complete cessation of *any* business dealings – including arm's length commercial dealings – with any SDNs, including his brothers Ali and Husayn and their businesses. *See, e.g.*, Feb. 2015 Update, p. 4. As

---

[3] As we noted in the Petition, [redacted] did lack full visibility into the corporate records of Ali Tajideen's companies. Its visibility into Kassim Tajideen's corporate and personal affairs, however, was extensive and would likely have revealed any significant activity by Kassim Tajideen vis-à-vis Ali Tajideen's business. If OFAC has specific information that [redacted] did not have access to that connects Kassim Tajideen to the actual management or operations of Ali Tajideen's business, then we request the opportunity to review and address such information.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 7

part of his remediation, Mr. Tajideen also severed prior nominal ties with Ali, as evidenced by his formal divestiture from Tajco SARL in 2010. **Exhibit L**; *See* Petition, p. 26.

As to the allegation in the OFAC's September 4, 2015 letter relating to a weapons depot in a village in the Ahmadieh district of Hasbaya, we have sought and obtained declarations from the mayors of the villages in Hasbaya where Ali Tajideen and his company, Tajco SARL, have been active. **Exhibit M** provides a declaration from Ismail Harfush, head of the village of Bargaz, who states that Tajco SARL constructed buildings in Bargaz and that Kassim Tajideen "has nothing to do with this company or its activities." **Exhibit N** provides a comparable declaration from Camille Faris, stating that Tajco SARL constructed buildings in the al-Kotrani area, but that Kassim Tajideen "has no relation with this company and its activities."

### 3. Hizballah official Mustafa Badr Al-Din's 2011 comments regarding the impact of Kassim Tajideen's deportation and loss of his financial interests from Angola

Despite an extensive review of publicly available materials, we could not locate the source of OFAC's allegation that the now-deceased Mustafa Badr Al-Din corroborated Mr. Tajideen's support for Hizballah. However, we are aware of a January 2010 *NOW Lebanon* article in which a different man, Mustafa Badreddin, mayor of Nabatiyyeh and a member of the Amal group led by Speaker Nabih Berri and a political competitor of Hizballah, provided comments about the crash of an Ethiopian Airlines flight that claimed the lives of 90 people, including Mr. Tajideen's brother Hassan Tajideen. **Exhibit O** provides a copy of that article, which contained a quote from Ali Badran, a cousin of Hassan Tajideen, noting the latter's strong ties to Hizballah. It may be that this article – which contained a quote from someone who was not Mustafa Badr Al-Din about someone who was not Kassim Tajideen – is the source of OFAC's allegation; if so, it reflects apparent confusion about the facts and represents another instance of false conflation impeding Mr. Tajideen's delisting efforts.

Kassim Tajideen has confirmed to us that he has never met Mustafa Badr Al-Din, nor was he aware of this man prior to Badr Al-Din's indictment by the Special Tribunal of Lebanon for participating in the conspiracy to kill former Prime Minister Rafiq Hariri.

In any case, even if Mustafa Badr Al-Din did indicate in public comments that Kassim Tajideen is a supporter of Hizballah, there is extensive evidence on the record in this case that directly refutes this supposed statement – and it would be grossly unfair for OFAC to maintain its designation of Mr. Tajideen based on such hearsay in the face of overwhelming evidence to the contrary.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 8

### 4. Attempted recruitment to join Hizballah's military apparatus by two employees of Mr. Tajideen who are Hizballah members living in Hanaway, Lebanon

OFAC alleged in its September 4, 2015 letter that Mr. Tajideen employs two Hizballah recruiters from Hanaway. However, when asked about this allegation, Mr. Tajideen stated that he has no knowledge that any of his employees are members of Hizballah and reaffirmed the policy of his companies not to provide employment to such members. In furtherance of that policy and consistent with his delisting efforts, Mr. Tajideen provides below a list of all of his employees from Hanaway. If OFAC believes that any such employee is a member of Hizballah, Mr. Tajideen commits that he will promptly terminate that person's employment and report such action to OFAC.

Yusef Kirisht
Ibrahim Kirisht
Ali Kirisht
Hammud Haidar
Abdallah Murtada
Musa Haidar
Ahmad Saqsuq

## Part II

### OFAC's Memo Provides a Flawed Basis to Maintain its Designation of Mr. Tajideen as an SDGT

OFAC's Memo is replete with inaccurate statements and conclusions that fatally impair the analysis upon which OFAC relied to maintain its continued designation of Mr. Tajideen. Below, we identify those errors, section-by-section, to show the extent to which the OFAC Memo is flawed.[4]

### 1. OFAC Memo Section A, "Procedural Background"

Footnote 7 of the OFAC Memo refers to OFAC's communication to Mr. Tajideen that he may cease providing quarterly reports about his remedial actions following the quarterly report dated August 19, 2013. The OFAC Memo states that, in doing so, OFAC suggested that quarterly

---

[4] Some parts of the OFAC Memo are redacted, and our comments in Part II cannot cover these sections. However, if OFAC would like us to address any of the points made in redacted parts of the OFAC Memo, we would be glad to do so.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 9

reporting should resume if "there was material new information." However, we offered on several occasions to provide continued quarterly reports, but each time OFAC responded that it did not want to receive additional reports because OFAC had no further questions about Mr. Tajideen's remediation or the extent to which those measures addressed the types of sanctions risks relating to Mr. Tajideen's designation as an SDGT.

### 2. OFAC Memo Section B, "Tajideen's Assertions"

In this section, the OFAC Memo characterizes the December 2012 Petition for Removal [Ex. 30 of the OFAC Memo] ("Petition") as presenting only Mr. Tajideen's "assertions" for delisting. This characterization diminishes the factual record Mr. Tajideen established to support his delisting, as well as the level of transparency he provided to OFAC about his business and personal activities. The keystone of the Petition was the extensive forensic investigation conducted by [redacted] which included a comprehensive examination of Mr. Tajideen's business operations. In that investigation, [redacted] found that there was no direct evidence of terrorist financing by Mr. Tajideen or his businesses during the period of examination (2003-2011). To our knowledge, [redacted] forensic work in this case was unparalleled relative to investigations undertaken in other OFAC delisting cases. To characterize the Petition as only presenting "assertions" by Mr. Tajideen unfairly misstates the factual basis Mr. Tajideen established in this case to his delisting.

### 3. OFAC Memo Section C, "Tajideen has failed to demonstrate that the circumstances resulting in his designation no longer apply"

The OFAC Memo asserts that the record supplied by Mr. Tajideen actually undermines Mr. Tajideen's case for delisting and therefore justifies his continued designation as an SDGT. However, every conclusion contained in Section C of the OFAC Memo is tainted by inaccuracy and mischaracterization. Section C of the OFAC Memo is broken into four subsections.

