_IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>TWO APPLE IPHONES, ONE APPLE IPAD,<br>and SIM CARDS | Case No. 17-cr-46 (RBW) |

Case No: 1:17-mj-507
Assigned To: Magistrate Judge Deborah A. Robinson
Date Assigned:  7/19/2017
Description: Search and Seizure Warrant

## **AFFIDAVIT IN SUPPORT OF AN**
## **APPLICATION UNDER RULE 41 FOR A**
## **WARRANT TO SEARCH AND SEIZE**

I, Steven J. Miller, being first duly sworn, hereby depose and state as follows:

### **INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of property - that is:

(A) one Apple iPhone 6 with International Mobile Equipment Identification ("IMEI")

number of 354443068711328 and with two SIM cards affixed to the exterior, hereinafter

"Target Device 1," further described in Attachment A, for the things described in

Attachment B;

(B) one Apple iPhone 6S Plus with Model Number: A 1688 and IC ID: 579C-E2946A and

with a black Ferrari protective case, hereinafter "Target Device 2," further described in

Attachment A, for the things described in Attachment B; and

(C) one Apple iPad serial number of DMPSF0C9GXQ4, hereinafter "Target Device 3,"

further described in Attachment A, for the things described in Attachment B.

Attachment A and Attachment B are incorporated herein for all purposes.

2.      I am a Special Agent ("SA") with the U.S. Drug Enforcement Administration

("DEA"), duly appointed according to law and acting as such.  I have been a Special Agent with

the DEA since 2007. Prior to my employment with DEA, I was an Assistant District Attorney ("ADA") in New York for seven years. During the last three years of my tenure as an ADA, I was the Deputy Supervising Assistant District Attorney for the Narcotics Program. Currently, I am assigned to Group 2 of the High Intensity Drug Trafficking Area of the New Jersey Field Division, where I am tasked with investigating international drug trafficking, money laundering, and other federal offenses. Since becoming a SA with the DEA, I have conducted numerous investigations of complex money laundering schemes in violation of 18 U.S.C. §§ 1956 and 1957, as well as violations of the International Emergency Economic Powers Act ("IEEPA") in violation of Title 50 U.S.C. § 1705(a). I have conducted and participated in wiretaps, physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefing of informants and witnesses and have reviewed taped conversations, telephone, financial and other records. Through my training, education and experience, I have become familiar with the manner in which financial information is manipulated by criminals to avoid detection, and how criminal organizations launder the proceeds of their illegal operations both locally and internationally.

3.     The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## JURISDICTION

4.     As discussed more fully below, my investigation involves violations of, among other things, the money laundering conspiracy statute (18 U.S.C. § 1956(h)) and of the IEEPA(50 U.S.C. § 1705(a)). These criminal violations were either begun or committed in part

2

in Washington, D.C., where the U.S. Department of the Treasury, Office of Foreign Assets
Control ("OFAC"), is located, and therefore where licenses or other permissions should have
been obtained, or were begun or committed overseas, out of the jurisdiction of any particular
state or district. Accordingly, venue for this application is proper in the District of Columbia.

## THE CHARGES

5.      On March 7, 2017, KASSIM TAJIDEEN and IMAD HASSOUN were charged
by a criminal indictment, *United States v. Kassim Tajideen.,* Case No. 17-cr-46 (RBW), in the
U.S. District Court in the District of Columbia. Defendants TAJIDEEN and HASSOUN were
charged with the following crimes: nine counts of violating the International Emergency
Economic Powers Act ("IEEPA") in violation of Title 50 U.S.C. § 1705(a); Conspiracy to
Defraud the United States in violation of 18 U.S.C. § 371; violating the Global Terrorism
Sanctions Regulations ("GTSR") in Title 31 C.F.R. 594; Aiding and Abetting and Causing an
Act to be Done in violation of Title 18 U.S.C. § 2; and Conspiracy to Launder Monetary
Instruments in violation of Title 18 U.S.C. §1956(h).  The indictment also implicated Criminal
Forfeiture pursuant to 18 U.S.C. §§ 981, 982, and 28 U.S.C. § 2461(c).  A copy of the Indictment
is attached hereto as Exhibit 1, and is fully incorporated herein.

