# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal Case No. 17-46 (RBW) |
| ) | |
| KASSIM TAJIDEEN ) | **FILED** |
| ) | **AUG 1 0 2018** |
| Defendant. ) | Clerk, U.S. District & Bankruptcy |
| ) | Courts for the District of Columbia |

## MEMORANDUM OPINION

A federal grand jury has indicted the defendant on the following charges: (1) one count of conspiracy to conduct unlawful transactions and cause United States persons to conduct unlawful transactions with a Specially-Designated Global Terrorist ("SDGT") and to defraud the United States by dishonest means; (2) nine counts of unlawful transactions with a SDGT; and (3) one count of conspiracy to commit money laundering. See generally Superseding Indictment ("Indictment"), ECF No. 89. The defendant has filed seven separate motions to dismiss[1] challenging various aspects of this prosecution and seeking dismissal of the Indictment in its entirety, all of which are ripe for consideration by the Court.[2] Additionally, the defendant has requested an evidentiary hearing regarding one of these seven motions to dismiss. See Request for Evidentiary Hearing on Defendant's Motion to Dismiss Pursuant to Rule of Specialty

---

[1] The Court encourages the defendant in the future to submit multiple requests for the same relief in a single motion when possible.

[2] See Defendant Kassim Tajideen's Motion to Dismiss No. 1 as to Superseding Indictment ("Def.'s 1st Mot. to Dismiss"), ECF No. 104; Defendant Kassim Tajideen's Motion to Dismiss No. 2 as to Superseding Indictment ("Def.'s 2d Mot. to Dismiss"), ECF No. 105; Defendant Kassim Tajideen's Motion to Dismiss No. 3 as to Superseding Indictment ("Def.'s 3d Mot. to Dismiss"), ECF No. 106; Defendant Kassim Tajideen's Motion to Dismiss No. 4 as to Superseding Indictment ("Def.'s 4th Mot. to Dismiss"), ECF No. 107; Defendant Kassim Tajideen's Motion to Dismiss No. 5 as to Superseding Indictment ("Def.'s 5th Mot. to Dismiss"), ECF No. 108; Defendant Kassim Tajideen's Motion to Dismiss No. 6 as to Superseding Indictment ("Def.'s 6th Mot. to Dismiss"), ECF No. 109; Defendant Kassim Tajideen's Motion to Dismiss No. 7 as to Superseding Indictment ("Def.'s 7th Mot. to Dismiss"), ECF No. 116.

("Def.'s Request"), ECF No. 137. Upon consideration of the parties' submissions,[3] the Court

concludes that it must deny each of the defendant's motions to dismiss the Indictment, as well as

his request for an evidentiary hearing.[4]

# I.   BACKGROUND

## A. Factual Background

On May 27, 2009, the defendant was publicly designated by United States Department of

the Treasury's Office of Foreign Assets Control ("the OFAC") as a SDGT. <u>See</u> Government's

Response to Defendant's Motion to Compel Discovery of Rule 16 and <u>Brady</u> Material ("Gov't's

Resp.") at 6, ECF No. 31. "The designation blocks all assets of a designee and prohibits, <u>inter</u>

<u>alia</u>, [United States] persons from knowingly participating in transactions with, or for the benefit

of, the defendant without first obtaining a license from [the] OFAC." <u>Id.</u> at 7. Thereafter, "[o]n,

---

[3] In addition to the filings previously identified, the Court considered the following submissions in rendering its decision: (1) the Government's Opposition to Defendant Tajideen's Motion to Dismiss No. 1 As to Superseding Indictment/Motion to Dismiss All Counts for Violating IEEPA ("Gov't's 1st Opp'n"), ECF No. 110; (2) the Government's Omnibus Opposition to Defendant's Revised Motions to Dismiss Nos. 1-6 ("Gov't's Omnibus Opp'n."), ECF No. 111; (3) the Government's Opposition to Defendant Kassim Tajideen's Motion to Dismiss No. 2 ("Gov't's 2d Opp'n"), ECF No. 91; (4) the Government's Opposition to Defendant Kassim Tajideen's Motion to Dismiss No. 3 ("Gov't's 3d Opp'n"), ECF No. 92; (5) the Government's Omnibus Opposition to Defendant Kassim Tajideen's Motions to Dismiss No. 4 and No. 5 ("Gov't's 4th Opp'n"), ECF No. 93; (6) the Government's Opposition to Defendant Kassim Tajideen's Motion to Dismiss No. 6/Motion to Dismiss Count Eleven ("Gov't's 5th Opp'n"), ECF No. 94; (7) the Government's Opposition to Defendant Kassim Tajideen's Motion to Dismiss No.7/Motion to Dismiss Pursuant to Rule of Specialty ("Gov't's 6th Opp'n"), ECF No. 132; (8) the Government's Memorandum of Law In Support of Opposition to Defendant's Request for Evidentiary Hearing on Motion to Dismiss No. 7/Motion to Dismiss Pursuant to Rule of Specialty ("Gov't's Hearing Opp'n"), ECF No. 146; (9) the Reply Memorandum in Support of Motion to Dismiss No. 1 as to Superseding Indictment ("Def.'s 1st Reply"), ECF No. 117; (10) the Reply Memorandum in Support of Motion to Dismiss No. 2 as to Superseding Indictment ("Def.'s 2d Reply"), ECF No. 118; (11) the Reply Memorandum in Support of Motion to Dismiss No.3 as to Superseding Indictment ("Def.'s 3d Reply"), ECF No. 119; (12) the Reply Memorandum in Support of Motion to Dismiss No. 4 as to Superseding Indictment ("Def.'s 4th Reply"), ECF No. 120; (13) the Reply Memorandum in Support of Motion to Dismiss No. 5 as to Superseding Indictment ("Def.'s 5th Reply"), ECF No. 121; (14) the Reply Memorandum in Support of Motion to Dismiss No. 6 as to Superseding Indictment ("Def.'s 6th Reply"), ECF No. 122; (15) the Reply in Support of Request for Evidentiary Hearing on Defendant's Motion to Dismiss Pursuant to Rule of Specialty ("Def.'s Hearing Request Reply"), ECF No. 147; and (16) the Reply Memorandum in Support of Motion to Dismiss Pursuant to Rule of Specialty ("Def.'s 7th Reply"), ECF No. 135.

[4] The defendant previously filed six separate motions to dismiss the original indictment filed against him. <u>See</u> ECF Nos. 67–72. However, given the filing of the Superseding Indictment and in light of the fact that the defendant's motions to dismiss all of the counts in that Indictment essentially reassert the same arguments raised in his original motions, the Court will deny as moot the defendant's six original motions to dismiss.

July 22, 2010, the defendant filed an application with [the] OFAC, . . . seeking his removal from the SDGT list." Id. The defendant continued to seek his delisting from the SDGT list, see id. at 8 (discussing his various efforts to have [the] OFAC remove him from the SDGT list), until May 4, 2017, when he withdrew his delisting application, see id.

"On March 7, 2017, a Grand Jury in the District of Columbia returned an Indictment charging the defendant with Conspiracy to Violate the International Emergency Economic Powers Act ('[the] IEEPA') and the Global Terrorism Sanctions Regulations ('[the] GTSR'), and to Defraud the United States; substantive violations of [the] IEEPA; and with conspiracy to launder monetary instruments." Gov't's 1st Opp'n at 5. "[O]n March 12, 2017, while traveling on business," the defendant "was detained in Morocco." Def.'s 7th Mot. to Dismiss at 2. "The [United States] Department of State submitted certified copies of [United States] Department of Justice papers, including the original indictment in this case, the arrest warrant, the applicable statutes, a summary of facts with an Arabic translation, and a photograph of [the defendant]" to Moroccan authorities. Id. at 3. The United States Department of State then "sent a diplomatic note to the Ministry of Foreign Affairs and Cooperation of the Kingdom of Morocco," which requested the defendant's extradition. Id. at 4. "[T]he Moroccan Court granted the government's extradition request, [and] on March 24, 2017, agents of the [United States] Drug Enforcement Agency transported [the defendant] to the United States." Id. at 5.

## B. Relevant Statutory Background

### 1. The International Emergency Economic Powers Act

Through much of the twentieth century, the United States utilized economic sanctions as a tool of foreign policy pursuant to the Trading with the Enemy Act ("the TWEA"). Passed in 1917, and amended in 1933, the TWEA granted the President broad authority to "investigate,

regulate, . . . prevent or prohibit . . . transactions" "[d]uring the time of war or during any other period of national emergency declared by the President." 12 U.S.C. § 95a (1976). In 1977, )through the passage of the IEEPA, Congress further amended the TWEA. The IEEPA delineates "the President's authority to regulate international economic transactions during wars or national emergencies." S. Rep. No. 95–466, at 2 (1977). The IEEPA limits the TWEA's application to periods of declared wars and to certain existing TWEA programs, while the IEEPA is applicable during other times of declared national emergencies. See Regan v. Wald, 468 U.S. 222, 227–28 (1984) (discussing the statutory history of the two statutes). Under the IEEPA, the President can declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a) (2012). The IEEPA authorizes the President to

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

Id. § 1702(a)(1)(B).

