**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No.  1:17-cr-0046-RBW** |
| | ) | |
| **KASSIM TAJIDEEN and** | ) | |
| **IMAD HASSOUN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____ )

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Kassim Tajideen, through undersigned counsel, submits this memorandum for the Court's consideration in connection with Mr. Tajideen's sentencing, scheduled for July 23, 2019. We recognize that Mr. Tajideen's guilty plea was entered pursuant to Fed. R. Crim. Pro. 11(c)(1)(C) and that the Court has agreed to impose the sentence of sixty months agreed between the government and the defendant. We submit this memorandum not to advocate for a different sentence, and certainly not to deny the charge to which he has pleaded guilty, but to provide the Court with a fuller picture of Mr. Tajideen than it has thus far received.

## I.     Mr. Tajideen's Personal History

On the sentencing date, in all likelihood, the courtroom gallery will be empty. If Mr. Tajideen were sentenced in Lebanon, or almost anywhere outside the United States, the courtroom would be filled with children and grandchildren, with siblings and nieces and nephews, with employees and business associates and charitable donees, and with Mr. Tajideen's wife Huda. None of them has visited Mr. Tajideen during his 28 months in jail, and none will attend his sentencing. This is emphatically not because of a lack of support or love. Family and friends miss Mr. Tajideen desperately; worry about him daily; and pray for his safe return. Mr. Tajideen's arrest in Morocco and extradition to the United States has affected far more than just

Mr. Tajideen. It has severely damaged his business, and frightened and confined his extended family and many of his friends. To Mr. Tajideen, that is punishment worse than his own incarceration in a foreign land.

Mr. Tajideen was born in severe poverty and overcame it through great labor. Today, at 64, he remains humble, religious, stoic, and perpetually grounded by work. He started working at age 7 or 8 and did not stop until his incarceration. Over time he became financially stable and then comfortable and finally wealthy, but he never lost the sensation of poverty. Long after he had any financial need to work, he still pored over business reports, called on suppliers and customers, and visited warehouses and offices. *See*, *e.g.*, Ex. 1 (Letter from Tarek Traboulsi). He redoubled his efforts in 2009, when the U.S. Department of Treasury identified him, wrongfully in his mind, as an SDGT. He spent years trying to figure out how to run his business while he was listed as an SDGT, and years trying to convince OFAC to remove him from the list. He acknowledges missteps in this process and is paying dearly for making them. But those errors should not overshadow his extraordinary life story. Nor should the Court discount that story because it happened entirely outside the United States, which today holds him to account.

A.     **Childhood**

Kassim Tajideen was born in 1955 in Hanaway, a small, rural village in southern Lebanon inland from Tyre. He was the second of 15 children and the oldest boy, which gave him a heavy burden of family responsibilities. Two of his siblings died in childbirth and one succumbed at age 6, basically a victim of harsh poverty. The family lived in a one room house with no plumbing, indoor toilet, or electricity. The family cow, a vital resource, actually shared the same room, although in a distinct area; among Mr. Tajideen's many responsibilities was to feed and care for the cow. When Mr. Tajideen was about 10, he helped his father build a somewhat larger house, with an indoor toilet. But throughout Mr. Tajideen's childhood, the

nearest potable water was a two-mile walk, which Mr. Tajideen made countless times to fill cans that held up to 20 liters. Food, fuel, electricity, and medicine were all in short supply. The family


*Hanaway, Lebanon 2016 (Google)*

members survived any way they could: foraging; selling yoghurt made from the cow's milk or herbs and vegetables grown in their garden; and performing odd jobs.

Mr. Tajideen's father drove a taxi during the day and often performed mechanical repairs on the vehicle at night. From the time he was a small boy, Mr. Tajideen helped his father repair the taxi, literally holding a candle so his father could see to perform repairs. Mr. Tajideen vividly remembers falling asleep with the candle burning while his father was working under the taxi, and causing a small grease fire that singed his father. His father informally apprenticed him to an automotive garage run by a family friend for the period when he was between seven and ten years old. During the school year he worked at night. Mr. Tajideen's father later acquired mechanical equipment for pressing olives from local groves into oil. The work was intense during the 2-3 month season, much of it occurring at night, and again Mr. Tajideen stayed awake through the night to help. Even today some of Mr. Tajideen's teachers recall that Mr. Tajideen was sometimes late to school – not because he was lazy, but because he slept only intermittently through the night. *See* Ex. 3 (Hassan Sayegh letter).

