**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 17-cr-46 (RBW)** |
| | : | |
| **KASSIM TAJIDEEN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**EMERGENCY MOTION TO REDUCE HIS SENTENCE**
**PURSUANT TO 18 U.S.C. 3582(c)(1)(A)(i)**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Opposition to Defendant's Motion To Reduce His Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 258) ("Motion" or "Def.'s Mtn."). The defendant has filed a motion to reduce his sentence under what is known as compassionate release. It is the defendant's burden to show "extraordinary and compelling reasons" here to warrant a reduction in this sentence, and as discussed below, he has not done so.

As will be seen below, the United States Bureau of Prisons ("BOP") and Federal Correctional Institution ("FCI") Cumberland, the facility where the defendant is incarcerated, have detailed significant efforts being made to protect both staff and inmates, including inmates with pre-existing conditions.  The defendant is a 65-year-old male incarcerated in a facility that as of this writing houses <u>no</u> inmates who are testing positive for the coronavirus.  The defendant has proffered no evidence that he would be more likely to contract COVID-19 during his incarceration at FCI Cumberland than he would in the community upon release.  The Motion fails to offer the court a specific release plan and instead speculates on the possible availability of three completely different courses of action, each of which is deeply flawed.  The defendant has not borne his burden

1

to show "extraordinary and compelling reasons" are present, and the Motion should therefore be denied.

## BACKGROUND

In 2009, the U.S. Treasury, through the Office of Foreign Assets Control ("OFAC") designated the defendant as a Specially Designated Global Terrorist.  This designation made it illegal for the defendant to do business with U.S. entities, in an effort to prevent him from making further extensive financial contributions to Hezbollah.  On March 7, 2017, after a Drug Enforcement Administration ("DEA") investigation spanning a period of years, a grand jury in the District of Columbia issued an indictment charging the defendant with violations of the International Emergency Economic Powers Act ("IEEPA"), the Global Terrorism Sanctions Regulations ("GTSR"), as well as conspiracy and money laundering statutes.  Foreign authorities arrested the defendant overseas on approximately March 12, 2017, and DEA agents transported him to the United States on March 24, 2017.  The defendant, a foreign national, was paroled into the United States by the Immigration and Customs Enforcement branch of the Department of Homeland Security for purposes of his prosecution.  The defendant was held without bond at the request of the government.  The defendant pleaded guilty in December 2018 and was sentenced to a 60-month term of incarceration by this Court on August 8, 2019.  After sentencing, BOP designated the defendant to serve his sentence at FCI Cumberland, a BOP facility located in Cumberland, Maryland. The defendant remains incarcerated at that facility.  The BOP projects the defendant's anticipated release date to be June 15, 2021.

On March 30, 2020, the defendant filed a request for release with the staff of FCI Cumberland, asserting that hypertension and other health issues put him at increased risk of serious infection or death from COVID-19.  The warden denied the request on April 22, 2020.  In the

denial, the warden acknowledged the defendant's health issues, but indicated that the defendant's medical condition was stable and the defendant was able to function in the correctional setting. See ECF 258-46 (Def. Mtn. Exhibit 44) at 6.

## CONDITIONS AT FCI CUMBERLAND[1]

FCI Cumberland houses approximately 1214 inmates, 994 of whom are housed in a medium security facility[2] where the defendant resides. A total of six inmates and two staff members have tested positive for COVID 19 at FCI Cumberland. All eight of these persons have recovered. Per CDC guidance, each remained quarantined from the rest of the inmates during their illness and for an appropriate time afterwards. The two staff members who tested positive did not work in the defendant's cellblock. The defendant's housing unit currently[3] holds 121 inmates. No inmates on that housing unit have now or previously tested positive for COVID 19. Each inmate is housed in a two-man cell which is walled off from other cells. Since March 9, 2020, the defendant has shared a cell with the same cellmate.

## <u>ARGUMENT</u>

Defendant has not met his burden of showing an extraordinary and compelling reason for his release pursuant to § 3582(c)(1)(A), as modified by the First Step Act. Stringent policies have been implemented at FCI Cumberland, including a modified lockdown in the defendant's unit, and are designed to minimize the risk of contact with infected persons. Given the extensive protective procedures implemented at FCI Cumberland and the relatively low number of confirmed cases

---

[1] Information herein regarding the conditions at FCI Cumberland was provided by a BOP employee at the facility.

