## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA       )
 )
    **v.**          )      **Criminal No.  1:17-cr-0046-RBW**
 )
**KASSIM TAJIDEEN,**       )
 )
    **Defendant.**       )
_____ )

### REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
### KASSIM TAJIDEEN'S EMERGENCY MOTION TO
### REDUCE HIS SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

William W. Taylor, III (D.C. Bar No. 84194)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W. Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com

John J. Connolly (DC Bar No. 495388)
Alicia L. Shelton (DC Bar No. 1531208)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
E-mail: jconnolly@zuckerman.com
      ashelton@zuckerman.com

Paul G. Cassell (Utah Bar No. 6078)
(admitted *pro hac vice*)
S.J. Quinney College of Law, Univ. of Utah[*]
383 S. University Street
Salt Lake City, UT  84112-0730
Tel: (801) 585-5202
Fax: (801) 585-2750
E-mail:  cassellp@law.utah.edu

Chibli Mallat (Beirut Bar No. 3877)
(admitted *pro hac vice*)
Presidential Professor of Law, Emeritus
S.J. Quinney College of Law, Univ. of Utah[*]
Principal, Mallat Law Offices
Museum Square, Beirut
Lebanon
Tel: +961 1 424812
E-mail: chibli.mallat@mallat.com

*Attorneys for Defendant Kassim Tajideen*

---

[*] This address is provided for identification and contact purposes only and is not intended to imply institutional endorsement for this private representation.

## **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................. 1

II.  REPLY ............................................................................................................................ 2

  A.  Medical records confirm Mr. Tajideen is at severe risk of death if he
      contracts COVID-19. ............................................................................................ 2

  B.  The BOP's continency plan for COVID-19 is insufficient to protect Mr.
      Tajideen ............................................................................................................... 8

  C.  The government has harmed Mr. Tajideen by failing to act on his
      Belgium transfer request ...................................................................................... 12

  D.  Release plans are fully feasible with the government's cooperation. ........................... 16

  E.  The applicable sentencing factors warrant a sentence reduction ................................. 19

III. CONCLUSION ................................................................................................................. 21

## I.     __INTRODUCTION__

The Court should grant Mr. Tajideen's statutorily authorized compassionate release motion. Indeed, the government's opposition makes clear that compassionate release is warranted. The government does not meaningfully dispute that Mr. Tajideen has served most of his sentence, that he paid a massive forfeiture sum, and that his release is unlikely to foster disrespect for the law or create risk to a community from which he seeks to leave. And it cannot deny that Lebanon, Mr. Tajideen's home country, is a far safer place to endure the COVID-19 crisis than the United States, and particularly a United States prison. But the clearest signal from the government's opposition is the complete absence of case citations in support of the government's specific arguments—after defendant cited innumerable cases that grant compassionate release in comparable circumstances (and cites many more in this reply).

The government quibbles with the severity of Mr. Tajideen's medical ailments but does not deny that he clearly fits within established COVID-19 risk groups. And the medical records cited by the government document Mr. Tajideen's health problems and fully confirm that Mr. Tajideen is at *severe* risk if he were to contract COVID-19. Moreover, the Bureau of Prison's COVID-19 generic mitigation plan, cited by the government here and in manifold other compassionate-release cases, has been deemed insufficient to protect high risk elderly prisoners by federal courts around the country, including in numerous cases where the movant's prison facility had few or no confirmed COVID-19 cases.

The government also claims Mr. Tajideen has somehow failed to provide a sufficiently detailed release plan. But the government obscures the fact that any release plan in this case requires some cooperation by the government, particularly because Mr. Tajideen is a foreign citizen. Indeed, the government for nearly a year has failed to take any steps to even consider one "release" plan—transferring Mr. Tajideen to Belgium, as this Court recommended at sentencing.

A release plan is certainly feasible, and in his motion, Mr. Tajideen suggested the Court simply order the parties to meet-and-confer to sort out logistical details—a proposal that the government ignores in its opposition. Mr. Tajideen is more than willing to work with the government in developing an appropriate release plan, and at least three recent cases have ordered compassionate release of non-citizens back to their home countries. This Court should adopt the same straightforward approach and grant Mr. Tajideen's motion for compassionate release.

## II.   REPLY

### A.   Medical records confirm Mr. Tajideen is at severe risk of death if he contracts COVID-19.

The government acknowledges that Mr. Tajideen is at medical risk for COVID-19 complications but it erroneously minimizes that risk. In particular, the government's position is inconsistent with federal district courts across the country that have been considering myriad underlying conditions when ordering release—not just the CDC-identified conditions. Mr. Tajideen's opening memorandum cited medical evidence supporting reasonable concerns arising from multiple underlying conditions. For the most part, the government does not even respond to this evidence. Of course, COVID-19 is so novel that medical professionals are uncertain about the relationship between underlying conditions and outcomes. What is reasonably certain, however, is that underlying medical conditions correlate with dire COVID-19 outcomes, and that multiple underlying conditions significantly aggravate the risk of death.