#### *Subsection 1: Tajideen has continued to provide financial support to Hizballah subsequent to his designation*

Subsection 1 suggests that Mr. Tajideen has continued to provide financial support to Hizballah subsequent to his designation. Much of the analysis in this subsection is redacted; we assume the redacted analysis relates to the allegations contained in OFAC's September 4, 2015 letter, which are refuted in Part I of this response. Here, we address the three areas identified in the OFAC Memo as evidence that Mr. Tajideen has continued to provide support for Hizballah: his real estate transactions, his activities in Iraq, and a largely redacted section that appears to concern Mr. Tajideen's relationship to his brother's company, Tajco SARL.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 10

### a. Tajideen's real estate transactions

The OFAC Memo's non-redacted analysis of Mr. Tajideen's real estate transactions can be broken down into two apparent concerns: (i) Mr. Tajideen has misrepresented the extent to which his real estate companies are "dormant"; and (ii) Mr. Tajideen's activities with respect to his real estate companies actually "circumvent{s} OFAC sanctions" and permit him to provide "support to Hizballah" as part of "a pattern in which entities tied to Hizballah have been buying up militarily strategic pieces of property in largely Christian areas of southern Lebanon." As discussed below, the OFAC Memo is incorrect on both accounts and is unsupported by the record in this case.

### i. The Dun and Bradstreet reports

OFAC first expressed its concern over whether Mr. Tajideen's real estate companies are actually "dormant" in December 17, 2013. In our April 28, 2014 response [Ex. 64 of the OFAC Memo] ("Apr. 2014 Resp."), we provided the following explanation to address what OFAC described as "the discrepancies between the description of Kassim Tajideen's real estate companies as dormant ... and Dun and Bradstreet business information" indicating that they were active:

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 11

As stated in the 2012 Delisting Petition and the first quarterly report to OFAC, Mr. Tajideen's REC were "not operational" and "inactive." Indeed, these companies did not engage in any commercial activity until the first quarter of 2013, when they acquired some land.[14] We have pulled Dun and Bradstreet business information reporting and note that the companies status is listed as "active" (copies of those reports are provided in **Exhibit 8** to ensure that they are the same materials as those referenced in your December 17, 2103 letter). As you know, Dun and Bradstreet reporting is based primarily on public records, such as business and government registries, media reports, and Internet sources. In some cases, Dun and Bradstreet will use on-location correspondents and obtain information directly from the subject of its reports. In this case, we believe that the "active" designation reflects only the fact that the companies at issue are currently registered with the relevant Lebanese authorities and remain in good standing at this time. Indeed, we have contacted Dun and Bradstreet and confirmed that the term "active" is meant to indicate that the company has not shut down or dissolved. From that standpoint, Mr. Tajideen's REC are "active," although they have not yet engaged in any significant commercial activity. However, as stated above, under the right market or financial condition, Mr. Tajideen remains open to the prospect of developing the land for ordinary commercial purposes or selling the land to a bona fide purchaser. Of course, in doing so Mr. Tajideen would fully comply with the internal compliance controls now in place, including screening the possible transactional parties against the SDN List and performing enhanced due diligence, as appropriate.

---

[14] The plot of land owned by the Egyptian Embassy (Mosseitbeh Plot # 4653) neighbors a plot of land held by Al Massar (Mosseitbeh Plot #4654).

[15] *See* Quarterly Report in Support of Delisting Petition of Kassim Tajideen (May 6, 2013), p. 5.

There is no discussion in the OFAC Memo of this response. Instead, the OFAC Memo simply echoes the concern first raised in OFAC's December 17, 2013 letter that the Dun and Bradstreet reports show the companies as operational.

The OFAC Memo misapprehends the record in this case. As explained in the Petition, the real estate companies were not operational insofar as they had no revenues or employees and were not actively involved in development projects on the real estate they owned. As excerpted above from the December 17, 2013 letter, the Dun and Bradstreet reports do not contradict this explanation – they simply reflect the fact that the companies are registered and remain in good standing with the relevant Lebanese authorities.

The OFAC Memo seems to suggest that Mr. Tajideen has tried to obfuscate or provide misleading information about his real estate companies. In fact, Mr. Tajideen has been transparent with OFAC about their operations, as evidenced by the multiple reports of such activities in submissions made to OFAC following the Petition (which are ignored in the OFAC Memo). In the May 6, 2013 quarterly report [Ex. 51 of the OFAC Memo] ("Q1 Report"), we noted that while the December 7, 2012 petition had indicated that the real estate companies were

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 12

largely dormant, "Mr. Tajideen wishes to report that during the January-March 2013 period, these companies had some initial activity that included an acquisition of new land." Q1 Report, p. 5. Then, in the February 26, 2015 letter updating OFAC on developments in the case [Ex. 75 of the OFAC Memo] ("Feb. 2015 Update"), we noted that the basic infrastructure improvements undertaken on Mr. Tajideen's real estate in the Chouf region of Lebanon were carried out simply to comply with applicable licensing and regulatory requirements (*e.g.*, land clearing and electrification).

The OFAC Memo's characterization of the real estate companies not only misreads the record on this issue, but ignores the fact that Mr. Tajideen has repeatedly gone out of his way during this case to provide transparency about their operations.

Accordingly, the first half of the analysis in OFAC's Memo in Section C(1)(a) does not support OFAC's continued designation of Mr. Tajideen as an SDGT.

### ii. The "pattern"

In the second half of the analysis in Section C(1)(a), the OFAC Memo concludes that Mr. Tajideen's real estate activities actually "circumvent" OFAC sanctions and "fit a pattern" of political activity by Hizballah. This conclusion is similarly misplaced and ignores extensive record evidence provided by Mr. Tajideen to the contrary, as summarized below:

- The Petition described redacted review of Mr. Tajideen's real estate transactions in the context of the December 2011 story published in *The New York Times* describing Hizballah activity in the Chouf region of Lebanon. As noted in the Petition, redacted review "did not uncover any direct evidence of payments and/or financial support to Hizballah"; "redacted investigation found no direct evidence linking Mr. Tajideen's purchase of these real estate companies to a larger Hizballah land grab"; and redacted "found no direct evidence that these payments were directed toward or used for terrorist financing, including and especially in support of Hizballah," Petition, p. 29.

  These important findings by redacted are not meaningfully addressed or rebutted by the OFAC Memo.

- In the August 19, 2013 quarterly report [Ex. 62 of the OFAC Memo] ("Q2 Report"), we addressed questions that OFAC raised in our May 6, 2013 meeting concerning the Lebanese real estate. We reiterated that redacted "specifically reviewed the transactions by which Mr. Tajideen acquired these holdings" and that "redacted did not uncover any direct evidence of payments and/or financial support to Hizballah," Q2 Report, pp. 7-8. We

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 13

explained that in the case of the real estate, as in all other business matters, Mr. Tajideen's motives are commercial, not political, and that he intended to develop the land for normal residential and/or commercial use. We also informed OFAC that if a bona fide buyer would offer to purchase the land for fair market value, then Mr. Tajideen would consider selling the property. We also reaffirmed Mr. Tajideen's commitment to "full transparency" with OFAC in the context of the Lebanese real estate. Id.

This response to OFAC's questions was also not meaningfully addressed or rebutted by the OFAC Memo.

- In the Q2 Report, we also provided a letter from Ishac Diwan, Director for Africa and the Middle East, Center for International Development, at the Harvard School of Government. Professor Diwan described his family's personal experience with Mr. Tajideen, in which Mr. Tajideen helped the Diwan family enforce its property rights in southern Lebanon which came under threat in the 1980s. The letter characterized Mr. Tajideen as "a man of honor, justice, and courage" who helped the Jewish Lebanese community in a manner that is at odds with Hizballah political strategy in southern Lebanon. Q2 Report, Appendix H.