6.      TAJIDEEN was apprehended outside of the United States pursuant to an Interpol
diffusion notice on or about March 12, 2017, and was detained pending his removal to the United
States.  On March 23, 2017, TAJIDEEN was extradited to the United States.  TAJIDEEN is
currently in federal custody near the District of Columbia awaiting trial.  At the time of arrest,
TAJIDEEN was in possession of the Target Devices and an agent of the DEAI seized all of
them.

7.      Target Devices 1, 2 and 3 are currently in the possession of the U.S Attorney's

3

Office for the District of Columbia. As described above, the equipment was found in

TAJIDEEN's possession and seized pursuant to his arrest and extradition on March 23, 2017.

After the equipment was seized, it was secured in sealed evidence bags and transported to the

District of New Jersey, and thereafter to the District of Columbia. No search of the equipment

has taken place.

## **PROBABLE CAUSE**

8.     KASSIM TAJIDEEN presides over a multi-billion dollar commodity and retail

goods distribution business that operates primarily in the Middle East and Africa through a web

of integrated companies, partnerships, and trade names. The primary focus of the business is to

source different goods from all over the world and to sell them in markets throughout West

Africa. TAJIDEEN is known in industry parlance as a trader.

9.     Agricultural commodities and other common household products are often traded

throughout the world by large distribution companies like TAJIDEEN's that are not involved in

the production or manufacturing of the goods traded. These companies simply buy goods from a

source in one part of the world and then sell them to a largescale buyer in another part of the

world who will further sell the goods down the stream of commerce to an eventual consumer.

10.     Traders throughout the world typically use English to communicate, and most

often utilize email, chat, and text-messaging services because they are easier than telephone for

traders whose first language is not English. Email, chat, and text messaging services are also an

efficient way to communicate across time zones and to archive the significant amount of

documentation involved in a trade, such as invoices, proof of payment, certifications, bank

receipts, and shipping records.

4

11.     Thousands of emails to which TAJIDEEN is a party were analyzed by my colleagues and me during this investigation. I observed that many of the illegal transactions listed in the Indictment were negotiated and conducted over email in English by TAJIDEEN, his employees, and employees at US companies identified in the Indictment as Company A, Company B, and Company C. Furthermore, I have observed that many of TAJIDEEN's emails involved in the transactions with Company A, Company B, and Company C indicate in writing in the body of the emails that they were sent by TAJIDEEN using a cellular telephone.

12.     I have also observed emails from TAJIDEEN that referred to conducting business over the telephone with his employees, including the illegal conduct charged in the Indictment. I am aware that as part of the fraud conspiracy charged in the Indictment, TAJIDEEN conducted several telephone calls with a U.S. person working at Company A regarding transactions that violated IEEPA and the GTSR.

13.     Because of its stability and universal recognition, traders generally conduct business in U.S. dollars. Electronic wire transfer of funds is the preferred method of payment between traders and vendors, as well as traders and buyers.

14.     Throughout this investigation, my colleagues and I have reviewed and analyzed thousands of financial transactions conducted by TAJIDEEN and his employees. I have observed that TAJIDEEN often conducted business in U.S. dollars and typically transferred and received payments for his many business lines through wire transfers. I have observed hundreds of payment receipts and records being circulated by TAJIDEEN's organization through email.

15.     TAJIDEEN controls, and benefits from, a sprawling trading empire headquartered in Lebanon and operating throughout the world. The organization is structured into three primary components: logistics, payments, and distribution. The components typically work

5

DOJ_02824662

together to facilitate commercial transactions between one or more countries in Africa and a source country, including the United States. Most of the communication between vendors and TAJIDEEN employees takes place through text, phone, chat, or email.

16.    For example, I am aware of records of text messages between employees of Company B in the Indictment and high-level employees of TAJIDEEN regarding transactions that violate IEEPA and the GTSR. Employees of Company B and TAJIDEEN's employees also communicated with TAJIDEEN via email to further coordinate the illegal transactions.