## 2. Executive Order 13,224

Following the September 11, 2001 terrorist attacks on the United States, on September 23, 2011, President George W. Bush issued Executive Order 13,224, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." Exec. Order. No. 13,224, 66 Fed. Reg. 49,079, 49,079 (Sept. 23, 2001). Through this Executive Order, President

Bush invoked the authority granted to him under the IEEPA, see id. § 1, and blocked all property and interests in property of twenty-seven foreign terrorists, terrorist organizations, and their supporters, each which were designated as SDGTs, id. annex.

## II.    STANDARD OF REVIEW

"Before trial, a defendant in a criminal case may move to dismiss an indictment on the grounds that it fails to state an offense . . . ." United States v. Hillie, 289 F. Supp. 3d 188, 193 (D.D.C. 2018); see also Al Bahlul v. United States, 767 F.3d 1, 10 n.6 (D.C. Cir. 2014) ("Failure to state an offense is simply another way of saying there is a defect in the indictment . . . ."); Fed. R. Crim. P. 12(b)(3)(B)(v) (providing that "a defect in the indictment . . . , including failure to state an offense," is a defense that "must be raised [ ] pretrial"). The district court's inquiry regarding a motion to dismiss is limited to "[t]he operative question [of] whether the allegations [in the indictment], if proven, would be sufficient to permit a jury to find that the crimes charged were committed." Hillie, 289 F. Supp. 3d at 193 (first and third alterations in original) (quoting United States v. Sanford, Ltd., 859 F. Supp. 2d 102, 107 (D.D.C. 2012)); see also United States v. Sunia, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (Walton, J.) (providing that the court's role "is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes" (emphasis, citation, and internal quotation marks omitted)). "Adherence to the language in the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001). Therefore, a district "court 'must presume the allegations of the indictment to be true, and may not dismiss an indictment on a determination of facts that should have been developed at trial,'" Hillie, 289 F. Supp. 3d at 193 (quoting Sunia, 643 F. Supp. 2d at 60).

## III.  ANALYSIS

### A.  The Defendant's Motion to Dismiss All Counts for the Alleged Violations of the IEEPA

At the outset, the defendant seeks dismissal of all counts charging an IEEPA violation, on

the basis that the IEEPA's

> text makes clear that the President's emergency powers under [the] IEEPA cannot
> be used as they have been used here—to create a sprawling and permanent
> regulatory regime addressing of a multitude of different threats that bear absolutely
> no relation to the September 11 emergency that catalyzed the regime in the first
> place.

Def.'s 1st Reply at 1.  From the defendant's perspective, "[t]his prosecution violates [the]

IEEPA," Def.'s 1st Mot. to Dismiss at 2, because "[i]t is premised on an Executive Order that

either exceeds the scope of the statute that authorized it or has been misapplied by the Treasury

Department," id. at 1; see also Def.'s 1st Reply at 2 (asserting that this motion seeks to

"challenge . . . a criminal prosecution based on the use of [the] IEEPA . . . to create a permanent

and general sanctions regime rather than a narrow emergency-based one").  In opposition, the

government argues that the Court should deny the defendant's motion because it invites "the

Court to dismantle a significant piece of the United States foreign policy and national security

apparatus designed to reduce the threat from foreign terrorists."  Gov't's 1st Opp'n at 3; see also

id. at 2 ("The defendant's theory is belied by the actions of Congress itself, by the inherent

Constitutional authority of the Executive, and by case law supporting the broad authority of the

Executive Branch in matters concerning foreign policy.").  The Court agrees with the

government.[5]

---

[5] The government devotes a significant portion of its opposition to reiterating its position that the defendant may not uses this criminal action to collaterally attack his designation by the OFAC as a SDGT.  See Gov't's 1st Opp'n at 5–8.  However, the defendant represents that his "motion challenges neither the factual basis for his designation nor the process by which the OFAC reached the decision to designate him.  It challenges only the legal viability of the entire

(continued . . .)

Because the defendant's motion contends that Executive Order 13,224 exceeds the scope of the IEEPA's statutory authorization, the Court's analysis must start with the plain language of the statute. See Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 450 (2002) ("As in all statutory construction cases, [the Court] begin[s] with the language of the statute."). In conducting this analysis, the Court must first "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," and its "inquiry ceases 'if the statutory language is unambiguous and the statutory scheme is coherent and consistent.'" Id. (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)). Here, the Court finds that the plain language of the IEEPA is unambiguous and that Executive Order 13,224 soundly comports with the scope and boundaries of the statute.

The President may avail himself of the broad authorities granted to him through the IEEPA if he declares a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). The President's declaration of a national emergency to address an "unusual and extraordinary threat," id., however, is not all-encompassing and without limitation, as the IEEPA directs "[a]ny exercise of [ ] authorities to deal with any new threat [to] be based on a new declaration of national emergency." Id. § 1701(b). Thus, a President's declaration of a national emergency must be confined "to a specific set of circumstances which constitutes a real emergency, and for no other purpose." H.R. Rep. 95–459 at 10 (1977).

---

(. . . continued)
scheme, including the regulations that [he] is alleged to have violated." Def.'s 1st Reply at 2. Based on this representation, the Court finds it unnecessary to address the government's argument on this subject again, which, as the government correctly notes, see Gov't's 1st Opp'n at 2, 6, has already been considered and rejected by the Court at a hearing on February 1, 2018, id. at 2.

Relevant to the parties' dispute, through Executive Order 13,224, former President Bush "declare[d] a national emergency to deal with th[e] threat" stemming from the

> grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001, . . . and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States.

Exec. Order No. 13,224, 66 Fed. Reg. at 49,079. He also found "that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists." Id. And he concluded "that a need exists for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism." Id. Consequently, "[t]hrough this Executive Order, President Bush invoked the authority granted to him under the IEEPA, and blocked all property and interests in property of twenty-seven foreign terrorist[s], terrorist organizations, and their supporters, each which were designated as SDGTs," Islamic Am. Relief Agency v. Unidentified FBI Agents, 394 F. Supp. 2d 34, 42 (D.D.C. 2005) (Walton, J.) (citations omitted), which as the defendant here asserts, are all related to Al-Qaeda, see Def.'s 1st Mot. to Dismiss at 5–6.

Against this backdrop, the defendant contends that the OFAC's "designation of Hizballah as [a Specially Designated National ('SDN')], and the subsidiary designation of [himself], cannot meaningfully be said to address the same 'threat' that motivated Executive Order 13,224." Id. at 12; see also id. ("If Executive Order 13,224 is so open-ended that it can support the government's designation and prosecution of [the defendant], then it is not the sort of narrowly-drawn emergency declaration that Congress authorized with [the] IEEPA."). However,

contrary to the defendant's position, see id. at 10–16, the OFAC's designation of Hizballah as a SDN and its designation of him as a SDGT pursuant to Executive Order 13,224, fall squarely within the IEEPA's requirement that "any new threat be based on a new declaration of national emergency," 50 U.S.C § 1701(b). The Court so concludes because, although the adoption of Executive Order 13,224 was motivated by the September 11, 2001 terrorist attacks, which were carried out by Al-Qaeda, there is no indication whatsoever that Executive Order 13,224 limits its declaration of a national emergency to Al-Qaeda. Rather, the plain language of Executive Order No. 13,224 clearly indicates that President Bush declared a national emergency with respect to the general threat of terrorism, not a specific terrorist group. See Exec. Order No. 13,224, 66 Fed. Reg. at 49,079 (providing "that grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks . . . committed on September 11, 2001, . . . and the continuing and immediate threat of further attacks[,] . . . constitute an unusual and extraordinary threat" (emphasis added)). In fact, Executive Order 13,224 explicitly

> authorizes the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to designate additional [SDNs and] SDGTs whose property or interests in property should be blocked because they "act for or on behalf of" or are "owned or controlled by" designated terrorists, or because they "assist in, sponsor, or provide . . . support for," or are 'otherwise associated' with them.

Islamic Am. Relief Agency, 394 F. Supp. 2d at 42 (omission in original) (quoting Exec. Order No. 13,224, § 1(c)–(d), 66 Fed. Reg. at 49,079–80); see also id. § 1(b), Fed. Reg. at 49,079. Thus, the Court does not find that Executive Order 13,224 exceeds the scope of the President's authority granted by the IEEPA. See Islamic Am. Relief Agency, 394 F. Supp. 2d at 46 (concluding that the President's determination of "an unusual and extraordinary threat" in Executive Order 13,224 was terrorism holistically, and, therefore the President properly invoked the broad authority granted to him under the IEEPA). Accordingly, the Court must deny the

defendant's motion to dismiss all IEEPA counts predicated on the theory that the application of

Executive Order 13,224 has been unlawfully applied to him.[6]

## B. The Defendant's Motion to Dismiss All IEEPA Counts of the Indictment for Failure to Satisfy the "U.S. Person" Element

Counts 1, 3 through 7, 9, and 10 of the Indictment each charge the defendant in some

fashion with "causing U.S. persons to transact with [a] [SDGT]." Def.'s 2d Mot. to Dismiss at 1.

The defendant contends that each of these counts should be dismissed "[b]ecause [he] is not a

U.S. person and thus cannot be prosecuted under the charged statutes and because, in any event,

the allegations in the [ ] [I]ndictment do not show that he 'caused' violations of those statutes

even if he were legally capable of doing so." Id. at 3. The government in response asserts that

"[a]n ordinary interpretation of the applicable law, as well as a plain reading of the Indictment,

cause both arguments of the [d]efendant to fail." Gov't's 2d Opp'n at 3–4.