Mr. Tajideen recalls that he was happy in school and a good student; excellent in math, poor in handwriting, and proficient at everything else. But his father removed him from school at about age 11 so he could work full time to provide for the growing family. Besides his many

household chores, Mr. Tajideen worked as an unskilled laborer for builders and local businesses. At about 13, long before he had a driver's license, he borrowed a friend's taxi cab during the off-hours and traveled to nearby towns to look for fares.

When Mr. Tajideen was 16 he had a serious argument with his father over a girl; a common dispute in all cultures, but this one was distinctly Middle Eastern. His father wanted Mr. Tajideen to marry one girl when Mr. Tajideen was interested in another. Feelings were hurt, and Mr. Tajideen left his home for Beirut. He would not reconcile with his father for six years.

Mr. Tajideen arrived in Beirut with nothing. At first he lived on the streets while working odd shifts in restaurants. After a month or so an uncle of one of his friends, Hussein, gave him a place to sleep. The place was a single room with about 15 other tenants, but Mr. Tajideen's spot was actually outside the room, sheltered by a stairway. For months he literally lived under a stairway; the stairway is still there and his adult sons point it out to visitors as they drive by today. Eventually he found a one-room apartment occupied by six residents from his village, and he lived among them, and many unannounced visitors from his village, for four or five years.

Hussein came to respect Mr. Tajideen's capacity for hard work. Mr. Tajideen knew he could make money driving a cab but he had no car and no savings. Eventually he convinced the uncle to sell him a car, a 1957 Mercedes-Benz 180, entirely on credit. The price was 3000 Lebanese pounds (about $1000), payable over a period of several years at an exorbitant interest rate. Mr. Tajideen paid it off in three months. He was still so small he had to sit on a pillow to see over the long hood – but he knew how to drive, and he knew how to hustle for fares. He



*1957 Mercedes 180D Ponton*

worked all hours of the day and night, often sleeping in the cab. He circled among the thriving

shops and nightclubs during Beirut's golden period, when the city was called the Paris of the Middle East. He still did not have a driver's license (which would not be available until he turned 18), much less a taxi license, but these were not significant obstacles at the time. From time to time his beloved Mercedes was confiscated by police and Mr. Tajideen would have to stop working for a few weeks. It was a cost of doing business; eventually the police would return the car and Mr. Tajideen would be back searching for fares.

Lebanon historically has been a pluralist country, rare in the Middle East, where Christians, Muslims, Jews and others lived among each other for centuries, although never in complete harmony. In 1975, the uneasy alliances that held the country together snapped, and the country descended into 15 years of violence. The Lebanese Civil War started as a sectarian


*Beirut Holiday Inn, Post-War*

conflict between the Christian-led national government and Palestinian groups. Mr. Tajideen's family were Shia Muslims from southern Lebanon, but his father was never interested in politics and neither was Kassim. Over the years alliances shifted and morphed and the violence waxed and waned. But Beirut's "Paris of the Middle East" days effectively ended at the outset of the war, with the so-called "Battle of the Hotels" that began in October 1975 and ran for months in the core tourist area of the city. Mr. Tajideen concluded that he needed to find another home.

### B.    Africa to Belgium

Hussein – the man who sold Mr. Tajideen the Mercedes – told Mr. Tajideen that his son in Ivory Coast, Africa, would give Mr. Tajideen a job if Mr. Tajideen could make it to the country. Mr. Tajideen had some family roots in west Africa and always wanted to go. He sold

the Mercedes and his other meager possessions, yielding about enough cash for a one-way ticket to Abidjan. Before he left, he returned to Hanaway and received his father's blessing.