[2] Despite the defendant's request and the Court's recommendation that the defendant be housed in a low security facility, such as the "camp" that houses the other 220 inmates at FCI Cumberland, the defendant is not eligible for such a placement under BOP policies due to his immigration status.

[3] Count obtained from FCI Cumberland on May 15, 2020.

there, none of the evidence proffered by the defendant shows that he is more likely to contract COVID-19 in prison than if he were to be released.  For these reasons, there is insufficient evidence of an extraordinary and compelling reason to release him.

**A.  Legal Standards**

The Court's ability to reduce a sentence is limited. *See Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." (alterations in *Dillon)*). The Court "may not modify a term of imprisonment once it has been imposed" unless one of the three exceptions set forth in 18 U.S.C. § 3582(c) is met. Of these exceptions, only the first one—found at § 3582(c)(1)(A)—applies here. Under this provision, as recently amended by the First Step Act:

> The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
>> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure[4] of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>>
>>> (i) extraordinary and compelling reasons warrant such a reduction;
>>
> . . . .
>>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

---

[4] Given the warden's April 22 denial of the defendant's release request, the government is not arguing that the defendant has failed to exhaust his administrative remedies,

18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added).

Section 1B1.13 of the United States Sentencing Commission's Guidelines Manual specifically provides the policy statement relating to Section 3582(c).  Section 1B1.13 states that, after considering the factors in 18 U.S.C. § 3553(a), the Court may grant a reduction where:

> (1)(A) Extraordinary and compelling reasons warrant the reduction; or
>
> (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;
>
> (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) The reduction is consistent with this policy statement.

*See* U.S.S.G. Section 1B1.13.

Application Note 1 to Section 1B1.13 further defines "Extraordinary and Compelling Reasons, in relevant part, as follows:

> Extraordinary and Compelling Reasons.--Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.--
>
>> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is--
>>
>>> (I) suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health

> because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.--The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
> …
>
> (D) Other Reasons.--As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*See* U.S.S.G § 1B1.13, App. Note 1. Application Note 1 thus provides three specific reasons that are considered "extraordinary and compelling," as well as a catchall provision recognizing as "extraordinary and compelling" any other reason as previously "determined by the Director of the Bureau of Prisons." *Id.*

The burden is on the defendant to demonstrate there are extraordinary and compelling reasons to reduce his sentence. 18 U.S.C. § 3582(c)(1)(A); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that an inmate, "as the § 3582(c)(2) movant, bears the burden of establishing" eligibility); *United States v. Greenhut*, Case No. 2:18-CR-00048-CAS – 1, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020). Compassionate release is a "rare" and "extraordinary" remedy. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019) (holding that "a compassionate release . . . is an extraordinary and rare event."); *United States v. Mangarella*, 3:06-cr-151-FDW-DCK-3, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020).

The issue before the Court is whether the defendant's age, combined with his hypertension and the existence of the COVID-19 pandemic, constitutes an extraordinary and compelling

circumstance warranting release. The defendant has not met his burden to show that his circumstances merit such a "rare" and "extraordinary" remedy.

**B. BOP and FCI Cumberland Have Instituted Safety Regimens to Ensure Inmate Health.**

### 1. BOP's Action Plan

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for the potential of coronavirus infections in its January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan. This modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to

facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement (Attached as Gov't Exhibit 2). That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission (Attached as Gov't Exhibit 3).

The BOP has been devoting all available resources to assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program, and to then process those inmates for transfer as quickly as possible.  At of this writing, BOP has transferred 2,799 inmates to home confinement, an increase of 98.1 percent. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution.  BOP professionals will also continue to monitor this situation

and adjust their practices as necessary to maintain the safety of prison staff and inmates, while also fulfilling its mandate to safely incarcerate all persons sentenced or detained based on judicial order.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## 2. *Protective Measures Implemented at FCI Cumberland[5].*

FCI Cumberland has had a total of 6 inmates and 2 staff members test positive for COVID 19. All eight have now recovered. None of the inmates or staff who tested positive were assigned to or worked on the defendant's cell block.