**Medical "stability."** The government emphasizes that Mr. Tajideen seems "stable" and is "practiced at advocating for himself with regard to medical care."[1] The question for this motion is

---

[1] For some reason the government asserts that Mr. Tajideen "typed and or wrote a lengthy, cogent letter to the warden in support of his request for release, and did so in English, which is not his native language." ECF 259 at 12. The Court should know that Mr. Tajideen can speak and understand English but his facility with the language is limited and certainly is not reflected in the administrative appeals that were filed on his behalf. The medical records

whether Mr. Tajideen has underlying medical conditions that exacerbate his risk of severe complications from COVID-19. A condition can be stable but still very serious, and an inmate's ability to "advocate" for care is meaningless if the advocacy does not result in useful treatment. Courts have been clear that in light of the current pandemic, the relevant assessment is not whether the defendant's medical conditions are stable at the present moment; "confined to a [facility] where social distancing is impossible, [the defendant] cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus." *United States v. Sarkisyan*, No. 3:15-cr-00234-CRB, Dkt. 1487, at 4 (N.D. Cal. May 19, 2020) [attached as Exhibit 45] (internal quotation marks omitted) (citing *United States v. Perez*, No. 17 Cr. 513-3 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020)).

**Age**. The government implicitly concedes that Mr. Tajideen's advanced age (65) is a major risk factor for COVID-19 but fails to credit its significance. First, the government does not deny that a very small percentage of federal inmates (about 3-4%) are Mr. Tajideen's age or older. *See* ECF 258-1, at 17. Thus, an order releasing Mr. Tajideen does not presage widespread release of other inmates for the simple reason that almost all other inmates are younger. Moreover, an age of 65 or over is the *first* risk factor cited by the CDC. ECF 258-21. The vast majority of people who die from COVID-19 are 65 or older. And absent a vaccine emerging in a miraculously brief time, the risk of death will persist for persons in this age group. It seems likely that throughout this country persons 65 and over face many months of social distancing, mask-wearing, travel limitations, teleworking, and other behavioral restrictions, even as the country begins to control the first wave of infections. Those restrictions, particularly the ongoing recommendation for social

---

attached by the government contain numerous examples of Mr. Tajideen's writing. *See* ECF 259 Ex. 1 (filed under seal), at PDF pages 69-73, 77-79.

distancing among older people, cannot be effectively achieved in a medium security prison. At age 65, Mr. Tajideen faces a very serious risk of exposure, disease, and death if he is required to stay at FCI Cumberland for the next 13 months.

**Hypertension**. The government acknowledges that Mr. Tajideen suffers from hypertension but strangely tries to minimize its severity. *See* ECF 259 at 13-14. Mr. Tajideen cited numerous sources suggesting that hypertension is a major aggravating factor in COVID-19. *See* ECF 258-23, at 006; 258-25;[2] 258-26. Increasing evidence suggests that strokes are a major co-morbidity for COVID-19, *e.g.*, ECF 258-25, and strokes are closely correlated with hypertension. And CDC publications certainly recognize hypertension as a major risk factor for COVID-19. *See*, *e.g.*, Ex. 46, at 001 (excerpt attached hereto) (CDC's *Morbidity and Mortality Weekly Report* dated April 17, 2020, stating that among a group of 178 adult COVID-19 patients who were hospitalized and had underlying conditions, "the most common were hypertension (49.7%), obesity (48.3%), chronic lung disease (34.6%), diabetes mellitus (28.3%), and cardiovascular disease (27.8%)"). The government claims that *pulmonary* hypertension is the risk factor, ECF 259 at 13 n.12, but that is not what the medical literature suggests or the case law recognizes. *E.g.*, *United States v. Ullings*, No. 1:10-cr-00406, 2020 WL 2394096, at *4 & n.7 (N.D. Ga. May 12, 2020) (release based on age (66), "hypertension," and obesity, and citing authority for hypertension as a risk factor); *United States v. Reid*, No. 3:17-cr-00175-CRB, Dkt. 554, at 4 (N.D. Cal. May 5, 2020) [attached as Exhibit 47] (release based on hypertension, high cholesterol, and treatment for Valley Fever, and noting that the defendant is "prone to heart disease due to his hypertension and high cholesterol"); *United States v. Anderson*, No. 15-CR-30015, 2020 WL 2521513, at *1, 5 (C.D. Ill.

---

[2] This exhibit was inadvertently included twice in the initial memorandum. *See also* ECF 258-34. ECF 258-34 should have been Exhibit 46, attached hereto.

May 18, 2020) (release for 56-year-old inmate with hypertension, hyperlipidemia, and obesity, citing CDC guidance that hypertension is a comorbidity that increases the likelihood of COVID-19 complications).

The government's suggestion that Mr. Tajideen's blood pressure readings are only modestly high is unpersuasive. Those readings record his blood pressure *on medication*. And the government's attempt to average these readings shows more zealousness than utility; systolic blood pressure readings that reached 169 while on medication are certainly a concern, irrespective of the average. And defense counsel's count of the readings reflects 6 of 15 with a systolic pressure of 140 or above. The bottom line is that the government's own records confirm that *government* physicians have diagnosed Mr. Tajideen with hypertension, *e.g.*, Gov't Ex. 1, at PDF 2, and numerous cases cite hypertension as an underlying condition supporting compassionate release.