The Diwan letter was not meaningfully addressed or rebutted by the OFAC Memo.

- In the Apr. 2014 Resp., Mr. Tajideen provided full transparency into his real estate companies, including the identity and roles of the parties to the transactions by which he acquired the companies; the means by which he financed his acquisition of the companies; the location, prior and intended use, and plans for the disposition of lands; and confirmation that neither the parties with whom Mr. Tajideen dealt in connection with the real estate companies nor the parties owning neighboring plots to his were sanctioned parties. That information further supports the position that Mr. Tajideen's real estate activities were not in furtherance of Hizballah political objectives.

Regrettably, the OFAC Memo has mischaracterized this information and used it against Mr. Tajideen by concluding that his real estate transactions were undertaken "to circumvent OFAC sanctions." However, we have explained that the complexity of Mr. Tajideen's real estate transactions (the acquisition of multiple real estate companies to own the land in the Chouf region; the use of third parties and "set-offs" to make payments to sellers; the supplementation of written agreements and records with information communications) was a necessity due to Mr. Tajideen's designation and was based on his intent to scale back his activities in Africa and redirect his financial

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 14

resources to Lebanon, where he would be less vulnerable to possible Angolan exploitation of his situation and better able to reduce sanctions risks.

- The Apr. 2014 Resp. also explained that Mr. Tajideen's real estate acquisition in Beirut was from the Hariri family ("In summary, in October 2010, Mr. Tajideen acquired five plots in Beirut ... We understand from Mr. Tajideen that {representative agents with whom he contracted} were acting on behalf of the Hariri family, which effectively owned the company and controlled the land." (emphasis added)). The OFAC Memo relies in part on the accusation that "the land purchase from the Hariri family is consistent with open source information that Hizballah is buying up large tracts of land owned by Christians and other non-Shi'as in southern Lebanon as the militant group rebuilds its defenses in preparation for a new war with Israel ..."

On this point, the OFAC Memo misconstrues the record in two important ways.

First, the source that the OFAC Memo cites, *The Sunday Telegraph* [Ex. 69 of the OFAC Memo], refers to "a mixed area of Christians, Shias and Druze Muslims" as the target of Hizballah's real estate acquisition. The Hariri family is Sunni, but the OFAC Memo ignores the fact that its own cited source is silent about Sunni land -- and simply lumps Sunnis in with Christians and Druze ("other non-Shi'as") referenced in *The Sunday Telegraph* article.

Second, and more problematic, OFAC has misapplied the information in the news accounts to the facts of this case. Both *The Sunday Telegraph* and *The New York Times* stories cited in the OFAC Memo concern real estate transactions in southern Lebanon. By contrast, Mr. Tajideen's acquisition from the Hariri family was not in southern Lebanon – it was in Beirut. *See* Apr. 2014 Resp, p. 12.

These types of errors evidence a troubling indifference to the actual facts of this case.

The OFAC Memo on this point also reflects an ongoing false conflation of Mr. Tajideen with his brothers. *The Sunday Telegraph* story cited in this section (and erroneously relied on by the OFAC Memo to support its conclusion that Mr. Tajideen's real estate transactions fit within a "pattern" of activity supporting Hizballah) discusses Ali Tajideen – not Kassim Tajideen. In our October 25, 2013 letter to OFAC, and elsewhere, we addressed this problem of false conflation and requested that OFAC properly analyze Mr. Tajideen's delisting case separate from other concerns that may exist about his brothers, Ali and Husayn Tajideen. Clearly, the OFAC Memo has not done so here – and has failed to take into account the facts on the record distinguishing Mr. Tajideen from his brothers.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 15

Inexplicably, the OFAC Memo does not even make mention of our October 25, 2013 letter and the false conflation issue. As we explained, considerable misinformation about Kassim Tajideen exists in the public domain, including statements made in Matthew Levitt's 2013 book *Hezbollah: The Global Footprint of Lebanon's Party of God*. In our October 25, 2013 letter, we examined and corrected, point-by-point, the public reports that incorrectly conflated Mr. Tajideen's activities with those of his family members. As we noted then, it is both incorrect and unfair to ascribe to Mr. Tajideen whatever risks of terrorist financing or support of Hizballah Mr. Tajideen's brothers present. In doing so, we also made clear that Mr. Tajideen's current activities do not involve those of his brothers and that he has taken definitive action to ensure that there is no such involvement on a going forward basis. *See, e.g.*, Apr. 2014 Resp., p. 6 (describing Mr. Tajideen's divestiture from Ali's company Tajco SARL; his cessation of a lease of office space from a building owned by Tajco SARL; and his termination of commercial dealings in Africa with companies owned by his brother that have been designated as SDGTs); Feb. 2015 Update, p. 4 (describing Mr. Tajideen's extreme risk aversion to any dealings whatsoever involving his brothers, including not only in his financial and commercial dealings with his brothers but also in his social affairs).

Accordingly, the second half of the analysis of the OFAC Memo in Section C(1)(a) does not support OFAC's continued designation of Mr. Tajideen as an SDGT.

### b. Activities in Iraq (and possible additional subsection(c))

The OFAC Memo is heavily redacted when it comes to analyzing Mr. Tajideen's business in Iraq. As disclosed to OFAC during this case, he had established a presence there in pursuit of several commercial opportunities that never materialized, and the companies he formed there are now dormant. Currently, Mr. Tajideen is not engaged in any activities in Iraq.

In a non-redacted paragraph that may be included in the "Activities in Iraq" subsection (b) or may be part of a new subsection (c), the OFAC Memo misreads the record in this case concerning Mr. Tajideen's relationship to his brother's company, Tajco SARL. OFAC Memo, p. 8. The OFAC Memo states that "even though" Mr. Tajideen divested himself from Tajco SARL in 2010, "[redacted] identified that Tajideen is listed as a shareholder in Tajco SARL." In fact, Mr. Tajideen divested from Tajco SARL in 2010, which [redacted] verified in its forensic investigation. As the Petition states on p. 23, "Mr. Tajideen held a 20 percent stake in Tajco SARL from its incorporation until he divested from it in August 2010." Thus, the OFAC Memo incorrectly suggests that Mr. Tajideen's representation concerning his divestment from Tajco SARL is undermined by [redacted] findings. Similarly, the OFAC Memo incorrectly states that [redacted] reliance on Tajideen's self-serving statements {do not} provide independent and unbiased

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 16

evidence that Tajideen has divested of Tajco SARL." As the Petition explains on p. 26, redacted confirmed Mr. Tajideen's divestment through his "*demonstration*" of formal divestiture. *See* **Exhibit L** for a copy of the documentation relied upon by redacted to re-confirm Mr. Tajideen's formal divestment from Tajco SARL.

Accordingly, the OFAC Memo's analysis in Section C(1)(b) does not support OFAC's continued designation of Mr. Tajideen as an SDGT.