17.    Logistics were generally overseen by TAJIDEEN and a core group of employees in Lebanon including co-defendant Imad Hassoun (aka Emad Hassoun). They generally arranged for the sourcing of different goods from vendors, arrange for payments, keep records, and coordinate communication between employees outside of Lebanon. TAJIDEEN and these core logistics employees operated using many different trade names, depending on the vendor, and have been observed identifying themselves as representing many different entities, including, but not limited to Agalimentos SA, Epsilon Trading, Fozkudia, GITEX Co, Garden Sea, Kin Trading, Sicam Ltd, Tanit Plast, Global and Infinite Traders, International Cross Trade Company, and Union Invest.

18.    Sales and distribution of goods by the TAJIDEEN organization generally take place throughout West Africa, including Angola, the Democratic Republic of Congo ("DRC"), Gambia, Ghana, and Sierra Leone. TAJIDEEN's organization operates entities in these countries to receive the sourced goods, warehouse them, transport, and then sell them to retailers, including TAJIDEEN's own.

19.    Payments to sources of goods were generally overseen by TAJIDEEN and a core group of employees in Lebanon, but the organization's banking is primarily based in the United

DOJ_02824662

Arab Emirates. TAJIDEEN's organization employed a series of corporate entities, such as AJC

Trading, Promo Incorporation, Elissar Trading, Hexad International, and Promo Incorporation,

that maintain accounts at various UAE financial institutions, and whose core function is to wire

and receive funds on behalf of other entities in the TAJIDEEN organization. Other accounts of

the TAJIDEEN organization in UAE are held in the name of some of the Lebanese trade names,

such as Epsilon Trading and International Cross Trade Company.

20.       On May 27, 2009, OFAC publicly identified TAJIDEEN as "an important

financial contributor to Hizballah" and designated him as a Specially Designated Global

Terrorist ("SDGT"). In December 2010, OFAC designated two of his brothers and business

partners, Ali Tajideen and Husayn Tajideen as SDGTs. At the same time, eight entities

associated with the three brothers were also designated as SDGTs: Grupo Arosfran

Empreendimentos E Participacoes Sarl ("Grupo Arosfran"), Ovlas Trading S.A ("Ovlas"), Tajco,

Congo Futur, Kairaba Supermarket, Tradex, Golfrate Holdings (Angola) Lda ("Golfrate"), Afri

Belg Commercio E Industria Lda ("Afri Belg"). A ninth entity, Grand Stores, was designated in

April of 2012. Hereinafter, these nine companies will be referred to as the "Designated

Entities."

21.       The Designated Entities, and at least forty more companies and trade names

associated with TAJIDEEN, make up TAJIDEEN's distribution empire. Since the time of the

designations by OFAC, which are published in the Federal Register and online, U.S. law has

prohibited U.S. persons[1] from transacting unlicensed business with TAJIDEEN, his two

designated brothers, the Designated Entities, or any companies which are operated for the benefit

---

[1] Under the GTSR, "The term *United States person* or *U.S. person* means any United States citizen, permanent
resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the
United States." 31 C.F.R. Part 594.315

7

of any of the SDGTs. Specifically, the GTSR prohibits, without a license, "[t]he making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked," including SDGTs such as TAJIDEEN and the Designated Entities. Among other effects, the SDGT designation of TAJIDEEN and the Designated Entities stripped him and any of his businesses of the ability to legally acquire goods from, or wire money into or out of, the United States. As a result, it is a violation of IEEPA for any U.S. person to do business with the SDGT's without a license from OFAC.

22.     The documents and other evidence obtained during DEA's extensive financial investigation of TAJIDEEN, which led to the current indictment, reveal that TAJIDEEN restructured his business empire after his designation in order to conceal his involvement in, and benefit from, businesses that were otherwise able to conduct lawful transactions with U.S. entities. As discussed in more detail below, since 2009, TAJIDEEN has undertaken an extensive conspiracy to evade the IEEPA sanctions against him, as well as a massive money laundering enterprise to move his IEEPA violation proceeds through the U.S. financial system.

23.     For example, in 2013, 2014, and 2015, a TAJIDEEN entity in Luanda, Angola, called Sicam Ltd received food products via container ships from the United States and Europe. Although consigned to Sicam Ltd, which is located in Angola, the goods were procured by a group of core Tajideen employees in Lebanon working under a different company name. Payments to the vendors in the United States and Europe were made via wire transfers from accounts in the United Arab Emirates held in the names Epsilon Trading and International Cross Trade Company. Proof of these payments was communicated by the transmission of SWIFT receipts via email.