The Court reiterates that resolution of the parties' dispute regarding this motion to

dismiss turns on statutory interpretation, which, as the Court previously noted, must begin with

the plain language of the IEEPA. See Barnhart, 534 U.S. at 450. With this principle guiding the

Court's analysis, the Court finds the United States District Court for the Southern District of

New York's analysis of the IEEPA's plain language regarding its applicability to non-United

States persons in United States v. Zarrab, although not binding, to be particularly instructive.

---

[6] The defendant also challenges the OFAC's authority to "promulgate[] regulations permitting it to designate [as SDGTs] people like [himself] without any connection to the September 11 attacks or even to attacks against the United States." Def.'s 1st Reply at 10; see also id. ("The question for this Court is not whether a general and permanent antiterrorism sanctions regulatory regime like the one [the] OFAC has created by regulation would be desirable as a policy matter, but whether [the] OFAC may bring such a regime about through its own administrative action, without Congress."). But, Executive Order 13,224 "authorizes the Secretary of Treasury to 'employ all powers granted to the President by [the] IEEPA and [the United National Participation Act ('[the] UNPA')' and to promulgate rules and regulations to carry out the purposes of the Order and to re-delegate such functions if he chose to do so." Islamic Am. Relief Agency, 394 F. Supp. 2d at 42 (alteration in original) (quoting Exec. Order No. 13,224, § 7, 66 Fed. Reg. at 49,081). Therefore, the Court finds the defendant's argument unpersuasive. See id. at 46–47 (rejecting the plaintiff's claim that the OFAC's designation of it as a SDGT pursuant to Executive Order 13,224 "exceeded its statutory authority," given that the Order "clearly designates the procedures for designating organizations as SDGTs").

See Crim. Action No. 15-867 (RMB), 2016 WL 6820737, at *1 (S.D.N.Y. Oct. 17, 2016). In

Zarrab, the defendant claimed that the IEEPA "d[id] not apply extraterritorially," and therefore,

because he was a Turkish/Iranian person and not a United States person, the IEEPA provisions

did not apply to him. See 2016 WL 6820737, at *8. Although the court noted that it did not

need to reach "the question of whether the IEEPA . . . appl[ied] extraterritorially," id., the court

concluded that the language of multiple provisions of the IEEPA "indicat[ed] that Congress

intended the statute to be applied extraterritorially," id. at *9. For instance, the court noted that

§ 1701(a) of the IEEPA "reads: 'Any authority granted to the President by section 1702 of this

title may be exercised to deal with any unusual or extraordinary threat, which has its source in

whole or substantial part outside the United States, to the national security, foreign policy, or

economy of the United States.'" Id. (quoting § 50 U.S.C. 1701(a)); see also id. (citing Envtl.

Def. Fund, Inc. v. Massey, 986 F.2d 528, 531 (D.C. Cir. 1993) for its holding that "the

presumption [against extraterritoriality] is generally not applied where the failure to extend the

scope of the statute to a foreign setting will result in adverse effects within the United States"

(alteration in original)). In addition, the court noted that "§ 1702(a)(1)(B) grants the President

broad powers, including the power to 'investigate, block during the pendency of an investigation,

regulate, direct and compel . . . any property in which any foreign country or a national thereof

has any interest . . . subject to the jurisdiction of the United States.'" Id. (omissions in original).

And, it recognized that "§ 1705(c) establishes criminal penalties for '[a] person who willfully

commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the

commission of, an unlawful act' described in the statute," and is therefore "not limited to

individual (such as U.S. citizens) who are subject to the jurisdiction of the United States." Id.

Consequently, the Zarrab court found that the IEEPA applies to non-United States persons.

Adopting this reasoning in full, this Court agrees with the Zarrab court that the plain language of several provisions of the IEEPA unambiguously indicate that the IEEPA applies extraterritorially. In opposition to extraterritorial application of the IEEPA in this case, the defendant urges the Court to follow the guidance provided by the District of Columbia Circuit in United States v. Yakou, 428 F.3d 241 (D.C. Cir. 2005), which he asserts stands for the proposition "that a 'U.S. person' restriction cannot be circumvented using secondary liability." Def.'s 2d Reply at 1; see also Def.'s 2d Mot. to Dismiss at 5 (noting a district court's reliance on Yakou in United States v. Chalmers, 474 F. Supp. 2d 555 (S.D.N.Y 2007), as the basis to "dismiss[] IEEPA charges against a Bahamian company . . . because the company was not a U.S. person under the applicable statute and regulations"). However, in Zarrab, the defendant likewise relied on Yakou and Chalmers as support for his position, and the court found the circumstances in Yakou and Chalmers to be distinguishable from those in Zarrab. See 2016 WL 6820737, at *10. Specifically, the defendants in Yakou and in Chalmers were charged under statutes that explicitly applied only to United States persons. See id. (citing Yakou and Chalmers). And in Yakou, it was undisputed that the conduct underlying the charged offenses in that case occurred outside of the United States, and the government did not contend that the defendant was subject to the jurisdiction of the United States. See id. (discussing Yakou). But, the defendant in Zarrab was charged under the IEEPA, among other statutes, which did apply extraterritorially. See id. For these same reasons, this Court finds the circumstances here distinguishable from those in Yakou and in Chalmers, and therefore concludes the defendant's reliance on those cases misplaced.

Having concluded that the IEEPA applies to the defendant as a non-United States person, the Court now turns to the defendant's alternative argument that the Indictment fails to set forth

sufficient allegations that he caused a United States person to violate the IEEPA. See Def.'s 2d

Mot. to Dismiss at 7. Specifically, he asserts that there are no allegations in the Indictment "that

the U.S. persons in question were unwitting or innocent." Id. at 8; see also id. at 8–9 ("[T]here

[are no] allegation[s] of fact indicating that the transactions were something other than arm's

length, that they were not agreed to knowingly and voluntarily by the U.S. persons, or that the

U.S. persons did not have the ability to decline them. If anything, the allegations [ ] in the [ ]

[I]ndictment show the opposite. They indicate that the U.S. companies that sold goods to [the

defendant] were aware that they were doing business with a[] SD[GT]."). The government

counters by asserting that its "theory of prosecution is not based on 18 U.S.C. § 2," as that statute

was only referenced "in the Indictment [to] provide[] notice to the [d]efendant that at trial the

factfinder may be asked to consider the acts of a co-conspirator or co-perpetrator as if they had

been committed by the [d]efendant himself." Gov't's 2d Opp'n at 13. The government also

argues that "none of the charges in the Indictment require the government to make . . . any

allegation that the U.S. persons [with whom (the defendant) transacted] were unwitting or

innocent, or, an allegation of fact indicating that the transactions were something other than

arm's length." Id. (first alteration in original) (citation and internal quotation marks omitted).

Again, the Court agrees with the government.

As the government notes, the Indictment does not charge the defendant with aiding and

abetting; rather, it alleges that the defendant "agree[d] with another to willfully violate [the]

IEEPA and to defraud the United States" and "willfully act[ed] in violation of [the] IEEPA in

seven additional substantive counts that involved transactions in the United States." Id. Further,

as this Circuit has explained:

> While aiding and abetting might commonly be thought of as an offense in itself, it
> is not an independent crime under 18 U.S.C. § 2. That statute provides no penalty,

13

but only abolishes the distinction between common law notions of "principal" and "accessory." Under it, the acts of the perpetrator become the acts of the aider and abettor and the latter can be charged with having done the acts himself. An individual may be indicted as a principal for commission of a substantive crime and convicted by proof showing him to be an aider or abettor. The indictment need not specially charge a violation of 18 U.S.C. § 2. An aiding and abetting instruction may be given in a case where the indictment does not allege violation of the aiding and abetting statute.

United States v. Kegler, 724 F.2d 190, 200–01 (D.C. Cir. 1983) (footnotes omitted). Moreover, contrary to the defendant's position, he has not cited any legal authority concluding that the government must prove beyond a reasonable doubt "that the U.S. companies that allegedly sold goods to [the defendant] were innocent intermediaries," Def.'s 2d Reply at 7, to meet its burden of establishing a violation of the IEEPA. See Def.'s 2d Mot. to Dismiss at 8.[7] And the Court is unaware of any legal authority requiring the government to make such a showing. See 50 U.S.C. § 1705(a) ("It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."). Accordingly, the Court must deny the defendant's motion to dismiss each of the IEPPA violations charged against him based on his United States person requirement argument.

### C. The Defendant's Motion to Dismiss Count One of the Indictment for Failure to State a Conspiracy to Defraud the United States of Money or Property

In relevant part, count one of the Indictment charges the defendant with conspiring

to defraud the United States Government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting dealing with SDGTs or in a blocked property without having first obtained the required licenses from [the] OFAC, by deceit, craft, trickery, and dishonest means.