When Mr. Tajideen arrived in Abidjan, his friend's son was not there to meet him. When Mr. Tajideen finally reached him, he said he had no job to offer and provided no other assistance. In those days Mr. Tajideen spoke no French or English, and he had little ability to find work on his own. He contacted an acquaintance in Abidjan, who told him to travel several hundred miles to Sierra Leone, the home of Faize, an in-law of Mr. Tajideen's mother. "Aunt Faize" offered Mr. Tajideen a nonpaying job working in her food shop in Sierra Leone. The shop was a small neighborhood operation. Mr. Tajideen rapidly learned the business and impressed his aunt by performing every task imaginable, from driving the supply truck to stocking shelves to ordering goods. He was so proficient that Faize rented a second store in Sierra Leone's second largest city, Kenema, and dispatched Mr. Tajideen to run it. Mr. Tajideen envisioned a business much larger than a mom-and-pop food bodega. He added shoes and clothing and other product lines. He purchased product in bulk from suppliers in Freetown, about 190 miles away, and drove the truck himself. On Fridays he packed the truck with goods and drove 12 hours on dirt roads to a rural market open on weekends, where the goods sold well because local residents had little access to retail stores.

Eventually Faize sent her daughter to Kenema to help Mr. Tajideen with the growing work load. Although the daughter, Huda, was a skilled retail worker, her appearance in Sierra Leone was probably part matchmaking. Mr. Tajideen and Huda married in 1976 within a year of her arrival in Kenema. Their first child, Mohammed, was born in 1977. Three more would follow as the couple moved around west and central Africa and then to Belgium and finally to Lebanon. All four children are now successful adults with children of their own.

As his Kenema store grew, Mr. Tajideen began to understand the value of credit. His supply runs to Freetown were too frequent and he returned with less than he needed. Suppliers, having been burned by African political upheaval and also by inefficient and uncommitted retailers, were unwilling to make bulk sales on credit. But Mr. Tajideen began earning a reputation for repaying debts earlier than due, and suppliers and banks slowly began extending him more credit than competitors. This allowed Mr. Tajideen to open new stores, first in Freetown and then in Bo, Sierra Leone. In each case, he brought one of his brothers from Lebanon to run the existing store while Mr. Tajideen moved to the new store. In or about 1984 he opened a store in Abidjan, Ivory Coast, followed by one or two others. When he had a stable of six or seven stores he was able to buy goods in bulk, and he started developing better relationships with suppliers. But after a bad experience with street robberies in Abidjan, he decided to close that store and open an office solely to manage the supply side of the business. At the time, much of the food and clothing destined for west Africa was shipped from ports in Belgium, and Mr. Tajideen ascertained that he could improve distribution and supply by setting up an office there. He moved his young family to Belgium while the retail business in Africa expanded, but still modestly. He added a store in Gambia and later in the Democratic Republic of Congo. The retail stores were all run by brothers or other close associates while Mr. Tajideen handled the supply from Belgium.[1]

### C.    Angola

One of Mr. Tajideen's retail customers was a family friend who ran a food store in Luanda, Angola. In late 1992, after Mr. Tajideen had sent a large shipment of goods to Angola, the long-simmering Angolan civil war flared up after a contested election. A three-day battle from October 30 through November 1, later known as the "Halloween Massacre," killed

---

[1] This is not to suggest that Mr. Tajideen currently has involvement in these stores.

anywhere between 10,000 and 40,000 Angolans, including many civilians. Mr. Tajideen's friend left the country, leaving the keys to the store with a friend. Mr. Tajideen was facing a huge loss of investment and a likely inability to pay his own creditors. Commercial travel to Angola was basically suspended, but Mr. Tajideen coaxed his way onto a cargo plane out of Portugal with no seats. He vividly remembers the three-mile taxi ride from the Luanda airport to his hotel. The cab veered continually left and right to avoid corpses strewn along the roadway. At the hotel, the political situation was so unstable he had to confirm his location every three hours by signing a logbook.

But Mr. Tajideen stuck it out and managed to open his cousin's store for business. He sold all his inventory to a populace that badly needed staples, and ordered more from Belgium, where Huda and an employee were maintaining the business. He ended up staying in Angola for ten months, interrupted only by one four-day visit to Belgium. The business thrived and he began opening new stores and signing on employees, relatives at first but then Angolans. Angola became the heart of Mr. Tajideen's business operations and eventually he would have over 70 brick-and-mortar outlets in the country – supermarkets, wholesale warehouses that also sold retail, a plastics manufacturing plant, and much more. The distribution business shipped food and other staples to every corner of the country. At its peak, Mr. Tajideen's companies employed over 4000 people in Angola.