Moreover, in addition to adopting the BOP procedures set forth in the preceding paragraphs, FCI Cumberland has implemented a modified lock-down plan.[6] Each inmate is

---

[5] All information regarding conditions, testing, and safety measures at FCI Cumberland have been provided by a BOP attorney in touch with the facility unless otherwise indicated.

[6] This is not a complete lock-down of the facility. Various minimal work crews have been authorized assist in ensuring the inmate population has access to showers, phones, commissary, laundry, and one hot meal a day. Each work detail inmate is screened for temperature and for symptoms each day before entering their work area. The

allowed out of their cell for 90 minutes three times per week with a small number of other inmates, to use showers, phones and computers.  Sanitation crews clean the area after each 90 minute period.

As a result, the defendant appears well positioned to avoid contact with any carriers of the coronavirus.  The defendant is housed in a unit that has had zero reported coronavirus positive tests, and the unit inmates are in modified lockdown.  For the vast majority of the week, the defendant is unable to interact with no one except for his cellmate, who has similar restrictions. He is permitted only limited time outside his cell, and then only for specific purposes in a sanitized area with a closely regulated number of inmates.

### 3. *The Defendant's Medical Situation Does not Affect his Ability to Care For Himself, or Constitute a "Serious Physical or Medical Condition" or a "Serious Deterioration of his Physical or Mental Health Due to Aging".*

The government recognizes that COVID-19 may affect whether an inmate can show an "extraordinary and compelling reason" warranting compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i)—but only to the extent that (1) the inmate has a condition or characteristic that is a cognizable basis for compassionate release under the current criteria (e.g., a serious medical condition, debilitating condition, elderly offender with medical conditions, etc.) and that condition or characteristic also elevates the inmate's risk of becoming seriously ill from COVID-19 under the CDC guidelines, and (2) the inmate is more likely to contract COVID-19 in his or her particular institution than if released.[7]  When assessed on the specific circumstances here —including the 18 U.S.C. § 3553(a) factors "to the extent that they are applicable," 18 U.S.C. § 3582(c)(1)(A)—and the risk of COVID-19 for vulnerable inmates as defined above against the outbreaks at

---

government's understanding from FCI Cumberland records pertaining to the defendant is that he is not assigned to any work detail.

[7]  Application note 1 to U.S.S.G. § 1B1.13, which is incorporated by reference in Section 3582(c)(1)(A), sets forth the current criteria, and the relevant BOP program statement can be found at www.bop.gov/policy/progstat/5050_050_EN.pdf.)

Cumberland, the defendant's situation does not require release. In addition, the defendant's proposed release plans are insufficient to avoid COVID-19 after release, further weighing against release.

The warden at FCI Cumberland has already considered the defendant's request for release based on COVID 19 –related factors, and rejected it. In reviewing the defendant's request, the warden acknowledged that "while [the defendant does] have medical concerns, the medical staff have listed [him] as Care 2 (Stable Chronic Care) and [is] able to function in the correctional setting." *See* ECF 258-46 (Def. Ex. 44, BOP Second Admin. Denial of Compassionate Release) at 5.

The defendant's institutional records[8] appear to corroborate the assessment of the defendant in the warden's denial. The records reveal a man who is practiced at advocating for himself with regard to medical care. He routinely visits available medical professionals, articulates his concerns, and advocates for himself in order to receive the services he believes he needs.[9] With the help of his attorneys, he pushed for dental treatment while incarcerated and persisted to overcome numerous obstacles to receive the treatment. He typed and/or wrote a lengthy, cogent letter to the warden in support of his request for release, and did so in English, which is not his native language. *See* ECF 258-46 at 3-5. Of course, the defendant's claims to be a self-made

---

[8] The full medical record of the defendant at FCI Cumberland as received from the BOP is attached to the Government's Motion to Seal Exhibit, filed contemporaneously herewith as ECF No. 260. Because this contains the defendant's medical information and personally identifiable information, the government moves the Court to allow this exhibit to be filed under seal. Hereinafter, that Exhibit is referred to herein as Government Exhibit 1.