**Bradycardia and tachycardia**. Although the government tries to brush aside Mr. Tajideen's other cardiac issues, the medical records it attaches tell a different and more concerning story. A prison electrocardiogram reported "[m]arked sinus bradycardia," or slow heart rate. *See* Gov't Ex. 1, at PDF 86. This marked bradycardia has existed throughout Mr. Tajideen's incarceration. At the same time, Mr. Tajideen has self-reported multiple episodes of tachycardia, but prison medical personnel have not been able to measure it and even scolded him—wrongly— for trying to obtain care during a tachycardic episode.[3] *See id.* at 85 ("my hearth was beating very

---

[3] According to FCI Cumberland's medical records, Mr. Tajideen has had several self-reported episodes of rapid heart rate, but tachycardia can be difficult to diagnose because it often does not occur in the presence of health care providers, much less during the few minutes an ECG machine is attached to the patient. For that reason tachycardia is often diagnosed by a Holter monitor or other device that the patient wears over the course of a day. *See* Mayo Clinic, Tachycardia (available at: https://www.mayoclinic.org/diseases-conditions/tachycardia/diagnosis-treatment/drc-20355133). Evidently those techniques are not readily available at FCI Cumberland, and so the next best method is for the patient to try to get to the provider when an episode occurs. Yet the FCI Cumberland records reflect that Mr. Tajideen was scolded for attempting to see the prison nurse during a tachycardic episode. Gov't Ex. 1, at PDF 71. Mr. Tajideen apologized and explained that the prison physician's assistant told him to "go to medical" any time his heart was "beating very high." *Id.* A note from the PA confirms Mr. Tajideen was dead right. *See id.* at

high i go to medical 18.30 the norse told me why u are hear i explain her my hearth is beating very high and [a physician's assistant] told me any time happen go to medical, she said sorry i am busy u can not be hear I return to my cel"); *see also id.* at 58 ("MY HEARTH some time beating very high i been to or 3 time at medical"). This combination of bradycardia and tachycardia is sometimes called "sick sinus syndrome," or "the inability of the heart's natural pacemaker (sinus node) to create a heart rate that's appropriate for the body's needs." Ex. 48, at 1. The condition can lead to atrial fibrillation, heart failure, stroke, or cardiac arrest. *Id.*; *see also United States v. Perdigao*, No. CR 07-103, 2020 WL 1672322, at *3 (E.D. La. Apr. 2, 2020) (finding that bradycardia and resultant atrial fibrillation "are chronic conditions from which it is not expect[ed] that Perdigao will recover" that warrant compassionate release). As far as the prison records reflect, however, Mr. Tajideen is receiving no meaningful treatment and, perhaps more concerning, he has not received a full cardiac workup despite a cluster of significant cardiac warning signs. *See supra* n.3.

**Edema**. The latest medical records reflect chronic swelling in the extremities, a potential sign of heart disease. *See* Gov't Ex. 1, at PDF 4 (complaining of leg swelling); at PDF 22 (complaining of ankle and foot swelling); at PDF 58 ("feets swelling"); at PDF 71 ("my feet swelling for over 10days, never 7subsided"). On the one occasion that prison health providers addressed the issue, a physician's assistant wrote "trace ankle swelling observed = just enough to make sock imprint that lasts less than 2 minutes after removal of socks." *Id.* at 23. That appears to be an unusual way of recording pitting edema, a possible sign of coronary disease. Mr. Tajideen's edema contributes to his other medical conditions that place him at heightened risk from COVID-

---

41 ("Advised pt to return to health services if rapid heart rate occurs since no tachycardia is observed on recent EKGs or vital sign measures").

19. *See United States v. Kubinski*, No. 3:93-CR-28-1H, 2020 WL 2475859, at *4 (E.D.N.C. May 13, 2020) (considering edema in conjunction with defendant's other medical conditions to determine that compassionate release is warranted, because "while . . . the government is correct that he does not have a terminal illness, [the Court] believes the government is short-sighted in not viewing Kubinski as a whole person. It is not the court's job to look at each individual medical condition, but to assess his medical condition as a whole against the relevant law").

**Shoulder pain**. Mr. Tajideen already possessed records establishing that he has a torn rotator cuff. The new records confirm that it causes chronic pain, Gov't Ex. 1, at PDF 1, 22, 40, 42, 48, 63, 70, 74, and that the prison will not be able to remediate it during the COVID-19 crisis. *Id.* at 50. Moreover, the records confirm that the problem is so severe and long-term that Mr. Tajideen has observable muscle atrophy in his right arm. Gov't Ex. 1, at 21. Although the government claims in a footnote that a shoulder injury is not relevant, ECF 259 at 14 n.12, Mr. Tajideen explained that the *pain* from the shoulder injury was the relevant risk factor. ECF 258-1 at 19 & Ex. 32. *See Kubinski*, 2020 WL 2475859, at *4. The government offers no response.

**Hyperlipidemia**. The latest medical records confirm that Mr. Tajideen has hyperlipidemia, a form of high cholesterol. Gov't Ex. 1, at PDF 34. Again, although the government here ignores this condition, the courts have not. *See*, *e.g.*, *United States* v. *Pena*, No. 15-cr-551 (AJN) 2020 WL 2301199 (S.D.N.Y. May 8, 2020) (compassionate release for 60 year old defendant with hypertension and, apparently, hyperlipidemia); *United States v. Copeland*, No. 02-CR-01120 (FB), 2020 WL 2537250 (E.D.N.Y. May 19, 2020) (determining that defendant is among the "most vulnerable to the severe symptoms and adverse outcomes of COVID-19" as a result of his medical conditions including hyperlipidemia, hypertension, and pre-diabetes, among others).