### *Subsection 2: Tajideen's consolidation of his businesses still permit the provision of financial support to Hizballah*

In Subsection 2 of Section C, the OFAC Memo generally concludes that Mr. Tajideen's remediation in this case is inadequate. However, as explained below, this conclusion is not supported by the record in this case and is at odds with OFAC's own guidance to companies seeking to comply with its sanctions regulations.

#### a. Tajideen's Reduction and Consolidation of Companies

##### i.  The risk of Hizballah financing

The OFAC Memo finds that Mr. Tajideen has failed to identify how the reduction and consolidation of his businesses "would fully address" the risk of Hizballah financing. At the same time, it also states that Mr. Tajideen "does indicate that the reorganized companies will implement redacted controls to address OFAC's concerns." The OFAC Memo thus misapprehends the relationship between redacted recommended controls and Mr. Tajideen's remedial action: through his remediation, which included the reduction and consolidation of businesses, Mr. Tajideen adopted redacted recommended controls to mitigate the risks that redacted had identified in its forensic investigation.

By way of background, we explained in the Petition that redacted found no direct evidence of payments and/or financial support to Hizballah. However, in the course of its investigation, redacted identified certain deficiencies in the financial management of Mr. Tajideen's businesses and provided recommendations to address those gaps. redacted recommendations reflect its vast experience advising global companies on sanctions, anti-money laundering (AML), and related areas of compliance in the context of strengthening their financial controls.

The Petition summarizes redacted recommendations in Appendix A, p. 14, and they are further enumerated in Appendix C. redacted provided these recommendations because "if implemented effectively, {they} would address" identified weaknesses in the financial controls that in redacted

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 17

expert opinion represented areas of risk. redacted also found that the implementation of its recommendations "would signal to U.S. and foreign government officials that Tajideen is willing and able to operate his affairs without any risk of involvement by or with Hizballah or other OFAC-sanctioned entities." Petition, Appendix A, pp. 14-15.

redacted specific recommendations fell into four broad categories: financial management, cash management, governance, and counterparty due diligence. To implement these remedial measures effectively, Mr. Tajideen decided to reduce and consolidate his businesses, which at times numbered 26 different corporate entities with vastly different governance structures and control procedures. P redacted iewed the reduction in the total number of corporate bank accounts, for example, as an important step toward improving Mr. Tajideen's transparency and effective control over his business operations.

The reduction and consolidation of Mr. Tajideen's businesses also addressed the risk of Hizballah financing in other ways. By scaling back his operations in Angola, where the cash-heavy import and distribution business presented a heightened risk, Mr. Tajideen was able to minimize the risk exposure that redacted had identified in its forensic investigation. Notably, this was accomplished in significant part by selling off capital assets in Angola and reinvesting the proceeds in Lebanese real estate. By consolidating his assets in this manner, Mr. Tajideen could better limit and control expenditures; limit the number and use of corporate bank accounts; limit exposure to risk of improper use of cash and other corporate assets; and provide greater transparency to OFAC about business operations. All of these steps were in line with redacted recommendations to address previous weaknesses and to mitigate sanctions risks applicable to Mr. Tajideen's businesses.

In taking such action, Mr. Tajideen committed to make quarterly reports to OFAC concerning his progress in implementing redacted recommendations. This was intended to "provide OFAC the opportunity to maintain full visibility into {the remediation} process on an ongoing basis." Petition, p. 25. Mr. Tajideen's quarterly reports clearly demonstrated how effectively he implemented redacted recommendations. As noted above, after two sets of quarterly reports, OFAC advised us that further reporting would not be necessary – and it never requested that such reporting be resumed after August 2013.

As discussed with OFAC at the time, Mr. Tajideen's remediation and reporting to OFAC was an extraordinary undertaking. It not only provided OFAC with full transparency into Mr. Tajideen's business activities, but transformed the manner in which those businesses operated. In that sense, this case should be viewed as a "success story" for OFAC because regardless of whether it correctly designated Mr. Tajideen as an SDGT, his engagement with OFAC in this

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 18

delisting case led to his adoption of redacted recommendations for remediation, which fully
addressed the sanctions risks giving rise to his designation.

Thus, the record in this case shows that Mr. Tajideen has effectively implemented redacted
recommendations to address the risk that his companies could be used to finance Hizballah – and
as noted above, OFAC has not requested that Mr. Tajideen adopt additional remediation despite
his longstanding commitment to take further remedial action if OFAC believed it was necessary.
Because the controls recommended by redacted and adopted by Mr. Tajideen were based on redacted
extensive experience in helping companies throughout the Middle East deal with sanctions risks
and requirements (and are similar to what OFAC itself has proposed for meeting compliance
obligations), Mr. Tajideen reasonably believed that his remedial efforts were consistent with
OFAC's expectations. Yet, despite these facts, the OFAC Memo simply concludes that Mr.
Tajideen failed to show how his remediation would address the risk of Hizballah financing and
was inadequate for delisting. This conclusion cannot be supported by the record.

### ii. "Shell" companies

The OFAC Memo reflects concern about what it refers to as Mr. Tajideen's "shell companies."
Specifically, the memo states that several corporate entities owned and controlled by Mr.
Tajideen could not be identified on UAE and Angola corporate registries, concluding that their
existence "actually intensifies the risk that Tajideen will continue to participate in the activities
for which he was originally designated." This conclusion is misplaced because, among other
reasons, the companies at issue are all properly registered with the relevant authorities. *See*
**Exhibits P-S**.

The OFAC Memo also expresses concern about what it characterizes as an admission by Mr.
Tajideen that the creation of non-Angolan entities will limit the Angolan government's oversight
of his business. However, this concern ignores information on the record as to why Mr. Tajideen
sought to limit his exposure in Angola: "Mr. Tajideen has encountered political pressure in
Angola resulting from his SDGT designation, and he has already been forced to sell certain
Angolan assets by that government without receiving fair compensation." Petition, p. 27. Thus,
the OFAC Memo distorts the record on this point by drawing a false conclusion about Mr.
Tajideen's effort to limit Angolan government involvement in his businesses there. Indeed, as
the record shows, Mr. Tajideen's action was not based on an intent to avoid Angolan government
scrutiny of his business; rather, it was done to limit possible expropriation of his property.

The OFAC Memo's slanted review of the record is further evidenced by its analysis of the forced
sale of Mr. Tajideen's Angolan assets to Nova Distribuidora Alimenter e Diversos ("NDAD").
According to the memo, Mr. Tajideen's statement that "he does not retain any ownership or

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 19

control over NDAD, nor the assets that he conveyed to NDAD" is untrue because
"{r}epresentatives from Tajideen are the ones that answered an inquiry on NDAD's connection
to Tajideen made by the Political-Economic Officer at the U.S. Embassy in Angola to Adelia
Bandeira of NDAD." OFAC Memo, pp. 10-11. This finding not only is incorrect, but it turns
Mr. Tajideen's good faith effort to provide transparency to OFAC in this case on its head.