8

24.     Between 2009 and 2017, dozens of unlicensed and, therefore, illegal transactions to acquire U.S. origin goods took place between TAJIDEEN-related companies and American vendors in similar fashion, all negotiated and finalized through email, text, and phone. During such transactions, TAJIDEEN caused U.S. financial institutions, exporters, transportation companies, and other firms to give direct and indirect benefit to TAJIDEEN by dealing with companies run at least in part for his benefit, in violation of IEEPA. These transactions comprised a significant portion of TAJIDEEN's business transactions.

25.     On an even larger scale during the same period, the TAJIDEEN organization was able to use the U.S. financial system to support wire transfers between its own entities, as well as to and from third party companies around the world. Bank records acquired during this investigation demonstrate that the TAJIDEEN organization sent thousands of wire transfers totaling hundreds of millions of U.S. dollars through U.S. financial institutions undetected using front company names. All of these transactions were unlicensed and in violation of IEEPA.

26.     A review of multiple email search warrant returns, bank transaction records, recorded telephone calls, and written statements revealed that TAJIDEEN, HASSOUN and his co-conspirators used multiple methods of communication to facilitate their fraud, money laundering, and IEEPA violations. TAJIDEEN and his employees sent approvals, deal terms, invoices, SWIFT receipts, and various notices through phone, emails or texts in support of their illegal enterprise.

27.     The investigation has uncovered evidence that Tajideen and his co-conspirators used telephone, text, chat, and email as recently as March of 2017 to conduct commercial activity in violation of IEEPA. Previously obtained records illustrate that TAJIDEEN personally and directly participated in various illegal transactions via email, including illegal wire transfers

9

DOJ_02824666

as well as multiple illegal shipments of good which exited American ports.

### Probable Cause to Believe That the Target Devices Contain Evidence, Fruits, and Instrumentalities

28.    As discussed above, the equipment is currently being stored by the investigative unit at the U.S Attorney's Office for the Distirct of Columbia. From my training and experience, as well as the training and experience of law enforcement personnel who routinely handle this type of equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

29.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones and tablets like Target Devices 1, 2 and 3, can now function essentially as small computers. Smartphones and tablets have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device; sending and receiving text messages, e-mails, and other electronic messages; and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

30.    From my training, experience, and information provided to me by other agents, I am aware that businesses frequently use electronic equipment to carry out, communicate about, and store records about their business operations. These tasks are frequently accomplished through sending and receiving business-related e-mail, texts and instant messages; drafting or transmitting correspondence and other business documents such as spreadsheets, presentations, articles of incorporation; scheduling business activities; keeping a calendar of business and other activities; arranging for business travel; keeping records of  business transactions, keeping track of the contact information of business associates, customers and suppliers, and storing pictures or

10

other records related to business activities.

31.    In the context of this case, I also know that TAJIDEEN communicated with his employees and with U.S. persons about his illegal financial transactions over the phone, and by email, instant messaging applications and the internet; executed illegal wire transfers involving millions of U.S. dollars over the internet; and prepared or transmitted or received Excel spreadsheets to account for the monies involved in his transactions.

32.    The Devices in question are two personal cell phones with two attached SIM cards, and one tablet seized from TAJIDEEN. In my training and experience, people often store their correspondence (including emails, text messages, or social media communications), photos, videos, Internet browsing history, and other potentially relevant evidence on so-called smartphones or tablets such as the Target Devices. This is especially true when a person regularly travels because a phone is a primary way that people stay in touch with family, friends, employees, partners, and other business associates. Further, review of other evidence available to me reveals that TAJIDEEN regularly uses mobile devices to communicate with other people regarding his business empire, including vendors in the United States that are prohibited by IEEPA from conducting unlicensed transactions with TAJIDEEN. There is thus probable cause to believe that relevant evidence concerning the offenses discussed herein may be found on the devices seized from TAJIDEEN.