Indictment ¶ 17(b); see also 18 U.S.C. § 371 (2012). Through his motion to dismiss count one of

---

[7] The defendant relies on United States v. Trie, 21 F. Supp. 2d 7 (D.D.C. 1998), as support for his proposition that the government must demonstrate that the United States companies were "innocent intermediaries." Def.'s 2d Mot to Dismiss at 8. However, the defendant's reliance on Trie is misplaced, particularly because the defendant in Trie was charged with aiding and abetting, whereas the defendant here is not.

the Indictment, the defendant asserts that this count should be dismissed because a conspiracy to defraud [ ] the United States under [18 U.S.C.] § 371 . . . cannot be predicated on a conspiracy to deprive the United States of an intangible right to function without impairment." Def.'s 3d Mot. to Dismiss at 1–2; see also id. (arguing that a conspiracy charged to defraud "under § 371 must involve a conspiracy to deprive the United States of money or property, or at the very least a conspiracy to bribe a federal government official" (citations omitted)). The government in response asserts that "[a] conspiracy to 'defraud the United States' does not need to cause monetary or property loss to the United States," Gov't's 3d Opp'n at 6, and that the Indictment sufficiently sets forth all of the allegations necessary to adequately plead a conspiracy to defraud the United States, see id. at 6–8. As the government correctly notes, see id. at 6–7, this Circuit and other Circuits have concluded that § 371 does not require the loss of property or money, see United States v. Dean, 55 F.3d 640, 647 (D.C. Cir. 1995) ("[I]f the government's evidence showed that [the defendant] conspired to impair the functioning of the Department of Housing and Urban Development, 'no other form of injury to the Federal Government need be established for the conspiracy to fall under § 371.'" (quoting Tanner v. United States, 483 U.S. 107, 128 (1987)); United States v. Rodman, 776 F.3d 638, 643 (9th Cir. 2015) ("[B]ecause Rodman's actions constitute a conspiracy to impair the functioning of the [Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF")], it was not necessary that there be evidence of any other form of injury to the ATF in order for Rodman to be found guilty of a conspiracy under 18 U.S.C. § 371."); United States v. Puerto, 730 F.2d 627, 630 (11th Cir. 1984) ("Conspiracies in violation of section 371 need not cause any monetary loss to the government, so long as they interfere with or obstruct its lawful functions."), nor does it require an agreement to bribe a federal official, see United States v. Collins, 78 F.3d 1021, 1037 (6th Cir. 1996) (noting that § 371 "has been given a

15

very broad meaning so that defraud extends beyond its common law usage and includes any interference or obstruction of a lawful governmental function by deceit, craft or treachery or at least by means that are dishonest" (citation and internal quotation marks omitted)); United States v. Rankin, 870 F.2d 109, 114 (3d Cir. 1989) (reinstating an indictment brought under § 371 charging the defendants with conspiring to defraud the United States "by impairing the lawful function of the United States District Court through the making of false, misleading, and deceitful representations and statements"). Again, the Court agrees with the government.

As support for his position that a conspiracy to defraud the United States must involve a deprivation of money or property, the defendant "acknowledge[s] that many courts have used language suggesting that § 371 covers conspiracies to impair the government's lawful functions, but [ ] explain[s] that no Supreme Court or D.C. Circuit decision has ever actually upheld a § 371 conviction under the 'lawful function' rubric beyond the limited context of bribery." Def.'s 3d Reply at 5. The defendant then goes further by seeking to distinguish the three Supreme Court cases the government relies on for its position that a § 371 conspiracy to defraud the United States is broadly interpreted "to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful government function of any department of government." See Gov't's 3d Opp'n at 3–4 (internal quotation marks omitted) (relying on Tanner, Hammerschmidt v. United States, 265 U.S. 182 (1924), and Haas v. Henkel, 216 U.S. 462, 479 (1910)); see also Def.'s 3d Reply at 5 (explaining why Haas, Hammerschmidt, and Tanner are not applicable to this case). Primarily, the defendant contends that Haas and Hammerschmidt are inapposite because "[t]he 'lawful function' language was [ ] not essential to the [defendants'] facial validity [challenge] of the indictment[s]." Def.'s 3d Mot. to Dismiss at 6; see also id. at 7. Therefore, from the defendant's perspective, even though the Supreme Court acknowledged in Haas that a § 371

conspiracy "is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government," id. at 6 (quoting Haas, 216 U.S. at 479) (internal quotation marks omitted), the defendant asserts that such language is merely dicta, see id. at 6–7.

Furthermore, the defendant uncategorically claims that the Supreme Court in Tanner "expressly reserved the question of whether § 371 encompasses 'lawful function' conspiracies." Id. at 5 (citing Tanner, 483 U.S. at 128). However, the Court is perplexed as to how the defendant arrived at this conclusion when the Supreme Court expressly emphasized that it

> ha[s] stated repeatedly that the fraud covered by [§ 371] "reaches ˙any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" [It] do[es] not reconsider that aspect of the scope of § 371 in this case. Therefore, if petitioners' actions constituted a conspiracy to impair the functioning of the [Rural Electrification Administration], no other form of injury to the Federal Government need be established for the conspiracy to fall under § 371.

Tanner, 483 U.S. at 128 (internal citations omitted). This pronouncement clearly conflicts with the defendant's position, and although the defendant may conceivably be correct that there has not been any Supreme Court precedent upholding "a § 371 conviction under the 'lawful function' rubric beyond the limited context of bribery," Def.'s 3d Reply at 5, the Supreme Court has nonetheless made clear that a § 371 conspiracy may be properly predicated on an alleged impairment or obstruction of a lawful function of any department of the government, see Tanner, 483 U.S. at 128. And the defendant has not proffered any meritorious arguments or authority that convinces this Court to disregard the unambiguous language of the Supreme Court and adopt his legally unsupported position.

Accordingly, because count one of the Indictment sufficiently alleges that the defendant conspired to defraud the United States by interfering with and obstructing the OFAC's lawful

governmental functions, see Indictment § 17(b), the Court must deny the defendant's motion to dismiss count one of the Indictment for failure to allege the deprivation of money or property.[8]

## D. The Defendant's Motion to Dismiss Count One of the Indictment for Failure to State a Conspiratorial Agreement

The defendant also argues that count one of the Indictment should be dismissed because it "contains no factual allegations suggesting that [he] entered into an agreement with any other person with respect to the second prong of the charged conspiracy—the alleged conspiracy to defraud [the] OFAC in violation of § 371." Def.'s 4th Mot. to Dismiss at 4; see also id. (noting the "stark contrast [from] the factual allegations regarding co-defendant Imad Hassoun in the first prong of the conspiracy—the conspiracy to transact business with [United States] persons in violation of [the] IEEPA"). Rather, from the defendant's perspective, count one only contains allegations that the defendant "himself attempted to mislead [the] OFAC—i.e., that he made a false statement," and "unilateral conduct does not amount to a conspiracy." Id. at 5. The government contends in response that the language in the Indictment is sufficient. See Gov't's 4th Opp'n at 9–13; see also id. at 11 ("[T]he [d]efendant's position that the Indictment fails to state a conspiratorial agreement ignores the plain language of the Indictment and that 'an

---

[8] Relying on McNally v. United States, 483 U.S. 350 (1987) and Skilling v. United States, 561 U.S. 358 (2010), the defendant implores the Court to "forb[id] the government from using the 'defraud' language in the mail fraud statute to prosecute deprivations of intangible rights beyond bribery schemes." Def.'s 3d Reply at 1. But, the Court finds the defendant's reliance on these Supreme Court cases misplaced, particularly because those case involved the application of the term "defraud" in § 1341, the mail fraud statute, and in § 1346, the honest services fraud statute, respectively, not § 371, the conspiracy statute. See generally McNally, 483 U.S. at 350; Skilling, 561 U.S. at 358. Given those distinctive statutory applications, the Supreme Court guidance explicitly interpreting the term "defraud" as used in § 371, and other Circuits' conclusions that the meaning of "defraud" as used in § 371 extends beyond an agreement to bribe a federal official, see supra Part III.C., the Court finds the defendant's argument that "[i]f § 371 covers any conspiracy aimed at the government's intangible right to conduct its lawful functions without interference, then it is impermissibly vague and must be limited to bribery cases," Def.'s 3d Reply at 4–5, to be unpersuasive.

indictment is not required to set forth all of the evidence the [g]overnment plans to present.'"

(quoting <u>United States v. Palfrey</u>, 499 F. Supp. 2d 34, 45 (D.D.C. 2007))).

Federal Rule of Criminal Procedure 7(c) requires that an "indictment . . . be a plain,

concise, and definite written statement of the essential facts constituting the offense charged."

Fed. R. Crim. P. 7(c). "An indictment alleging a § 371 conspiracy is sufficient if it describes the

essential nature of the conspiratorial agreement and sets forth the essential elements of the

offense." <u>United States v. Recognition Equip., Inc.</u>, 711 F. Supp. 1, 5 (D.D.C. 1989), <u>overruled</u>

<u>by Supreme Court recognized on other grounds</u> as noted in <u>Moore v. Hartman</u>, Civ. Action Nos.

92-2288 (NHJ), 93-0324 (NHJ), 1993 WL 405785, at *8 (D.D.C. Sept. 24, 1993) (citing <u>United</u>

<u>States v. Williams</u>, 504 U.S. 26, 50–55 (1992). Other than "stat[ing] the essential elements of

the offense," an indictment charging a § 371 conspiracy must simply "allege at least one overt

act in furtherance of the conspiracy, and [ ] serve[] to apprise [the] defendant[] of what [he] must

be prepared to defend. No further allegations are required in a § 371 indictment." <u>Id.</u> at 4

(internal citation omitted).