Through the 1990s Mr. Tajideen managed his business operations from the office in Belgium. He purchased goods throughout the world and had a number of strategic relationships with U.S. suppliers such as Tysons. In the early 2000s, he moved the business to his home country of Lebanon. Lebanon remained his home thereafter, although he made frequent trips to

Africa, where most of his operations remained, and to other parts of the world to call on suppliers, buyers, banks, and others.

### D. Setback

In or about 2001, Belgian authorities somehow concluded (erroneously, as was later determined) that Mr. Tajideen was financially linked to Hezbollah. In late 2002, accusations were made that he had financed terrorism and smuggled blood diamonds out of Africa. Believing the accusations were meritless, Mr. Tajideen and his wife travelled to Belgium to defend themselves, despite the risk they would be jailed. They were wrong to believe that baseless charges would not support detention, and they were in fact jailed for roughly six months in 2003 as the case made its way slowly through the Belgian system. The original charges of financing terrorism and smuggling diamonds were not pursued for lack of evidence, although the Tajideens were convicted of false-document and related crimes that had nothing to do with terrorism.

As the Belgian proceedings were finally coming to conclusion in 2009, the U.S. Office of Foreign Assets Control (OFAC) placed Mr. Tajideen on its list of Specially Designated Global Terrorists (SDGTs). The basis for the designation is not at issue in this matter and Mr. Tajideen must and will refrain from refuting it. *See* ECF 215, at § VII ("The parties agree that the factual basis underlying OFAC's designation of the defendant is not relevant for purposes of sentencing in this case."). It is a fact, however, that Mr. Tajideen spent eight years and considerable financial resources trying to convince OFAC to remove him from the SDGT list. He made extraordinary efforts, assisted by a major law firm and a Big Four accounting firm, to explain his businesses to OFAC. The Court is aware that the OFAC proceedings terminated with Mr. Tajideen's indictment in early 2017, and his subsequent arrest in Morocco and extradition to the United States in March 2017.

The SDGT listing in May 2009 was followed by the January 2010 death of Mr. Tajideen's younger brother and business partner Hassan, who was aboard Ethiopian Airlines Flight 409 when it crashed into the Mediterranean Sea shortly after takeoff from Beirut. A cousin also perished in the crash. They were returning to Africa after attending the funeral of Hassan's and Mr. Tajideen's mother. Hassan had been Mr. Tajideen's closest sibling in recent years and the violent crash, whose cause was never conclusively established (the official report found pilot error, which the airline disputes), still haunts Mr. Tajideen. One of Hassan's sons has written to the Court describing his relationship with Mr. Tajideen before and after his father's death. *See* Ex. 10 (Kassim Hassan Tajideen letter).

Afterward, the OFAC listing began taking a massive toll on the family businesses and many family members individually. Banks stopped extending credit, then ceased business altogether. Mr. Tajideen has not had a credit card or a bank account since 2009. The companies' hard-earned business reputation was trashed around the world through the Internet. The 4000+ employees in Angola alone had shrunk to about 500 when Mr. Tajideen was arrested, and have further contracted since he has been incarcerated. Other family members were also affected. In recent years even some of his grandchildren have been rejected when they try to open bank accounts. An adult nephew with the same name was arrested in Dubai and held for nearly three weeks. He was released with help from local counsel and support from Amnesty International; no explanation was given beyond that he was a member of the Tajideen family.

To be clear, family businesses still operate, albeit from a much smaller base. Mr. Tajideen realizes he has been fortunate in business and he is grateful that his business success has benefited so many family members, employees, charities, and others. But he has paid a high

price for the OFAC designation, and that price is not limited to the forfeiture amount and the loss of freedom that his guilty plea entails.

### E.    Family

Mr. Tajideen, although  reserved in personality, is the focal point of a large and loving family. Three generations of family members today recognize Mr. Tajideen as the first to pull himself out of poverty, and they honor him for pulling other family members up with him. A collection of letters from family members emphasizes this theme. Mr. Tajideen's youngest son Hussen tells a poignant story of how his father, who left school at 11, had difficulty expressing his profound pride when Hussen received his Master's degree in London. *See* Ex. 4 (Hussen Tajideen letter).