[9] His routine visits and plethora of complaints apparently engendered counseling on more than one occasion for failure to follow up on numerous reports of ailments. *See, e.g.,* Gov. Ex 1 at 1 ("Despite a request to be seen for L eye pain, feet swelling, shoulder pain, fast pulse and kidney stone eval, he states the only thing he is concerned about is his [blood pressure] at this time").

billionaire, and his ability to run the massive money laundering scheme to which he pleaded guilty, speak to his confidence in his own abilities.

Further, his medical records indicate that the defendant's medical condition is not exceptional, let alone exceptionally poor. His most recent available blood pressure reading on May 8 was 137/55. Gov. Ex. 1 at 1. The average of the numerous blood pressure readings the defendant attached as exhibits to his motion is approximately 138.5/70.[10] According to the Harvard Medical School's report on the revised guidelines for hypertension published by the American Heart Association and others, these numbers place the defendant in Stage 1 Hypertension category (the lower of the two stages). *See "Reading the New Blood Pressure Guidelines"* https://www.health.harvard.edu/heart-health/reading-the-new-blood-pressure-guidelines, Harvard Health Publishing, Harvard Medical School, updated December 13, 2019. However, the same Harvard report indicates that *70 to 79% of all men age 55 or older are now classified as having hypertension under this standard. Id. (*Emphasis added).[11] In addition, the defendant's most recently available medical records, from his May 8, 2020 medical visit, show medical personnel's conclusion that his blood pressure is well controlled. *See* Gov. Ex. 1 at 2 (indicating the defendant should "continue use of [blood pressure] medication due to well controlled [blood pressure] observed.") None the of defendant's other complaints[12], including his

---

[10] *See* ECF 258-7 and 258-8 (Blood pressure readings from medical visits at Rappahannock and Cumberland.) Average computed by adding all systolic numbers and dividing the total by the number of readings, and performing the same calculations for all diastolic readings. The highest reported blood systolic pressure during the period shown by these records is 169; the lowest is 113.

[11] The report also indicates that the pre-2017 guidelines set the threshold at 140/90 for those under age 65 and 150/80 for those age 65 or older. Under these older guidelines, the defendant's most recent reading and his average readings cited above are below the threshold for hypertension.

[12] The government does not dispute the defendant's assertions that he has hypertension, however, hypertension does not constitute a CDC-recognized risk factor. The CDC's current guidance states that persons with serious heart conditions – including pulmonary hypertension – are at increased risk for severe COVID-19 infection, but defendant does not assert that he has pulmonary hypertension. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk html#serious-heart-conditions. "Serious heart_conditions, including heart failure,

torn rotator cuff for which he now awaits surgery, can be considered a "serious physical or medical condition" or a "serious deterioration due to age" of the sort that would support the extraordinary and rare remedy of cutting short the defendant's sentence.

### 4. 3553(a) Factors Militate Against the Defendant's Release.

In sentencing this defendant, the Court took into account the factors to be considered under 18 U.S.C. Section 3553(a), which included:

- the nature and circumstances of the offense;
- the history and characteristics of the defendant;
- the need for the sentence reflect the seriousness of the offense to promote respect for the law and to provide just punishment for the offense;
- to afford adequate deterrence to criminal conduct; and
- to protect the public from further crimes of the defendant.