This constellation of advanced age and underlying medical conditions, and others presented in Mr. Tajideen's opening memorandum, establish beyond doubt that Mr. Tajideen has met his burden to show a medical ground for compassionate release. *E.g.*, *United States v. Doshi*, No. 13-cr-20349, 2020 WL 2556794, at *2-3 (E.D. Mich. May 20, 2020) (releasing 64-year-old defendant who "relies on numerous prescriptions" to manage his medical conditions, including hypertension, hyperlipidemia, diabetes, and coronary artery syndrome because his pre-existing conditions "in combination with a rapidly transmittable virus that thrives in institutional settings— diminishes a defendant's ability to provide self-care").

**B.      The BOP's contingency plan for COVID-19 is insufficient to protect Mr. Tajideen**

The government next argues, as it has in many other cases,[4] that compassionate release is not warranted because the inmate's institution has few confirmed cases. Notably, the government cites no cases whatever to support its position. That is because courts throughout the country have rejected the government's argument. Before turning to those cases, however, it is worth considering one example of the shortcomings in the BOP's containment plan. The government mentions that "BOP has increased detainees' telephone allowance to 500 minutes per month," but the government may not appreciate what that means. In a recent call from FCI Cumberland, undersigned counsel (John Connolly) learned from Mr. Tajideen that there were six telephones used by all inmates in the Unit. The government indicates that the Unit currently holds 121 inmates. ECF 259, at 3. At the time of the call (mid-day on May 20, 2020), Mr. Tajideen reported that there were six inmates waiting behind him to use the phone. The others were "three meters" or more

---

[4] *See* Letter of Federal Public Defenders to Hon. Mitch McConnell et al., at 8-9 (May 11, 2020) (reporting that DOJ opposes "nearly all compassionate release motions" and "argues that the situation in BOP facilities is under control, and that people's risk of contracting COVID-19 might *increase* if released") (available at https://www.fd.org/sites/default/files/covid19/other_resources/2020.05.11_letter_from_fd_to_congress_fixed.pdf).

back but on occasion would stand next to Mr. Tajideen when he used the phone. Mr. Tajideen said that telephones were not cleaned between uses. Before counsel could ask further questions, such as whether the inmates were wearing masks, washing their hands before and after using the phone, and so forth, the telephone line cut out.[5]

This one example of a likely disease vector in prison confirms the wisdom of the many courts that have found prison containment plans to be inadequate to protect vulnerable inmates, even when a particular facility had few or no cases. For example, in In *United States v. Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585, *2-4 (D. Nev. Apr. 17, 2020), the court granted compassionate release notwithstanding that his institution, FCP Atwater, had seen no cases of COVID-19. The court rejected the government's argument that BOP has sufficient measures in place to protect inmates. *Id.* at *3-4. As the court explained, the realities of prison life make it impossible for medically vulnerable inmates to follow CDC guidelines to protect themselves:

> Other courts throughout the country have noted the "obvious shortcomings" in the BOP's COVID-19 Action Plan: "First, testing inside prisons has been scant except for people who self-report symptoms—which means that statistics about the number of infections already in BOP facilities are largely meaningless. And second, the plan provides no additional protections for high-risk individuals." *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) (footnote citation omitted). The *Esparza* court further noted that "[e]ven in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others."

*Id.* at *3. *See also Kubinski*, 2020 WL 2475859, at *5 (granting release from facility with no reported active cases over government's objection); *United States v. Mattingley*, No. 6:15-CR-

---

[5] Dropped calls from prisons are common enough, so counsel is not alleging malice, but it does reflect the difficulty in representing incarcerated clients in the current environment, where attorney visits are prohibited, curtailed, or medically inadvisable.

00005, 2020 WL 2499707, at *3–4 (W.D. Va. May 14, 2020) (rejecting government argument that inmate was safer at FMC Devens than at home confinement in Lynchburg, Virginia, even though FMC Devens had taken many precautions and had only one COVID-19 case); *Doshi*, No. 13-cr-20349, 2020 WL 2556794, at *3 ("Doshi's age and health put him at great risk of COVID-19. The Court will not force Doshi to wait until there is an outbreak at his facility before determining that the pandemic represents an extraordinary and compelling reason for his release.").

At least one court reached a similar conclusion as to FCI Cumberland, the same facility where Mr. Tajideen is held. In *United States v. Gutman*, No. RDB-19-0069, 2020 WL 2467435 (D. Md. May 13, 2020), a case decided after Mr. Tajideen filed his motion, a 56-year-old defendant who had served four months of a six-month sentence for wire fraud sought compassionate release from FCI Cumberland. The government opposed in part because "as of this filing, the BOP is reporting no cases of COVID-19 among inmates at FCI Cumberland." Ex. 49, at 3. Nevertheless, Judge Bennett of the U.S. District Court for the District of Maryland granted the motion and ordered that "[t]he Warden of FCI Cumberland shall forthwith release from custody the person of the Defendant." *Gutman*, 2020 WL 2467435, at *3.

Many other courts concur on the need for compassionate release for prisoners of advanced age with underlying medical conditions. In *United States v. Pabon*, No. 17-165-1, 2020 WL 2112265, *5 (E.D. Pa. May 4, 2020), for instance, the court granted release of an inmate in his mid-50s with hypertension and diabetes even though there were no known outbreaks at the institution (Lewisburg). Notably, the court concluded that the institution could not show that it could safeguard the inmate without testing and data. "Without mass testing—any detailed information about the current conditions at the Lewisburg Camp—the Court may be getting a false picture. If the Court waits to act until the BOP confirms its first case of COVID-19 at Lewisburg,

it may be too late for vulnerable inmates like Mr. Pabon. The Court is not willing to take that risk." *Id.* at *5.