As the record shows, the response by Mr. Tajideen's representative *followed* the Political-
Economic Officer's meeting with NDAD and was sent "after learning about NDAD's meeting
with the US Embassy." This was done "to further demonstrate Mr. Tajideen's ongoing
commitment to maintain transparency and accountability with the U.S. Government." Thus, the
record is clear that Mr. Tajideen's representatives did not attempt to answer an inquiry made to
NDAD; instead, they provided additional context to the U.S. Embassy *following* its meeting with
NDAD. The letter, which we included as Ex. 10 in the Apr. 2014 Resp., clearly makes this point:

12 June 2013

Thomas Hastings
Political-Economic Counselor
Embassy of the United States
Rua Houari Boumedienne, 32
Miramar
Luanda

Dear Mr. Hastings:

On behalf of my employer, Mr. Kassim Tajideen, I write to provide some background
information to you related to Mr. Tajideen's sale of certain assets to Nova Distribuidora
Alimentar Limitada ("NDAD"). I understand from Adelia Bandeira at NDAD that you and your
colleagues met with her on 22 May 2013 to learn more about that transaction. Consistent with
our respect for the United States and its foreign policy objectives and with Mr. Tajideen's
commitment to transparency about his business operations, we wish to assist your inquiry with
further details about the sale.

Once again, the OFAC Memo misconstrues the facts in this case and draws an adverse
conclusion from its misreading of the record.

Accordingly, the analysis in OFAC's Memo in Section C(2)(a) does not support OFAC's
continued designation of Mr. Tajideen as an SDGT.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 20

### b. Tajideen Companies' Operations and Compliance Controls[5]

### i. GAAP and the compliance "guarantee"

As the record in this case shows, Mr. Tajideen retained <span>redacted</span> to conduct an extensive forensic investigation of his businesses and implemented <span>redacted</span> recommendations for remediation so as to address sanctions risks relating to his designation. We know of no other delisting case where a petitioner has done as much as Mr. Tajideen to engage leading forensic experts to investigate the designation and to validate grounds for removal as an SDGT. Yet, the OFAC Memo downplays the importance of these efforts and concludes that the financial and compliance controls that Mr. Tajideen instituted on <span>redacted</span> recommendation are insufficient because they "do not guarantee compliance." OFAC Memo, p. 11.

Obviously, the standard that the OFAC Memo applies in this case ("guarantee compliance") is an impossible one to meet and is at odds with OFAC's own statements about expected standards of conduct.

For example, at its September 22, 2015 Fall Symposium, OFAC acknowledged that companies trying to comply with its sanctions regulations may not always succeed. This echoed remarks by Acting Under Secretary for Terrorism and Financial Intelligence Adam Szubin in March 2015 at the ACAMS Anti-Money Laundering and Financial Crime Conference:

> First, I want to make clear that we do not expect perfection from the private sector. We understand that financial institutions are not infallible, and that it is not possible or practical for them to prevent every single potentially illicit transaction flowing through them.

What OFAC has always expected from the private sector is a sober examination of sanctions risks, followed by the design, implementation, and testing of a compliance program that is reasonably calibrated to address such risks. As the record in this case amply shows, Mr. Tajideen has done just that. For example, the remedial measures that Mr. Tajideen implemented were designed and tested by <span>redacted</span> based on (i) its unique expertise advising global companies on sanctions and anti-money laundering compliance; and (ii) its thorough assessment of the risks

---

[5] The OFAC Memo contains two subsection 3s (apparently in error). On page 13, subsection 3 is titled "Tajideen's controls and quarterly reports," which is similar to the part of this part titled "Tajideen companies' operations and compliance controls." A second subsection 3, on page 15, is titled "Tajideen has not demonstrated that his original designation was in error." Because the subsection 3 beginning on page 13 is essentially the same as this part beginning on page 11 and examines mostly the same aspects of this case, we are addressing them collectively here.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 21

that Mr. Tajideen's companies had evidenced during the 2003-2011 period of its review in the areas of corporate governance, financial management, cash management, and compliance.

The OFAC Memo dismisses these efforts as merely "standard accounting rules, regulations, and procedures used by companies in maintaining their financial records as outlined in the Generally Accepted Accounting Principles (GAAP)," OFAC Memo, p. 11. However, this characterization ignores how much these "standard accounting rules, regulations, and procedures" target and mitigate the specific risks that [redacted] identified in its forensic investigation. For example, [redacted] found that Mr. Tajideen's companies in Africa, which dealt in the importation, warehousing, and distribution of foodstuffs and other consumer goods, were heavily reliant on cash transactions. [redacted] recommendations addressed this risk by establishing limits on authority to use corporate bank accounts; limiting access to corporate cash including by documenting collections and deposits; and reconciling bank and petty cash accounts to the company general ledgers. *See* Petition, Appendix C. These steps are not simply "standard" bookkeeping measures, but significantly reduce "the risk of improper conduct by third parties" – a concern that [redacted] addressed with remediation so as to mitigate possible terrorist financing.

Cash management measures are just one example of the financial and compliance controls that Mr. Tajideen put in place at his companies to address the areas of sanctions risks that [redacted] identified. Other key measures include counterparty screening against OFAC's SDN list. The OFAC Memo makes no mention of these controls, just as it ignores the enhanced due diligence and sanctions-based risk management efforts that Mr. Tajideen implemented in response to [redacted] recommendations. *See, e.g.*, Q2 Report, pp. 21-22; February 2015 Update, p. 2. These are further examples of glaring omissions in the OFAC Memo's analysis of Mr. Tajideen's remediation.

### ii.   The reduction and consolidation of Mr. Tajideen's operations

As noted, the OFAC Memo is likewise dismissive of the reduction and consolidation of Mr. Tajideen's import/export business because it was followed by the creation of "shell or offshore companies established in the UAE." OFAC Memo, p. 12. We discussed above the various ways in which the OFAC Memo broadly misreads the record on this point. More specifically, the OFAC Memo is incorrect when it refers to "shell or offshore companies" like the UAE-based entity, International Cross Trade Company Ltd. ("ICTC"). **Exhibit T.** Contrary to this characterization, there is no indication that ICTC or any "shell or offshore" company owned or controlled by Mr. Tajideen "provid{es} financial support to Hizballah." Indeed, there is evidence on the record that Mr. Tajideen's companies, including ICTC, have implemented compliance controls to prevent such financial support from ever occurring. In one important example, we provided quarterly reports demonstrating that ICTC not only has 37 suppliers

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 22

(evidencing its commercial activity, as opposed to its existence as a "shell" company), but also that it screened those suppliers against OFAC's SDN list. Q2 Report, pp. 21-22, Appendix N.

The OFAC Memo also suggests that Mr. Tajideen is seeking to conceal or disassociate himself from these companies. In fact, the opposite is true in this case. Mr. Tajideen voluntarily disclosed their existence and operations to OFAC as part of his delisting efforts. If he had wished "to provide{} financial support to Hizballah without being connected directly to the businesses, transactions or accounts involved," as the OFAC Memo suggests, then he would not have spent the past five years going out of his way to provide extensive information and reports to OFAC about the activities of these companies.

### iii.   [redacted] forensic investigation

The OFAC Memo observes that [redacted] forensic investigation "raises a variety of issues, including concerns that indicate inadequate and non-transparent corporate governance structures; a lack of policies; procedures and internal controls surrounding critical finance, accounting, and cash management processes; and an apparent willingness to disregard certain commonly accepted working practices." OFAC Memo, p. 12. This observation misapprehends the findings made by [redacted] and reflects further flaws in the OFAC Memo's analysis.