33.    With regards to Target Devices 1 and 2 (the two smartphones and accompanying SIM cards), and Target Device 3 (the IPAD), I submit that there is probable cause to believe the devices currently contain, among other evidence:

> a.  Electronic messages including, but not limited to, chats, text messages, voicemails, and emails between TAJIDEEN and other members of a fraud, money laundering, or IEEPA conspiracy, including but not limited to HASSOUN, or which are evidence of charged or uncharged IEEPA violations, fraud, or money laundering

11

involving TAJIDEEN, his businesses or associates;

b. Records, communications, documents or other indicia of TAJIDEEN's ownership or control of, or relationship to business entities which conducted business with Companies A, B or C as listed in the Indictment or other U.S. persons or entities after TAJIDEEN was designated by OFAC as an SDGT;

c. Records, communications, documents or other indicia of TAJIDEEN's involvement in charged or uncharged IEEPA violations, fraud, or money laundering;

d. Records, communications, documents or other indicia of TAJIDEEN's knowledge of the OFAC designation or his intent to cause violations of U.S. laws, including IEEPA violations, fraud, or money laundering;

e. contact information for TAJIDEEN, and TAJIDEEN'S employees and criminal associates, including names, email addresses, photos, and phone numbers, who were involved in charged or uncharged IEEPA violations, fraud, or money laundering;

f. information regarding scheduled meetings or trips, including information about the identity of the participants and location, regarding TAJIDEEN's businesses or charged or uncharged IEEPA violations, fraud, or money laundering;

g. information regarding the websites that TAJIDEEN accessed including but not limited to online banking websites used to facilitate charged or uncharged IEEPA violations, fraud, or money laundering;

h. information regarding recent incoming and outgoing phone calls, including the identity the user of the phone inputted by TAJIDEEN into the Contacts application, which may be related to charged or uncharged IEEPA violations, fraud, or money laundering;

i. information regarding bank accounts TAJIDEEN or his associates used to facilitate charged or uncharged IEEPA violations, fraud, or money laundering.

j. forensic electronic evidence or information that establishes how the electronic storage media or digital devices were used, the purpose of their use, who used them, and when and where they were used.

34. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

12

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      In addition, based on my knowledge, training, and experience, I know that businesses and businesspeople often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes.

## Forensic Evidence

35.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as evidence of charged or uncharged conduct related to charges in the Indictment, but also for forensic electronic evidence or information that establishes how electronic storage media or digital devices were used, the purpose of their use, who used them, and when and where they were used. Based on my knowledge, training, and experience, as well as information related to me by agents and others

13

involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be on the Target Devices because:

a. Although some of the evidence sought by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic information as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is amenable to being segregated from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data on the electronic storage media not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data that show what tasks and processes on a smart phone were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, and the times smart phone, or other digital device was in use. Smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a computer, smart phone, or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the device at a relevant time.

c. A person with appropriate familiarity with how a smart phone works can, after examining this forensic evidence in its proper context, draw conclusions about how the device was used, the purpose of its use, who used it, and when and where it was used.

14

DOJ_02824671

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance many of the types of the records to be sought, electronic storage media and digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on electronic storage media or digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how electronic storage media or a digital device was used, the purpose of its use, who used it, and when and where, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.  I know that when an individual uses a digital device to conduct illegal business transactions, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

**Methods To Be Used To Search Digital Devices**

36.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.  Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary

15

DOJ_02824672

to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.  Digital data is vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from electronic storage media also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device requires an examination of the device as a whole. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for smart phones and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is

16

necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.  Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

37.   Based on all of the foregoing, I respectfully submit that searching any electronic storage media or digital device for the information, records, or evidence subject to seizure pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the media or devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

38.   In searching for information, records, or evidence, further described in Attachment

17

B, law enforcement personnel executing this search warrant will employ the following procedures:

    a.    The analysis of the contents of any seized electronic storage media or digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

    b.    In searching the seized electronic storage media or digital devices, the forensic examiners may examine as much of the contents of the electronic storage media or digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized electronic storage media or digital devices will be specifically chosen to identify only the specific items to be seized under this warrant.

39.    For this warrant application:

    a.    "Equipment" means any hardware, software, storage media, and data.

    b.    "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

    c.    "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

    d.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or

memory card).

e.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

f.    "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

40.    Based on the information described above, as well as that described in the attached Indictment, I have probable cause to believe that KASSIM TAJIDEEN has violated, among other statutes, the International Emergency Economic Powers Act, 50 U.S.C. § 1705(a), the Money Laundering Control Act, 18 U.S.C. § 1956, Conspiracy, 18 U.S.C. § 371 and Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.