Here, the Court finds that "[t]he indictment puts [the] defendant[] on notice that [he] must

be prepared to defend actions allegedly taken in furtherance of a conspiracy," <u>id.</u> at 5, "to

defraud the United States by interfering with the OFAC's enforcement of its laws and regulations

prohibiting United States persons from dealing with SDGTs or blocked property," Gov't's 4th

Opp'n at 10. As the government correctly notes, <u>see id.</u> at 9, paragraph 17 of the Indictment

clearly alleges that the defendant conspired with co-defendant Imad Hassoun and others to

obstruct the lawful functions of the OFAC, <u>see</u> Indictment ¶ 17. The Indictment further asserts

the "objects" of the alleged conspiracy, <u>see id.</u> ¶ 19, and details the means by which the

defendant, as well as others, effected the alleged conspiracy to impede the OFAC and its lawful

functions, including the purportedly overt actions the defendant allegedly committed to further the conspiracy, see id. ¶¶ 25–41.[9] Therefore, the Court finds that count one of the Indictment not only contains sufficient detail to meet the requirements of Rule 7(c), but also sufficiently pleads a conspiratorial agreement under § 371 between the defendant and other individuals to defraud the United States by allegedly interfering with and obstructing the OFAC's governmental functions. Accordingly, the Court must deny the defendant's motion to dismiss count one of the Indictment in its entirety for failure to plead a conspiratorial agreement.[10]

### E. The Defendant's Motion to Dismiss Count One of the Indictment for Failure to Specifically Plead False Statements

The defendant further contends that count one of the Indictment must be dismissed because "the conspiracy to defraud charged in [c]ount [one] [ ] fails to identify what exactly in [his] submissions to [the] OFAC [were] false." Def.'s 5th Mot. to Dismiss at 4. Specifically, the defendant argues that the allegedly false statements in the Indictment that "form the basis of the charge that [he] conspired to defraud [the] OFAC . . . fail[] 'to sufficiently apprise [him] of what he must be prepared to meet,'" and therefore, he "cannot meaningfully prepare his defense." Id. at 6 (quoting Russell v. United States, 369 U.S. 749, 764 (1962)). The government in response

---

[9] The defendant contends that dismissal of count one of the Indictment for failure to allege a conspiratorial agreement is warranted because the factual allegations regarding his purported false statements indicate unilateral conduct on his behalf. See Def.'s 4th Mot. to Dismiss at 5. However, the Court finds this argument unconvincing as the Indictment clearly alleges the use of false statements in communications with the OFAC as one type of overt act allegedly committed in furtherance of the alleged conspiracy between the defendant and other individuals. See Indictment ¶¶ 25–41.

[10] Alternatively, the defendant asserts that count one of the Indictment must be dismissed because it "does not allege 'one overall agreement among the various parties' to both defraud [the] OFAC and violate [the] IEEPA." Def.'s 4th Mot. to Dismiss at 6 (citation omitted); see also id. at 5 (arguing that count one of the Indictment violates the rule against duplicity which precludes the joining of two or more distinct and separate offenses in one count). The Court disagrees. As the Supreme Court has observed, "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for '[t]he conspiracy is the crime, and that is one, however diverse its objects.'" Braverman v. United States, 317 U.S. 49, 54 (1942) (quoting Frohwerk v. United States, 249 U.S. 204, 210 (1919)). And in this case, the Court finds that the Indictment sufficiently alleges one conspiratorial agreement between the defendant and other individuals.

maintains that count one sufficiently "gives [the defendant] the gist of the offense of conspiracy, the agreement to commit an unlawful act[,] and the means by which that agreement was to be achieved." Gov't's 4th Opp'n at 14 (quoting Schino v. United States, 209 F.2d 67, 69 (9th Cir. 1953)). In any event, the government asserts that "portions of [c]ount [o]ne of the Indictment actually identify which submissions to [the] OFAC included fraudulent representations." Id. at 14 n.10 (citing Indictment ¶ 28).

To survive a pretrial challenge to its facial sufficiency, an indictment must "first[] contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend, and second, enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974). "The test for sufficiency is whether it is fair to require the accused to defend himself on the basis of the charge as stated in the indictment[,]" and an indictment passes muster under this test "if it clearly informs the defendant of the precise offense of which he is accused so that he may prepare his defense." United States v. Conlon, 628 F.2d 150, 155 (D.C. Cir. 1980). Therefore, an indictment "must fairly apprise the accused of the conduct allegedly constituting the offense so as to enable him to prepare a defense against those allegations." United States v. Dale, 782 F. Supp. 615, 621 (D.D.C. 1991). And, "the language of the statute may be used in the general description of an offen[s]e, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offen[s]e, coming under the general description, with which he is charged." Hamling, 418 U.S. at 117–18. Consequently, "[a]n indictment not framed to apprise the defendant 'with reasonable certainty[ ] of the nature of the accusation against him is defective, although it may follow the language of the statute.'" United States v. Hillie, 227 F. Supp. 3d 57, 71 (D.D.C. 2017) (alterations in original) (quoting United

States v. Nance, 533 F.2d 699, 701 (D.C. Cir. 1976)).

Moreover, "[w]hen testing the sufficiency of the charges in an indictment, 'the indictment must be viewed as a whole and the allegations [therein] must be accepted as true at this stage of the proceedings.'" Id. (alteration in original) (quoting United States v. Bowdoin, 770 F. Supp. 2d 142, 145 (D.D.C. 2011)). In making this determination, "the court 'is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes.'" Id. (quoting United States v. Sunia, 643 F. Supp. 2d 51, 60 (D.D.C. 2009)).

Here, the Court finds that count one of the Indictment sufficiently apprises the defendant with reasonable certainty of the conduct allegedly constituting the conspiracy to defraud the United States, and therefore is not facially defective. Initially, as the government notes, "the [d]efendant is not charged with making a false statement to [the] OFAC; rather, the [d]efendant is charged with conspiring with others to interfere with [the] OFAC's lawful functions of enforcement of laws and regulations prohibiting U.S. persons from doing business with SDGTs or blocked property without a license from [the] OFAC." Gov't's 4th Opp'n at 15. Further, as the Court previously noted, the making of false statements to the OFAC is but only one type of overt act that the defendant allegedly committed in furtherance of the conspiracy to defraud as charged in count one of the indictment. See Indictment ¶¶ 25–41. And contrary to the defendant's proposition, see Def.'s 5th Reply at 2 (asserting that the other two categories of alleged overt acts do not apply to the charged conspiracy to defraud the United States because "neither subsection . . . mention[] [the] OFAC" (emphasis removed)), the language of count one of the Indictment does not limit any of the asserted overt acts to any one particular object of the conspiracy, see Indictment ¶¶ 26–41. Rather, the language clearly states that the defendant purportedly "committed" each of the asserted overt acts "[i]n furtherance of [the charged]

22

conspiracy." Id. ¶ 25. Thus, the Court finds the defendant's argument that the charged

conspiracy to defraud the United States is limited to the overt acts concerning his purportedly

false statements made to the OFAC unconvincing. See id. ¶ 17(b) (charging the defendant with

conspiracy "to defraud the United States [g]overnment by interfering with and obstructing a

lawful government function, that is, the enforcement of laws and regulations prohibiting dealing

with SDGTs or in blocked property without having first obtained the required licenses"

(emphasis added), which logically would involve the alleged overt acts of conducting

transactions with United States companies and corresponding with United States persons in

furtherance of the charged conspiracy).[11]

In any event, the Indictment does contain factual allegations that sufficiently apprise the

defendant of the allegedly false statements made to the OFAC. For instance, count one

specifically identifies three letters purportedly sent either by the defendant or at the defendant's

direction containing misrepresentations made to the OFAC, see id. ¶¶ 26–28, and count one

further characterizes the defendant's purported misrepresentations, see, e.g., id. ¶ 27 (asserting

that the defendant "claimed that the [attached] report represented[] 'an unimpeded, objective

view into [his] life and business,' when, in fact, [he] and others endeavored to conceal relevant

facts and circumstances regarding his business dealings and the companies under his control

from those preparing the report"). Consequently, count one of the Indictment adequately puts

the defendant on notice of the allegations regarding his purportedly false statements made to the

OFAC that he must defend against. And inapposite to the defendant's contention, see Def.'s 5th

---

[11] The defendant appears to suggest that the government must prove that he intended to conspire to defraud the
United States government. See Def.'s 5th Reply at 3 ("[T]he government has provided no authority whatsoever for
the proposition that merely violating a law (such as the IEEPA) in a manner that involves deception—with no
intention to interact with the government, either directly or indirectly—can amount to a conspiracy to defraud the
United States. It obviously cannot. The very core of the offense is a deception of the U.S. government, not some
other purported victim.").

to Dismiss at 7 ("His submissions to [the] OFAC were many pages long, and each had multiple attachments. It is simply not sufficient for the government to identify [his] general summations of those attachments . . . without providing factual allegations that actually explain to him what he is accused of concealing."), count one of the Indictment need not allege all false representations purportedly made to the OFAC for it to be sufficient, see Palfrey, 499 F. Supp. 2d at 45 ("[A]n indictment is not required to set forth all the evidence the [g]overnment plans to present."), particularly "[b]ecause an indictment is a charging instrument rather than a discovery device," United States v. Crosby, 789 F. Supp. 440, 443 (D.D.C. 1992). Accordingly, the Court finds count one of the Indictment facially valid, as it places the defendant on notice of the allegedly false statements made to the OFAC in furtherance of the charged conspiracy, and therefore, the Court must also deny this aspect of the defendant's motion to dismiss.