*Mr. Tajideen with grandchildren*

Mr. Tajideen, by then a wealthy man, left a note for Hussen with three humble gifts – a bottle of Mr. Tajideen's cologne to remind Hussen of his father's presence; a pair of socks for warmth in his absence; and a string of prayer beads for comfort in hard times. *Id.* A bottle of cologne, a pair of socks, a string of beads: family, warmth, spirituality. These were Mr. Tajideen's wishes for his son, not wealth, possessions, and privilege.

A longtime employee in the family's Belgium operation writes that her work for Mr. Tajideen was "the best job I ever did" and expresses how much she appreciated Mr. Tajideen's concern and love for her own family. *See* Ex. 5 (Marilou Thys letter). A nephew – the son of the brother killed in the crash – writes that he now treats Mr. Tajideen as his father and sought Mr. Tajideen's blessing before he asked his wife to marry. Ex. 10. He recalls his own father's refrain that "we are where we are thanks to" Mr. Tajideen. "The biggest lesson I learned from him is to

be humble." This is from a nephew who also bears the name Kassim Tajideen, and who once spent 18 days in jail in the United Arab Emirates "for no other reason than sharing his name." *Id.*

A grandchild, 15, writes that "it breaks my heart to see my grandfather, my father, my idol in a prisoner's jumpsuit … [a]sking me, if I am doing well, when he is the one not eating well, had lost his teeth, and lost tremendous weight." Ex. 11 (name of minor redacted). He adds what he has learned from Mr. Tajideen: "I have learned to respect all kinds of people no matter what their religion or where they come from, I have learned to respect the poor … I have learned never to forget where I came from and last but not least I have learned that family comes first."[2]

### F.    Charity

Mr. Tajideen is a lifelong adherent of Islam, although not an extreme one, and he finds comfort today in daily prayer and study of the Koran. One of the five pillars of Islam is almsgiving. Given his background, Mr. Tajideen has always recognized his religious duty to help others less fortunate. Many of his gifts have been private and direct; paying tuition or hospital bills for needy people who have contacted him, for instance. He has made substantial donations over the years to charitable institutions, with a focus on medical and education charities. A sampling of letters from grateful beneficiaries is attached. His former school principal recalls not only Mr. Tajideen's youthful poverty and his determination to overcome it, but his kindness, before he became wealthy, in delivering "food for our family for free in [his] taxi." Ex. 3. The current principal of the school notes that Mr. Tajideen paid the registration fee for "each and every student in our institution" for six years. Ex. 8. The school averages 300 students per year. *See id.* A visually impaired resident of Hanaway, Mr. Tajideen's home village, writes that Mr.

---

[2] Mr. Tajideen's closeness with his family did not prevent him from seeking to divest his businesses from those of brothers who were also identified as SDGTs. This became an issue in the OFAC administrative proceedings, but it is not an issue for sentencing and will not be re-litigated here. Suffice it to say that Mr. Tajideen continues to denounce terrorism or the financing of terrorist groups – irrespective of what any other family member may say or do – which is one reason why he fought so long to be removed from the SDGT list.

Tajideen provided him with a house that suited his impairment, and also paid for his infant son's heart surgery. Ex. 7. "Thanks to Kassim Tajideen's support, my son is perfectly healthy and is now 10 years old." The manager of the Tyr branch of the Lebanese Red Cross speaks of his gratitude for Mr. Tajideen's extensive donations to support capital projects and to meet cash flow needs. These contributions "did not stop him from supporting other social and educational [NGOs]," or from "hiring hundreds of freshly graduated students into his companies in Africa. And not to forget the amount of scholarships he was offering to gifted students in the region." Ex. 6. Mr. Tajideen has also made substantial donations to other medical and educational charities.