18 U.S.C. Section 3553(a)(1) and (2).

---

coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension, may put people at higher risk for severe illness from COVID-19." The majority of the defendant's other assertions regarding his health conditions are belied by the defendant's own exhibits or medical records. *Compare, e.g.,* ECF Dkt # 258-1 (Def. Memo in support of Def. Motion, hereinafter "Def. Memo") at 5 ("Mr. Taijideen has significant cardiac issues.") *with* ECF Dkt # 258-9 (Def. CT Scan report) at 1 ("Normal CT Examination of the chest is seen"); *compare* Def. Memo. at 5 ("A recent MRI shows prominent epicardial fat adjacent to the distal descending thoracic aorta.")(citing to ECF Dkt # 258-9 (CT Scan report) *with* ECF Dkt # 258-9 (CT Scan report) ("Prominent epicardial fat adjacent to the distal descending thoracic aorta <u>represents a normal variant</u>." (emphasis added); *compare* Def. Memo at 5 ("Mr. Tajideen has a family history of colon disease.") *with* Gov. Exhibit 1 (Def. Cumberland Med Records) at 6 ("Pt continues to insist on a Colonoscopy since he reports a family hx of cancer = <u>he provides proof of a family member being [diagnosed] with adenocarcinoma of the stomach</u> but <u>not colon cancer.</u>") (emphasis added); *compare* Def. Memo at 5 ("[the defendant] reports . . . he has been unable to get a change in [blood pressure] medication") *with* Gov. Ex. 1 at 52 (" Pt states he is reluctant to change the [blood pressure] medication at this time after being offered a different kind of [blood pressure] medication."). *See also* Def. Memo at 18 (indicating that "severe obesity is a significant risk factor for Covid 19" while also admitting that the defendant does not qualify as obese, let alone severely obese.). Further, the defendant's repeated requests for a colonoscopy were declined on numerous instances since a colonoscopy is recommended once each 5 years and the defendant last reported having the procedure done in 2017. *See also* Def. Memo at 6 (indicating that the defendant's "unresolved cough" appears currently to be resolved since "Mr. Tajideen is not currently reporting a cough").

Regardless, these assertions are not relevant here. This brief does not address the defendant's claims that unresolved coughs, shoulder injuries or other alleged risk factors not reported by the CDC may raise his risk profile, because they are not relevant to the defendant's burden to show that his situation at FCI Cumberland is so dangerous for him as to be extraordinary and compelling. FCI Cumberland has put forth unprecedented efforts to protect the defendant and the rest of its inmates, and to date, those efforts appear to have borne fruit. Incarcerated or released, the defendant's risk factors- whatever they may be- remain the same.

None of the above factors have changed since the Court imposed the agreed-upon sentence of 60 months on the defendant.  The defendant's crime remains serious, involved a massive scheme to dupe U.S. entities into doing business with him without the required licenses, and resulted in massive amounts of money moving illegally in and out of the United States in violation of money laundering statutes.  The defendant's OFAC designation remains in effect. The need for the sentence imposed to reflect the seriousness of the offense and to promote deterrence by others and respect for U.S. laws around the world remains.  Not even the history and characteristics of the defendant have changed significantly, since his medical condition, apart from his torn rotator cuff, remains similar to his condition when he was first incarcerated.

### C. THE DEFENDANT'S SUGGESTIONS FOR HIS RELEASE ARE NOT FEASIBLE OR ARE ILL-CONCEIVED.

The defendant's ill-conceived and partially formed suggestions regarding what might happen after his release provide no support for his argument.  The defendant posits three possibilities for his post-release placement which he claims will be able to reduce his potential exposure to the virus.  Each is reviewed below.

#### 1. *Belgium*

The defendant notes that the Court recommended that the defendant be transferred to Belgium "to serve the balance of his sentence" and suggest that such a transfer might be feasible upon his release.  The International Prisoner Transfer Unit ("IPTU") of the Department of Justice indicates that all treaty transfers are currently suspended in light of the pandemic.  *See also* ECF 258-41 (Def. Ex. 39)(*US v. Mace* No 417-cr-618 (S.D. Texas April 1, 2020)(defendant's transfer suspended due to pandemic).  Further, as of May 12, 2020, the IPTU had received no

correspondence of which they were aware from Belgium of any kind regarding Mr. Tajideen.  This includes the required request from Belgium that would formally initiate the transfer process.[13]

### 2.  *The Boston Area*

The defendant next postulates that he could be released to home confinement in the Boston area with "family friends".  Def. Memo. at 23.  Due to the detainer lodged against the defendant by Immigration and Customs Enforcement, the defendant is not eligible for home confinement under BOP regulations.  The defendant's attempt to analogize *U.S. v. Mace*, 4:17-cr-618 (S.D.Texas April 1, 2020) (attached as ECF 258-41, Def. Ex. 39) fails.  There, the defendant had pleaded guilty, cooperated with the government, been approved for treaty transfer and moved to New York City before his further transfer to London was suspended due to COVID 19.  Here, the defendant proposes to be released to home confinement to await an uncertain future, with no treaty transfer or other arrangements in place, and despite the existence of an ICE detainer.