The absence of adequate testing is an especially important factor counseling in favor of release. *See United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221, at *3 (E.D.N.Y. April 17, 2020) ("absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility"); *United States v. Washington*, No. 2:07-cr-258, Dkt. 529, at 1-2 (E.D. Pa. May 14, 2020) [attached as Exhibit 50] ("As of May 12, 2020, FCI Beckley has reported no cases of COVID-19 among its inmates and staff members. However, there has been no testing of inmates at FCI Beckley for COVID-19."); *United States v. Ginsberg*, No. 14 CR 462, 2020 WL 2494643, at *2 (N.D. Ill. May 14, 2020). Courts recognize that a number of federal prisons purportedly had zero cases well after they implemented their containment plans and still experienced outbreaks. *E.g.*, *United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *4 (N.D. Cal., April 10, 2020) ("Federal correctional institutions, which had reported zero COVID-19 cases only weeks ago, and despite the steps the BOP has taken to contain the disease within its facilities, are now reporting numerous virus-related deaths."). Most recently, a district court emphasized that statistics provided by the government in reporting that an institution has no reported cases of COIVD-19 are "meaningless" absent evidence that the facility is sufficiently testing inmates and staff:

> If the Government wishes to argue that early release in this case (or any other case before this Court) is inappropriate because the facility has no reported cases of COVID-19, that claim must be adequately supported with actual test results from testing conducted by the Bureau of Prisons. This Court does not and will not consider a dearth of testing competent evidence that there are no COVID-19 cases in a given BOP facility.

*Sarkisyan*, No. 3:15-cr-00234-CRB, Dkt. 1487, at 4 [Ex. 45].

In short, as courts around the country have concluded, the BOP has yet to develop a COVID-19 abatement strategy that will reasonably reduce the risk to vulnerable inmates like Mr. Tajideen. Whether this is BOP's fault—and it may not be given the novelty and transmissibility of the virus and the density and constriction of prison environments—is not the point. Either way, the end result could be, quite literally, death for Mr. Tajideen. The Court should release Mr. Tajideen before it is too late.

C.   **The government has harmed Mr. Tajideen by failing to act on his Belgium transfer request**

For all the reasons just explained, Mr. Tajideen faces a serious of risk of death if he remains in U.S. custody. And common sense would suggest that releasing him from the close quarters of confinement here in the U.S. would significantly reduce the risk to his life. For this reason, in his opening memorandum, Mr. Tajideen suggested that the Court could simply direct the parties to meet and confer to provide an appropriate plan for his release. ECF 258-1 at 21-25. Mr. Tajideen offered as possible plans for his release going to Belgium, Lebanon, or the Boston area. *Id.*

In response, the government ignores the idea that it would meet and confer on these issues and instead simply calls Mr. Tajideen's plans "not feasible" or "ill-conceived." ECF 259 at 15. The first plan that the government discusses is transferring Mr. Tajideen to Belgium to serve the balance of his sentence—something that this Court specifically recommended at sentencing, without any objection from the government at that time. Indeed, the plea agreement between Mr. Tajideen and the government addressed this very point. ECF 258-1 at 24 (*citing* ECF 215 at 7).

Now, however, the government apparently views this option as "not feasible," explaining that its International Prisoner Transfer Unit ("IPTU") has suspended all treaty transfers. ECF 259 at 15. But the government fails to discuss that its failures are why no progress has been made on a transfer at this time. As Mr. Tajideen explained in his opening memorandum (ECF 258-1 at 3-5),

12

undersigned counsel has sent *four* letters on Mr. Tajideen's behalf to the IPTU requesting transfer. Counsel sent the first letter on November 13, 2019,[6] and the fourth letter on April 10, 2020. For more than six months, the IPTU has not even *acknowledged* receipt of *any* of those letters, much less made a substantive response to Mr. Tajideen's treaty transfer request. Had the government responded, perhaps more progress could have been made on the transfer issues.

Instead of explaining its failure to respond to Mr. Tajideen's counsel, the government wrongly blames the Kingdom of Belgium. The government states that, "as of May 12, 2020, the IPTU had received no correspondence of which they were aware from Belgium regarding Mr. Tajideen." ECF 259 at 15-16. This statement is carefully hedged because, as the government *is* seemingly aware, the Belgian Department of Justice believes that it has sent such a letter to the IPTU, dated 25 February 2020. As recounted in the attached letter from Mr. Tajideen's advocaat (defense attorney) in Belgium, as recently as May 20, 2020, the Belgium Department of Justice confirmed sending such a letter to the IPTU nearly two months ago. Letter from Benjamin Gillard to Paul Cassell [attached as Exhibit 51] at 2. And in one of the four letters never acknowledged by IPTU, Mr. Tajideen's undersigned counsel had specifically noted the existence of the letter sent from the Belgian authorities (ECF 258-1, Ex. 4 at 1)—a letter that the IPTU should have received.