Contrary to the OFAC Memo's suggestion, the "issues" that [redacted] forensic investigation raised were not weaknesses that impeded or undermined [redacted] recommendations; instead, they were the identified focal points for Mr. Tajideen's subsequent remedial efforts to mitigate possible sanctions risks. *See* Petition, p. 23. The record demonstrates that *following* the [redacted] forensic investigation, Mr. Tajideen developed, implemented, and tested comprehensive remedial controls to address the risk of terrorist financing at his companies. These included (but were not limited to) controls to address the specific concerns that OFAC identified in the OFAC Memo: the use of nominal shareholders and Mr. Tajideen's use of corporate funds.

As noted, Mr. Tajideen's remedial controls included the testing of corrective actions put into place. On this point, the OFAC Memo raises a concern about [redacted] finding in the first quarterly report of "certain instances in which withdrawals occurred outside of established procedures." OFAC Memo, p. 14. However, the OFAC Memo's reference to this issue misses the intent of such testing and the extent to which Mr. Tajideen sought to be transparent with OFAC about his remediation. The reason for such testing is to track the efficacy of internal controls and to ensure that their implementation improves over time. This is not a weakness of Mr. Tajideen's remedial efforts – it is a strength. Indeed, as the OFAC Memo later acknowledges, the second quarterly report demonstrated continued progress on this type of internal control and in other areas of compliance. OFAC Memo, p. 14.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 23

The OFAC Memo also makes a critical analytical error on page 13, where in a section on Mr. Tajideen's controls and quarterly reports it observes that [redacted]investigation was limited by certain factors such as the unavailability of electronic financial records at all of Mr. Tajideen's companies. Here, the OFAC Memo once again confuses the gaps identified by [redacted]in its forensic investigation (which focused on the 2003-2011 time period) with the remedial improvements that Mr. Tajideen subsequently put into place at his companies *based on* [redacted] *findings and recommendations*. These improvements include the maintenance of electronic financial records that the OFAC Memo referenced as a prior weakness. There was no finding by [redacted]that Mr. Tajideen's companies lacked adequate records after his implementation of the recommended controls.

Nevertheless, despite Mr. Tajideen's successful implementation of these measures, the OFAC Memo dismisses them as inadequate because they are unable to "guarantee compliance" – a standard that OFAC elsewhere has acknowledged no company can ever meet. Fundamentally, this delisting case is about Mr. Tajideen's demonstration that whatever occurred in the past, he and his companies do not present an ongoing threat of terrorist financing or support of Hizballah due to the extensive remediation he put into place in connection with his delisting efforts. *See* Petition, pp. 8-12 (discussing the limits of IEEPA and Executive Order 13224 to impose sanctions against those posing a *present* threat to the United States and the OFAC regulations that contemplate remediation as a path off the SDN list). The OFAC Memo grossly distorts the record concerning the relationship between [redacted]forensic investigation and Mr. Tajideen's adoption of its recommendations and uses an impossible standard to discount Mr. Tajideen's extensive efforts to mitigate the risks relating to his designation. These errors place Mr. Tajideen in an untenable situation where delisting can never be achieved.

#### iv.  Sicam and Tanit

The quarterly reports and additional updates that Mr. Tajideen has provided to OFAC in this case were "intended not only to substantiate the progress that Mr. Tajideen {had} made in implementing [redacted] recommendations, but also to bring to OFAC's attention relevant factual developments. The latter purpose reflect{ing} Mr. Tajideen's ongoing commitment to transparency in this matter." Q1 Report, p. 5. In the first quarterly report, Mr. Tajideen explained that he had wound down the operations of FozKudia Industrial, LDA in Angola and transferred its operational activity to Sicam Limited, LDA and Tanit Plastics Limited, LDA. Id. He emphasized that these new companies would "have the same remedial measures as those implemented at other operational companies" and this transfer "would not result in diminished financial and compliance controls." Id. Indeed, the quarterly reports provided ongoing visibility

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 24

to OFAC into the improved controls at these companies – not to obfuscate Mr. Tajideen's
commercial activities.

Nevertheless, the OFAC Memo found that because Mr. Tajideen himself is not listed in the
business documentation of Tanit and because OFAC could not find Sicam in the local Angolan
business registry, these companies "provide{} excellent cover for illicit financial activity."
OFAC Memo, p. 14. While it is true that Mr. Tajideen is not himself listed in the Dun &
Bradstreet reports in connection with these companies, his use of local Angolan agents is neither
unusual, nor evidence of any wrongdoing. (*See* **Exhibit U** and **Exhibit V**). The record in this
case contains extensive discussion of the difficulties that Mr. Tajideen has faced in Angola,
including being forced to sell some of his Angolan assets by the Angolan government under
duress (due to his SDGT designation). *E.g.*, Petition, p. 27. Indeed, as reported to OFAC, the
transfer of operational activities from FozKudia to Sicam and Tanit was the result of banking
pressures that Mr. Tajideen faced in Angola. Q1 Report, p. 5. While the OFAC Memo appears
to take Mr. Tajideen's efforts to respond to such pressures as evidence of "evading" his
designation, in fact Mr. Tajideen has done everything in his power to ensure that his continued
operations comply with applicable sanctions requirements, including the implementation of
remedial measures at Sicam and Tanit. The use of local agents in Angola in connection with the
establishment of Sicam and Tanit was necessary for Mr. Tajideen to avoid losing everything he
had built in that country over several decades.

The OFAC Memo also fails to recognize that Mr. Tajideen's activities in Angola have been
extensively reported to OFAC throughout his delisting case. This includes, notably, Mr.
Tajideen's efforts to ensure that OFAC was aware of the U.S. Embassy communications with
NDAD in Luanda concerning his sale of certain assets to NDAD, as well as Mr. Tajideen's
disclosures to OFAC in the quarterly reports about the creation of Sicam and Tanit. The OFAC
Memo accuses Mr. Tajideen of seeking "to continue his financial support of Hizballah without
directing attention to himself, {Sicam and Tanit} or his activity by government or banking
regulators." OFAC Memo, p. 14. This statement completely ignores the fact that Mr. Tajideen
*informed OFAC of the creation of Sicam and Tanit in the first place*. Q1 Report, p. 5. Rather
than credit Mr. Tajideen for his transparency to OFAC – not just in the context of Angola but
throughout this case – the OFAC Memo distorts the record by stating that his actions are
attempts to use companies like Sicam and Tanit to divert "attention to himself." Obviously, he
would not have engaged with OFAC and provided this level of transparency in this case over the
past five years, if such diversion were his intent.

Accordingly, the analysis in OFAC's Memo in Section C(2)(b) does not support OFAC's
continued designation of Mr. Tajideen as an SDGT.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 25

*Subsection 3: Tajideen has not demonstrated that his original designation was in error*

In this subsection, the OFAC Memo fundamentally rejects Mr. Tajideen's demonstration that he is not and has never been a supporter of Hizballah. In Part III of this submission, we address Mr. Tajideen's ongoing commitment to take any action that OFAC requests to confirm that he does not support Hizballah. Here, we address several of the criticisms that the OFAC Memo makes about Mr. Tajideen's delisting efforts.