41.    Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B to each warrant, are contained within the equipment described in Attachment A to each warrant.

## REQUEST TO APPEAR BY TELEPHONIC MEANS

42.    I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. In support of this request, I hereby inform the Court that I am currently assigned to the FBI's Newark Office in New Jersey where I am working on the investigation of this and other matters. If I were required to appear before the Court in person, it would be an expense to the United States both in travel funds and time diverted from the substantive investigation. I submit that an attorney for the United States is capable of identifying my voice and telephone number for the Court.

19

Sworn to under the pains and penalties of perjury,

Thomas Gillice on behalf of
Steven J. Miller     Agent Steven Miller
Special Agent                   with consent
Drug Enforcement Administration

⌐JUL 19 2017

Subscribed and sworn to before me on this _____ day of July, 2017

HON. DEBORAH ROBINSON
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA

20

**DOJ_02824677**

...

## ATTACHMENT A

### Description of Equipment to Be Searched

A. **Target Device No. 1**

The equipment to be searched, Target Device 1, consists of an iPhone 6 and two external SIM cards, hereinafter SIM Cards 1 and 2, that were taped to the back, or non-screen side, of the iPhone 6. SIM Card 1 is the color gold with Arabic writing on one side, while the reverse side was colored red. SIM Card 2 was the color gold on one side, while the reserve was the color blue with the words "Touch" written on it. The front of the iPhone 6 is the color black, while the back side is silver and is stamped "IMEI 354443068711328" at the bottom. The back side also contains a white sticker with a bar code and the numbers "09384619255." Target Device 1 was found in TAJIDEEN's possession on March 23, 2017, and currently is in the possession of the Investigative Unit of the U.S. Attorney's Office for the District of Columbia. The following is a photograph of Target Device 1:



21

## B. Target Device No. 2

The equipment to be searched, Target Device 2, consists of an iPhone 6S wrapped in a protective case or sleeve marked with a yellow medallion associated with the Ferrari car company. The front of the iPhone 6S is the color black, while the back, or non-screen side, is silver and is stamped "Model Number: A 1688" and "IC ID: 579C-E2946A" at the bottom. Accompanying it was a black Ferrari iPhone case. Target Device 2 was found in TAJIDEEN's possession on March 23, 2017, and currently is in the possession of the Investigative Unit of the U.S. Attorney's Office for the District of Columbia. The following are two photographs of Target Device 2:



22

**DOJ_02824680**



23

## C. Target Device No. 3

The equipment to be searched, Target Device 3, is an Apple Ipad Pro found in TAJIDEEN's possession on March 23, 2017. The back of the iPad is the color silver and the front is black.  The Serial number is: DMPSF0C9GXQ4. The equipment is in the possession of the Investigative Unit of the U.S. Attorney's Office for the District of Columbia.

**ATTACHMENT B**

**Items to Be Seized**

I.      During the search of Target Device 1 (including SIM cards 1 and 2), and Target Devices 2, and 3, the items to be seized are evidence, fruits, or instrumentalities, in whatever form, of the violations of 50 U.S.C. § 1705(a), 18 U.S.C. § 1956, 18 U.S.C. § 371, 31 C.F.R. § 594, 18 U.S.C. 1956, 1957, and 1512(c) and 1512(k).

II.     For any electronic storage media or digital device whose seizure is otherwise authorized by this warrant, and any electronic storage media or digital device that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "TARGET DEVICE"):

>      a.  evidence of who used, owned, or controlled the TARGET DEVICE at the time the information or documents described in Part III of this attachment were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;
>
>      b.  evidence of software, or the lack thereof, that would allow others to control the TARGET DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;
>
>      c.  evidence of the attachment to the TARGET DEVICE of other storage devices or similar containers for electronic evidence;
>
>      d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICE;

25

e.  evidence of the times the TARGET DEVICE was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICE;

g.  documentation and manuals that may be necessary to access the TARGET DEVICE or to conduct a forensic examination of the TARGET DEVICE;

h.  records of or information about Internet Protocol addresses used by the TARGET DEVICE; and

i.  records of or information about the TARGET DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks, SIM cards or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The terms "electronic storage media" and "digital devices" include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; smart phones, SIM cards, personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such