Alternatively, the defendant requests that the Court require the government to furnish him with "a bill of particulars regarding the allegedly false statements." Def.'s 5th Mot. to Dismiss at 7. As support for his position, the defendant argues that he "cannot 'adequately prepare' for trial without knowing which specific statements or omissions in his voluminous submissions to [the] OFAC are alleged to be false, and in what sense they are alleged to be false." Id. at 8. In response, the government contends that the "information the [d]efendant presently requests is available to him in another form—his assessment of the materials he provided to [the] OFAC and which the government disclosed in the instant matter and the other and copious discovery provided to him." Gov't's 4th Opp'n at 17–18. The government further argues that the Indictment "more than adequately advise the [d]efendant of the particulars of the government's case against him." Id. at 18. And, the defendant does not refute the government's claim that the Indictment and the discovery it has now produced provide him with the information he seeks

through a bill of particulars. See Def.'s 5th Reply at 5. Therefore, the Court agrees with the government's position.

A trial court has discretion "to determine whether a bill of particulars should be provided, and the court should grant a motion for a bill of particulars to the extent it believes it is necessary to allow the defendant[] to adequately prepare for and avoid surprise at trial." United States v. Bazezew, 783 F. Supp. 2d 160, 167 (D.D.C. 2011); see also United States v. Anderson, 441 F. Supp. 2d 15, 19 (D.D.C. 2006) ("[T]he [c]ourt should grant such motions when 'necessary to prevent unfair surprise at trial.'" (quoting United States v. Espy, 989 F. Supp. 17, 34 (D.D.C. 1997))). Although "[t]he Court must strike a 'prudent balance' between the legitimate interests of the government and those of the defendant[]," id. (quoting United States v. MacFarlane, 759 F. Supp. 1163, 1169 (W.D. Pa. 1991)), it is mindful that "[a] bill of particulars is not a discovery tool or a device for allowing the defense to preview the government's theories or the government's evidence," id.

Here, the Court concludes that the defendant, through a bill of particulars, "is [not] entitled to know precisely which allegedly false statements the government relies on in each paragraph, the way in which the government alleges them to be false, and when approximately they were allegedly made." Anderson, 441 F. Supp. 2d at 20. Although another member of this Court in Anderson granted a defendant's request for a bill of particulars to provide the defendant the ability to know precisely what his false statements were, see id., as the government correctly notes, in this case "false statements [are not] at the core of the [defendant's] charges against him[,]" Gov't's 4th Opp'n at 18. Rather, the defendant is charged with conspiracy

> to [ ] among other things, defraud the United States government by interfering with
> [the] OFAC's lawful function of enforcing laws and regulations prohibiting U.S.
> persons from doing business with SDGTs or in blocked property without a license,
> and the [d]efendant's submissions to [the] OFAC, which included

> misrepresentations or fraudulent statements, constituted some of the charged over
> acts taken in furtherance in conspiracy.

Id. Moreover, the Court finds the allegations in the Indictment to clearly set forth the

submissions and the defendant's underlying misrepresentations allegedly made to the OFAC that

constitute overt acts in furtherance of the conspiracy for him to prepare an adequate defense at

trial. See Indictment ¶¶ 26–28.[12]

Accordingly, because a bill of particulars is not a discovery tool, the Court must deny the

defendant's alternative request for a bill of particulars.

### F. The Defendant's Motion to Dismiss the Money Laundering Count of the Indictment

Count eleven of the Indictment charges the defendant with conspiring to commit money

laundering in violation of 18 U.S.C. § 1956(a)(2)(A) and 1956(a)(2)(B)(i). See Indictment

¶¶ 44–55. The defendant contends that count eleven "must be dismissed for failure to state an

offense pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v)." Def.'s 6th Mot. to

Dismiss at 1. Specifically, the defendant asserts that "[i]t is a basic requirement of such a charge

that the alleged money laundering be separate and distinct from the underlying offense that

generated the proceeds to be laundered." Id.; see also Def.'s 6th Reply at 4 (asserting that

dismissal is required because 18 U.S.C. § 1956(a)(2)(A) and (B)(i), require the "act of money

laundering [to be] distinct from the underlying [specified unlawful activity]"). But, in this case,

the defendant claims that "every single one of the payments that the [ ] [I]ndictment alleges in

---

[12] The Court notes the untimeliness of the defendant's request for a bill of particulars, which "comes 308 days after arraignment." Gov't's 4th Opp'n at 17. Under Federal Rule of Criminal Procedure 7(f), a defendant should move for a bill of particulars "within 14 days after arraignment or at a later time if the court permits." Fed. R. Crim. P. 7(f); see also United States v. Homaune, 898 F. Supp. 2d 153, 165 (D.D.C. 2012). As the government correctly points out, the defendant "does not provide an explanation for the significant departure from the 14-day default established by the rule," Gov't's 4th Opp'n at 17; see Def.'s 5th Reply at 5, thereby lending additional support to the Court's conclusion that the defendant's request for a bill of particulars should be denied. See Homaune, 898 F. Supp. 2d at 165 (denying the defendant's request for a bill of particulars in part because "the motion came fifty-two days after arraignment—far beyond Rule 7(f)'s fourteen-day default—with no explanation for why his request took so long to lodge").

support of the money laundering conspiracy also is alleged as part of the underlying offense." Def.'s 6th Mot. to Dismiss at 1; see also id. at 3 ("[E]very single one of the overt acts that the government alleges [the defendant's] companies undertook in furtherance of a money laundering conspiracy was simply a payment for goods that formed the basis for the underlying IEEPA counts in the [ ] [I]ndictment."). In response, the government argues "that raising this issue, commonly referred to as 'merger,' is premature at this time, but in any event, the motion is without merit and should be denied." Gov't's 5th Opp'n at 3; see also id. at 4 ("Specifically, (1) the issue of whether or not the money laundering charge impermissibly merges with the other charges is a fact-driven, post-conviction issue, primarily concerned with fairness in sentencing and punishment, and it is premature to consider it via a pretrial motion to dismiss; and (2) even if the court were to consider the issue properly subject to a pre-trial adjudication, the motion should be denied.").

The defendant's challenge is primarily predicated on whether 18 U.S.C. § 1956(a)(2) requires "a distinct act of money laundering separate and apart from the transactions that allegedly violated [the] IEEPA and constituted the [specified unlawful activity] for money laundering." Def.'s 6th Reply at 2.[13] As this issue turns on statutory interpretation, the Court's analysis would generally begin with the language of the statute to determine whether or not the language is unambiguous. See Barnhart, 534 U.S. at 450. The Court finds the Second Circuit's analysis and reasoning in United States v. Piervinanzi, 23 F.3d 670 (2d Cir. 1994), to be particularly informative. In Piervinanzi, the petitioner argued that his conviction under

---

[13] The parties spend a substantial amount of time in their briefing discussing whether the issue presented in the defendant's challenge involves consideration of a potential "merger" conflict. See Gov't's 5th Opp'n at 6–8; Def.'s 6th Reply at 3–5. Given the Court's analysis provided infra in this section, the Court finds it unnecessary to address this dispute, which the Court notes that the parties agree, to some extent, is not applicable to this case, see, e.g., Def.'s 6th Reply at 3.

§ 1956(a)(2) was improper because "the [statutory] language [and] . . . its legislative history . . . support the conclusion that this provision proscribes only 'laundering' activity that is analytically distinct from the underlying criminal activity that it promotes." 23 F.3d at 679. Rejecting the petitioner's position, the Second Circuit conducted an "[a]nalysis of the overall structure of § 1956," and concluded that:

> Section 1956(a)(1), the domestic money laundering statute, penalizes financial transactions that "involv[e] . . . the proceeds of specified unlawful activity." The provision requires first that the proceeds of specified unlawful activity be generated, and second that the defendant, knowing the proceeds to be tainted, conduct or attempt to conduct a financial transaction with these proceeds with the intent to promote specified unlawful activity. By contrast, § 1956(a)(2) contains no requirement that "proceeds" first be generated by unlawful activity, followed by a financial transaction with those proceeds, for criminal liability to attach. Instead, it penalizes an overseas transfer "with the intent to promote the carrying on of specified unlawful activity."

Id. at 679–80 (alteration and omission in original) (footnotes omitted) (quoting 18 U.S.C. § 1956(a)(2)(A)). The Second Circuit further reasoned that "[t]he fact that Congress uses different language in defining violations in a statute indicates that Congress intentionally sought to create distinct offenses[,]" and therefore, "[t]he clearly demarcated two-step requirement which [the petitioner] advocate[d] in the construction of § 1956(a)(2) is apparent in other provisions of the federal money laundering statues, but not in § 1956(a)(2)." Id. at 680.