### G. Jail

Mr. Tajideen has been incarcerated, largely in Rappahannock Regional Jail in Stafford, Virginia, since March 2017. For the entirety of that period – about 28 months – he has had no or virtually no visits from family or friends (a few officials from Lebanon have visited, as have many lawyers). Although Mr. Tajideen is grateful that the jail permits a weekly video conference, the absence of personal visits from family is a severe and uncommon punishment for any inmate in the United States. It is especially devastating for Mr. Tajideen, the patriarch of a large and loving family and the nucleus of a network of intensely devoted friends. If Mr. Tajideen were incarcerated in Lebanon, or Belgium, or almost any place other than the United States, he would have a continuous stream of friends and family as visitors.

Mr. Tajideen suffers from a number of medical ailments that need more attention than they have received. As noted above, he lost substantial weight because he could not digest the jail food. He lost his two front teeth (crowns) and lived without them for months when the jail declined to replace them. (He is grateful to the Court for ordering the jail to allow him to pay an outside dentist for new crowns.) He also has significant hypertension, which is treated with

medication, as well as kidney stones, high cholesterol, a history of both bradycardia and tachycardia, and various chronic dental issues. In recent months he has had significant shoulder pain, which the jail medical personnel treated with long-term ibuprofen (600 mg twice per day) and more recently naproxen – a protocol that may be contraindicated in persons of his age with hypertension. *See* Gregory Curfman, MD, *FDA strengthens warning that NSAIDs increase heart attack and stroke risk*, Harvard Health Blog (updated Aug. 22, 2017).

Jail is not pleasant for anyone, of course, but it is particularly harsh on a person who lived all his life in cultures far different from those of the typical U.S. inmate. Mr. Tajideen speaks English, but with difficulty and with a strong accent. (He has not been formally trained in any language, but can communicate in Arabic, French, English, and Portuguese.) He virtually never communicates in his native language, Arabic, with other inmates or jail staff. He has a Koran and prays five times daily by himself, but he has virtually no access to an imam.

Despite these considerable handicaps, Mr. Tajideen has been a compliant and respectful inmate. He is one of the longest-serving inmates at the jail, which was not designed to hold individual prisoners for 28 months. He has seen cell-mates and others come and go – persons with far different tastes in music, literature, culture, religion, and food – and he has managed to coexist with them all. He believes he has had only one infraction (he's not sure that is the correct term) during his incarceration, and that was because he inadvertently had a food item in his cell at the wrong time.

During his incarceration, Mr. Tajideen has had ample time to reflect on his life. He wants the Court to know that he acknowledges his own shortcomings. Although he thinks of himself as fundamentally reserved, he acknowledges a business competitiveness that from time to time has pushed him over regulatory lines. Whether this competitiveness is borne of poverty, or

insecurity, or business culture in other lands, is not the point. He knows it must be cabined and managed. He further recognizes that the U.S. OFAC regulations must be respected in letter and spirit, even when purchasing frozen chicken from U.S. companies. Perhaps no person inside or outside the United States has paid more dearly for that lesson than Kassim Tajideen.

In the end, Mr. Tajideen asks the Court to consider his life in full. He knows he is not perfect, but he hopes and believes he is good. He certainly means a great deal to many people – to family, friends, employees, and others. Those people miss him and devoutly wish for his safe return.

## II.   <u>Issues for Sentencing</u>

### A.   **The Terms of the Plea Agreement**

Mr. Tajideen has pleaded guilty to Count 11 in the superseding indictment, which charges conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). ECF 215, at 1. The plea agreement was tendered under Rule 11(c)(1)(C) and establishes an agreed-upon sentence of incarceration of 60 months, to be "reduced by time served as of the date of sentencing." *Id.* at § IV.A. The agreement further states that there will be "no period of supervised release or probation." *Id.* at § IV. (Mr. Tajideen is not a U.S. citizen and supervised release would interfere with his removal from the country after his term expires.) Accordingly, the Court should enter a sentence of 60 months' incarceration, with credit for time served (about 28 months as of the June 11), and with no period of supervised release or probation. The Court should dismiss the remaining charges of the superseding indictment with prejudice. *See* ECF 215, at § III.