---

[13] The defendant's Memorandum includes lengthy discussion of issues surrounding his petition for a transfer to Belgium to serve the remainder of his sentence there.  *See,,e.g.,* Def. Memo at 3-5 and 24-25.  The relevance of these issues to the Court's determination of the instant motion is unclear.  Treaty transfers require acknowledgement and acquiescence from the receiving country – here, Belgium – prior to arrangements being made for the physical transfer of the prisoner.

In addition, the defendant's motion acknowledges that his plea agreement indicates that the government "agrees not to oppose a request to the Bureau of Prisons that [Mr. Tajideen] be transferred to the Kingdom of Belgium pursuant to the International Prisoner Transfer Program if, and only if, the Government receives assurances from the government of Belgium that the length of the defendant's incarceration will not be reduced (beyond the Defendant's expected release date as calculated by the United States Bureau of Prisons) in connection with or as a result of any such transfer to Belgium." ECF 215, at 7.  The government has received no such assurances, and in fact has been advised by persons within the Department of Justice familiar with Belgian treaty transfers that, to the contrary, it is likely that the defendant would be released very shortly after any transfer to Belgium, regardless of the time remaining to be served under this Court's sentence.  The defendant has not indicated that he is aware of any such assurances, and, as noted above, as of May 12 the IPTU had heard nothing from Belgium.  In light of this information and in light of the bargaining between the parties regarding his transfer to Belgium, which was not intended to create a windfall for the defendant in terms of early release, the government has informed the IPTU that, in the absence of such assurances, it opposes a treaty transfer to Belgium.

### *3. Lebanon*

The defendant's proposal that he be released to return to Lebanon ignores current conditions.  As the defendant alludes to in his brief, the repatriation flights sponsored by the Lebanese government feature crowded planes in which it appears the virus could spread widely. (*See* Def. Memo at 22 ("there has been criticism of some of the health measures taken on these flights. . .").  *See also* ECF 258-37 Def. Ex. 35 (Lebanon Daily News article indicating that the Lebanese repatriation effort "transported 5500 passengers on 40 flights" and that on at least one such flight passengers were seated next to each other in violation of social distancing guidelines). In addition, Lebanon itself has seen a recent spike in infections in recent days. *See* "Lebanon to Reinstate Total Lockdown Amid Spike in Infections" Washington Post, May 13, p A1.[14]  These factors, which increase the likelihood that the defendant would be exposed to the coronavirus prior to even reaching home, and once again after his arrival, do not support his release.

## **CONCLUSION**

The defendant's health, while not perfect, is not so serious as to fall within the established medical reasons generally supporting compassionate release.  The efforts of the BOP and FCI Cumberland are designed to maximize the defendant's ability to follow CDC guidance and minimize his risk of exposure to the virus.  The defendant's suggestions regarding his release appear not to be feasible and to risk exposure of the defendant to the virus.  For all of the foregoing reasons, the Court should deny the defendant's emergency motion for compassionate release.

Respectfully submitted,

---

[14] Also available at https://www.washingtonpost.com/world/middle_east/lebanon-to-reinstate-total-lockdown-amid-spike-in-infections/2020/05/13/dc10f3e0-950d-11ea-87a3-22d324235636_story html

TIMOTHY J. SHEA
United States Attorney
D.C. Bar Number 437437

By: /s/ Thomas A. Gillice
    Thomas A. Gillice
    D.C. Bar No. 452336
    Assistant United States Attorney
    National Security Section
    United States Attorney's Office
    555 Fourth Street, N.W.
    Washington, D.C.  20530
    Phone:  (202) 252-1791
    Thomas.Gillice@usdoj.gov

And

DEBORAH L. CONNOR
CHIEF

By:     /S/
    Joseph Palazzo, MA Bar #669666
    Trial Attorney
    Money Laundering and Asset Recovery
     Section, Criminal Division
    United States Department of Justice
    1400 New York Avenue NW, 10th Floor
    Washington, D.C.  20005
    (202) 514-1263
    joseph.palazzo@usdoj.gov