Leaving aside the IPTU's handling of correspondence from a foreign nation, the fact remains that the government should have been moving forward with Mr. Tajideen's treaty transfer request without waiting for a letter from overseas. Remarkably, in its filing with this court, the government claims that a letter of some sort is necessary, because it would "include[] the *required*

---

[6] Counsel was unable to send a letter any earlier than this date, because Mr. Tajideen had not yet been designated to any particular federal facility. For reasons that remain unclear, it took the Bureau of Prisons approximately three months to make a designation decision for him, when in counsel's experience the process usually moves much more rapidly.

request from Belgium that would *formally initiate* the transfer process." ECF 259 at 16 (emphases added). The government misdescribes the treaty transfer process. Again, as Mr. Tajideen's Belgian advocaat indicates, the Belgium Ministry has strongly emphasized several times that, because Mr. Tajideen is in United States custody, it is the U.S. who takes the first step in initiating a treaty transfer discussion. Ex. 51 at 2.

The plain text of the transfer treaty confirms what common sense suggests—the country holding a prisoner begins the process of possibly transferring him. As stated in Article 4(2) of the Convention on the Transfer of Sentenced Persons (Strasberg, 21.Ill.1983), "[i]f the sentenced person has expressed an interest to the sentencing State in being transferred under this Convention, *that State* shall so inform the administering State as soon as practicable after the judgment becomes final" (emphasis added).[7] In this case, of course, the "sentencing State" is the U.S.; the "administering state" is Belgium. Mr. Tajideen's judgment became final on or about August 12, 2019. *See* ECF 251 (signed judgment). And, of course, at that time Mr. Tajideen had expressed an interest in being transferred to Belgium—an interest that this Court took note of in recommending the transfer as well. Indeed, the government was well aware of Mr. Tajideen's interest months before the sentencing, as the plea agreement, which was entered on December 6, 2018, contained a provision on that very subject. ECF 215 at 10. Thus, by international treaty agreement, the U.S. as the "sentencing state" arguably should have been in contact with Belgium as the "administering state" to facilitate a treaty transfer as early as December 2018—but certainly "as soon as practicable" after August 12, 2019.

---

[7] The text of the treaty is available at https://rm.coe.int/1680079529 (visited May 20, 2020).

Indeed, the Justice Department's own public website suggests that the government's claim that a Belgian request was "required" to "formally initiate" the treaty transfer process is inaccurate. *See* "How the Program Works," U.S. Dep't of Justice Website.[8]  The Justice Department's website has a section for the Office of International Affairs, which in turn contains a section describing the international treaty transfer program. *Id.* The website explains that "[a]lthough either the prisoner or the prisoner's country can initiate the transfer process, *most applications begin with the prisoner*." *Id.* The website further explains that a prisoner who wants to transfer should contact his case manager, who upon request will prepare a transfer application package. *Id.* After review of this information, the IPTU will make the final transfer decision. *Id.* It is only at this point that the Justice Department "will notify the prisoner *and the prisoner's home country* of its transfer decision." *Id.* (emphasis added). And it is only at this point that, if the Justice Department "approves the transfer, the prisoner's home country must also review the prisoner's transfer request and make a decision whether to approve the transfer. DOJ will prepare an approval package for the foreign country to review." *Id.*

Because of the government's unexplained foot-dragging, it now appears that a transfer to Belgium is not immediately feasible.[9] But the Court should take notice of the government's undue

---

[8] *See* https://www.justice.gov/criminal-oia/how-program-works (visited May 20, 2020).

[9] Indeed, whether transfer is ever going to be feasible now appears to be open to serious question—given the government's latest statements. During plea negotiations, counsel for Mr. Tajideen and the government discussed providing assurances that, if transferred to Belgium, he would serve his full sentence there. But in its latest filing, the government states that it "has been advised by persons within the Department of Justice familiar with Belgian treaty transfers that … it is likely that the defendant would be released very shortly after any transfer to Belgium …." ECF 259 at 16. This was not the understanding on which Mr. Tajideen was proceeding during his plea discussions with the government and also appears to be contrary to the practice in Belgium. *See* Ex. 51 at 2.

Moreover, the plea agreement was negotiated before COVID-19 existed. It now will likely be difficult for Mr. Tajideen to obtain a commitment from Belgian authorities that he will remain in custody, even if he becomes infectious and thus a danger to other inmates and security personnel in that country. This changed circumstance, beyond Mr. Tajideen's control, should weigh in favor of trying to find some means of compassionate release.

delay and failure to properly handle this request, because the net result is that Mr. Tajideen remains in this country without any serious consideration of his treaty transfer request. *Cf.* Preamble, Convention of the Transfer of Sentenced Persons, *supra* (noting goal that "foreigners who are deprived of their liberty as a result of their commission of a criminal offense should be given the opportunity to serve their sentences within their own society"); Art. 2(1) (parties to the Convention "undertake to afford each other the widest measure of co-operation in respect of the transfer of sentenced persons in accordance with the provisions of this Convention.").

**D.    Release plans are fully feasible with the government's cooperation.**

If the court determines that compassionate release is appropriate in this case, then the question arises as to how to expeditiously and efficaciously implement that release. Because the government's delays have likely rendered a Belgian transfer not currently feasible, it is important to consider other options. Other options are available—and, indeed, in his opening memorandum, Mr. Tajideen simply asked that this Court reach a ruling on the appropriateness of his compassionate release, and then direct the parties to meet-and-confer to sort through the details of release in the rapidly evolving environment. *See* ECF 258-1 at 21-22, 25. In its response, the government does not deny that compassionate release is feasible. Instead, it debates the merits of the several options that Mr. Tajideen set out in his memorandum.