### a. Mr. Tajideen's evidence

The OFAC Memo states that Mr. Tajideen "fails to provide any evidence such as personal electronic mail messages or other communications, personal financial records or receipts, or any other relevant personal information or data by which his assertions may be verified," OFAC Memo, p. 15. This conclusion grossly ignores the record in this case. In fact, Mr. Tajideen has provided OFAC with hundreds of pages of evidence supporting his delisting, which included:

- The Executive Summary from redacted report of its forensic investigation, which distilled redacted analysis of approximately 3.9 million transactions (by 21 companies) that were subjected to advanced forensic analysis by more than 30 redacted ssociates, partners, and others working in Washington and Beirut over nearly a year;

- Letters of support for Mr. Tajideen, including by third parties who have corroborated Mr. Tajideen's denial of the allegations OFAC has made against him (*See, e.g.*, letter from Ishac Diwan of the Harvard Kennedy School, Q2 Report, Ex. H);

- Documents providing transparency into Mr. Tajideen's sale of certain assets to NDAD in Angola, including copies of the NDAD sales agreements;

- Contracts and plot descriptions concerning Mr. Tajideen's real estate in Beirut;

- Contracts and plot descriptions concerning Mr. Tajideen's real estate in the Chouf region of Lebanon;

- The loan agreement between the Lebanese Canadian Bank ("LCB") and two companies, Delhamyeh Development Company and Delhamyeh Country Club, that Mr. Tajideen acquired in connection with his acquisition of real estate in the Chouf region of Lebanon, as well as a copy of the relevant LCB Statement of Account;

- Corporate records including transfers of ownership and registration;

- Maps of real estate owned by Mr. Tajideen; and

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 26

- Examples of the remedial measures implemented at Mr. Tajideen's companies, including evidence of the due diligence and other compliance controls that Mr. Tajideen and his companies designed, implemented, and tested (with continued involvement by `redacted` to comprehensively address the apparent risks that `redacted` dentified during its forensic investigation (including, but not limited to, copies of screening logs for every one of Mr. Tajideen's companies that had engaged in commercial or financial dealings in the six months preceding the Apr. 2014 Resp., which had been provided to and corroborated by `redacted`

If OFAC has questions or concerns about such evidence, then Mr. Tajideen remains eager to address them and to provide whatever additional documentation OFAC deems is necessary to further establish that he has not supported, and does not support, Hizballah. In any event, the outcome in this case cannot properly rely on the OFAC Memo's conclusion that he has failed to provide evidence supporting his delisting: that finding is unfair and grossly misreads the record in this case.

### b. The `redacted` report

The OFAC Memo focuses on the stated limitations of the `redacted` orensic investigation and finds them to be dispositive in rejecting Mr. Tajideen's delisting efforts. OFAC Memo, p. 16. For example, the memo states that "… `redacted` was unable to analyze financial records for all of Tajideen's 'Controlled Companies'" and that "`redacted` could not completely rule out the allegations made by OFAC that Tajideen provides material support to Hizballah, due to observations regarding weaknesses in the internal control activities governing critical corporate functions (e.g., finance, accounting, cash management)." The analysis that the OFAC Memo uses to reach these findings is fundamentally flawed, as it overstates `redacted` caveats and understates the importance of Mr. Tajideen's remedial response in this case.

At the outset, the OFAC Memo fails to appreciate that Mr. Tajideen's companies – prior to `redacted` forensic investigation and prior to the remedial controls he established based on `redacted` recommendations – exhibited the kinds of deficiencies that are common for privately-held, family run businesses operating in the developing world. The stated limits of `redacted` forensic investigation were largely attributable to such deficiencies (e.g., as noted in the OFAC Memo, a lack of complete electronic financial records). A significant factor behind Mr. Tajideen's decision to adopt the types of controls recommended by `redacted` was that running his companies more like an advanced, Western-style corporation (including pursuant to GAAP principles) would make his business activities better able to respond to inquiries from `redacted` (when testing the efficacy of other remedial measures) and from OFAC. Indeed, as evidenced in the quarterly reports, these controls significantly aided Mr. Tajideen's ability to demonstrate to `redacted` that his remedial action was working as designed to address areas of identified risk. As a result, Mr.

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 27

Tajideen's companies are now much better positioned to respond to any additional questions that OFAC may have about particular transactions or corporate activities.

Despite the stated limitations (which are commonly set forth for any forensic investigation), redacted examination of Mr. Tajideen's business activities was comprehensive -- and likely unprecedented in scope and rigor for an OFAC delisting case. Based on a year-long investigation by over 30 experts in which *approximately 3.9 million transactions* were subjected to advanced forensic analysis redacted found no direct evidence that Mr. Tajideen had supported Hizballah.

As noted, the OFAC Memo applies a skewed standard in assessing the redacted report. On the one hand, it finds that the "weaknesses in the internal control activities governing critical corporate functions (*e.g.*, finance, accounting, cash management)" doom Mr. Tajideen's delisting case, while at the same time dismisses Mr. Tajideen's efforts to address such weaknesses because they are unable to "guarantee compliance." This is a no-win situation for Mr. Tajideen with respect to his remediation, suggesting that other factors may be at play in determining OFAC's view of the case. Perhaps those factors relate to OFAC's mistaken views about Mr. Tajideen's alleged activities since his designation, as communicated in its September 4, 2015 letter. If that is true, we have refuted those allegations in Part I of this submission, and they should no longer cast doubt on Mr. Tajideen's delisting efforts.

### c. Ownership and control

The OFAC Memo finds that Ovlas Trading is the parent company of several other entities – Golfrate Holdings Angola LDA, Afribelg Commercio e Industria, and Gruopo Arosfran Empreendimentos E Participacoes SARL. OFAC Memo, p. 17. The memo indicates that the existence of these entities reflect a "lack of independence." However, as explained in the Petition and accompanying redacted report, these four companies were identified among the so-called "Controlled Companies" of Mr. Tajideen, *i.e.*, those that he owned or controlled during the time of redacted forensic investigation. *See, e.g.*, Petition, Appendix A, p. 5. As such, they were all under Mr. Tajideen's effective control at the time, and the OFAC Memo is incorrect on this point.

The OFAC Memo also notes that other entities that Mr. Tajideen did *not* own or control – in particular, Congo Futur, Tajco Ltd. – were listed on the Ovlas Trading web site on June 2009 as subsidiaries of Ovlas Trading. OFAC Memo, pp. 17-18. However, the Petition explained the actual relationship between Mr. Tajideen's Controlled Companies and the additional companies (including SDGTs Congo Futur and Tajco Ltd.) that were outside the scope of redacted forensic investigation:

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 28

Mr. Tajideen began {his African importing business} in Sierra Leone in the late 1970s, where he founded Tajco Ltd. By the early 1990s, Mr. Tajideen had transferred ownership and full control of Tajco Ltd. in Sierra Leone to his brother, Jaffer Tajideen, and moved his family to Belgium. This pattern – establishing import and distribution companies in West Africa in connection with members of his family, and then leaving those family members in full ownership and control of those companies – would be repeated in Ghana, The Gambia, and Sierra Leone. Only in Angola would Mr. Tajideen retain ownership and control over the businesses he developed there.