26

as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

III.    During the search of Target Device 1 (including SIM cards 1 and 2), and Target Devices 2, and 3, the items to be seized are evidence, fruits, or instrumentalities, in whatever form, of the violations of 50 U.S.C. § 1705(a), 18 U.S.C. § 1956, 18 U.S.C. § 371, 31 C.F.R. § 594, 18 U.S.C. 1956, 1957, and 1512(c) and 1512(k)., including, but not limited to, the following:

    a.  Electronic messages including, but not limited to, chats, text messages, voicemails, and emails between TAJIDEEN and other members of a fraud, money laundering, or IEEPA conspiracy, including but not limited to HASSOUN, or which are evidence of charged or uncharged IEEPA violations, fraud, or money laundering involving TAJIDEEN, his businesses or associates;

    b.  Records, communications, documents or other indicia of TAJIDEEN's ownership or control of, or relationship to business entities which conducted business with Companies A, B or C as listed in the Indictment or other U.S. persons or entities after TAJIDEEN was designated by OFAC as an SDGT;

    c.  Records, communications, documents or other indicia of TAJIDEEN's involvement in charged or uncharged IEEPA violations, fraud, or money laundering;

    d.  Records, communications, documents or other indicia of TAJIDEEN's knowledge of the OFAC designation or his intent to cause violations of U.S. laws, including IEEPA violations, fraud, or money laundering;

    e.  contact information for TAJIDEEN, and TAJIDEEN'S employees and criminal associates, including names, email addresses, photos, and phone numbers, who were involved in charged or uncharged IEEPA violations, fraud, or money laundering;

    f.  information regarding the websites that TAJIDEEN accessed including but not limited to online banking websites used to facilitate charged or uncharged IEEPA violations, fraud, or money laundering;

    g.  information regarding recent incoming and outgoing phone calls, including the

DOJ_02824685

identity the user of the phone inputted by TAJIDEEN into the Contacts application, which may be related to charged or uncharged IEEPA violations, fraud, or money laundering;

h.  forensic electronic evidence or information that establishes how the electronic storage media or digital devices were used, the purpose of their use, who used them, and when and where they were used;

i.  records and information relating to the following financial records:

    1.  Books, records, ledgers, journals, statements, cash register receipts and/or tapes, invoices, billings, financial statements, balance sheets, notes and work papers;

    2.  All correspondence, letters, memorandum, applications, powers of attorney, and listings, which contain financial information, such as income, expenses, assets, liabilities, transfer of money;

    3.  Bank and other financial institution records, including bank statements, passbooks, deposit slips, withdrawal slips, cancelled checks, bank receipts, bank checks, money order receipts, wire transfers, credit and debit memos, and safe deposit keys and records;

    4.  Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency;

    5.  Loans or letters of credit including contracts, mortgages, notes, agreements, applications, payments, and financial statements;

    6.  Credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

    7.  Records indicating the purchase, lease, rental, possession or maintaining of equipment, vehicle inventory, capital assets and any other assets;

    8.  Records of real estate transactions, including contracts, agreements, settlement sheets, deeds, rental agreements, lease agreements, payments and receipts of money;

    9.  Records of personal and living expenses including bills, invoices, payments, receipts, invoices, statements, photographs, passports, airline tickets, records of travel and other evidence of expense;

DOJ_02824685

j.  Records and information relating to: employment records and personnel files including payroll journals, payroll records and correspondence that indicate cash payments to employees;

k.  Records and information relating to: address and/or telephone logs/books, Rolodex indices, diaries, calendars, and items reflecting names, addresses, telephone numbers, pager numbers, and/or fax numbers, e-mail addresses, and web sites of possible clients, customers, vendors, creditors, financial institutions, and other individuals or businesses with whom a financial relationship exists;

l.  Records and information relating to: customer lists, customer names, customer addresses, and customer telephone numbers. Customer billing records, customer payment records, and customer accounts receivable records. Correspondence to and from customers and associates;

m.  Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

n.  Evidence indicating the email account owner's state of mind as it relates to the criminal activity under investigation;

o.  Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

29