Moreover, the Second Circuit continued its analysis by considering "[t]he relatively scanty legislative history of § 1956(a)(2)," which it found to support its conclusion. Id. The Second Circuit noted that

> [t]he Senate report on the version of the bill reported to the Senate explains that § 1956(a)(2) is "designed to illegalize international money laundering transactions," and "covers situations in which money is being laundered . . . by transferring it out of the United States." The Senate [r]eport's discussion of § 1956(a)(2) is conspicuously silent about any requirement that the funds be proceeds of some distinct activity, merely stating that the statute is violated when a defendant "engage[s] in an act of transporting or attempted transporting and either

> intend[s] to facilitate a crime or know[s] that the transaction was designed to facilitate a crime." By contrast, the Senate [r]eport explains that § 1956(a)(1) "requires that the property involved in a transaction must in fact be proceeds of 'specified unlawful activity' . . . ."

Id. at 680–81 (omissions and second, third, and fourth alterations in original) (internal citations omitted). And although the Second Circuit acknowledged that "[t]he House [r]eport [ ] discusse[d] a version of the money laundering bill too different from that enacted to be of any use in divining congressional intent with respect to the enacted provisions of § 1956," it nonetheless determined that "the broader language that Congress ultimately adopted besp[oke] an intention not to be constrained to punishing laundering activity involving separately derived criminal property." Id. at 681.

Agreeing with the Second Circuit's analysis, the Court adopts its conclusion that, contrary to the defendant's position, § 1956(a)(2) does not require a "a distinct act of money laundering separate and apart from the transactions that allegedly violated [the] IEEPA and constituted the [specified unlawful activity] for money laundering." Def.'s 6th Reply at 2.[14]

Although the defendant does not challenge the holding in Piervinanzi,[15] he nonetheless contends that this Court should follow United States v. Hall, 613 F.3d 249 (D.C. Cir. 2010),

---

[14] The defendant also states that a distinct act requirement "is especially apparent when the underlying [specified unlawful activity] is an offense that, like an IEEPA violation, normally involves an international transaction." Def.'s 6th Reply at 7; see also id. (relying on United States v. Santos, 553 U.S. 507 (2008), for the proposition that "[t]he Supreme Court has cautioned against interpreting the money laundering statute in such a way that entire categories of crimes that Congress has penalized elsewhere would constitute money laundering every time"). The defendant fails to cite any other legal authority supporting his position, and moreover, the defendant in Santos was charged pursuant to § 1956(a)(1), see Santos, 553 U.S. at 509, and not § 1956(a)(2). Additionally, as the government notes, "courts have specifically approved money laundering charges coupled with underlying IEEPA counts." Gov't's 5th Opp'n at 13 (collecting cases). Thus, the Court finds the argument on this point unconvincing.

[15] The defendant does not assert any arguments either to distinguish Piervinanzi or demonstrate why the Second Circuit's analysis and conclusion is not applicable to this case. See Def.'s 6th Reply at 5 (stating, without any explanation or support, only that "the government's leading case for the proposition that [§ 1956](a)(2) offenses are different actually confirms that the act of international money laundering must be 'analytically distinct' from the underlying [specified unlawful activity]").

wherein this Circuit reversed a defendant's "conviction because 'the government failed to prove the elements of conspiracy to commit money laundering' given that 'the alleged money laundering activity was part and parcel of the underlying [specified unlawful activity].'" Def.'s 6th Reply at 4 (quoting Hall, 613 F.3d at 253–54). However, the defendant's reliance on Hall is to no avail. In Hall, the defendant "was charged in the indictment with, and found guilty by the jury of, conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h)." 613 F.3d at 253. In reviewing the statutory language of § 1956(a)(1), this Circuit concluded that "[t]he offense of money laundering must be separate and distinct from the underlying offense that generated the money to be laundered." Id. at 254 (collecting cases from various Circuits supporting this conclusion). Again, the defendant overlooks that he has been charged pursuant to § 1956(a)(2), not § 1956(a)(1), and therefore, the Circuit's holding in Hall, which was limited to § 1956(a)(1), is inapplicable to the circumstances at hand. Accordingly, because the statutory language of § 1956(a)(2) does not contain a distinct act requirement, the Court must deny the defendant's motion to dismiss the money laundering count of the Indictment.

### G. The Defendant's Motion to Dismiss Pursuant to the Rule of Specialty

The defendant next argues that the Indictment should be dismissed in its entirety because

the government's conduct [ ] in obtaining an indictment laden with misleading allegations of terrorism for the purpose of facilitating extradition under misleading pretense . . . constitute[s] abuse of the grand jury . . . [and] a violation of the Rule of Specialty, which limits how a prosecution may proceed when the defendant's extradition was procured by government misconduct.

Def.'s 7th Mot. to Dismiss at 2. In other words, the defendant contends that this prosecution must be dismissed because "the government procured [his] extradition by obtaining an indictment with inflammatory [terrorism] allegations that it declined [to] pursue after [he] was

30

safely in U.S. custody." Id. at 10; see also id. at 12–13 ("[T]he evidence is incontrovertible that the United States misled Moroccan authorities into believing that [the defendant] was charged with being a terrorist and would be prosecuted for serious crimes of terrorism in this country."). In response, the government asserts that "the [d]efendant lacks standing to invoke the Rule of Specialty," and that in any event, his "arguments are without merit" because it "has acted within the law at all times." Gov't's 6th Opp'n at 4.

"The Rule of Specialty is a doctrine that 'an internationally extradited defendant may be tried only for the offenses specified in the warrant of extradition . . . .'" United States v. Apodaca, 275 F. Supp. 3d 123, 140 (D.D.C. 2017) (quoting Day v. Trump, 860 F.3d 686, 689 (D.C. Cir. 2017)); see also United States v. Valencia-Trujillo, 573 F.3d 1171, 1173–74 (11th Cir. 2009) ("The rule of specialty 'stands for the proposition that the requesting state, which secures the surrender of a person, can prosecute that person only for the offense for which he or she was surrendered by the requested state or else must allow that person an opportunity to leave the prosecuting state to which he or she had been surrendered.'" (quoting United States v. Gallo-Chamorro, 48 F.3d 502, 504 (11th Cir. 1995))). Although the rule of specialty is a "treaty-law doctrine," United States v. Stokes, 726 F.3d 880, 887 (7th Cir. 2013), there is a split among the Circuits on whether the rule applies in situations where an individual is not extradited pursuant to a treaty, compare Valencia-Trujillo, 573 F.3d at 1179 ("The rule of specialty applies only to extraditions pursuant to a treaty."), with United States v. Kaufman, 858 F.2d 994, 1007 n.4 (5th Cir. 1988) ("The rule of specialty is a general rule of international law which applies with equal force whether extradition occurs by treaty or comity." (citing Fiocconi v. Attorney Gen. of U.S., 462 F.2d 475, 479–80 (2d Cir. 1972)). However, as this Circuit has explained, "[t]he very foundation of specialty is international comity[.] . . . The specialty doctrine

31

encourages international cooperation in the extradition system by giving assurance that, when a country gives up persons for extradition only for specified purposes or on certain conditions, those terms will not be flouted." United States v. Trabelsi, 845 F.3d 1181, 1196 (D.C. Cir. 2017).

The case law of this Circuit is unclear as to whether "a criminal defendant has [ ] standing to assert the principle of specialty, because only the requested state has the right to raise such an objection." United States v. Sensi, 879 F.2d 888, 892 n.1 (D.C. Cir. 1989) (collecting cases); see also United States v. Lopesierra-Gutierrez, 708 F.3d 193, 206 (D.C. Cir. 2013) (acknowledging the "conflicting authority as to whether a criminal defendant—as opposed to the extraditing state—has standing to assert the doctrine of specialty"). But, case law is clear that the rule of specialty "governs prosecutions, not evidence." Lopesierra-Gutierrez, 708 F.3d at 206; see also Sensi, 879 F.2d at 892 ("[A] person can be prosecuted only for those charges on which he was extradited . . . .").

Here, the Court finds that the government did not violate rule of specialty in its attempt to secure the defendant's extradition from Morocco for him to face prosecution for the charges alleged in the Indictment. Initially, consistent with this Circuit's precedent, see Lopesierra-Gutierrez, 708 F.3d at 206, the Court's conclusion does not require it to reach the issue of whether a criminal defendant has standing to assert the rule of specialty. However, even assuming that the defendant has standing to assert the rule, see Sensi, 879 F.2d at 892 n.1 (declining to address the issue of standing and proceeding to the merits), his claim would be "without merit," Lopesierra-Gutierrez, 708 F.3d at 206. As the defendant correctly notes, see Def.'s 7th Mot. to Dismiss at 8–9, he was extradited in accordance with Moroccan law, which provides that "[e]xtradition is not allowed except under the condition of not prosecuting the

extradited person or sentencing him or subjecting him to any measure restricting his personal freedom, for any action whatsoever preceding the extradition, other than the crime for which he was extradited," id. at 9 (emphasis removed) (citation omitted). And, as the government contends, the defendant "currently faces prosecution for the exact same charges under which he was extradited." Gov't's 6th Opp'n at 10; see also id. ("The charges in the initial [i]ndictment, which was provided to Morocco as part of the extradition process, remain entirely intact in the Superseding Indictment save for superfluous language regarding background on [the defendant's] listing as a [SDGT] by [the OFAC], and the omission of part of the one of the [d]efendant's own statements to [the] OFAC in which the [d]efendant mentioned Hizballah." (footnote omitted)). This is a fact not contested by the defendant. See Def.'s 7th Mot. to Dismiss at 14–15 (not disputing the fact that he currently faces prosecution of the same charges presented to the Moroccan authorities). Therefore, because the defendant is only charged with crimes that were the basis for his extradition, the defendant's claim that the rule of specialty has been violated lacks merit.