**B.     Mr. Tajideen, through his family, has made extraordinary efforts to raise the forfeiture amount**

The plea agreement also requires Mr. Tajideen to pay $50 million in forfeiture, with a credit for certain other funds that brings the amount to $45,478,966.41. When he signed the plea agreement, Mr. Tajideen knew he had ample assets to cover the forfeiture payment, but he and his family, having lived under OFAC's cloud for a number of years, also foresaw difficulty in liquidating the assets and transferring the funds to the United States. For that reason, the plea agreement includes a provision that the government "will use its best efforts to facilitate the payment of the forfeiture amount." ECF 215, at § XI(c). As contemplated by the plea agreement, the sentencing date was moved several times while Mr. Tajideen's family attempted to assemble and transfer the funds.

For undersigned counsel, the fear of OFAC abroad became clear when the Tajideen family first began reporting an inability to convince Lebanon banks to assist in the transfer of funds to satisfy the forfeiture. The family was unable to liquidate any substantial asset for the purpose of paying the forfeiture judgment. Notwithstanding an OFAC license that specifically permitted transfer of funds for the purpose of satisfying the forfeiture, no commercial bank in Lebanon would assist the family. In general, as counsel understands it, no Lebanon institution wants to be known as a Tajideen bank, however briefly. The banks are gravely concerned that they will be shunned by other institutions, including in particular U.S. correspondent banks whose services are vital for movement of funds around the world. Private investors have expressed similar concerns; in essence, their own bankers tell them not to write checks, purchase real estate assets, or lend funds to the Tajideens in connection with a forfeiture transaction. A simple Google search of the Tajideen name perhaps provides some basis for these reactions.

For these reasons, the Tajideen family and, we understand, the U.S. Department of Treasury, repeatedly sought the assistance of the Lebanon Central Bank (LCB). The LCB's responses, at least insofar as U.S. counsel were concerned, were difficult to decipher; doubtless the LCB had internal political considerations to balance. In the end, the LCB was not willing to assist in depositing or transferring the funds, although the LCB did not block a transfer by other means, and for that the family is grateful.

redacted

Mr. Tajideen, having been incarcerated already for more than two years, poses no prospective threat to U.S. interests. Going forward, he will continue to attempt to persuade OFAC that he should be delisted and he hopes to engage OFAC and any other relevant agency, on whatever conditions they find appropriate, to clear his name and that of his children. He hopes to make clear his interest in working further with relevant U.S. authorities to prove that he deserves to be delisted.

### C.  The Court should recommend FCI Butner Low Security Institution for medical and other reasons

Mr. Tajideen has no criminal convictions in the United States and his criminal history category is I (the Belgium proceedings do not count under the guidelines). The plea agreement provides that the government will not object to a request that Mr. Tajideen be designated to a minimum security institution "or to a specified institution selected by your client that meets his particular needs" so long as it is at least a minimum security institution. ECF 215, at § VII. Mr. Tajideen respectfully requests that the Court recommend that the Bureau of Prisons designate him for the low security institution at FCI Butner in Butner, North Carolina. (Butner does not have a minimum security camp, but counsel believe Mr. Tajideen, as a non-citizen, will not be eligible for a camp – although they surely do not want to foreclose that possibility if the BOP considers it available.)

FCI Butner has extensive medical facilities on-site and Mr. Tajideen has a demonstrated need for medical care. *See* 18 U.S.C. § 3553(a)(2)(D) (sentence shall consider the need "to provide the defendant with … medical care … in the most effective manner"). In particular, his heart ailments, dental problems, and arthritis would all benefit from having on-site treatment available. In recent months, Mr. Tajideen has had chronic pain in his left shoulder that is significant enough to interfere with sleep, and which has not been responsive to the medication

(NSAIDs) that jail physicians have prescribed. During the period of this shoulder pain, Mr. Tajideen's left upper arm has visibly atrophied by inches. Mr. Tajideen was recently transported off-site for an MRI; counsel has not yet seen the results, but Mr. Tajideen believes the MRI disclosed a tear of some type and that jail physicians are recommending that he see a specialist. In addition, Mr. Tajideen's ankles have recently swelled, a sign that his heart ailments may be worsening or that his kidneys are malfunctioning. The cause of this swelling has not been diagnosed as of this writing.

Mr. Tajideen is not an invalid and he is not requesting designation to FMC Butner; rather, he believes the proximity of the prison medical facilities to FCI Butner will serve both his and the BOP's interests. In addition, Butner, North Carolina, is reasonably accessible to Mr. Tajideen's Washington-based counsel, who will need continuing access to Mr. Tajideen for ongoing legal issues with OFAC and potentially with civil forfeiture claims. His lead counsel is a North Carolina native and often returns to the state for family visits.