The court should not dwell on these logistical details in ruling on Mr. Tajideen's motion for compassionate release. Instead, the big picture is important. Mr. Tajideen did not enter this country voluntarily; he was taken from overseas to this country by U.S. government agents. He now must remain in a country whose residents face exponentially higher risk from COVID-19 than the residents of his home country in Lebanon. According to World Health Organization data, the United States has suffered 94,605 deaths from COVID-19 (as of May 20, 2020), while Lebanon

has suffered just 26.[10] Even accounting for the larger population of the United States, the per capita death rate in this country is more than 75 times higher—289 per million in this country versus Lebanon's 3.8 per million. And, of course, these figures rely on a death rate for all Americans, not high-risk populations—and high-risk populations confined in close quarters. Incarceration in a foreign land is hard enough; incarceration in a foreign land with pandemic levels of COVID-19 is terrifying.

Other federal courts have found ways to order efficacious release of noncitizen-inmates, including several who have had ICE detainers. For example, in *United States v. Mace*, the U.S. District Court for the Southern District of Texas (Hittner, J.) simply entered an order directing, in relevant part, that "[t]he Federal Bureau of Prisons is directed to proceed expeditiously to avoid any unnecessary delay in [defendant] Mace's release from custody and his ultimate return to the United Kingdom." ECF 258-1, Ex. 39, at 3. Here, the Court should simply enter a similar order.

The government attempts to distinguish *Mace* on the ground that Mr. Tajideen "proposes to be released to home confinement to await an uncertain future, with no treaty transfer or other arrangements in place." ECF 259 at 16. But surely the government cannot prevail in opposition to an otherwise-fully-justified compassionate release motion by refusing to cooperate with release efforts. Just as Judge Hittner generally directed the compassionate release of Mr. Mace, this Court here should generally direct the compassionate release of Mr. Tajideen.

Nor is an ICE detainer an insurmountable problem. Of course, the party before the Court is the United States, represented by the U.S. Department of Justice. Mr. Tajideen is currently held in custody by one U.S. agency—the Bureau of Prisons—with a detainer lodged by another—ICE.

---

[10] https://www.realclearpolitics.com/coronavirus/ (visited on May 20, 2020).

The issue has devolved to whether Mr. Tajideen should be released from the custody of the United States, and the Justice Department can be expected to have its client agencies sort through the appropriate details to implement any order that this Court might enter.

Here again, other courts have entered efficacious orders that achieve Congress's clear objective in allowing compassionate release. In *United States v. Ullings*, 2020 WL 2394096, at *1 (N.D. Ga. May 12, 2020), the inmate was a 66-year-old Netherlands resident sentenced to eight months' incarceration for an antitrust conviction. The court granted her compassionate release motion and cut her sentence in half (to four months) so she could be released immediately and returned to her home in the Netherlands. *Id.* at *6. The Court's Order, a possible model for this case, provided:

> The Court REDUCES Defendant's sentence to time served. The Court ORDERS the U.S. Marshal to transfer Defendant to the custody of U.S. Immigration and Customs Enforcement ("ICE") and ORDERS ICE to effectuate this Court's January 23, 2020, Order of Judicial Removal by removing Defendant from the United States to the Netherlands, or allowing her to voluntarily remove herself at her own expense to the Netherlands, as promptly hereafter as can be effectuated. If removal is not effectuated within fourteen (14) days from the date of this Order, the Court ORDERS ICE to report back to the Court on the status of the removal.

*Id.*

Similarly, in *United States v. Morgan*, No. 4:92cr4013-WS/CAS, Dkt. 2337 (attached as Exhibit 52) (S.D. Fla Apr. 27, 2020), the inmate was a Jamaican national who had been convicted of five offenses regarding crack cocaine and one involving malicious destruction of property. The court granted his motion for compassionate release and ordered that the BOP "shall have up to fourteen (14) days to release Morgan into" ICE custody and both the BOP and ICE "shall take all reasonable precautions to protect Morgan from exposure to the coronavirus." *Id.* at p. 9.

The Court can also rest assured that, if Mr. Tajideen is released to Lebanon, steps could be taken to protect any others who might come in contact with him during that release process. For example, counsel understand that the Bureau of Prisons will typically quarantine someone for fourteen days before release. Here, the BOP could quarantine Mr. Tajideen for fourteen days, and then release him to undersigned counsel. At this point, counsel will have arranged for transportation to Lebanon. His counsel will take him from the prison door to the airport and ensure that he gets on the flight leaving the U.S.—and he will be on his way home to his family. At that point, not only is Mr. Tajideen released from the close quarters confinement that creates the risk to him—but security personnel and other prisoners at FCI-Cumberland are also no longer at risk from him. And, Lebanon already has in place well-established procedures for processing Mr. Tajideen into the country.[11]

To be sure, this plan (like any other) requires government cooperation. Counsel has offered to work with the government to achieve the result that both should desire. The Court should simply enter an order of the type described a above and require the parties to meet and confer expeditiously about implementing that order.