Each of the African businesses came to rely on Mr. Tajideen's relationships with suppliers in Europe and elsewhere, which he managed from the late 1980s through early 2000s ... Over time, Mr. Tajideen relinquished ownership and control over the non-Angolan companies to members of his family so that they could work for themselves and build upon the foundation that he had started. ... By the end of the period reviewed by [redacted] Mr. Tajideen retained no ownership or control over the non-Angolan African companies *and* retained no significant role even in providing counsel or guidance to family there. Thus, the companies that Mr. Tajideen played a role in forming in Ghana, The Gambia, and Sierra Leone are not among the Controlled Companies reviewed by [redacted]

Petition, pp. 17-18 (footnotes omitted; footnote 30 notes that Mr. Tajideen never exercised control over Congo Futur, though his companies did act as suppliers to that company). The fact that the Ovlas Trading website listed some of the non-Angolan companies run by Mr. Tajideen's brothers as "subsidiaries" does not change the fact that Mr. Tajideen did not exercise ownership or control over those entities. He did, as of 2009, supply each of those companies from the Ovlas Trading platform and marketed his business accordingly; the Petition and subsequent submissions to OFAC have never suggested otherwise.

However, OFAC's analysis fails to examine or credit Mr. Tajideen with a much more important fact in this case: his fulfilled commitment to cease all commercial and financial dealings with Tajco Ltd., Congo Futur, and any other company owned or controlled by his brothers or others designated as SDGTs. *See, e.g.*, Apr. 2014 Resp., p. 6 ("[redacted] has tested the books and records of Mr. Tajideen's companies since 2013, as provided by Mr. Tajideen's designee, and noted that whereas during its forensic investigation of activity between 2003-2011 there were dealings between Mr. Tajideen's companies in Angola and those of his brothers in the Democratic Republic of Congo, The Gambia, and elsewhere, such dealings have largely ceased.").

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 29

The record is clear that Mr. Tajideen plays no role in the operation or management of these non-Angolan companies – and it is equally clear that he has ceased all dealings with them. Their appearance on the Ovlas Trading website in 2009 as "subsidiaries" is irrelevant, given the developments in this case since that time.

### d. The original designation

As OFAC has acknowledged in this case, Mr. Tajideen does not need to demonstrate that OFAC's original designation of him was in error in order to become delisted as an SDGT. *See* Petition, pp. 8-12. The International Emergency Economic Powers Act, Executive Order 13224, and OFAC's regulations contemplate that an SDGT designation is not a punitive measure but a prophylactic one to prevent activity that is inconsistent with U.S. national security and foreign policy interests. OFAC's continued designation of Mr. Tajideen can only be based on a finding that his business activities prevent an ongoing threat to such interests. Therefore, even if OFAC continues to find that its original designation of Mr. Tajideen was correct because of his pre-2009 activities, it should remove his SDGT designation in this case because of Mr. Tajideen's remediation demonstrating that his current activities no longer present an ongoing terrorist financing risk.

Accordingly, the analysis in OFAC's Memo in Section C(3) does not support OFAC's continued designation of Mr. Tajideen as an SDGT.

### Part III

### Mr. Tajideen is prepared to further demonstrate that he is not a supporter of Hizballah

In our January 13, 2016 letter to OFAC, we sought to address a core question in this case: in light of OFAC's apparent concern about Mr. Tajideen's support of Hizballah, how can we assure OFAC that this concern is unfounded? It seems clear that without such assurance, OFAC will continue to doubt the credibility and effectiveness of Mr. Tajideen's delisting efforts – no matter how much the record otherwise supports his removal as an SDGT. In our letter, we outlined at least five ways in which Mr. Tajideen could further demonstrate that he is not a supporter of Hizballah:

1) Affidavits
2) Interview(s) with U.S. Government officials
3) Additional divestitures or other means of corporate reorganization to address areas of particular concern to OFAC

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 30

4) The participation of a third-party monitor prior to and/or following OFAC's removal of the SDGT designation

5) Public statements

Notably, Mr. Tajideen has already taken the courageous step of making several public statements condemning political extremism in Lebanon. In a report earlier this year by the investigative news organization 100Reporters, Mr. Tajideen stated:

> "I am unequivocally opposed to terrorism and other acts of political violence," Tajideen said. "I am unequivocally opposed to narcotics trafficking and related criminal enterprises." Tajideen said he had no connection to Hezbollah and had worked to avoid any "unnecessary entanglements" with the organization "despite the challenges of doing so while conducting business in Lebanon."

In several federal court cases in which Mr. Tajideen has opposed attempts to attach or garnish his blocked assets since 2015, he has submitted public sworn affidavits attesting that he has no ties to Hezbollah or to any terrorist group:

> "I am unequivocally opposed to terrorism and other acts of political violence…I am not an agent of Hizbollah…I am not an instrumentality of Hizballah…I do not support Hizbollah…I am not a member or affiliate of Hizbollah…I have never knowingly supported Hizbollah…either in my personal capacity or through any corporate entity I control…" *See Stansell et al v. Revolutionary Armed Forces of Colombia et al*, 1:15-cv-06826 (N.D. Ill. September 30, 2015) (Affidavit in Support of Memorandum in Opposition to Motion); *Doe v. Ejercito de Liberacion et al*, 1:15-cv-08652 (S.D.N.Y. November 11, 2015) (Affidavit in Support of Memorandum of Law in Opposition); *Doe v. Ejercito de Liberacion et al*, 1:15-mc-00023 (N.D.N.Y. November 11, 2015) (Affidavit in Support of Memorandum of Law in Opposition).

In addition, in 2016 Mr. Tajideen has made public, on-the-record statements to reporters from *The Guardian* and the *International Consortium of Investigative Journalists* describing the efforts he has undertaken to prove his innocence and noting that he "has not been and is not a supporter of Hizballah – and remains willing to back up those statements with actions prescribed [by] the Treasury Department as part of this delisting effort."

* * *

WILMERHALE

Gregory Gatjanis
May 27, 2016
Page 31

In light of the above facts and the extraordinary efforts Mr. Tajideen has undertaken in this case over the past five years, it would be unconscionable for OFAC to ignore Mr. Tajideen's willingness to do what OFAC believes is necessary for delisting and to deny him the opportunity to make good on his long-stated commitment to fully remediate his designation, which OFAC has acknowledged throughout this case is sufficient for removal as an SDGT.

The information provided in this document consists of proprietary and confidential information to Mr. Tajideen, the disclosure of which would be harmful to him. We therefore request confidential treatment of this information, and any further information disclosed in connection with this petition, consistent with the Freedom of Information Act (5 U.S.C. § 552(b)(4)) and the Trade Secrets Act (18 U.S.C. § 1905). If OFAC is considering a decision to publicly release this information pursuant to a FOIA request, or for any other reason, despite this request for confidentiality, we request an opportunity to be heard on the matter prior to any such public release.

We look forward to further discussions with OFAC about this submission. In the meantime, please feel free to contact me at any time at 202-663-6389 or Ronald.Meltzer@wilmerhale.com.

Sincerely,

Ronald I. Meltzer

Exhibits