Nonetheless, the defendant contends that the government's "presentation of th[ose] charges" to the Moroccan authorities were based "solely on allegations of terrorist acts." Id. at 14 (citing the meeting minutes of the Moroccan authorities with the defendant).[16] Thus, from the defendant's perspective, because the Indictment now contains no references to "alleged terrorist activity," id. at 1–2, the government violated the rule of specialty because his "prosecution [is not] 'based on the same facts as those set forth in the request for extradition,'" id. at 12 (quoting

---

[16] The defendant also asserts that "the government has a misguided view of what constitutes the 'charges'" and that "the original indictment included inflammatory charges that [he] supported acts of terrorism and financed terrorist organizations. That the indictment did not include a count styled as 'terrorism' does not mean that the allegations of terrorism were not part of the charges." Def.'s 7th Reply at 9. However, the Court is baffled in regard to how the defendant can claim that the allegations about terrorism referenced in the original indictment constituted charges. See id. In any event, the Court considers the plain meaning of the term "charges" to be unambiguous and intuitive—that being the individual crimes enumerated as the separate counts of the indictment.

Sensi, 879 F.2d at 895–96). However, the defendant's reliance on Sensi is misplaced for several reasons. First, as the government notes, the defendant has not cited, nor has the Court been able to locate, any authority where a court found that the rule of specialty limits the prosecution of an individual extradited to the facts set forth in the extradition request. In addition, although this Circuit's language in Sensi relied on by the defendant would appear to facially support his proposition that the prosecution must be based on the same facts, the Circuit in Sensi emphasized this requirement as part of its analysis of whether the rule of specialty was violated, given the explicit language of the treaty pursuant to which the defendant in Sensi was extradited. See 879 F.2d at 895 (noting that the treaty provided that "[a] person extradited shall not be detained or proceeded against in the territory of the requesting Party [in the present case, the United States] for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted"); see also id. ("The plain terms of . . . the Extradition Treaty set out the two requirements that must be met for each count of the indictment. First, the charge must be 'an extraditable offense.' Second, the charge must be 'established by the facts in respect of which [the defendant's] extradition has been granted.'"). Here, the Moroccan law incorporating the rule of specialty pursuant to which the defendant was extradited does not contain such language which limits the prosecution to the facts set forth in the request for extradition; rather, as acknowledged by the defendant, it limits the prosecution of the extradited person to the "the crime for which he was extradited." See Def.'s 7th Mot. to Dismiss at 9 (citation and internal quotation marks omitted). Consequently, the Court finds unconvincing the defendant's argument predicated on Sensi that this prosecution must be terminated because it is

no longer based on the same facts presented to the Moroccan authorities.[17]

The defendant further contends that the government's use of "inflammatory allegations [of terrorist activity] that are not material to the charges" in the original indictment and its presentation of those allegations to the Moroccan authorities constituted misconduct because it only "us[ed] those allegations to mislead" the Moroccan authorities. Def.'s 7th Reply at 10. The Court disagrees. As the government notes, the original indictment did not allege that the defendant "participated in any acts of terrorism." Gov't's 6th Opp'n at 11. Rather, the original indictment only iterated the OFAC's designation of Hizballah as a SDN and the defendant as a SDGT, see Original Indictment ¶¶ 1–3, ECF No. 1, to "make[] clear that the [d]efendant was sanctioned by the U.S. government, and he now stands charged with subverting those sanctions," Gov't's 6th Opp'n at 11. Moreover, the Court concurs with the government that "the documents cited by the [d]efendant as provided to Morocco in furtherance of the [d]efendant's extradition likewise accurately cited the charges pending against [him] and contained summaries which mentioned [the] OFAC's findings pursuant to the designation." Id. at 11–12 (footnote omitted); see also Def.'s 6th Mot. to Dismiss, Exhibits ("Exs.") 1–4E. Thus, the Court finds that no misconduct was committed by the government.

Finally, the defendant asserts that "the Court should order the government to produce all grand jury transcripts forthwith so the defendant and the Court can ascertain whether the

---

[17] The defendant also cites Johnson v. Browne, 205 U.S. 309 (1907), and Casey v. U.S. Dep't of State, 980 F.2d 1472 (D.C. Cir. 1992), as further support for his position. See Def.'s 7th Mot. to Dismiss at 10–12. The defendant's reliance on these cases is also misplaced. In Johnson, the Supreme Court examined the Canadian extradition treaty to determine whether that defendant's extradition violated the rule of specialty, see 205 U.S. at 316–20, and concluded that "nothing in the treaty [ ] provide[d] [for] a person [to] be surrendered for one offense and then . . . be punished for another," id. at 321. Thus, the Court focused on the crimes or charges being prosecuted, not the factual allegations set forth in the extradition request. Furthermore, Casey focused on the application of the doctrine of "dual criminality," not the rule of specialty. See 980 F.2d at 1475. In any event, the Circuit in Casey reiterated the holding in Johnson that "the principle of specialty . . . [requires] a fugitive [to] only be prosecuted for the crime for which he was extradited." Id. at 1476 n.5 (emphasis added).

government in fact procured [his] initial indictment and subsequent extradition based on misconduct that occurred before the grand jury." Def.'s 7th Mot. to Dismiss at 17–18. "Although grand jury proceedings are usually kept secret, '[t]he court may authorize disclosure . . . at the request of the defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.'" United States v. Wright, 234 F. Supp. 3d 45, 47 (D.D.C. 20170 (alteration and omission in original) (citing Fed. R. Crim. P. 6(e)(3)(E)). And "[i]n this circuit, a defendant must show a 'particularized need' for disclosure," which "requires a 'factual basis'—'conclusory or speculative allegations of misconduct' do not suffice." Id. (quoting United States v. Naegele, 474 F. Supp. 2d 9, 10 (D.D.C. 2007)). Moreover, "[t]he threshold for such a showing is very demanding, and the disclosure of grand jury information is 'exceedingly rare.'" Id. at 47–48 (quoting Naegele, 474 F. Supp. 2d at 11). Here, because the Court has concluded that the documents submitted to the Moroccan authorities do not indicate that the government engaged in misconduct in securing the defendant's extradition, the defendant has not met the exceedingly high burden of demonstrating a particularized need for disclosure of the grand jury transcripts in this case. Therefore, the Court must deny this alternative request by the defendant.

In sum, the Court finds the defendant's argument that the government violated the rule of specialty to be meritless because this prosecution is based on the same charges for which he was extradited. Additionally, the record before the Court does not indicate that the government engaged in any misconduct to secure the defendant's extradition. Accordingly, the Court must deny the defendant's motion to dismiss pursuant to the rule of specialty and alleged government

or prosecutorial misconduct.[18]

## IV.  CONCLUSION

For the foregoing reasons, the Court must deny each of the defendant's six motions to dismiss the original indictment, each of the defendant's seven motions to dismiss the Superseding Indictment, and his request for an evidentiary hearing on his motion to dismiss pursuant to the rule of specialty.

**SO ORDERED** this _10_ th day of August, 2018.[19]

REGGIE B. WALTON
United States District Judge

---

[18] The defendant also requests that the Court conduct an evidentiary hearing on his motion to dismiss pursuant to the rule of specialty. See Def.'s Request at 1. Specifically, the defendant states that "it appears that a [Drug Enforcement Administration ('DEA')] official met face-to-face with Moroccan officials to request [his] extradition, but the government has not mentioned the meeting, much less produced notes or memoranda reflecting what occurred," and therefore, "the government [should] be [required] to produce a witness who can testify to precisely what role U.S. government officials played in requesting [his] extradition, and what the Moroccan government was told about [his] alleged connection with Hizballah and terrorism." Id. at 2. Having concluded that denial of the defendant's motion to dismiss pursuant to the rule of specialty is warranted, the Court finds it unnecessary to hold an evidentiary hearing on that motion. And regarding the defendant's contention that a hearing is necessary given the government's purported omission of evidence concerning the purported face-to-face meeting between the Moroccan government and a DEA agent, the defendant does not proffer any argument or evidence regarding how that alleged omission would alter the Court's ruling on his motion to dismiss. In fact, contrary to the defendant's alleged assertion, the documentary evidence attached to his evidentiary request does not "suggest that the DEA, in its meeting with Moroccan authorities, would have wrongly emphasized that [he] was wanted for terrorism and financing of terrorism." Def.'s Request Reply at 2 (asserting this position without any citation to any language in the attached document). Instead, that document only contains a recitation of the charges the defendant faces in this prosecution, as well as one comment allegedly made by the defendant "that he was not involved with terrorists." Def.'s Request, Ex. 1 (DEA Report of Investigation (Mar. 28, 2017) (filed under seal) at DOJ_01299966. Accordingly, the Court must deny the defendant's request for an evidentiary hearing.

[19] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.