### D.     The Court should recommend transfer to Belgium for humanitarian reasons

As noted, Mr. Tajideen's family and friends live overseas and have not been able to visit him during his incarceration. Counsel have explored the possibility that Mr. Tajideen could serve some or all of his sentence in Belgium, where Mr. Tajideen is a citizen and where his family can travel without great difficulty. A transfer for that purpose must be approved first by the Bureau of Prisons and then by the Department of Justice, and the process cannot start until the sentence is imposed.

The plea agreement includes a statement that the government "agrees not to oppose a request to the Bureau of Prisons that [Mr. Tajideen] be transferred to the Kingdom of Belgium pursuant to the International Prisoner Transfer Program," but only if the government receives assurances from Belgium that the length of incarceration will not be reduced. ECF 215, at VII.

Mr. Tajideen believes Belgium will provide those assurances and he intends to apply for transfer as soon as possible. Counsel understand that the Court does not have authority over that process, but they believe the Court's recommendation in support of a transfer would be helpful. Accordingly, Mr. Tajideen respectfully requests, in light of the factors set forth in Part I above, that the Court include in its sentence a recommendation that the Bureau of Prisons and the Department of Justice permit Mr. Tajideen to serve some or all of his sentence in Belgium.

**III.** <u>**Conclusion**</u>

For the reasons stated, defendant Kassim Tajideen respectfully requests that the Court:

- Enter a conviction under Count 11 of the Superseding Indictment and dismiss all other counts with prejudice;

- Impose a sentence of 60 months' incarceration with credit for time served and without any period of supervised release or probation after the sentence concludes;

- Recommend to the Bureau of Prisons that Mr. Tajideen be designated to serve the U.S. portion of his sentence at FCI Butner Low Security; and that he be considered eligible to serve his sentence at a minimum security institution if the BOP's other requirements for service at such an institution are satisfied; and

- Recommend to the Bureau of Prisons and the Department of Justice that Mr. Tajideen should be considered eligible for transfer to the Kingdom of Belgium to serve the balance of his sentence there.

Dated:  July 15, 2019                                    Respectfully submitted,


Paul G. Cassell (Utah Bar. No. 6078)                            /s/ William W. Taylor III
S.J. Quinney College of Law, Univ. of Utah[3]          William W. Taylor, III (D.C. Bar. No. 84194)
383 S. University Street                                Steven N. Herman (D.C. Bar No. 987250)
Salt Lake City, UT  84112-0730                          ZUCKERMAN SPAEDER LLP
Tel: (801) 585-5202                                     1800 M Street, N.W.
Fax: (801) 585-2750                                     Washington, D.C. 20036
E-mail:  cassellp@law.utah.edu                          Tel: (202) 778-1800
                                                        Fax: (202) 822-8106
                                                        E-mail:  wtaylor@zuckerman.com
Chibli Mallat (Beirut Bar No. 3877)
Pro Hac Vice
Presidential Professor of Law, Emeritus                 William J. Murphy (D.C. Bar No. 350371)
S.J. Quinney College of Law, Univ. of Utah[4]          John J. Connolly (D.C. Bar No. 495388)
Principal, Mallat Law Offices                           ZUCKERMAN SPAEDER LLP
Museum Square, Beirut                                   100 East Pratt Street, Suite 2440
Lebanon                                                 Baltimore, MD 21202
Tel: +961 1 424812                                      Tel: (410) 332-0444
E-mail: chibli.mallat@gmail.com                         Fax: (410) 659-0436
                                                        E-mail: wmurphy@zuckerman.com


*Attorneys for Defendant Kassim Tajideen*

---

[3] This address is provided for identification and contact purposes only and is not intended to imply institutional endorsement for this private representation.

[4] This address is provided for identification and contact purposes only and is not intended to imply institutional endorsement for this private representation.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 15, 2019, the foregoing was filed with the Court's CM/ECF Service and provided by email to counsel of record.


_____ /s/ *John J. Connolly* _____
John J. Connolly