### E.    The applicable sentencing factors warrant a sentence reduction.

Finally, the government tersely states that the Court already "took into account" the § 3553(a) factors at sentencing and "[n]one … have changed" since the Court imposed the agreed-upon 60 month sentence. ECF 259 at 14. But the Court's obligation is simply to "consider[]" the

---

[11] Mr. Tajideen's Lebanese-based counsel, Mr. Chibli Mallat, has investigated the Lebanese arrival situation and has been advised that, on arrival in Beirut, every traveler is interviewed by a number of representatives of the ministries, including the health ministry. Travelers who do not carry proof of a negative test are separated from the rest and tested. Those who test positive are taken to a specially designated COVID-19 hospital ten minutes away from the airport, where they are treated as long as necessary. The rest of the travelers are asked to stay quarantined at home, with additional precautions explained for interaction with their families, for fourteen days. Luggage is sanitized at the airport. Every day or so, the recently arrived travelers receive calls from representatives from the Ministry of Interior and/or Health to ensure that they observe quarantine and are doing well.

factors, not to demand proof that they have changed. *See* 18 U.S.C. § 3582; *see United States v. Johnson*, No 15-cr-125 (KBJ), 2020 WL 2515856, at *13 (D.D.C. May 16, 2020); *Doshi*, 2020 WL 2556794, at *3-4 (Section 3553(a) factors were considered in U.S.S.G. § 1B1.13 analysis citing pre-trial and sentencing determinations that defendant is not a danger to the community). As Mr. Tajideen explained in his opening memorandum, ECF 258-1 at 26-29, the § 3553(a) factors are fully consistent with compassionate release here, and the government does not seriously dispute Mr. Tajideen's argument. Mr. Tajideen has not denied that the crime was serious. But it was non-violent. And to say that it "resulted in massive amounts of money moving illegally in and out of the United States," ECF 259 at 15, is not to say that someone *lost* massive amounts of money. The indictment alleged that Mr. Tajideen engaged in ordinary commercial transactions, most involving the purchase and re-sale of food products like chicken, that were made unlawful only because the Department of Treasury put Mr. Tajideen on the OFAC list. The persons or entities who sold, transported, and repurchased the chicken did not lose money, and neither did the financial institutions who handled the funds. The person who lost money—$50 million in forfeiture funds alone—was Mr. Tajideen.

More important, the government's position that none of the sentencing factors has changed ignores the blindingly obvious fact that the entire world has changed since the Court sentenced Mr. Tajideen. Since March 28, 2020, the U.S. Bureau of Prisons has posted sixty-three press releases on its website.[12] Fifty-six of them have been to announce inmate deaths—every one of them linked to COVID-19. Today, perhaps the worst place in the world to be is a U.S. prison (state or federal). The Court, like the parties, had no idea at sentencing that it was consigning Mr.

---

[12] *See* https://www.bop.gov/resources/press_releases.jsp (last visited May 20, 2020).

Tajideen to five years in prison, approximately 16 months of which would be spent trying to dodge a virulent pathogen—one that preys upon older individuals with pre-existing conditions, and spreads uncontrollably in confined quarters.

There is a reason why the government in its opposition cites no specific cases on this point while the defendant cites many. *See, e.g.,* ECF 258-1 at 26-29. That reason is that federal judges across the country recognize that the weight given to factors they took into account at sentencing has changed *because of the pandemic*. *E.g.*, *Johnson*, 2020 WL 2515856, at *13. This does not mean that every inmate is released, but it does mean that federal judges are re-considering the proportionality and humanity of their sentences in light of changed circumstances—and in light of the statutory directive that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing] …." 18 U.S.C. § 3553(a)(2) (discussed in *U.S. v. Rodriguez*, 2020 WL 1627331 at *12 (E.D. Pa. April 1, 2020)). After such reconsideration, judges are releasing non-violent individuals who have served significant portions of their sentences and are at significant risk of dying from COVID-19. For vulnerable inmates like Mr. Tajideen, the prison environment is dire and shows no sign of improving. He should be compassionately released.

## III.   **CONCLUSION**

For the reasons stated herein and in his initial motion and memorandum, Mr. Tajideen respectfully requests that his motion for compassionate release be granted.

Dated: May 21, 2020

Respectfully submitted,

_____/s/ Paul G. Cassell_____

William W. Taylor, III (D.C. Bar No. 84194)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W. Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com

John J. Connolly (DC Bar No. 495388)
Alicia L. Shelton (DC Bar No. 1531208)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
E-mail: jconnolly@zuckerman.com
         ashelton@zuckerman.com

Paul G. Cassell (Utah Bar. No. 6078)
(admitted *pro hac vice*)
S.J. Quinney College of Law, Univ. of Utah[*]
383 S. University Street
Salt Lake City, UT  84112-0730
Tel: (801) 585-5202
Fax: (801) 585-2750
E-mail:  cassellp@law.utah.edu

Chibli Mallat (Beirut Bar No. 3877)
(admitted *pro hac vice*)
Presidential Professor of Law, Emeritus
S.J. Quinney College of Law, Univ. of Utah[*]
Principal, Mallat Law Offices
Museum Square, Beirut
Lebanon
Tel: +961 1 424812
E-mail: chibli.mallat@mallat.com

*Attorneys for Defendant Kassim Tajideen*

---

[*] This address is provided for identification and contact purposes only and is not intended to imply institutional endorsement for this private representation.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 21, 2020, the foregoing was served on counsel of record via the Court's CM/ECF Service.


_____/s/ John J. Connolly_____
John J. Connolly